Worcester Federal Court

EA  KE
~~Worcester Superior Court~~
~~225 Main Street~~
Worcester, MA 01608
93A Civil RICO AND Civil Rights Suit      Complaint

Edward Ahern of 11 Camp Street Worcester, MA and
Kai Kunz of 111 Church Street. Northbridge, MA 01588.

Versus

1. Attorney Anthony Scola of 47 Harvard Street. Worcester, MA
2. Sheila Mcquinn of 67 June Street Worcester, MA 01602
3. Ronald Mcquinn of 67 June Street Worcester, MA 01602
4. Kelle O'Keefe of 1 Ash Street Greenville, NH
5. Daniel Loring of 44 Woods LN. Lancaster, MA
6. Mark Kavanach of 680 Mechanic Street Leominster, MA
7. Keller Williams North Central. 680 Mechanic Street. Leominster, MA
8. Apple Country Realty of 63-65 Park Street. Ayer, MA
9. Joseph Solans of 170 W Main Street. Groton, MA
10. Christina Solans of 170 W Main Street Groton, MA
11. Fiefdom Holdings Syndicate of 170 W Main Street. Groton, MA
12. Polonia Realty Holdings LLC of 170 W. Main Street Groton, MA
13. Jorge Torres of 54 Oread Street. Worcester, MA.  01604
14. Keller Williams Corporate 1221 South Mopac Expressway.,
    Suite 400. Austin, TX. 78746
15. Attorney Michael Keller 250 Summer Street. Boston, MA.  02210
16. Attorney Scott Burke 250 Summer Street. Boston, MA.  02210
17. Richard Rawson 33 Scenic Drive. Worcester, MA.  01602
18. Keller Williams Greater Worcester 324 Grove Street. Worcester, MA. 01605
19. Lydia Rawson of 33 Scenic Drive. Worcester, MA 01602.
20. Jeffery Stephens of 65 Walnut Street. Leominster, MA
21. David Hill of Keller Williams Greater Worcester of 324 Grove Street. Worcester, MA. 01605
22. MPAT (Massachusetts Property Assistance Trust of 67 June Street. Worcester, MA 01602
23. Home Savers of 65 James Street. Worcester, MA.
24. David Boudreau of 253 Fernwood Drive. Gardner, MA. 01440
25. Lorie Spaulding of 165 Cedar Street. Fitchburg, MA. 01420
26. H SI Home savers 70 James St. STE 276. Worcester, MA. 01603

Edward Ahern's Demand: $1,700,000.00 trebled to $5,100,000.00

Kai Kunz's Demand: $19,000,000.00 trebled to $57,000,000.00

Note that both lawsuits filed together as Edward Ahern's damages were part of Racketeering conspiracy
that was directed primarily against Kai Kunz, Michael Simmons, and others. Said Lawsuits overlap and are
being filed together. This will also be more efficient, save papers/trees, and court expenses as well.

## Edward Ahern's introduction to Lawsuit

Above entities indirectly and directly have caused me psychological torture, harassment, as (among other
criminal acts committed against me) I have been taken hostage, threats have been said against family, their

has been murder attempts against me, I was extorted into massive utility bills that exceed $100,000.00, financial and social relationships, business ventures, and more has been disrupted and destroyed due to the fanatical Racketeering/Domestic Terrorist conspiracy of many of the individuals/entities in this Law suit.

I am disabled due to a heart problem (White Parkinson Wolfs Syndrome) and ADHD problems. I have tried hard over the years to overcome my Disabilities. I score high genius level in IQ and do an incredible amount of independent studies and Scholarly pursuits in spite of my limitations. I was harassed, tortured, threatened, and had My personal and financial interests destroyed due to a fanatical Racketeering/Domestic Terrorist Conspiracy. I have enough obstacles with my disabilities and don't need to be a target of a Fanatical agenda that is nothing short of a direct threat to the United States and Public safety During these tough economic times. I have attached as much information as possible to this law suit. I will Also work to obtain the expert testimony of at least one (1) Forensic Accountant when possible, for indisputable evidence of damages. The $100,000.00+ in utility bill extortion and the ruining of my credit is just part of damages.

## Kai Kunz's introduction to lawsuit:

Above entities acted far outside the mere white collar fraud and victimizing that would be expected of Real Estate Agents, Real Estate Brokers, Mortgage Brokers, Real Estate Developers, Public officials, and professionals. The Racketeering that at least borders on Domestic Terrorism that was and is committed by the above entities, is a new paradigm to organized criminal activities that is in many ways precedent setting. Never before have white collar professionals that are trusted with so much information, committed violent actions in a coordinated/organized manner around their professions. The cumulative actions and the organization behind them, make this case particularly important, in shedding light on a very dangerous and original version of Racketeering. A version that has more destructive potential than present/former mafias' and large gangs.

The damages I suffered were far more than merely the millions of dollars in assets in real estate and their future appreciation and cash flow. The damages were primarily due to what the harassment, theft, kidnapping, murder attempts, extortion, vandalism, computer hacking, email hacking, phone cloning, and numerous other Racketeering actions and what they hindered me from completing. Hundreds of millions in SEC Whistle Blower claims, patents, business models, and more are part of the damages that far exceed the millions in real estate.

This lawsuit isn't simply about the traditional fraud wherein realtors, real estate brokers, mortgage brokers, sellers and the usual people commit fraud during sales and acquisitions. In the above the actions of many of the defendants were exceptionally original and psychopathic during standard Real Estate transactions.

To then plan and execute extortion, murder conspiracies, extortion plots against victims families/friends, stalk, threaten, hack into computers, hack into emails, clone cell phones, and commit many other extraordinary acts of racketeering against original white collar victims in a coordinated way. This is a first of its' kind, and the plans by many defendants to utilize similar tactics for intimidating law enforcement and gaining power that traditional mafias never enjoyed, is exceptional. The danger involved with the potential database of clients at Keller Williams and financial records for extortion and more is uniquely serious for these new developments in Racketeering. One's house is more often than not, an individual and or families largest investment. Some of the affidavits and developments outlined in this lawsuit will shed much truth about this. It is necessary to include Racketeering objectives of defendants that are not directly related to either my own or Edward Ahern's damages for a few reasons.

1. Showing the extreme viciousness and psychopathic ferocity by which organization operates. This is important due to actions committed against me being exceptional and a first of their time. It therefore becomes necessary to give examples of how defendants are cutting edge and original in their methods. That they are both capable of, and commit the Racketeering actions I allege in their business modus operandi as a rule. In ways beyond what directly effected me.

2. Demonstrate that the actions of defendants have been successful in undermining law enforcement to some extent, and that the defendants are very capable of committing the very organized and cutting edge Racketeering/Domestic Terrorist actions that they committed against myself and Edward Ahern on a very large scale.

3. Often people can be prejudiced about believing events and actions that are outside of what is conceivable. What was once inconceivable often becomes well known in the future as history demonstrates in the courts and elsewhere. Likewise their should be little restraints when it comes to describing the actions of exceptionally rare and vicious Racketeering methods that are anything but typical. That is why describing goals and other actions of organization are very relevant to these PRO SE lawsuits. Having a legal advantage because defendants actions are inconceivable shouldn't be acceptable. There is a definite need for explaining the actions, goals, and agendas of defendants, even when they don't directly relate to monetary damages Plaintiff suffered.

Their was a time when civil rights for all was an inconceivable thought. In many ways the actions of defendants might be convenient to dismiss, due to how it can challenge ones' beliefs about society and what we believe to be the boundaries of human behavior. It is unfortunate and true that most defendants have crossed boundaries that aren't even acceptable to hardened inmates. I will back up this statement and justify every word and statement that I make about defendants actions, character, and the extremeness/rarity of their actions/criminal agendas. No doubt their will be motions to dismiss much of the language used in this lawsuit. That is to be expected, but I will very effectively demonstrate that every statement, description, and analysis in this Lawsuit will be both responsible and conservative.

Being broad in detailing the actions and goals of defendants is necessary at times for making my case and demonstrating that the inconceivable has happened. That what is typical for defendants is exceptionally rare but a dangerously real Racketeering/Domestic Terrorist actions/agendas of defendants. Myself (Kai Kunz) and Edward Ahern are just a few of the victims that have had the courage to speak up and file a lawsuit, while others have feared too much for their own lives and that of their families and friends.

Recommendation to attorneys for efficiently. Since the lawsuit herein is substantial, only about facts and specific actions committed by defendants. I expect (aside from the motions to dismiss that will be filed) that their will be very brazen tactics utilized for drawing attention away from the facts as much as possible. I volunteer to undertake any test or testing that will add or decrease my cases strength based upon the testing results. I will score in small percentage of top 1% when it comes to any accurate testing of substance. Offer any testing before, making any baseless claims about me individually.

**Part 1.** Chronology of specific actions committed against Kai Kunz and Edward Ahern by defendants.

**Part 2.** Being efficient and saving court time by proactively addressing Motions to Dismiss that are inevitably going to be filed by opposing counsel. This will tighten cases of Edward Ahern and Kai Kunz and clarify complaint significantly.

Part 3. Ways in which individuals act in coordinated Racketeering/Domestic Terrorist conspiracy. How their actions caused financial and individual damage to Edward Ahern and Kai Kunz.

Part 4. Preliminary and Partial list of 79 exhibits and their relation to Racketeering/Domestic Terrorist conspiracy that caused Kai Kunz and Edward Ahern huge amounts of harm and torture. Note that these exhibits are merely a fraction of what is available at this time. The vast majority of papers, financials, and more were taken from office, deleted from computer, and deleted from online email sources during Racketeering/Domestic Terrorist explosion.

Part 5. Justification for Edward Ahern's demand of $1,700,000.00 trebled to $5,100,000.00 and Kai Kunz's demand of $19,000,000.00 trebled to $57,000,000.00

Part 6. Some of what will be addressed at depositions and discovery.

Part 7. Some of the individuals who will be witnesses or subject to subpoena.

## I would like to point out the following:

When motions to dismiss inevitably come due to defendants being unable to dispute what I say and wanting to silence a disabled victim like Edward Ahern. The motions to dismiss and motions to have wording stricken from the record shouldn't be granted. Quoting cases that had certain language stricken from the Lawsuit doesn't apply here. I can back up the need for every single statement and description of defendants. Details and descriptions were used in this Lawsuit for the purpose of backing up testimony and providing evidence that can and will be evaluated. This will prove to be useful when the inevitable lies and acts of extortion are once again committed against Kai Kunz and Edward Ahern in retaliation for filing this complaint. Just as the same retaliatory actions were committed against Kai Kunz after filing 1024B Lawsuit in Worcester Superior Court previously.

The guaranteed motions to dismiss will in no way take the following into account

1. The fact that the cases cited by counsel were not typical examples of justifications for motions to dismiss. That the cases of dismissal that will be addressed in Motion's to Dismiss by opposing counsel/defendants allowed for at least time to amend complaint (especially if it was a PRO SE Plaintiff.)

2. There is no comparison to the cases that will be cited and this precedent setting lawsuit.

# Part 1. Chronology of specific actions committed against Kai Kunz and Edward Ahern by defendants.

### Introduction by Edward Ahern

I have enclosed a chronology of events related to Kai Kunz, Michael Simmons to some extent, and Myself (Edward Ahern). Complaint can only be fully understood, when the depth and level of defendants Racketeering and Domestic Terrorist actions are more fully understood. Others have witnessed much of the actions that were committed against Kai Kunz, Michael Simmons, myself, and others. Almost everyone has refused to speak up about their experiences due to the threats and terrorizing committed against victims and their family/friends.

I would also like to point out that I wrote several hundred pages about Racketeering/Domestic Terrorist conspiracy. I signed my statements with a notary under the pains and penalties of perjury. I then mailed the pages to (among other agencies)  the FBI, Local Police, Department of Homeland Security, Real Estate Board, Banking Commissioner, and others. I also mailed the papers I will be presenting in this complaint into the above agencies in late 2010 and beyond. I  have affidavits from others about the Racketeering/Domestic Terrorism perpetuated by many of the defendants in complaint, and will be able to present many more from dozens of individuals.

I was a convenient victim that defendants felt was unable to fight back legally due to my inability to afford counsel and my disabilities. The actions that were specifically committed against me were part of the Racketeering/Domestic Terrorist agenda that was, and is also being committed against Michael Simmons, Kai Kunz, and others. As such, it is necessary to incorporate actions committed by defendants against others and to show how these actions led to the need for defendants to use me as a tool for gaining more money for defendants, and for advancing their larger ambitions. While all defendants in complaint herein work together for furthering the Racketeering/Domestic Terrorism that caused me  considerable harm. Kai Kunz and myself  have included sections in this part of complaint. Sections are used to distinguish Racketeering individuals and entities that work most closely together (such as in this first part of seven parts herein). Kai Kunz and myself will devote section three for giving a cursory description of the means by which all individuals and entities in complaint herein have, and presently work towards mutual ends. Kai Kunz and myself have included Attorney Keller and Attorney Burke in complaint, due to their unethical and at least borderline criminal actions in working to silence me (Edward Ahern) in Superior Court. The same attorneys will be looked into to determine if they have aided and abetted Racketeering/Domestic Terrorism of defendants in any other capacity as well.

Events and actions committed against Edward Ahern and Kai Kunz

Chronology of events and actions committed by Kelle O'Keefe, Joseph Solans, their serial killer sidekick and others (believe Duke Kenny), Daniel Loring, Mark Kavanach, Christina Solans, Apple Country Realty, Keller Williams North

Central and Keller Williams Corporate. How the Racketeering and Domestic Terrorist conspiracies of above individuals and entities caused Kai Kunz and Edward Ahern financial harm, psychological torture, and ruined Edward Ahern's academic and business plans/goals.

# 1A: Joseph Solans --

1- Was involved with and executed Kai Kunz and Edward Ahern being kidnapped/held as hostages.

2- Was directly involved with Home Invasions committed against Kai Kunz

3- Did assault with a deadly weapon when he pointed an AK47 Assault weapon at Kai Kunz and Edward Ahern.

4- Did many threats against Edward Ahern and Kai Kunz and promised to do what he fucking pleases to do, just like his Bank Robberies (bragged about multiple bank robberies to Edward Ahern and Kai Kunz).

5- Had Kai Kunz and Edward Ahern stalked constantly

6- Cloned/tapped Kai Kunz's cell phone and had his conversations played back to him.

7- Hacked into Kai Kunz's computer and emails against Federal Law

8- Had individuals try and kill Kai Kunz through poison and Edward Ahern twice through firearm (missed when shooting at him).

9- Had the cell phones, emails, computers of Kai Kunz's relatives and friends hacked/compromised

10- Did extortion against Kai Kunz through committing Federal Wire Tap, Federal Computer Hacking, and Federal email hacking crimes against many of his friends and relatives as well.

11. Associated with known felon serial killer friend for kidnapping and extorting Kai Kunz and Edward Ahern.

12. Was involved with the Utility Bill fraud committed against Edward Ahern and Kai Kunz.

13- Was involved in aiding and abetting murder conspiracy against Kai Kunz and Edward Ahern.

14. Was directly involved with the Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

15- Was directly involved with rental thefts, extortion, property thefts, voyeurism/photo shop extortion scams and more.

# 1B: Kelle O'Keefe

1- Was involved with and executed Kai Kunz and Edward Ahern being kidnapped/held as hostages.

2- Was directly involved with Home Invasions committed against Kai Kunz

3- Did many threats against Kai Kunz through email and on phone

4- Had Kai Kunz and Edward Ahern stalked constantly

5- Cloned/tapped Kai Kunz's cell phone and had his conversations played back to him.

6- Hacked into Kai Kunz's computer and emails against Federal Law

7- Had individuals try and kill Kai Kunz through poison and Edward Ahern twice through firearm (missed when shooting at him).

8- Had the cell phones, emails, computers of Kai Kunz's relatives and friends hacked/compromised

9- Did extortion against Kai Kunz through committing Federal Wire Tap, Federal Computer Hacking, and Federal email hacking crimes against many of his friends and relatives as well.

10. Associated with known felon serial killer friend for kidnapping and extorting Kai Kunz and Edward Ahern.

11. Was involved with the Utility Bill fraud committed against Edward Ahern and Kai Kunz.

12- Was involved in aiding and abetting murder conspiracy against Kai Kunz and Edward Ahern.

13. Was directly involved with the Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

14- Was directly involved with rental thefts, extortion, property thefts, voyeurism/photo shop extortion scams and more.

15. Did financial fraud with Michael Simmons parents financial and faxed altered documents to mortgage brokers, realtors, sellers, and more.

16. Committed forgery against Michael Simmons several times.

# 1C: Mark Kavanach

1- Was involved with and executed kidnapping Of Kai Kunz and Edward Ahern.

2- Aided and Abetted the Cloning/tapping of Kai Kunz's my cell phone and had my conversations played back to him.

3- Aided and abetted the Hacking into of Kai Kunz's computer and emails against Federal Law

4- Aided and abetted individuals trying to kill Kai Kunz through poison and Edward Ahern twice (missed when shooting him.)

5- Aided and abetted having the cell phones, emails, computers of Kai Kunz's relatives and friends hacked/compromised

6- Did extortion against Kai Kunz through committing Federal Wire Tap, Federal Computer Hacking, and Federal email hacking crimes against friends and relatives.

7- Associated with known felon serial killer friend for kidnapping and extorting Kai Kunz and Edward Ahern.

8- Was involved in aiding and abetting murder conspiracy against Kai Kunz and Edward Ahern.

# 1D: Daniel Loring

1- Was involved with and executed Kai Kunz and Edward Ahern being kidnapped/held as hostages.

2- Was directly involved with Home Invasions committed against Kai Kunz

3- Did many threats against Kai Kunz at offices of Keller Williams North Central and Apple Country Realty.

4- Had Kai Kunz and Edward Ahern stalked constantly

5- Cloned/tapped Kai Kunz's cell phone and had his conversations played back to him.

6- Hacked into Kai Kunz's computer and emails against Federal Law

7- Had individuals try and kill Kai Kunz through poison and Edward Ahern twice through firearm (missed when shooting at him).

8- Had the cell phones, emails, computers of Kai Kunz's relatives and friends hacked/compromised

9- Did extortion against Kai Kunz through committing Federal Wire Tap, Federal Computer Hacking, and Federal email hacking crimes against many of his friends and relatives.

10- Associated with known felon serial killer friend for kidnapping and extorting Kai Kunz and Edward Ahern.

11- Was involved with the Utility Bill fraud committed against Edward Ahern and Kai Kunz.

12- Was involved in aiding and abetting murder conspiracy against Kai Kunz and Edward Ahern.

13- Was directly involved with the Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

14- Was directly involved with rental thefts, extortion, property thefts, voyeurism/photo shop extortion

scams and more.

15- Did financial fraud with Michael Simmons parents financial and faxed altered documents to mortgage brokers, realtors, sellers, and more.

16- Committed forgery against Michael Simmons several times.

# 1E:   Keller Williams Corporate 1221 South Mopac Expressway.,
## Suite 400. Austin, TX. 78746

1- Was neglectful and allowed for Racketeering to flourish on an unprecedented level at Keller Williams North Central and Keller Williams Greater Worcester, MA.

2- Was neglectful and allowed to flourish on a level at Keller Williams North Central, Keller Williams Greater Worcester, MA that was legion.

3- Was neglectful and allowed for white collar fraud to flourish at Keller Williams North Central and Keller Williams Greater Worcester, MA.

4- Is known to be the go to Broker for hiding assets, working fraud, and doing criminal actions with impunity.

5- Keller Williams Corporate is a conduit for criminal activities that normally wouldn't take place at Real Estate franchisee offices.

6- Their Actions/inactions allow for the statistic wherein the first ever cases of a whole new magnitude of Racketeering/Domestic Terrorism occurred at a full two Offices that are satellites of Keller Williams Corporate.

7- Their neglect, lack of oversight, encouraged  criminal activities of franchisees by extension (as long as it makes money) encouraged exceptionally psychopathic individuals to run their offices in much the same scenario wherein banks with a lack of oversight were a magnet for individuals/entities committing financial fraud and thereby undermining Americas financial health.

8- Turned a blind eye to, and was neglectful about Utility Bill extortion that was committed against Edward Ahern for financial reasons and by implication aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

# 1F  and 1G:  Apple Country Realty and Keller Williams North Central

Apple Country Realty OF 63-65 Park Street. Ayer, MA is merely an extension of Daniel Loring. Daniel Loring's opening of Keller Williams North Central of 680 Mechanic Street. Leominster, MA was just a way for him to hide the tax evasion, false

financials given during divorce proceedings, and for insulating the Racketeering/Domestic Terrorism that he has helped to facilitate directly and indirectly. Racketeering and Domestic Terrorism that Daniel Loring was orchestrating through Joseph Solans and associates at the office of Apple Country Realty at 63-65 Park Street. Ayer, MA in particular.

# 1H:  Fiefdom Holdings Syndicate LLC of 170 W Main Street Groton, MA

## And

# 1I:  Polonia Realty Holdings LLC of 170 W Main Street. Groton, MA:

Both of the above business entities are nothing more than legal entities that were created as shields for furthering the murders, drug dealing, white collar fraud, extortion, Racketeering, Domestic Terrorism, and other conspiracies of Joseph Solans. Christina and Joseph Solans change management/ownership of both entities often, for insulating Joseph Solans from his Racketeering and Domestic Terrorist goals as much as possible.

This part will be broken up into two parts

1. Part related to the events and chronology of Racketeering and Domestic Terrorist Conspiracy and how Daniel Loring, Kelle O'Keefe, Mark Kavanagh, Joseph Solans, Mcquinns,  their serial killer sidekick, and others helped to facilitate it.

2. The white collar fraud that was perpetuated by Daniel Loring, Kelle O'Keefe, Mark Kavanagh, and Keller Williams North Central. This is relevant as the acquisitions and the Racketeering/Domestic Terrorism before, during, and after purchases was the cause of the financial and personal harm I suffered.

## Racketeering and Domestic Terrorism conspiracies

Give a numbered and concise summary with a statement of complaint against Kelle O'Keefe, Daniel Loring, Mark Kavanach, Joseph Solans,

Apple Country Realty, and Keller Williams North Central and Keller Williams Corporate.

1. James Crossin of North American Financial Services called Kai Kunz and Michael Simmons and informed them that he had Banks, private lenders, and venture Capitalists that could finance new developments, and cash flow properties with 100% LTV Financing. Kai was most interested in Venture Capital funding, while Michael was more interested in starting a business for monthly cash flow profits.

2. James Crossin said that Venture Capitalists he spoke to wanted to see a larger real estate portfolio prior to financing business models and new applications.

3. Kai had a real estate license but never liked the Real Estate Broker and Sales Agent Profession. He also didn't have the time to drive around and look at properties.

4. Kai Kunz and Michael Simmons were introduced to Kelle O'Keefe by James Crossin who was the owner of North American Financial Services on Main St. Worcester, MA. 01608. James Crossin and Kelle O'Keefe herself said that she sold sixty properties a year and was extremely knowledgeable about cash flow properties.

5. James Crossin adamantly said that Kelle was the person to work with on acquisitions and that he wouldn't use the great financing sources he had unless Kelle was the realtor during the transactions. This was in September 2006.

6. James Crossin and Kelle were completing a deal wherein Kelle's buyer was purchasing a laundry machine business. I found out later that they with held tax returns that Kelle's buyer wanted to see, and that this caused the buyers to loose money monthly in spite of putting large sums of money into laundry business that they purchased. Kelle laughed about this during the end of association with Kai and Michael Simmons in November 2007. She further said that the chinks deserved it.

7. Kai and Michael Simmons reviewed several properties with Kelle O'Keefe and placed several offers on properties in 2006 and into February, 2007. They were for 100% CLTV Purchases with Interbay Funding in Mansfield Mass as the lender (or offers had thirty percent seller seconds and seventy percent bank financing). James Crossin and Kelle O'Keefe knew the representative at Interbay named Paul Keane.

8. In November 2006 Kelle O'Keefe started to tell dozens of Brokers, Sales Agents, and Sellers that Michael Simmons had an Eight Million Dollar Trust fund and that Kai Kunz had millions of dollars. She tried to entice sellers to do deals and also see who would be interested in engaging in Racketeering and extortion against both Kai Kunz and Michael Simmons after property acquisitions.

9. From January 2007 onwards Kelle O'Keefe went around and told many brokers, sales agents, sellers, and known felons that Michael Simmons and Kai W Kunz had exceptionally wealthy families and mega trust funds.

10. During time of January 2007 and afterwards Kelle O'Keefe and Daniel Loring tried to find sellers and realtors for helping to orchestrate future extortion and Racketeering against Kai and Michael Simmons.

11. Kelle O'Keefe, Daniel Loring, Mark Kavanach, and Joseph Solans were most aggressive about future Racketeering, rental theft, extortion, property theft. Denise Peach introduced Joseph Solans to Kelle O'Keefe, Daniel Loring, Mark Kavanach in early 2007 and the Racketeering/white collar fraud exploded into whole new territories.

12. Kai and Michael Simmons were stalked and threatened staring in August 2007 when they started to find out about fraud rental and expense information and other scams that Kelle, Daniel Loring, and others at Apple Country Realty were involved with against their interests. Kai and Michael only knew a very small percentage of the extent of the fraud due to papers being taken from office/residence and email/computer hacking with deleting of financial materials.

13. Threats, false enticements, and extortion through playing  back conversations Kai and Michael had with relatives on cell phones were done with Worcester, MA property acquisitions starting in August 2007. Conversations that Michael Simmons and Kai Kunz had with others such as family were played back to them with threats to kill family and friends. This was orchestrated by Daniel Loring, Kelle O'Keefe, Joseph Solans and their serial killer sidekick.

14. Kelle O'Keefe, Daniel Loring, Mark Kavanach continued to speak to many realtors, brokers, sellers, and more about Kai and Michaels alleged wealth and why they should be pursued through racketeering (because we were allegedly rich kids). Daniel Loring, Mark Kavanach, and Kelle O'Keefe used this tactic to encourage future Racketeering and Domestic Terrorism against Kai and Michael Simmons. That is why their motives and views are relevant to case (without getting into how these views are used for uniting gang members for furthering their large scale ambitions).

15. In January 2007 James Crossin and Keller O'Keefe told Kai and Michael Simmons that Interbay would no longer do 100% CLTV Loans. That the existing Residential loans could close, but the commercial loans with Interbay Funding could not be finalized.

16. During this time in January 2007 James Crossin and Kelle O'Keefe told Kai and Michael that the following could get the commercial deals done (deals wherein rental figures and expenses were already altered by Kelle Okeefe and James Crossin) during their many meetings.

- Family Financials such as assets that Michael Simmons parents had.
- HUDs and information from transactions that Kai and Michael completed in past transactions.
- Existing property information for utilizing properties as collateral for down payments.
- Having Michael sign mortgage disclosures for a bank and North American Financial Services (James Crossin's Company) that would finance properties.

17. Kelle O'Keefe met with Seller David Boudreau several times from January 2007 onwards and told him about the alleged wealth of Michael Simmons and the extent to which he (David Boudreau) could potentially extort and steal from him (Michael Simmons) and Kai Kunz with her help after deals were completed.

18. David Boudreau ended up committing multiple layers of fraud and theft against Kai and Michael Simmons after the sale of his properties (as was planned from start with the help of Kelle O'Keefe, Daniel Loring, and Joseph Solans).

19. David Boudreau found help from Kelle O'Keefe, Joseph Solans and his serial killer sidekick after property purchase transactions were finalized and steps were in place for accomplishing the post purchase

goals of Kelle O'Keefe, Daniel Loring, David Boudreau, and their serial killer sidekick. David Boudreau was a willing participant in Kelle O'Keefe, Daniel Lorings, and Joseph Solans premeditated Racketeering, extortion, theft, and murder conspiracies (murder if the latter schemes failed as planned) from the start. David Boudreau sold properties on 1-11-2007 for 74 Abbott Street Gardner, MA 01440, AND ON April 12, 2007 for 7-11 Glazier Street and 205-213 Park Street Gardner, MA 01440.

20. Kelle O'Keefe and James Crossin asked Michael Simmons to go to James Crossin's office for signing mortgage disclosure statements. Michael went into office and signed the Mortgage Disclosures with Kelle and James Crossin on February 7th, 2007.

21. Kelle O'Keefe and James Crossin claimed that disclosures were for working with banks that would be able to finance properties. The disclosures were almost completely for properties that had offers on them pending. They were for the original offers with seventy percent bank and thirty percent seller second financing. Their were two pages to each disclosure and James Crossin plus Kelle O'Keefe put Michael Simmons initials on page two (which wasn't ever in pile for any of the 3 page disclosures.) Note that their were three page disclosures for each of the approximately 14 properties.

22. Since having signed the mortgage disclosures, James Crossin was never available and Kelle O'Keefe no longer had much interest in finalizing the properties that had the mortgage disclosures signed on them by Michael Simmons when he was in office with Kelle O'Keefe and James Crossin on February 7th, 2007.

23. Michael and Kai were referred to Denise Peach as a potential financer and encouraged to work with Saverio Fulciniti for finalizing deals. Kelle O'Keefe said that James Crossin would sue Michael Simmons if he didn't do more deals and use Denise Peach and Saverio for fiancing deals. Crossin acknowledged and Kelle O'Keefe confirmed that he would get a split commission from Denise Peach and Saverio Fulciniti. This occurred in the middle of February 2007.

24. Kelle O'Keefe, Denise Peach and Saverio Fulciniti (who Kelle wanted to start a Commercial Real Estate training business with) assured Michael Simmons and myself (Kai Kunz) that they could cross collateralize the equities in properties that Kai and Michael Simmons owned for acquiring new cash flow properties without any significant down payments.

25. Saverio Fulciniti and Denise Peach told Kai and Michael Simmons that their would be a need to give them the same information that James Crossin wanted

- Updated Family Financials such as assets that Michaels parents had.
- HUDs and information from transactions that I (Michaels business partner) completed.
- Existing property information for utilizing properties as collateral for down payments.
- Having Michael sign mortgage disclosures for a bank that would finance properties.

These were sent to Saverio Fulciniti and Denise Peach throughout 2007.

26. Kelle O'Keefe acted as a conduit for mortgage brokers. She faxed papers to mortgage brokers from Apple Country Realty and Keller Williams North Central. The papers she faxed included the assets of Michaels parents which she, Daniel Loring, and the mortgage brokers altered to Michael Simmons name during all of 2007 and into 2008.

27. The rental and expense fraud committed by Kelle O'Keefe and Daniel Loring on every single property purchase combined with altering the financials of Michael Simmons parents into his name, allowed the most liberal banks to finance deals that they ordinarily wouldn't come close to financing. These being

banks such as Bayview Loan Servicing, Green Point Mortgage, and other lenders that already had extremely high default rates.

28. Kelle O'Keefe and Daniel Loring continually altered financials of Michael parents and sent altered documents through fax and email to dozens of realtors, banks, sales brokers, sellers, and others.

29. Kelle O'Keefe and Daniel also altered the rental and expense information on properties being looked at and purchased. These actions by Daniel Loring and Kelle O'Keefe occurred at Apple Country Realty and continued at Keller Williams North Central thereafter. Daniel Loring utilized this tactic with many buyers other than Michael Simmons and Kai Kunz.

30. Kelle O'Keefe faxed altered financial papers to dozens of realtors and sellers. She also communicated by email in her attempts to determine what Brokers and realtors would engage her with fraud throughout 2007 and into 2008.

31. Kelle O'Keefe spoke to brokers, sellers, real estate agents, and more for determining what sellers and sales agents would potentially entertain her future Racketeering aims against Kai and Michael Simmons after property acquisitions were completed. Kelle and Daniel Loring eventually found willing participants in at least Richard Rawson and David Boudreau. This occurred throughout 2007 and into 2008.

32. In late April 2007 James Crossin filed a $65,000.00 lawsuit against Michael Simmons, that was filed in Worcester Superior Court. North American Financial Services was listed as Plaintiff and Attorney Abodeeley was the attorney for James Crossin.

33. James Crossin was asking for money on deals he never consummated as mortgage broker and wanted to get what no mortgage broker would ever ask a client (to be paid points and fees even if no deals were completed.) Just sign the papers and I'll get paid the same if I do nothing or if I work hard and get deals financed. James Crossin and Kelle O'Keefe predated the documents during this fraud case that is exceptional in its' level of being an outright scam. It is a perfect example of the multi layered extortion and fraud that was committed by Kelle O'Keefe, Daniel Loring, and Joseph Solans.

34. Kai, Michael, and Edward Ahern found out later on in early 2009 (when much of the Racketeering and Domestic Terrorist actions came to light) that Kelle O'Keefe worked this fraud with James Crossin. Kelle was to split any settlements that came from the lawsuit. James Crossin could get paid for doing nothing and Kelle could get paid on top of any other deals she got paid for from the fifty percent of settlement that James Crossin was to give to her.

35. James Crossins fraud lawsuit with Kelle O'Keefe was a first round plot to the multi layered fraud and extortion conspiracy that Kelle O'Keefe would orchestrate. She worked cash deals through scams because she could avoid paying the bankruptcy court and the IRS through such scams that violated the banking Laws in this case. James Crossin wanted Michael Simmons to pay for mortgage points whether or not the loans were funded. It was in total violation of Banking Laws but Kelle and James Crossin wanted to extort money out of Michael Simmons for loans that were not going to be funded.

36. Kelle O'keefe and James Crossin had an arrangement for splitting half of the law suit that they hoped to get Michael Simmons to settle on. The date of signing the disclosures was 2-7-2007 but James Crossin and Kelle O'Keefe had the dates predated for the mortgage disclosures. The mortgage disclosures that had the second page fraudulently initialed, and now had their dates altered were the backbone of James Crossins fraud lawsuit..

37. Kelle O'Keefe was working extortion, murder plots, and more from the very beginning. Kelle, Daniel Loring, and Mr. Crossin predated the documents in order to help cover for both the loan submissions previously submitted and the date on the P and S agreements for the properties on specific mortgage disclosures. That is to say that (although Michael Signed mortgage disclosures on February 7, 2007), the mortgage disclosure for property A would say October 13, 2006 for the date on the mortgage disclosure, if the P and S agreement or offer was done just prior to October 13, 2006 (October 11, 2006 as an example.) It was a fraudulent scheme that was just a small demonstration of the outrageously brazen and fanatical Racketeering frenzy that was to follow.

38. Kelle O'Keefe is a long term friend and business partner of Kelle O'Keefe. Denise Peach introduced Kelle and Daniel Loring to Joseph Solans, and his serial killer sidekick in May 2007.

39. During May 2007 and later, Kelle O'Keefe and Daniel Loring assisted Joseph Solans in finding vulnerable land owners that could be extorted out of land and huge second mortgages (seller seconds) by Joseph Solans and his serial killer sidekick.

40. Daniel Loring made plans for the move from the Apple Country Realty office at 63-65 Park St. Ayer, MA into the new Keller Williams North Central Office in Leominster, MA.

41. Daniel Loring's move was in anticipation for working a new Racketeering/white collar fraud business and hiding assets due to his divorce and IRS fraud.

42. During move to Keller Williams North Central office, Daniel Loring moved Joseph Solans into the Apple Country Realty office at 63-65 Park Street Ayer, MA and kept a few of his workers from Apple Country Realty at the old Apple Country office.

43. Joseph Solans worked for Andrew Sears as a mortgage broker and did massive amounts of appraisal puff and cash out straw purchase deals at 63-65 Park Street Ayer, MA. He had seven straw buyers and most strongly utilized straw buyer named James McCall out of Gloucester, MA. Daniel Loring and Kelle O'Keefe aided and abetted this fraud and extortion/murder plots on behalf of Joseph Solans for money as well.

44. Kelle O'Keefe and Denise Peach worked for Joseph Solans. Daniel Loring assisted Joseph Solans with his fraud deals and helped Joseph Solans with his drug dealing, extortion, murders through drug tampering, and other murder conspiracies from the Apple Country Realty Office.

45. Daniel Loring and Kelle O'Keefe assisted Joseph Solans in every way and identified potential victims for Joseph Solans who was working out of the office space of Apple Country Realty.

46. Daniel Loring, Mark Kavanach, Kelle O'Keefe's Racketeering went into full force from May 2007 onwards, wherein they aided and abetted Joseph Solans and his serial killer sidekick. Aiding and Abetting by Daniel Loring, Kelle O'Keefe, Mark Kavanach was instrumental in the New Hampshire extortions involving land, second mortgages, and property against elderly people, war veterans, and others

47. During June 2007 Kelle O'Keefe had Kai and then Michael Simmons cell phone's borrowed when they were at Keller Williams North Central.

48. Kai Kunz and Michael Simmon's cell phones were subsequently cloned/bugged by Joseph Solans and his serial killer sidekick.

49. Kelle O'Keefe also had the cell phone of at least one Informant bugged , while doing this to others as well. She targeted informants and even individuals in law enforcement with the help of Joseph Solans.

50. Kelle O'Keefe and Joseph Solans were orchestrating their plans for making Joseph Solans drug dealing gang member tenants into sophisticated and organized gangs. Like taking the massive numbers of unsophisticated gang members and making them into an organization that is more effective and destructive by implication, by orders of magnitude.

51. During August 2007 and onwards, Kai and Michael got calls and had the conversations that they previously had with others played back to them. This was being orchestrated by Joseph Solans, Kelle O'Keefe, Daniel Loring, and their muscle/ground people.

52. This was followed up with individuals pointing guns at Michael Simmons and Kai Kunz, with threats to kill friends and family if the spoke about anything. Kai Kunz and Michael Simmons were not sure as to what the source of threats and extortion was from at the time.

53. It was during August 2007 onward that the cell phone tapping, email, computer hacking, and more went into full force. Kelle O'Keefe loved to talk, and told several people about her plans against the spoiled rich kids in Michael Simmons and Kai Kunz.

54. The extortion, fraud, Racketeering/Domestic Terrorism that Kelle O'Keefe, Daniel Loring, and others were assisting Joseph Solans with was central to Kelle O'Keefe and Daniel Loring bringing many organized criminals into their future Racketeering plans. Plans that were with (among others) Joseph Solans, and their serial killer sidekick.

55. In October 2007 The plans of Kelle O'Keefe and Joseph Solans were made more grand. The essentials were to indoctrinate gang members with a quasi Marxist doctrine in simplistic form. This would be combined with the respected cultural heritage of members being indoctrinated. This approach would be synergistically combined with existing gang rules and thereby make gangs much more powerful, organized, and dangerous.

56. Kelle O'Keefe met with David Bain, David Boudreau, Juliana Bain, and Richard Rawson several times in June, July, August, and September 2007.

57. Kelle met with David Boudreau, David Bain, Julianna Bain, Richard Rawson because she wanted to line up future extortion, theft, and Racketeering conspiracies for after the fraud transactions in Worcester, MA were completed.

58. Kelle O'Keefe, Daniel Loring, and Joseph Solans were worried that Michael Simmons who handled the books, would find out about the fraud rental figures and expense figures from acquisitions that occurred.

59. Kelle O'Keefe, Joseph Solans, Daniel Loring undermined the time when he and Kai found out about rental, financial, expense and other frauds by over a year and a half. This was due to the break ins at office with the subsequent stealing of financial documents, the deleting and altering of emails with financial documents in them, and the hacking of computers at office. Kelle O'Keefe, Daniel Loring, Joseph Solans and the Enterprise thereby slowed down the time by which Kai and Michael found out about the fraud and

full extent of the Racketeering/Domestic Terrorism by well over a years time.

60. Kelle O'Keefe, Daniel Loring, Joseph Solans, serial killer sidekick, and others started to utilize email and computer hacking against other potential customers. These activities were accelerated substantially in the middle of 2007 due to other victims that were becoming aware of the white collar fraud and other schemes that were perpetuated by Daniel Loring, Kelle O'Keefe, Joseph Solans, Andrew Sears, Denise Peach, and others in Racketeering/Domestic Terrorist criminal enterprise. They thereby wanted and needed to utilize more extreme tactics for silencing Racketeering victims.

61. Kai and Michael noticed often, that their were emails sent from their email address that didn't come from them in late 2007.

62. Kai Kunz and Michael Simmons however didn't determine the source of this Racketeering until much later. Kai and Michael thought that the emails might have been sent from random hackers who sometimes sent out messages and were sloppy due to the mass of individuals they hacked for surface deep reasons.. Things seemed odd, but Kai and Michael hadn't put the pieces together.

63. Kelle O'Keefe, Daniel Loring, Mark Kavanaugh (to a less extent), Joseph Solans, serial killer sidekick, and Denise Peach worked hard to clone other victims cell phones. They even managed to be successful at cloning a cell phone, hacking into the email, and computer of at least one person who is in law enforcement. This happened from July 2007 onward, when their was a Racketeering explosion due to Kelle O'Keefe, Joseph Solans, Denise Peach, serial killer sidekick, Daniel Loring, working together synergistically on a very high level. Others worked very hard on their behalf as well in mutually violating Federal wire tap laws and tapping the cell phones of potential threats/informants, and hacking into the computers and emails of these potential threats and informants.

64. Kelle O'Keefe, Joseph Solans, serial Killer sidekick, Denise Peach, and Daniel Loring worked criminal espionage tactics for both determining who potential Rats were, and for finding out their potential weaknesses and concerns. This was done mostly against former customers of Apple Country Realty and Keller Williams North Central. Note that their was focus on a fairly low percentage of people that could be potential informants or people that would make good extortion victims (like the land owners in New Hampshire mentioned earlier.)

65. For the few emails with threats from Kelle about her fathers Gambino connections and her having met up with his former associates. Their were countless threats by Denise Peach, Joseph Solans, Kelle O'Keefe about what will happen to Kai Kunz and Michael Simmons, if they discontinued using Kelle O'Keefe and Daniel Loring as a real estate agent and Broker respectively. The face to face threats and extortion tactics in 2007 usually happened when either Kai or Michael were at the office of Keller Williams North Central.

66. The extortion tactics and threats against Kai Kunz in particular usually involved statements from others. Their were also previous conversations by Kai and Michael that were played back to them when they answered their cell phone.

67. Both Kai and Michael would get calls wherein their previous conversations were played back to them, and they would then get a call about 10 minutes later from Kelle O'Keefe, Denise Peach, Joseph Solans, and they would be laughing slightly and say "Kai, you and Mike aren't going to stop using Kelle are you…??" This happened primarily in October and November 2007 and afterwards.

68. Kai and Michael weren't aware of the large scale Racketeering frenzy until later in early 2009, as

they were putting the pieces together. Something didn't seem right and Kai and Michael were ready to stop dealing with Kelle in spite of the potential danger in late 2007.

69. Kai and Michael started to find out that some the rental and expense figures were a lie in July 2007 but didn't know who specifically committed the fraud. They started to find out a small amount about the extent of the fraud that had been done against them.

70. In August and September 2007 Kai and Michael were concerned about potential cash flow problems due to the inaccurate financials. The extent of the fraud wasn't fully grasped due to the theft of financial papers, email hacking and computer hacking that was being perpetuated against Michael and Kai. Kai and Michael wanted potential solutions and the need for extra working capital for making the changes that would greatly enhance cash flow.

71. It was during this time of uncertainty that Kelle mentioned Worcester cash flow properties, and a Realtor named Richard Rawson, that had a seller that wanted to sell properties and act as a private lender after the property sales. The seller (Alan Kupelnick) was said to have wanted to still have a name in Worcester, MA after selling his properties according to Kelle O'Keefe and Richard Rawson.

72. Kelle met with the managers of the Worcester, MA property owner (Alan Kupelnick) named David Bain and Juliana Bain in July and August 2007.

73. Kelle and Richard Rawson told Kai and Michael Simmons that the Seller Alan Kupelnick (see exhibit or email in August 2007), wanted to have Kai and Michael use his managers (Julianna and David Bain) for managing properties after they were sold.

74. Kai and Michael met with the managers once with the seller prior to the sales. Kelle O'Keefe met with the managers David Bain and Julianna Bain several times, just as Kelle O'Keefe met with and spoke to David Boudreau many times prior to sales in Gardner, MA. being finalized.

75. Kelle O'Keefe, Denise Peach, Daniel Loring, worked plans for future Racketeering with Richard Rawson and found him to be a perfect candidate for their plans.

76. In November 2007 Kelle O'Keefe met Kai Kunz and Michael Simmons secretary named Holly Hanson at residence/office at 111 Church Street. Northbridge, MA 01588.

77. Kelle wanted to show Holly how to put financial information into computers, and also asked her and Kai many questions about where papers were stored, and Kai and Michael schedules at office in case she has to call. This seemed very odd because Kai and Michael both had cell phones. Kelle also discouraged Holly in the use of emails for handling financial information. I found this to be odd because it was a permanent footprint in case a paper was lost.

78. Kai and Michael Simmons decided that they would take their chances and tell Kelle that they were no longer going to deal with her as a real estate agent and Daniel Loring as a Broker. Kai and Michael both called Kelle to let her know this in early December 2007.

79. After stopping association with Kelle O'Keefe. Kai and Michael got a call from Joseph Solans. He called both Michael and Kai several times in December 2007 and January- February 2008 and told them "I will bury you both for not playing by my rules and by dissing my girl Kelle O'Keefe and my main man Daniel Loring." Joseph Solans said "I will come after both of you with my connections with a fanaticism that has no rival." Joseph Solans then said "you better be making payments and also keep your mouth shut

about Kelle, Denise Peach, Daniel Loring, and their kickbacks from closings." "Also, If any of you say a word about my deals with Andrew Sears, Denise Peach and Daniel Loring to the authorities, you will be killed very painfully and your body will ground up into a dildo and used for raping your relatives and friends by my associates!!"

Daniel Loring referred many customers to Joseph Solans as discovery and depositions will show..

80. In March 2008 Kai took plates and noticed that their was a considerable amount of familiarity with vehicles and a motorcycle driver, who followed him often, and who Kai saw around residence/office often. Said individual on motorcycle committed home invasion, assault with deadly weapon, extortion, kidnapping, and more. Said stalkers pointed guns at Michael Simmons and Kai with much more increased ferocity. AZ769 MA was another Racketeering fanatic.

81. Kai and Michael saw a lot of traffic going to and from neighbor Mariom Alverez apartment where her son Joseph Alverez lived. This occurred around April 2008 when their were definite changes. Joseph Alverez spoke to kidnapper several times as did Richard Rawson in July 2009 in particular.

82. In late March 2008 Joseph Solans and his serial killer sidekick picked my lock and planted cameras that were tiny and above ceilings and bugs. Kai would often have calls to me wherein conversations he had at his place were played back to him. It was usually while Kai was in his vehicle during the call and during this time he would have someone honk their horn and say "where's the payments" after he received the call wherein his conversations to family/friends were played back.

83. Kai and Michael Simmons would often have papers missing at Kai's residence/office, emails deleted, and information in their computers compromised. This started to into full throttle around the middle of April 2008 or after Joseph Solans, Kelle O'Keefe, Daniel Loring, and Denise Peach had Kai's neighbor Mariom Alverez, her son Joseph Alverez, and Shawn Taylor of R and R payed to keep an eye on his comings and goings. This was to help them enter my residence/office for working their corporate espionage, theft, voyeurism, extortion, and conspiracy to commit murder schemes later on.

84. Shawn Taylor of R and R, Joseph Alverez, Marion Alverez were payed big money by Kelle O'Keefe, Joseph Solans, Daniel Loring for the extortion, voyeurism/photo shop fraud, and lock pick B and Es. They assisted with these actions and murder conspiracies thereafter.

85. In May 2008 David Boudreau sent emails to Kai and Michael Simmons and spoke about having Michael and his mother arrested without cause, the two being raped in jail, and shooting anyone who prevented him from liquidating his second and third mortgages. Dave Boudreau also sent emails wherein he has "people watching me and Michael Simmons and that he knows all of our movements." In fact David Boudreau was involved with the Racketeering conspiracies and more with Joseph Solans, Kelle O'Keefe, Daniel Loring, serial killer sidekick and associates.

86. In June 2008 Kai noticed a camera that was ceiling level and called the authorities from another phone. They told me to put tape over it and that they would handle the rest. Kai got notice thereafter that matters were bigger than he thought but wasn't given specifics, other than to say that they were taking care of very substantial matters.

87. Kai started to get thousands of calls on his residence phone and cell phone in June 2008 wherein his location was trying to be determined as a result of the concern Joseph Solans, Kelle O'Keefe, Denise Peach, Daniel Loring, and associates had about his knowledge of their camera and photo shop schemes for extorting him, his relatives, and more.

88. It was during late May and early June 2008 that David Bain (the Worcester MA manager) that was doing a considerable amount of theft, told Kai Kunz and Michael Simmons that they should get loan modifications done. He said that the Mcquinns could lower interest rates and prevent foreclosures. This was interesting timing, because it was during this time that the Racketeering was going into full throttle.

89. Kai Kunz and Michael Simmons met the Mcquinns in June 2008 and found out later that David Bain was trying to unite Kelle Okeefe, Daniel Loring, Joseph Solans, serial killer sidekick with the Mcquinns on a much higher level of interaction.

90. David Bain knew that he could profit from creating such an alliance and that the Racketeering and new form of Domestic Terrorism could explode onto a much higher plane when Kelle O'Keefe, Joseph Solans, Daniel Loring, serial killer sidekick, Mark Kavanach met up with the Mcquinn's, Shawn Taylor of R and R, Mariom Alverez, and Joseph Alverez.

91. It was amazing that properties were held onto for as long as they were with the thefts from David Bain, the thefts of Joseph Solans serial killer sidekick in Fitchburg , MA, and the job that David Boudreau was doing in Gardner, MA. Which went into full throttle in 2008

92. It was during October 2008 that Bruce Boguslav and the Mcquinns crossed paths with Joseph Solans, Kelle O'Keefe, serial killer sidekick, Denise Peach, Daniel Loring, and others. It was a Racketeering and Domestic Terrorist unification fit for the Guinness Book of world records under the title of "most intense and multi layered Racketeering conspiracy."

93. The Mcquinns and Bruce Boguslav were very concerned about helping Joseph Solans, Kelle O'Keefe, Denise Peach and serial killer sidekick cover their tracks at the residence/office of Kai Kunz. They believed that the FBI would ruin their grand plans if their modus operandi was determined.

94. Joseph Solans, Daniel Loring, David Boudreau, and Kelle O'Keefe asked the Mcquinns and Bruce Boguslav about buying the properties that they were getting payed to do loan modifications on for pennies on the dollar through inside dealing with banks in October 2008.

95. In October 2008 Bruce Boguslav and the Mcquinns started to communicate with and met up with the serial killer sidekick of Joseph Solans, Kelle O'Keefe that kidnapped Kai Kunz and Edward Ahern. He was the muscle for their corporate espionage, voyeurism, extortion and more.

96. Bruce Boguslav and Michael Fronte entered Kai Kunz's residence on November 7th 2008 and he was confronted at gun point by 166LXO RI, AZ769 MA, and Solans serial killer sidekick that held him hostage. They told him to leave or get mowed down by firearms. They were assisting Kelle O'Keefe, Joseph Solans, Daniel Loring, and Denise Peach.

97. David Bain and Richard Rawson entered Kai's residence and tried to throw Kai out by force on November 9th 2008. They took many papers, and they were scoping residence to help Solans get camera and bugging equipment for his corporate espionage and extortion schemes. Two of Joseph Solans and the Mcquinns grunts pointed guns at Kai to support them and their activities. The doors to Kai Kunz's residence/office were screwed shut by them. See Exhibit.

98. Although Joseph Solans wanted to do property thefts of Kai's Worcester Properties. Richard Rawson ended up having a falling out with the Mcquinns and Bruce Boguslav because he wanted to have the Worcester, MA properties taken by the original seller Alan Kupelnick whereas the Mcquinns and Bruce Boguslav wanted to help Solans, Kelle, Daniel Loring and associates in getting Kai Kunz and Michael

Simmons Worcester properties for pennies on the dollar through insider bank dealings and extortion.

99. In June 2009 Richard Rawson brought Joseph Solans and Christina Solans by Kai Kunz's Fitchburg properties and listed them, stole rents from them through Joseph Solans drug pusher in Worcester, MA named Jorge Torres.

100. Richard Rawson furthered his criminal conspiracy with Kai Kunz's Worcester, Northbridge, and Fitchburg properties.

101. Richard Rawson, Joseph Solans, Christina Solans had P and S agreements uttered falsely. This was for advancing Racketeering, extortion, murder, property theft, rental theft, and more of Joseph Solans, Kelle O'Keefe, Daniel Loring, Mark Kavanach, serial killer sidekick, and others.

102.   Richard Rawson, Joseph Solans, Christina Solans did multiple forgeries, and criminal conspiracies to orchestrate this property theft with Joseph Solans. Richard Rawson and Joseph Solans spoke to my tenants to orchestrate their criminal conspiracy. This was for advancing Racketeering, extortion, murder, property theft, rental theft, and more of Joseph Solans, Kelle O'Keefe, Daniel Loring, Mark Kavanach, serial killer sidekick, and others.

103. Several machine gun messages were left on Kai Kunz's answering machine on November 11th by Joseph Solans, Kelle O'Keefe, Daniel Loring and associates and later.

104. Kelle O'Keefe, Daniel Loring, Mark Kavanach, the Mcquinn's, and their serial killer sidekick were concerned that Kai Kunz was onto their murder and camera and bug setup in his residence/office, and were making their threats be known. Kai mailed tapes and many others to FBI and had informed them about camera setup in residence and office. They scoped my place thoroughly and dealt with it in the right way I'm sure.

105. Kelle O'Keefe, Joseph Solans, The Mcquinns, Bruce Boguslav, serial killer sidekick had meetings in October and November 2008 for determining how to cover their tracks and avoid exposure with FBI. See affidavits.

106. The Mcquinns and Boguslav met several times with Kelle O'Keefe, Joseph Solans, serial killer sidekick (have affidavits from a few meetings) in October and November 2008. The Mcquinns started Home Savers in early November 2008, for the purpose of trying to separate themselves from the attempted murder, shakedowns, kidnapping, and more that was about to go into full throttle with the tag team effort of the Mcquinns and Bruce Boguslav and Kelle, Joseph Solans, Denise Peach and Daniel Loring.

107. The Mcquinns and Bruce Boguslav communicated with Kelle, Solans and their serial killer sidekick with new cell phones in November 2008 (didn't prior to this) and worked on negotiating the lowest possible prices with the banks with insider bank dealings on behalf of Joseph Solans, Kelle O'Keefe, Denise Peach and their serial killer sidekick. It was all based upon anticipating extortion and murder (if that didn't work) against Kai Kunz and or Michael Simmons. Payments were made to the Mcquinn's while the Mcquinns were instrumental in helping to assist the above mentioned Racketeering schemes (among others).

108. The Mcquinns were payed tens of thousands of dollars for loan modifications as they aided and abetted the following actions against Kai Kunz on behalf of Joseph Solans, Daniel Loring, Mark Kavanach, serial killer sidekick.

- Conspired to have Kai killed
- Conspired to have Kai agree to short sales from kidnapping.
- Conspired to have Kai agree to short sales by having people point guns at me
- Encourages David Bain, Michael Fronte, and David Bain to give them a cut from their rental thefts, in return for being offered lower prices on my properties, that they expected me to sell by force or after Kai was dead through Michael Simmons or the banks.
- Had Kai stalked by 166LXO RJ, 2716XO MA, AZ769 MA and others.
- Violated Federal Wire Tap Laws against Kai by having his cell phone, email, and computers hacked/tapped.
- Like Joseph Solans, Kelle O'Keefe, and Daniel Loring. The Mcquinns and Bruce Boguslav had Kai called with conversations that he had with family, friends, attorneys, and others, played back to him.
- The Mcquinns and Bruce Boguslav helped Joseph Solans and Kelle O'Keefe in trying to hopefully cover their tracks with the corporate espionage, voyeurism/extortion camera and bug setup at Kai Kunz's residence and office. Too late....

109. Continued to have Kai Kunz's cell phones tapped, computer and email hacked, in order to undermine and find out about what he might have revealed to the FEDs

110. In November 2008 and afterwards, The Mcquinns, Bruce Boguslav, Joseph Solans, Richard Rawson, Kelle O'Keefe, Daniel Loring Orchestrated and planned Racketeering/Domestic Terrorist plots in trying to and planning to tap the cell phones and hack into the computers and emails of individuals in law enforcement. SEE Exhibits/Affidavits. Don't know if they succeeded but do know that they did the same in hacking into emails of mine and calls Kai made that were to the authorities. The planning rippled into new territories once their was a meeting of the minds.

111. The Mcquinns stopped dealing with Kai in November, 2008 while receiving money for loan modifications in November 2008 and thereafter. The Mcquinns were having meetings continually without Kai Kunz or even Michael Simmons. The Mcquinns however were meeting regularly with David Bain, Michael Fronte, David Boudreau, Joseph Solans, and others in Racketeering/Domestic Terrorist conspiracy.

112. The Mcquinns had the contract I (Kai Kunz) refused to sign taken from my residence on November 7th, 2008 thru Bruce Boguslav and Michael Fronte.

113. The disclosure of the Mcquinns for covering their associations with Joseph Solans, Kelle O'Keefe, David Boudreau and others had information about needing to have David Bain and Michael Fronte collect rents. The contract also asked for a blanket permission for the Mcquinns and Boguslav to talk to anyone and all interested parties about my (Kai Kunz's) properties.

114. Boguslav and the Mcquinns sent a similar contract to Kai Kunz and Michael Simmons in January 2009 which Kai Kunz will be presenting during Depositions. The Mcquinns were hired and payed tens of thousands to do loan modifications on behalf of Kai Kunz and Michael Simmons from the start! The Mcquinns did contract because they wanted to cover for having previously spoken to and started to orchestrate Racketeering and Domestic Terrorist plans with Kelle, Joseph Solans, and others.

115. Kelle O'Keefe, Daniel Loring, Joseph Solans, their serial killer sidekick, Denise Peach, and others had quite the Racketeering and Domestic Terrorist plans from the beginning. It was a multi layered conspiracy that built upon itself from the beginning of 2007 well into 2011 and even 2012.

116. The Racketeering and Domestic Terrorist plots have not ended and continue to this day. They have been continuous and caused the damages that are part of claim.

117. Their were many threats, extortion plots, phone tapping, email and computer hacking and more that didn't stop. It would take sixty pages to list all the specific incidences involving the gun threats, extortion plots, thefts, frauds and more from Joseph Solans, Kelle O'Keefe, Daniel Loring, Denise Peach, the Mcquinns, Bruce Boguslav, their serial killer sidekick, and associates.

118. It would be redundant and a part of the testimony at depositions, discovery, and more. Kelle Okeefe constantly tried to get others involved in her extorting and Racketeering schemes with others by talking endlessly about me and Michael Simmons alleged privilege and how she had it tough growing up, and her background as a prostitute.

119. Kelle O'Keefe always asked for and demanded extra commissions in order to facilitate deals and kickbacks in many forums from sellers.

120. Kelle O'Keefe tried to justify actions against Kai Kunz and Michael Simmons due to our alleged privileges compared to her background and that of others.

121. Kelle O'Keefe and Daniel Loring got kickbacks and constantly worked against me and Michael Simmons interests while orchestrating Racketeering and future conspiracies with Joseph Solans, their serial killer sidekick, Denise Peach and associates against Kai Kunz, Edward Ahern, and Michael Simmons.

122. Kelle O'Keefe and Denise Peach pulled Michaels credit and Kai Kunz's while also having a system wherein they knew if either Kai Kunz's or Michael Simmons credit was pulled.

Well over two thousand pages worth of pictures, information, plates, information on individuals, tapes and audio, and more to the right authorities. That certainly shows that I back up everything I claim. I say the above and everything else in this letter of opposition to Attorney Gregory's motion to dismiss under the pains and penalties of perjury.

PART 2. The white collar fraud that was perpetuated by Daniel Loring, Kelle O'Keefe, Mark Kavanagh, Joseph Solans, Keller Williams Greater Worcester, Keller Williams North Central, and Keller Williams Corporate due to lack of oversight and negligence.

The following white collar frauds will be labeled as follows to save time

A. Will represent fraud rental information given during property acquisitions.

B. Will represent fraud expense information given during property acquisitions.

C Will represent altered documents that Kelle and Daniel Loring worked with Mortgage Brokers to get deals done.

D. Will represent deals wherein Kelle and or others got kickbacks.

E. Will represent deals wherein Kelle and associates filled vacant units with furniture and lied to appraisers about occupancy.

F. Will represent deals wherein Kelle and associates had appraisals altered.

G. Will represent deals wherein Kelle worked future arrangements with selling brokers and or seller for after sales against me and Michael Simmons.

H. Deals that had fraud escrow statements

1. 3-5 Johnson St. Fitchburg, MA 01420 that closed on 12-29-2006

A, B, E, C (Kelle faxed altered Financial of Michaels parents to James Crossin and the paper was used for closing loan).

2. 74 Abbott St. Gardner, MA. 01440 that closed on 1-11-2007

B, C (Kelle faxed altered Financial of Michaels parents to James Crossin and the paper was used for closing loan).

3. 6-8 Mariom St. Haverhill, MA 01830 which closed on January 8, 2007

B, C Kelle gave the same altered financials that she gave to James Crossin to Denise Peach who got the deal done. D - Kelle always got a kick from Denise Peach.

4. 348 Elm St. Fitchburg, MA 01420 closed in the beginning of March 2007.

E, C - Kelle gave James Crossin the altered financials.

5. 207-213 Park Gardner, MA 01440 closed on April 12th, 2007

A,B, C, E, H, G

6. 7-11 Glazier St. Gardner, MA 01440 closed on April 12th, 2007.

A,B, C, E, H, G

7. 50-60 Prichard St. Fitchburg, MA 01440 closed in the middle of May 2007

A, B, C, H, E

8. 62-64 Prichard St. Fitchburg, MA 01440 closed in the middle of May 2007

A,B ,C, H, E

9. 26-30 Crescent St. Fitchburg, MA 01420 closed in the middle of July 2007

B, C

10. 153 Prichard St. Fitchburg, MA 01420 closed at the end of July 2007

A,B , C

11. 158 Prichard St. Fitchburg, MA 01420 closed at the end of July 2007

A, B, C

12. 94-96 Daniels St. Fitchburg, MA 01420 closed at the end of July 2007

A, B, C

13. 64-66 Mechanic St. Leominster, MA 01420 closed at the end of July 2007

C

14. 129 S Elm St. Haverhill, MA which closed near the end of July 2007

A, B, C, D, E, F, H, 1

15. 99-105 Church St. Northbridge, MA 01534 closed in August 2007

Kelle tried E and was listed as contact for Appraiser through Saverio Fulciniti who financed deal.

16. 32-32 ½ Ellsworth St. Worcester, MA  closed in September 2007

B, C, D, F, G, I

17. 5-7 Lowell St. Worcester, MA closed in September 2007

B, C, D, F, G, I

18. 19 Ward St. Worcester, MA  closed in October  2007

B, C, D, F, G, I

19. 476 Park Ave  Worcester, MA closed in October 2007

A, B, C, D, F, G, I

20. 215 Beacon St, 217 Beacon St, 69 Maywood St, 71 Maywood St, 32 Birch St  Worcester, MA

All closed simultaneously in late January 2008

A, B, C, D, E, G, H, I

Of note is that it would be redundant and take about fifty pages of information to give all the chronological specifics on the White Collar fraud committed against Kai Kunz and Michael Simmons during property acquisitions and the Racketeering and Domestic Terrorism that followed. Numbered averments, Solid points above provide a cursory but clear description of the specific frauds, and Racketeering that was committed against Kai Kunz, Michael Simmons, and Edward Ahern.

# 1J:  Christina Solans of 170 W  Main Street. Groton, MA

1- Helped the extortion, murder conspiracies, rental theft, white collar crime, property theft, land theft, drug dealing, Racketeering, Domestic Terrorist, and other conspiracies of her husband Joseph Solans.
2- Illegally Uttered documents falsely by making out P and S agreements for properties not owned by person on Purchase and sales agreements. See Exhibit 13.
3- Was used for hiding assets that were gained from drug dealing, murder, extortion, Racketeering, Domestic Terrorist schemes that her husband Joseph Solans mastered.
4- Was in vehicle and laughed when Joseph Solans serial killer sidekick pointed an AK 47 at Edward Ahern.
5- Was directly involved with the Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

# 1K: Sheila Mcquinn, 1L: Ronald Mcquinn, and their asset scam companies 1M: MPAT (Massachusetts Property Assistance Trust), and 1N: Home Savers Company.

Note that MPAT was an alleged legal masterpiece wherein Ronald Mcquinn bragged that he would have endless beneficiaries that owned MPAT into infinity in case of a lawsuit. This would be accomplished with the help of fraudster notary Seth Woolard who would predate documents on behalf of the Mcquinns. Ronald Mcquinn bragged about being able to outthink the system and have incorporation fluidity with Home Savers by making it a non profit in order to out maneuver the FEDs just as was done with the gas tax fraud, according to Ronald Mcquinn.

1- Helped orchestrate rental thefts involving David Bain

2- Lied to FBI and aided and abetted Racketeering/Domestic Terrorism that caused me financial and other harm.

3- See chronology of events and how Racketeering, white collar fraud, and Domestic Terrorist acts of Sheila and Ronald Mcquinn caused Kai Kunz huge amounts of financial and personal harm.

4- Home Savers was incorporated about a week before the murder attempts against Kai Kunz and Edward Ahern, as it was nothing but a legal shield for Ronald Mcquinn and Sheila Mcquinn that were trying to distance themselves from their involvement with the Racketeering and Domestic Terrorism of Joseph Solans and associates. Incorporations were also for stopping further exposure of Mcquinns to Attorney Generals investigation of MPAT and Ronald Mcquinn.

5- Was directly involved with the Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

6- Committed financial fraud, extortion, violated Federal wire tap and RICO computer hacking laws.

Descriptions of the Mcquinns actions and a Chronology of their actions and involvement in Racketeering/Domestic Terrorist Conspiracy that caused financial, punitive, and personal harm to Edward Ahern and Kai Kunz

1. Ronald Mcquinn laundered money:

KAI KUNZ'S ANSWER:

- Ronald Mcquinn and Sheila Mcquinn have separate accounts in the Virgin Islands. Ronald and Sheila are well known to launder money from the Short Sale frauds and rental theft that they engage in against their customers and others. David Bain and Diane Larson said this to Kai Kunz. Diane Larson stressed concern

about the Mcquinns and their criminal financial frauds. The Mcquinns used money laundering for hiding rental theft income and money they got from, short sale frauds that violate Banking, IRS, and federal laws and rental theft in particular. As such the Mcquinns money laundering was used as a conduit for the financial fraud and damages done against Kai Kunz and is relevant to case. It is fair game for the case and affidavits about the Mcquinns money laundering will certainly be relevant to lawsuit.

- Laundering is one of the laws that are part of the RICO Statute, and hence is relevant to complaint. I made the point of saying that when the Attorney Generals Investigation was initiated against the Mcquinns by Judge Horan, the Mcquinns moved money around with account overseas for obstructing justice. Judge Horan and many if not all of the attorneys that the Mcquinns went through, were only aware of the less severe and overt criminal actions that they commit. Since I will subpoena Federal witnesses, the money Laundering will be addressed fully during depositions and discovery.

- The Mcquinns bank accounts will be fair game because they will make an accounting of the money they received from Kai Kunz and Michael Simmons, William XI Properties Series LLC, and through Michael Simmons directly. The Mcquinns bank accounts will be a part of depositions and discovery, and their accounting for the Attorney General investigation will be as well. They used their bank accounts for trying to cover up the massive rental theft that their worker David Bain committed against Kai Kunz, Michael Simmons, and their company as part of their involvement in Racketeering frenzy. For these reasons, their accounts and money laundering are relevant and will be a part of complaint herein.

2. Ronald Mcquinn and Sheila Mcquinn defrauds Banks and the IRS:

KAI KUNZ'S ANSWER:

The Mcquinns would get paid more money based upon how much they convinced the banks to lower what they would accept with their short sales. Since the Mcquinns provided fraudulent information for short sales (I never approved) of on my properties to Joseph Solans, Kelle O'Keefe, Dave Boudreau and others, that were behind my back. The fact that Ronald Mcquinn defrauds the IRS and Banks will be part of depositions and discovery. The methods he utilized for such fraud were used to victimize Kai Kunz financially. This was the corollary for getting deals done profitably and then hoping to have Kai sign deeds at the barrel of a gun.. The Mcquinns and their fraud with banks and the IRS is relevant to case as such.

2A- The Mcquinns had their paid contractor named David Thibault greatly inflate property related issues in Fitchburg, MA and elsewhere. Mr. Thibault did this for the purpose of helping the Mcquinns when they talked to Banks about lowering the price they will accept for short sales. This was done on behalf of extortion buyers such as Joseph Solans, Dave Boudreau, and others that tried to extort Kai Kunz, Michael Simmons, and more. Making the IRS and Bank fraud of Ronald Mcquinn and Sheila Mcquinn relevant.

I would like to have the following pointed out:

2B-- Conversations, I had on cell phone to relatives and camera views of personal encounters I had with ex finance and others that was photo shopped were played back to me by phone. This was done during kidnapping when I was held as a hostage. When this extortion and gun threats didn't work by people affiliated with Joseph Solans and the Mcquinns (that I have identified). They tried to have me killed.

2C-The Mcquinns spoke to the Banks about short sale prices and negotiated prices with Joseph Solans.

Joseph Solans was communicating with the Mcquinns and Bruce Boguslav about buying Kai Kunz's properties through short sale at the barrel of a gun or through extortion. Amazing that multi layered extortion and Racketeering built upon itself from 2007 up until the present.

2D- The Fitchburg, MA properties were given to the town and their was only a fraction of the needed repair costs that David Thibault presented to the Banks. This speak volumes about the inflated property related issues, the Mcquinns financial fraud, and inside bank dealings. They are all committed in total conflict of interests and in a way that surpasses typical insider trading in white collar criminality.

When the Mcquinns attempted to get massive kick backs by selling Kai Kunz's properties through extortion and illegal negotiations - The following occured.

2E- Ronald Mcquinn said that their was a million dollars for him to make if his buyer (Joseph Solans) bought properties through short sales. Ronald Mcquinn and Michael Fronte both said that the families of Kai Kunz and Michael Simmons would be dead, if either of them interfered with the organizations plans.

2F- The Mcquinns furthered their rental thefts through false accounting with the IRS and their defrauding of banks.

2G- Both Mcquinns commit Bank and Tax fraud. Since the fraud involves
Hiding money from rental thefts they both received from Kai Kunz's properties, and the money the Mcquinns and Bruce Boguslav received from inside auction deal with two of Kai Kunz's Gardner MA, properties. It makes the issue of the Mcquinns money laundering, defrauding banks, and tax evasion fair game for this lawsuit. Their criminal actions were utilized for financial scams, extortion, theft, and the victimizing that Kai Kunz suffered from.

2H- During and prior to the sales of Kai Kunz and Michael Simmons properties through extortion the property related matters were greatly exaggerated prior to auction on behalf of the Mcquinns prearranged buyer. This was all done in direct conflict to the interests of clients (me and Michael Simmons) who payed the McQuinns well over $75,000.00 to do next to nothing. The Mcquinns were paid over $100,000.00 while the Mcquinns worked tirelessly against the interests of Kai Kunz and Michael Simmons.

3. Extorted Plaintiff through contacts in Russian Organized Crime:

KAI KUNZ'S ANSWER:

Ronald Mcquinn spoke freely about his association in Russian Organized Crime in November 2008. Bruce Boguslav was just one such example of someone in Russian Organized Crime (ROC). Ronald Mcquinn used Mr. Boguslav for helping him to extort Kai Kunz and Michael Simmons on behalf of his own interests and those of Kelle O'Keefe, Daniel Loring, Joseph Solans, and the organization. During deposition and discovery, when Federal witnesses are asked questions. It will provide rather powerful testimony about Ronald Mcquinns associations.

4. Held Kai Kunz hostage and had him kidnapped:

KAI KUNZ'S ANSWER:

I gave the date and time of this incident, which was November 17th 2008 at his residence at 111 Church St and at the building next door to it at 99-105 Church St. Northbridge, MA. 01588. Kai had been dealing with the FBI and told them everything, as he have worked with them and told them about his concerns about police corruption at Northbridge, MA. Kai has filed an Internal Affairs complaint with the Northbridge Police and Exhibit 77 speaks about this. Kai spoke to the FBI about the kidnapper and gave them plates, information, and identified people who pointed guns at him. Kai can and has described the kidnappers penis information from when he threatened to have him raped by metal and his penis. Kidnapper is well known associate of Joseph Solans. An anonymous source/informant who had his head smashed with a rock, told me to be careful because the same individual who kidnapped me, also extorted New Hampshire property owners out of land on behalf of Joseph Solans. The same serial killer that kidnapped Kai served time for Manslaughter in spite of being a serial killer (just as Ronald Mcquinn said.) The serial killer who Ronald Mcquinn knowingly engaged for his short sale extortion plans mentioned, Ronald Mcquinn and the penalties for ratting during kidnapping just as 2716XO MA, AZ769 MA, and 166LXO RI has. They mentioned this during the RICO explosion that occurred after Ronald Mcquinn, Sheila Mcquinn, Bruce Boguslav crossed paths with Kelle O'Keefe, Joseph Solans, Denise Peach in October 2008.

From their they planned murder, extortion, the kidnapping, and other tactics. Affidavits from an individual who has flipped and reported Ronald Mcquinns knowledge of, and involvement with assisting Joseph Solans and others is interesting information.

5. Ronald/Sheila Mcquinn and associates Hacked into Kai Kunz's and other clients emails to maximize vulnerabilities and for leveraging extortion:

KAI KUNZ'S ANSWER:

The computer of an informant was brought to a Lab and it revealed that some individuals in complaint herein were involved with computer and email hacking. It was done against Kai Kunz as well. Bruce Boguslav in particular uses this method on behalf of the Mcquinns. Bruce Boguslav braggs of being dangerous with technology by his own words - See Exhibit 23. During discovery and depositions, clients of the Mcquinns will be asked about calls and computer/email hacking that occurred since hiring the services of Ronald and Sheila Mcquinn.

6. Had multiple Individuals point guns at Kai Kunz:

KAI KUNZ'S ANSWER:

2716XO MA, 166LXO RI, 2618GY MA, AZ769 MA, and 62AC82 MA to name a few. Ronald Mcquinn and Sheila Mcquinns cell phone (s), phone records, emails, and list of associates will be analyzed during discovery. I wouldn't be surprised if the same individuals and others have pointed guns at others as well on behalf of Ronald Mcquinn, Sheila Mcquinn, Kelle Okeefe, Joseph Solans, Daniel Loring, and their Racketeering and Domestic Terrorist agendas. The individuals such as the ones with the plates above, are connected to Ronald Mcquinn Sheila Mcquinn, and Joseph Solans. All of the above individuals changed plates or at least swapped often. The made changes most frequently after RICO explosion and attempted murder against Kai Kunz and Edward Ahern.

7. Ronald and Sheila Mcquinn Mastered many White Collar Frauds:

### KAI KUNZ'S ANSWER:

One such fraud involves setting up properties that their clients own up for short sales when the clients are working to save their homes. This is done when the client wants to have their house saved through Loan Modifications. Clients are in a very vulnerable situation and the Mcquinns milk the situation for all it's worth. Ronald Mcquinn has mastered accounting schemes and Sheila has mastered ways to use psychological manipulation through her insights as a doctor of psychology. The combination of their two talents are synergistically combined for executing the white collar fraud they use through MPAT and Home Savers. Many white collar frauds were executed by both Mcquinns as they moved across the country over the years. Both Ronald and Sheila Mcquinn were enthusiastically accepted into ROC due to their inherent understanding of the changing/fluid criminal matrixes of ROC.

8. Did lies about loan modifications while insisting that rent stealers David Bain and Michael Fronte continually be used for collecting rents: This was in the contract that the Mcquinns put together that I mentioned earlier in this complaint.

### KAI KUNZ'S ANSWER:

Kai Kunz refused to sign an indemnification paper for the Mcquinns. The unsigned contract paper was subsequently taken from his residence on 11-07-2008. A second Indemnification paper was sent through email in January 2009. The contract said that Michael Fronte and David Bain would collect rents. Contract also gave blank check permission to allow The Mcquinns and Bruce Boguslav to speak to David Boudreau, Alan Kupelnick, Joseph Solans, Daniel Loring, Kelle O'Keefe, or any other interested parties in properties.

Kai Kunz saw right through the contract and was trying to play ignorant to what was going on, out of fear for his life.

The Mcquinns and Bruce Boguslav wanted a signature of the documents in order to protect them from having previously talked to David Boudreau, Kelle Okeefe, Joseph Solans and others. The indemnification was used in hopes of covering the Mcquinns and Bruce Boguslavs association with the above individuals among others, and the Mcquinns having talked to banks about short sales, when they were hired and paid to do loan modifications. The Mcquinns hoped that they could at least cover their selves civilly by having both Kai Kunz and Michael Simmons sign the indemnification, that would also relieve them of responsibility of their worker and rent stealer David Bain and Michael Fronte. Both Michael Fronte and David Bain gave the Mcquinns and Bruce Boguslav monies from their rental thefts.

9. Paid contractors to inflate property related issues and had properties vandalized:

### KAI KUNZ'S ANSWER:

Properties in Fitchburg, MA went to receivership. The individuals who took over properties brought the properties up to code at a fraction of the cost that was presented by the Mcquinns contractor David Thibault. David Thibault is used as a conduit for defrauding banks, and his fraud information was submitted to lower the amount that the bank would accept for short sales. Short sales of properties that Kai Kunz

owned wherein the Mcquinns expected to get paid close to a million dollars on during their insider fraud extortion short sales/property thefts. Properties in Fitchburg, MA and elsewhere were routinely vandalized prior to calls to the Fitchburg Health department and elsewhere. When witnesses, FED testimony and more comes out, I believe it will prove the Mcquinns knowledge of and encouragement of the vandalizing of properties. The callers to the Board of Health were RICO plotters. Joseph Solans himself often called the Board of Health and did it on the day that Richard Rawson stopped his Racketeering theft and fraud in Fitchburg MASS on October 20th, 2009.

10. The Mcquinns Knew about and encouraged murder plots against Kai Kunz:

## KAI KUNZ'S ANSWER:

The Mcquinns and Bruce Boguslav were directly involved with, and encouraged Richard Rawson and Dave Bain to enter my residence on 11-09-2008 to take papers that were incriminating against the Mcquinns, David Bain, Joseph Solans, Kelle O'Keefe and others. Bruce Boguslav and Michael Fronte entered my residence two days prior to scope out the property, take papers, and help Joseph Solans and Kelle Okeefe in trying to cover their tracks with camera and bug equipment that they wanted to get out of the common hallway, and Kai Kunz's residence/office.

It was after the attempt to throw Kai Kunz out of his residence by force on November 9th, 2008 that Kai noticed that their was a poison attempt. Bruce Boguslav worked directly with Ronald Mcquinn and wanted to cover for Joseph Solans. An affidavit from a participant in a meeting mentions how Ronald Mcquinn knew about and wanted to help Joseph Solans, take video and bugging equipment out of his residence.

During Kidnapping, times before kidnapping, and thereafter 166LXO RI, 62AC82 MA, 2716XO MA, AZ769 MA and others pointed guns at Kai Kunz and Edward Ahern. They all made it clear, that both would disappear if they posed a problem, and reported what Solans, Kelle, the Mcquinns, and Joseph Solans, among others, were doing. Kai Kunz and Edward Ahern made identifications with the FEDs about extortion fanatics. It was no coincidence that a homicide attempt occurred shortly after meeting that Boguslav and the Mcquinns had with Joseph Solans. The meeting happened shortly before the Mcquinns opened a new business in Home Savers. Affidavits in Exhibits state that Michael Fronte, David Bain, the Mcquinns, Bruce Boguslav and others were aware of murder conspiracy.

11. The Mcquinns Organized plots for mass murders against Rats and their families.

## MY ANSWER:

I have no reason to doubt the affidavits that were signed, notarized, and sent to my attorney Joseph Lussier months ago, by someone who was at meetings with the Mcquinns and others. The Affidavits mention talks that the Mcquinns, Joseph Solans, Fronte, Boguslav, Kelle O'Keefe had about killing rats/informants and their families. I also believe the laughs and promises that my days and those of family and friends are numbered by Ronald Mcquinn among others. The other individuals that laughed about me being a future murder victim included (among others) Michael Fronte, Joseph Solans serial killer sidekick. Threats left on my answering machine, threats left on answering machines of relatives (messages I sent to FBI.) Several of the threats against me, family, and friends happened after I filed complaint 1024B at Worcester Superior Court and had it was served all of the defendants in complaint herein. The threats were on Kai Kunz's phone and the phones of his relatives. The FBI got the tapes and far more previously.

12. The Mcquinns Worked tirelessly to undermine an electronics recycling program that I was developing:

## MY ANSWER:

The people who worked with Kai Kunz weren't foolish enough to fall for the attempts being tried against him. His insights became a statewide initiative by the Highest ranking American Mason, and it will become National among over 3,000,000 members who offer substantial man power. The project raised over $3,700.00 on its' first try. When it is fully statewide and National it will raise an extra 700,000,000.00/year for helping hundreds of thousands to read and recycle massive amounts of metal through the worlds largest fraternity (Masonry.) My point was to show that the fanatical psychopathic Racketeering of the Mcquinns and others has absolutely no boundaries. Kai Kunz's being stalked, stolen from, harassed, having to buy food and eat it right away due to previous poison attempts, and more, made it impossible for him to work on the recycling project. Kai couldn't expand it among Lodges in the State and the inevitable statewide/national expansion has been delayed as a result. Kai believes that this has effected thousands if not hundreds of thousands of people. The point was merely to show that while even the Italian Mafia, prisoners, and other Mafias have boundaries in conduct that excludes acting against the well being of children and the unfortunate. The Mcquinns and most individuals in complaint are among the top percentile on any reputable psychopathic testing scale. Testing methods among many other fiduciary responsibilities that Keller Williams Corporate was negligent with.

## A short summary of complaint against Ronald Mcquinn and Sheila Mcquinn.

Ronald Mcquinn and Sheila Mcquinn are largely correct about one thing in their motion to dismiss that was filed in Worcester Superior court by attorney Sinrich. The Mcquinns didn't complete loan modifications.

1. The McQuinns however got over $100,000.00 dollars to do loan modifications. The Mcquinns never had any intentions of doing what they promised they could get done in a month or two with loan modifications (they said that they could complete loan modifications within a three and maybe two months).

2. The Mcquinns were however honest when they promised that the banks were willing to give incredible interest rates, and lower principle balances, in order to make mortgages work and thereby avoid short sales or a REO.

3. The Mcquinns were correct about what they said about the banks and the banks willingness to make good deals with loan modifications.

4. The Mcquinns financial fraud cost Kai Kunz a $12,000.00+/month income, about two million in principle balances waived and more. This is part of damages, and the Mcquinns role in aiding and abetting Racketeering/Domestic Terrorism contributed to far larger damages.

5. The Mcquinns teamed up with others such as Kelle O'Keefe, Daniel Loring, Joseph Solans, their

serial killer sidekick and others, that had originally committed fraud and Racketeering against Kai Kunz and Michael Simmons before, during, and after property acquisitions.

6.     The Mcquinns, Joseph Solans, Kelle O'Keefe, Daniel Loring, David Boudreau committed a White Collar Racketeering fraud through themselves and MPAT from the beginning.

7.     The Mcquinns forming of Home Savers shortly after the Attorney Generals Investigation against them and just prior to the Kidnapping and murder attempt against Kai Kunz was no coincidence.

8.     The Mcquinns made Home Savers a non profit and they made some of their MPAT workers such as Dave Garvey into owners of Home Savers.

9.     Home Savers was created to convolute matters legally and make it more difficult to prosecute the Mcquinns and Bruce Boguslav civilly. The Mcquinns and Boguslav for instance could point fingers and talk endlessly about what business handled what in order to obstruct a civil suit.

10.    The Mcquinns actions with Loan Modifications is a simple 93A for criminal fraud.

11.    What the Mcquinns did beyond this 93A white collar fraud/ The Mcquinns Racketeering and Domestic Terrorism against Kai Kunz and Michael Simmons brings the original white collar fraud to a whole new level of conspiracy.

12.    This makes the Mcquinns and their business Home Svaers (who's purpose is for money laundering and for hiding the Mcquinns fraud) a racket.

13.    Home Savers, and MPAT are a shield and sham companies for the Mcquinns and their Racketeering/Domestic Terrorist actions which culminated in the damages that such actions caused Kai Kunz. These damages were far beyond property specific financial damages.

14.  I want to also thank the Mcquinns for actually admitting in Motion to Dismiss that many of the allegations that Kai Kunz was very conservative/reserved making against both Mcquinns, and the others in the complaint is factual.

15.  It would be an oxymoron to admit to many of his claims as factual, and then say that he am placing blame for losses in Real Estate. This further demonstrates the lack of good faith and honesty in motions to dismiss by Attorney Sinrich on behalf of the Mcquinns during his response to 1024B Lawsuit.

3. I will give further descriptions about complaint with a chronology, numbered averments, sentences and paragraphs that are specific to a single situation. This will go up and beyond the specific reasons for motions to dismiss cited by attorney Sinrich. This part will add clarity  and information to existing complaint that was filed. This will address Attorney Sinrichs foundation for motions to dismiss.

1. The Mcquinns were introduced to Kai Kunz by David Bain in early June 2008, for fixing the mortgage problems that were occurring due to rental thefts, extortion, false rental/expense information during sales, false vacancy information during sales, and false mortgage information during mortgage disclosures and sales.

2. David Bain met with Kelle O'Keefe several times prior to the closing on properties in Worcester, MA which he managed. Namely 32-32 ½ Ellsworth Street, 5-7 Lowell Street, 19 Ward Street, 476 Park Avenue, 32 Birch Street, 215 Beacon Street, 217 Beacon Street, 69 Maywood Street, and 71 Maywood Street Worcester, MA.

3. Richard Rawson and Kelle O'Keefe insisted that the seller for the Worcester Properties would lend money for fixing property problems. This capital was desperately needed due having a cash reserve for fixing tenant problems at other properties, setting up office, helping fix the problems from the false rent and expense information at other properties and on.

4. The Worcester Properties would (based upon false rental and expense figures that were provided) also add a positive cash flow, had the rental and expense figures been correct.

5. Richard Rawson and Kelle O'Keefe said through email that the seller wanted David Bain to be the manager.

6. David Bain was a conduit for Kelle O'Keefe and Joseph Solans premeditated Racketeering and Domestic Terrorist agendas. He agreed to assist Kelle O'Keefe and Joseph Solans with their post purchase Racketeering/Domestic Terrorist goals. This agreement came from meetings David Bain and Julianna had with Kelle O'Keefe and Joseph Solans prior to Worcester property purchases. Namely 32-32 ½ Ellsworth Street, 5-7 Lowell Street, 19 Ward Street, 476 Park Avenue, 215 Beacon Street, 217 Beacon Street, 69 Maywood Street, and 71 Maywood Street Worcester, MA.

7. MPAT worker David Bain offered to furthering the Racketeering, fraud and extortion that went from selling properties and moved all the way into poison into Kai Kunz's sink, supplements, and the Bullets that were aimed at Edward Ahern.

8. The same happened in a similar way when Kelle O'Keefe spoke to David Boudreau at Keller Williams North Central prior to the purchase of his Gardner properties (207-213 Park Street, 7-11 Glazier Street, and 74 Abbott Street Gardner, MA) and lined up the Gardner property take backs, rental thefts, and more.

9. Kelle O'Keefe spoke to dozens of realtors, sent them Michael Simmons parents financials which she and Daniel Loring altered.

10. Kelle O'Keefe, Daniel Loring, Mark Kavanach, Joseph Solans, and their serial killer sidekick found willing Racketeering participants in David Boudreau, Richard Rawson, and David Bain from the start for future extortion and racketeering after property purchases by Kai Kunz and Michael Simmons.

11. The Racketeering goals and focus of Kelle O'Keefe, Joseph Solans, Mark Kavanach, Daniel Loring, and associates grew and then exploded in October 2008. The original Racketeering/criminal conspiracy transformed into a fanatical Racketeering frenzy when the Mcquinns and Bruce Boguslav crossed paths with Kelle O'Keefe, Daniel Loring, Joseph Solans, Mark Kavanach, and associates in October 2008.

12. David Bain, Richard Rawson, and David Boudreau met at Apple Country Realty, Keller Williams Greater Worcester and Keller Williams North Central several times without me and Michael Simmons.

13. David Bain, David Boudreau, and Richard Rawson met with Kelle Okeefe, Joseph Solans, and Daniel Loring prior to the purchases of the Gardner Properties (Dave Boudreau sales) and Worcester properties (David Bain was the manager of the seller of the Worcester properties).

14. It was a multi layered criminal conspiracy/extortion, and fiancial fraud/theft plan from the very beginning. It was spear headed by Joseph Solans and Kelle O'Keefe who worked at Daniel Lorings Apple Country office at 63-65 Park St. Ayer, MA.

15. After Daniel Loring opened the Keller Williams North Central office in Leominster, MA in May 2007. Kelle and Loring moved to Keller Williams North Central while Daniel Loring continued business

with Joseph Solans and Apple Country at the old address at 63-65 Park St. in Ayer, MA. It was white collar fraud that was planned from the start, with additional plans that were executed long after initial purchases that were more grand and fanatical than anything that John Gotti could ever envision.

16. Kelle O'Keefe met with my secretary named Holly Hanson in November 2007 in order to better scope out the property for Joseph Solans and his serial killer sidekick that kidnapped me and was involved with the murder conspiracies against Kai Kunz and Edward Ahern. Her goal was to be able to spend time scoping out residence/office more thoroughly for future racketeering, extortion, and possibly murder conspiracies that were planned from the very beginning of real estate associations with Kai Kunz and Michael Simmons.

17. The Camera, bugging, and other conspiracies inside Kai Kunz's residence and office went into full throttle in April 2008 , but the phone tapping, email/computer hacking and more went into effect with Kelle O'Keefe, Joseph Solans, their serial killer sidekick, and Daniel Loring in July 2007.

18. The fraudulent rental/expense information, the fraud rental agreements and rental scams, altered Appraisals, altered HUDs and more, added massively to the weight of the massive thefts that were being committed by David Boudreau and David Bain. This made mortgage defaults a foregone conclusion without even factoring out the additional problems from false mortgage rate figures/altered mortgage disclosures which were the standard with Denise Peach and Saverio Fulciniti. Both being mortgage brokers with personal and financial relationships with Kelle O'Keefe.

19. The Mcquinns were enthusiastically recommended by David Bain for loan modifications.

20. Kai Kunz and Michael Simmons met the Mcquinns at 10 Mariom St. Worcester, MA or at David Bain's residence in June 2008. Loan modifications on properties were discussed with the Mcquinns. Neither Kai Kunz or Michael Simmons ever discussed short sales.

21. Sheila Mcquinn said that Loan Modification could be accomplished in a month or two for most properties. Kai Kunz and Michael Simmons signed an agreement with the Mcquinns for doing loan modifications.

22. I Kai Kunz and Michael Simmons read a lot and studied loan modifications and knew that they could be done in a month or two at the latest with a good professional. Kai Kunz believed and still believes that he could do the loan modifications best, but didn't have the time to pursue them due to computer language code that he was working hard on. Kai Kunz was prevented from doing this in future due to Extortion frenzy that continually threatened him as well if he interfered with the Mcquinns and Joseph Solans plans.

23. The Mcquinns were told and emailed proof that Kai Kunz was 75% owner of properties through Company William XI Properties Series LLC at first meeting in June and by email several times thereafter. Proof can and will be provided. The Mcquinns were also given information about ownership in properties by phone and fax by attorney Joseph Lussier, and the corporate papers that were emailed to both Mcquinns in September 2008.

24. The Mcquinns brought Bruce Boguslav into the picture in August 2008, as he was a worker on behalf of the Mcquinns. The Mcquinns worked a prearranged short sale fraud and wanted to work to milk properties monthly cash flow and not make loan modifications work. The Mcquinns worked to have the vast majority of properties go to short sale with potential inside buyers.

25. Bruce Boguslav and the Mcquinns started to hack into Kai Kunz's computer/email, tap his phone, and have him scoped by their associates in Russian Organized Crime (ROC) in late August 2008.

26. In October 2008 Bruce Boguslav and the Mcquinns started to communicate with and met up with Joseph Solans, Kelle O'Keefe, and their serial Killer Sidekick that kidnapped Kai Kunz and Edward Ahern. Their serial killer sidekick held Kai Kunz and Edward Ahern hostage and was a ground person for the corporate espionage, voyeurism, extortion of Kelle O'Keefe, Joseph Solans, Daniel Loring, Mark Kavanach, and then eventually the Mcquinns and Bruce Boguslav.

27. Bruce Boguslav and Michael Fronte entered Kai Kunz's residence on November 7th 2008 and he was confronted at gun point by 166LXO RI, AZ769 MA, and Solans serial killer sidekick that held Kai Kunz and Edward Ahern hostage. They told Kai to leave or get mowed down by their firearms.

28. David Bain and Richard Rawson entered Kai Kunz's residence on November 9th, 2008 and tried to throw him out by force on Novemebr 9th 2008. They took many papers, and they were scoping residence to help Solans get camera and bugging equipment for his corporate espionage and extortion schemes. Two of Joseph Solans and the Mcquinns grunts pointed guns at Kai Kunz to support them and their activities. One was Joseph Solans serial killer sidekick, AZ769 MA and 166LXO RI.

29. Several machine gun messages were left on Kai Kunz's answering machine on November 11th and later - he mailed tapes and many others to FBI and had informed them about camera setup in my residence and office. They scoped my place thoroughly and dealt with it in the right way I'm sure....

30. Then after the Mcquinns and Boguslav met with Kelle O'Keefe, Joseph Solans, serial killer sidekick at meetings several times (have affidavits from a few meetings) the Mcquinns started Home Savers for the purpose of trying to separate themselves from the attempted murder, shakedowns, kidnapping, and more that was about to go into full throttle, and with a fanaticism that would make the defenders of Iwo Jima during WW2 look reasonable in battle, when they were out of ammunition.

31. The Mcquinns and Bruce Boguslav communicated with Kelle O'Keefe, Daniel Loring, Mark Kavanach, Joseph Solans, and their serial killer sidekick with new cell phones in December 2008.

32. The Mcquinns worked on negotiating the lowest possible prices with the banks on behalf of Joseph Solans, Kelle O'Keefe, Denise Peach and their serial killer sidekick. The anticipation was that Kai Kunz and or Michael Simmons would be extorted into signing deeds and doing sales while the Mcquinns were being paid thousands every month to do loan modifications. Kind of like stealing from a bakery and then raiding/taking over the wheat farm that provides the grain for making the bakeries inventory.

33. The Mcquinns were payed tens of thousands of dollars for loan modifications as they committed the following against at least one client - Kai Kunz-----

33A- Conspired to have Kai Kunz killed

33B- Conspired to have Kai Kunz agree to short sales from kidnapping.

33C- Conspired to have Kai Kunz agree to short sales by having people point guns at me

33D- Encouraged David Bain, Michael Fronte, and Richard Rawson to give them a cut from their rental thefts.

33E- Were given money by Solans and O'Keefe in return for getting banks to accept lower prices on Kai Kunz/Michael Simmons properties, that Joseph Solans, Kelle O'Keefe, Daniel Loring, the Mcquinns, Bruce Boguslav, and David Boudreau expected Kai Kunz to sell by force. It would be death (as murder attempts demonstrate) if Kai Kunz or Michaqel Simmons got in the way of the plans.

33F- Had Kai Kunz stalked by 166LXO RI, 2716XO MA, AZ769 MA, 62AC82 MA, and others.

33G- Violated Federal Wire Tap Laws against Kai Kunz by having his cell phone, email, and computers hacked/tapped.

33H- Like Joseph Solans, Kelle O'Keefe, and Daniel Loring, the Mcquinns and Bruce Boguslav had Kai Kunz called with conversations that he had with family, friends, attorneys, and others, played back to him.

33I- The Mcquinns and Bruce Boguslav helped Joseph Solans and Kelle O'Keefe in trying to hopefully cover their tracks with the corporate espionage, voyeurism/extortion camera and bug setup at Kai Kunz's residence and office. Too late....

34. The Mcquinns continued to have Kai Kunz's cell phones tapped, computer and email hacked, in order to undermine and find out about what he might have revealed to the FEDs. This continued into 2009, 2010, 2011, and beyond.

35. The Mcquinns Orchestrated and planned Racketeering/Domestic Terrorist plots in trying to and planning to tap the cell phones and hack into the computers and emails of individuals in law enforcement. Affidavits of their plans are included in this lawsuit. Don't know if they succeeded.

36. The Mcquinns grand Racketeering plans against Law Enforcement did succeed in the following way. Many of Kai Kunz's calls were made to the authorities and hence the phones and cell phones of authorities were compromised by the Mcquinns/their muscle or associate, Kelle O'Keefe, Daniel Loring, Mark Kavanach, Joseph Solans, their serial killer sidekick and others.

37. The Mcquinns stopped dealing with Kai Kunz in late November 2008 while they were still receiving money for loan modifications. The Mcquinns and Bruce Boguslav were meeting continually without Kai Kunz or even Michael Simmons. The Mcquinns however were meeting with David Bain, Michael Fronte, David Boudreau, Joseph Solans, and others in Racketeering/Domestic Terrorist conspiracy during same time.

38. The Mcquinns had the contract Kai Kunz refused to sign taken from his residence on November 7th, 2008 thru Bruce Boguslav and Michael Fronte.

39. The Mcquinns had information about needing to have David Bain and Michael Fronte collect rents in contract. David Bain and Michael Fronte were huge rent stealers. Both Michael Fronte and Davi Bain gave cuts/kickbacks to the Mcquinns and Bruce Boguslav for largely being the masterminds of their rental thefts and fraud criminal actions.

40. The contract that the Mcquinns tried to force Kai Kunz to sign asked for a blanket permission for the Mcquinns and Boguslav to talk to anyone and all interested parties about Kai Kunz and Michael Simmons properties.

41. Boguslav and the Mcquinns emailed a similar contract in January 2009 which Kai Kunz and Michael Simmons have. Interesting that they would need such an authorization for doing loan modifications as they were hired to do.

40. The Mcquinns were being paid tens of thousands from the start to do loan modifications as they ignored clients, spoke to Racketeering conspirators and worked extortion schemes against clients!

41. On several occasions Kai Kunz was threatened at gun point and told that he had better sign the contract. This was the corollary of the Mcquinns meetings and Racketeering plans.

42. Bruce Boguslav and the Mcquinns emailed Kai Kunz another contract for covering their involvement in having dealt with Joseph Solans, Daniel Loring, Kelle O;keefe, their serial killer sidekick and others. It was very similar to the original contract that Bruce Boguslav took from Kai Kunz's residence with Michael Fronte. It was emailed in January 2009 but subsequently deleted by a Mcquinn grounds person or enforcer during RICO frenzy. Kai has had the email retrieved through computer forensics.

43. Ronald Mcquinn and Sheila Mcquinn are largely correct about one thing in their motion to dismiss that they has filed in response to Kai Kunz's 1024B lawsuit that was filed in Worcester Superior Court. The Mcquinns didn't complete a loan modification. They however got over $100,000.00 to do loan modifications.

44. The Mcquinns were honest when they promised that the banks were willing to give incredible interest rates and lower principle balances to make mortgages work and avoid short sales or a REO.

45. The Mcquinns were correct about what they said about the banks being flexible and willing to do very financially beneficial loan modifications on the properties owned by Michael Simmons and Kai Kunz.

46. The Mcquinns Racketeering/Domestic Terrorist plans cost Kai Kunz a $12,000.00+/month income, about a million in principle balances waved and more. This is part of damages and the Mcquinns role in aiding and abetting Racketeering/Domestic Terrorism contributed to far larger damages.

47. Ronald/Sheila Mcquinn and their fraud companies/trusts named MPAT and Home Savers always worked tirelessly against Kai Kunz and Michael Simmons interests. Resorting to extreme acts of intimidation, extortion, rental theft through workers, corporate espionage, violations of wire tap laws and more.

Richard Rawson and Keller Williams Greater Worcester:

# 1O: Richard Rawson

1- Was involved with and executed the kidnapping of Kai Kunz on November 17th, 2008 and the kidnapping of Edward Ahern.

2- Did assault with a deadly weapon against Kai Kunz and Edward Ahern when he had associates point an AK74 Assault weapon, hand guns, and other deadly weapons against both Plaintiffs.

3- Did many threats against Kai Kunz and Edward Ahern.

4- Was involved with and encouraged individuals to murder Kai Kunz by poison, and Edward Ahern by gun.

5- Was aware of and encouraged the following criminal actions against Kai Kunz and Edward Ahern through Joseph Solans, Kelle O'Keefe, Daniel Loring and associates (Had the cell phones, emails, computers of Kai Kunz, Edward Ahern and their relatives and friends hacked/compromised.

6- Was aware of, paid money towards, and encouraged extortion against Kai Kunz and Edward Ahern through committing Federal Wire Tap, Federal Computer Hacking, and Federal email hacking crimes against many their friends and relatives.

7. Associated with known felon serial killer friend for kidnapping and extorting Kai Kunz and Edward Ahern.

8- Stole $200,000.00 plus from properties of Kai Kunz and Michael Simmons. Properties wherein utilities were in the name of Edward Ahern due to kidnapping and other extortion actions committed against him.

9- Richard Rawson prevented utilities from being paid after having extorted Edward Ahern through the use of deadly force.

10- Orchestrated a criminal conspiracy that Edward Ahern and Kai Kunz suffered from greatly.

11- Was involved with the Utility Bill fraud committed against Kai Kunz and Edward Ahern.

12- Was involved in aiding and abetting murder conspiracy against Kai Kunz and Edward Ahern.

13- Committed Identity theft committed against Edward Ahern and Uttered Documents falsely against Kai Kunz and Edward Ahern..

15. Was directly involved with the Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

16. Put William XI Properties into his name, with the mailing address and phone number of Richard Rawson.

# 1P: Keller Williams Greater Worcester

1- Was beyond negligent in ignoring Racketeering and Domestic Terrorism that Richard Rawson used Keller Williams Greater Worcester as a conduit for.

2- Keller Williams North Central was a conduit for the fraud, Racketeering, property theft, rental theft, fraud listings, documents uttered falsely, murder conspiracies of Richard Rawson in much the same way as Keller Williams North Central was a conduit for advancing the Racketeering/Domestic Terrorist actions of Joseph Solans, Kelle O'Keefe, Daniel Loring, Mark Kavanach, and others.

3- Allowed for false listings of Kai Kunz's properties to be posted without authorizations from him.

39. Said individuals followed up by saying that Kai Kunz and family would die if he reported Rawson, Joseph Solans, Kelle O'Keefe, Ronald Mcquinn.

40. Richard Rawson went on to steal in excess of $120,000.00 from Kai Kunz's Worcester properties.

41. Since Kai Kunz's cell phone was tapped, he would get a gun pointed at him the day, he spoke to anyone about what was going on.

42. Richard Rawson listed Kai Kunz's properties without his permission (company William XI Properties was 75% owner of properties).

43. Richard Rawson also advertised the properties for rent through Keller Williams Greater Worcester.

44. Richard Rawson should not have been allowed to do the listing agreements and rental listings, as Keller Williams Greater Worcester should not have been negligent.

45. Richard Rawson ended up stealing huge amounts of rent, lying to tenants for furthering criminal conspiracy/extortion (have affidavits) and more.

46. Kai Kunz was 100% owner of 62-64 Prichard St, 50-60 Prichard St, 3-5 Johnson St, 158 Prichard St, and 153 Prichard St. Fitchburg, MA 01420 by myself from March 19th 2009 onwards.

47. During April 2009, Realtor Richard Rawson listed the properties without my permission. I have a document that he used to list the properties with the MLS by fraud. Richard Rawson stole north of $10,000.00 from Kai Kunz's Fitchburg properties.

48. Rawson uttered listing agreement falsely for Kai Kunz's Fitchburg properties and committed fraud for furthering a criminal conspiracy against Kai Kunz and properties that he owned.

49. Richard Rawson had Edward Ahern kidnapped and extorted into putting utilities into his name in early 2009. Said extortion was for furthering the rental theft of Richard Rawson and Joseph Solans by limiting the amount of payments that would have to go towards utility bills. Utilities were about to be shut off and Richard Rawson and Joseph Solans knew that tenants wouldn't pay rent if their utilities were shut off.

50. The Racketeering of Richard Rawson that Keller Williams Greater Worcester helped to facilitate included some of the following: Racketeering involving criminal actions that were part of a pattern of criminal actions.

51. Keller Williams North Central knowingly allowed multiple layers of fraud and criminal actions/conspiracy to be committed due to their negligence and their having possibly aided and abetted criminal conspiracies.

52. Fraud and criminal actions committed by Richard Rawson were committed for furthering a RICO conspiracy. Keller Williams Greater Worcester never showed the proper oversight over the conduct of Richard Rawson.

53. Keller Williams Greater Worcester allowed their license to be used for the furtherance of RICO conspiracy (enough for significant civil suit.) Depositions and discovery will show that Keller Williams Greater Worcester was aware of and helped facilitate Racketeering conspiracy.

54. Kai Kunz had specific individuals, during specific times point guns at him and demand that he sign deeds to above Fitchburg properties and more to Christina Solans. This was before and after P and S agreements and other documents were uttered falsely for facilitating criminal conspiracy/extortion.

55. Kai Kunz has license plates of said individuals, have identified the individuals, have spoken to the FBI about the individuals, and spoke to the them about many other matters such as conspiracy to commit murder.

56. The fraudulent listing agreements were ignored by Keller Williams Greater Worcester.

57. Basic rules of oversight and fiduciary responsibilities can prevent not just specific frauds, but frauds that are used a conduit for furthering Racketeering and Domestic Terrorist conspiracies. Keller Williams Greater Worcester was negligent in all of this.

58. After having committed these atrocities, Richard Rawson put utility bills into the name of Edward

Ahern through identity theft as well as the extortion through assault with deadly weapons and kidnapping.

59. Richard Rawson also did identity theft and fraud against Kai Kunz's business named William XI Properties Series LLC. Richard Rawson posted his phone number and residence to William XI Property Series online.

60. David Hill of Keller Williams Greater Worcester regularly sent Kai Kunz emails some months about seminars after having spoken to him on the phone in late October 2008 about his knowledge of Racketeering, as described in complaint filed.

61. David Hill of Keller Williams Greater Worcester stopped sending Kai Kunz the emails for some time after he asked him to forward any information he is aware of about murder conspiracy and more to agent Steven Zeringue of the FBI through email.

62. David Hill subsequently stopped emailing Kai Kunz about events for a few months.

63. David Hill emailed Kai Kunz shortly after he was served with 11-1024B. After being served said complaint, Kai Kunz received an email for a seminar from the other branch of Keller Williams Greater Worcester, MA.

64. During time of Richard Rawson's fraud listing of Kai Kunz's properties in Fitchburg, MA. Christina Solans signed P and S agreements as Richard Rawson was listing Kai Kunz's properties and collecting rents through fraud, extortion, and theft. Kai Kunz have several affidavits from tenants about the lies for furthering his racketeering conspiracy which was made possible through Keller William North Centrals negligence. For every affidavit their were several tenants that were too scared to speak up about the criminal conspiracies of Richard Rawson, Anthony Scola, Joseph Solans, Christina Solans, Kelle O'Keefe, Daniel Loring, and on.

65. There is also much more, such as $35,000.00 utility bills that were after six months at a 3 unit condo building, a $17,000.00 electric bill for 1 month of use at the same building that has three condos, and more. It was a Racketeering conspiracy that was so aggressive, I believe it would make the late John Gotti flinch.

66. Kelle O'Keefe, Richard Rawson, and Denise Peach picked appraisers that they knew personally, as Denise Peach used banks that gave her the flexibility to pick her own attorney and appraisers.

67. Keller Williams Corporate offices in Texas had/have a setup that allows rogue franchisee offices to work unhindered. This is at least partially negligent in these transactions and much more.

68. The Racketeering/Domestic Terrorism that was largely committed against Kai Kunz and Michael Simmons was largely after real estate transactions.

69. When the fraud money pump died Kelle O'Keefe, Daniel Loring, Richard Rawson and others in Racketeering conspiracy brought the conspiracy outside of initial transactions. Or way outside the boundaries that white collar criminal middle professionals have had.

70. When Richard Rawson, Kelle O'Keefe, Joseph Solans, Mcquinns and others determined that Kai Kunz would not bend to the extortion and intimidation tactics (he would prefer to die than negotiate with Domestic Terrorists) they tried to have him killed so as to look like natural causes. They were more concerned about what he could figure out and report more, and subsequently tried to murder him.

71. The conspiracies of Richard Rawson were furthered even more due to Keller Williams Greater Worcester, Keller Williams Corporate, and David Hills negligence, and their having potentially aided and abetted Racketeering/at least Borderline Domestic Terrorism. A few instances of negligence is one thing, but the cumulative effect from their Brokers license being used as a conduit for such actions makes them responsible for financial damages, punitive damages, pain and suffering, and more. This should be pretty clear when someone analysis's the cumulative fraud, theft, and multi layered conspiracies that Richard Rawson, Kelle O'Keefe, Joseph Solans, and Daniel Loring were involved in.

72. After Kai Kunz spoke to former CIA operatives and the FBI about several topics (that were found out about because he used his regular number by accident), in June 2009. Joseph Solans and his wife were brought by his Northbridge, MA properties by Richard Rawson in July 2009.

73. During visit to properties Christina Solans threatened to shoot Kai Kunz and she told Joseph and Mariom Alverez that they failed to plant the pellets and powder properly in spite of being paid $5,000.00.

74.    Richard Rawson and Attorney Scola constantly aided and abetted the murder conspiracies, extortion, and other tactics by Joseph Solans and their serial killer sidekick (among others.)

Emails from David Hill, Richard Rawson, Principals of Keller Williams Greater Worcester, and workers thereof and their phone records and more will be part of deposition and discovery. Deleted emails will be recovered and any emails that were deleted will likely be very telling.

Aside from the many acts of negligence on the part of Keller Williams Greater Worcester. Keller Williams Greater Worcester, and Keller Williams Corporate were aware of the criminal conspiracy being orchestrated by Richard Rawson and others. They chose to ignore the situation. It is a felony to not report murder conspiracies to the authorities and depositions and discovery will reveal the extent to which David Hill, Keller Williams Greater Worcester, Keller Williams Corporate knew about Racketeering and whether or not they were "only" negligent.

I would like to clarify, that I stand by my words about the worst actions in the history of the real estate broker and salesman profession occurring from Brokers and salesman from Keller Williams North Central and Keller Williams Greater Worcester. Not only did real estate agents and a broker in the case of Daniel Loring, engage in misrepresentations, fraud, and deceit. Their was the following criminal actions that were all fully committed against Kai Kunz and many but not all of the below actions were committed against Edward Ahern. These actions were committed primarily after initial victimization with property acquisitions (or after phase one/two) of multi layered Racketeering/Domestic Terrorist Conspiracy:

- Extortion
- White collar fraud
- conspiracy to commit murder
- attempted murder
- home invasions
- voyeurism
- stalking
- threats
- Domestic Terrorism
- rental theft
- computer hacking
- email hacking
- phone cloning and violations of Federal wire tap laws.
- theft
- kidnapping
- holding as a hostage
- assault with a deadly weapon
- interference with contract relations
- corporate espionage
- obstruction of justice
- bribery
- kickbacks
- tax evasion
- lying to investigators
- perjury

- conspiracy against law enforcement
- civil rights violations
- wire fraud
- mortgage fraud
- bank fraud
- identity theft

# 1Q:  Attorney Anthony Scola

1- Aided and abetted racketeering and domestic terrorism of enterprise

2- Called banks and financial institutions for furthering criminal conspiracy that Kai Kunz and Edward Ahern suffered greatly from.

3- Aided and abetted murder/assassination conspiracies against Kai Kunz (likely similar to how he planned and killed his wife).

4- Attorney Scola never spoke to, never emailed Kai Kunz, or communicated in any fashion as he worked transactions involving properties that Kai was either 75% owner of or 100% owner of.

5- Attorney Scola did legal work without communicating with Kai Kunz (from stolen rent money stolen from me by Richard Rawson) while the following was going on from January 2009 until March 2010 and beyond.

6- Aided and abetted Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

7- Aided Documents that were uttered falsely.

9- Encouraged Murder attempts were committed against Kai Kunz and Edward Ahern for legal concerns.

10- Knew about Extortion and property theft schemes that were committed against Kai Kunz while he helped actions with legal work while Kai was 100% or 75% owner of properties.

11- Called and spoken to, in anticipation of Kai Kunz being extorted into signing deeds or properties over to Racketeering conspirators.

Give specific averments and a numbered and concise summary of complaint against Attorney Anthony Scola.

1. Attorney Scola was referred to my business partner Michael Simmons in December 2008 by Richard Rawson.

2. Richard Rawson had done several fraud Real Estate transactions with Attorney Scola involving

purchases by Michael Comeau. During the transactions, Richard Rawson took funds that were supposed to go to Michael Comeau.

3. Richard Rawson gave a cut of illegally acquired kickback funds that were illegally hidden on HUDs and gave part of proceeds to attorney Scola.

4. Richard Rawson lied about and forged the rental figures that he gave to Michael Comeau before the closings with Michael Comeau as buyer.

5. These transactions were completed from March 2008 until September 2008.

6. Richard Rawson referred Michael Simmons to his business associate and friend Attorney Scola. He referred Michael Simmons to Attorney Scola because Richard Rawson knew that Attorney Scola would act in the interests of Richard Rawson and give all advice to clients based upon the financial interests and criminal goals of Richard Rawson. The actions of Attorney Scola attest to this.

7. Richard Rawson committed massive quantities of rental theft from Kai Kunz's Worcester, MA properties FROM January 2009 into March 2010 and his Fitchburg properties from June 2009 until November 2009.

8. During this time Richard Rawson lied to Kai Kunz's tenants and told them he wasn't the owner and he stole massive amounts of rents, listed properties on MLS without his permission, and spoke to banks with Attorney Scola in anticipation that the threats with guns and other acts of extortion would get Kai Kunz to sign deeds over to Christina/Joseph Solans and anyone else of interest.

9. Attorney Scola who really worked for Richard Rawson's interests, gave legal advice to Racketeering conspirators from the stolen rent money he received from my properties from December 2008 until April 2010.

10. Attorney Scola never accounted for the stolen rent money during the reprimand with the Board of Bar Overseers and committed fraud against the Board and Kai Kunz in unison.

11. Attorney Scola and Richard Rawson sent emails and correspondence to banks, Attorneys, and individuals involved with Racketeering conspiracy during December 2008 and into April 2010. Richard Rawson and Attorney Scola did this while having zero communications with Kai Kunz, the owner of properties. Kai Kunz was either 75% or 100% owner of properties wherein these actions were committed by Attorney Scola and Richard Rawson behind his back for furthering Racketeering, Extortion, rental theft, property theft, murder, and Domestic Terrorist Conspiracy.

In a very provable nutshell Attorney Scola and Richard Rawson did the 11 specific averments and actions above and..

1. Gave legal advice to individuals engaged in Racketeering and theft against Kai Kunz (after being paid from rent money stolen from him).

2. Spoke to banks about selling properties that Kai Kunz was either 100% owner of or 75% owner of.

3. Attorney Scola and Richard Rawson consulted with and sent emails out for the purpose of selling properties Kai Kunz was either 100% owner of or 75% owner of to Joseph Solans and his wife, as Rawson stole rents, uttered documents falsely, listed properties behind my back, and lied to tenants for furthering the racketeering conspiracy.

4. Worked as a Real Estate agent and attorney as team with legal consulting, real estate agent work, and emails for selling Kai Kunz's properties as people pointed guns at him to sell his properties.

Attorney Scola and Richard Rawson never said a word to Kai Kunz while they did the above actions. No matter how you twist it, they committed 93A theft, fraud, and at least aided and abetted Racketeering and Domestic Terrorism against Kai Kunz from the money stolen from Kai which funded the actions of Richard Rawson and Attorney Scola. Kind of like having your cake and eating it too, and then hijacking the bakery, sugar fields, plus the dairy farms that supply the bakery for making the cakes and ice cream.

The above was to simply put the magnitude of the multi layered fraud, misconduct, and theft of Richard Rawson, and Attorney Scola into perspective.

Further analysis of Richard Rawson's Actions and his aiding and abetting Racketeering and Domestic Terrorist Conspiracy.

I would also like to point out that the massive hits that banks took in regards to properties owned by Michael Simmons and Kai Kunz (which Michael Simmons and Kai Kunz to a smaller extent are on the hook for) were largely a result of the multi layered criminal conspiracies that occurred long after the acquisitions of properties. Rental thefts, inside short sale arrangements, inflated property related matters, damages caused by massive rental thefts and neglect, stalking Kai Kunz who devoted countless hours to properties, trying to have him killed, threatening him, hacking into his emails, deleting his emails, sending out emails from his email address for hurting his business connections, and more. This caused huge losses for banks and Kai Kunz/Michael Simmons. The initial checks that Daniel Loring, Kelle O'Keefe, Richard Rawson, Denise Peach received from transactions, that had false rental and expense information and other frauds wasn't enough. The above duo and others had to then orchestrate a multi layered conspiracy long after the initial victimizations during property acquisitions.

Richard Rawson and Attorney Scola never spoke to, never emailed Kai Kunz, or communicated in any fashion, as both worked transactions involving properties that he was either 75% owner of or 100% owner of. Richard Rawson paid Attorney Scola from rental thefts to do legal work without communicating with Kai Kunz (from stolen rent money stolen from me by Richard Rawson) while the following was going on from January 2009 until March 2010 and beyond - -

--- Rental theft money was used for paying Attorney Scola so that Scola could give legal advice to Richard Rawson and other Racketeering conspirators as they were involved with......Murder conspiracy, property thefts, fraud, and more against Kai Kunz, Michael Simmons, and Edward Ahern (kidnapping, against Edward Ahern).

I believe that without even factoring what will come out in discovery and depositions. The following could be said and the circumstantial evidence clearly shows that

1. Richard Rawson and Attorney Scola aided and abetted Racketeering and Domestic Terrorist conspiracies.

2. Richard Rawson and Attorney Scola had numerous conflicts of interests.

3. Richard Rawson stole money, misappropriated funds.

4. Richard Rawson outright committed fraud.

5. Attorney Scola lied to the Board of Bar Overseers.

All were done as a pattern and multi layered conspiracy for furthering the Racketeering of others and himself.

## Attorney Scola and Richard Rawson spoke to banks behind Kai Kunz's back and ignored Kai Kunz as the following was being committed against him.

1. Massive quantities of rental theft was being stolen from Kai Kunz's Fitchburg (by Rawson, Jorge Torres and Solans serial killer sidekick) and Worcester properties by Richard Rawson.

2. Guns were pointed at Kai Kunz numerous times and he was told to do as Rawson says.

3. Their was more than one poison attempt against Kai Kunz and shooting attempts on Edward Ahern.

4. Kai Kunz had papers taken from his office/residence from sophisticated lock picks.

5. Kai Kunz's Worcester, Northbridge, and Fitchburg MA properties were listed on MLS behind his back.

6. P and S agreements were uttered falsely by Christina Solans through the help of Richard Rawson and Attorney Scola.

7. Richard Rawson texted Kai Kunz and told him "not to give him any orders" after Kai told him not to manage or do anything at his properties without Kai's permission in January 2009.

8. Kai received numerous death threats and directives informing him to do as Richard Rawson and others wanted.

9. Kai was stalked constantly while Rawson committed his Criminal Conspiracies and fraud with others.

10. Richard Rawson and Attorney Scola were talking to the banks involved with Kai Kunz's Worcester, Northbridge, and Fitchburg properties.

11. Richard Rawson legally advised Michael Simmons not to talk to Kai Kunz or report anything.

12. Richard Rawson and Attorney Scola communicated to Joseph Solans and associates through phone and email.

A short summary with specific numbered averments against Anthony Scola.

1. Attorney Scola was referred to Kai Kunz's business partner Michael Simmons in December 2008 by Richard Rawson.

2. Richard Rawson had done several fraud Real Estate transactions with Attorney Scola involving purchases by Michael Comeau. During the transactions, Richard Rawson took funds that were supposed to go to Michael Comeau and gave a cut to attorney Scola and lied about the rental figures with Michael Comeau. These transactions were completed from March 2008 until September 2008.

3. Richard Rawson referred Michael Simmons to his business associate and friend Attorney Scola.

4. Richard Rawson knew that Attorney Scola would act in the interests of Richard Rawson and give all advice to clients based upon the financial interests of and criminal goals of Richard Rawson.

5. Richard Rawson committed massive quantities of rental theft from Kai Kunz's Worcester, MA properties FROM January 2009 into March 2010 and his Fitchburg properties from June 2009 until November 2009.

6. During this time Richard Rawson lied to my tenants and told them Kai Kunz wasn't the owner as he stole massive amounts of rents, listed properties on MLS without Kai Kunz's permission, and spoke to banks with Attorney Scola in anticipation that the threats with guns and other acts of extortion would get Kai Kunz to sign deeds over to Joseph Solans and anyone else of interest.

7. Attorney Scola gave legal advice to Racketeering conspirators from the stolen rent money he received from Kai Kunz's properties from December 2008 until April 2010.

8. Attorney Scola never accounted for the stolen rent money during the reprimand with the Board of Bar Overseers and committed fraud against the Board and myself in unison.

9. Attorney Scola sent emails and correspondence to banks, Richard Rawson, Attorneys, and individuals involved with Racketeering conspiracy during December 2008 and into April 2010.

10. Attorney Scola communicated with Banks while he intentionally had zero communications with Kai Kunz, the owner of properties.

In a very provable nutshell Attorney Scola did the above and..

1. Gave legal advice to individuals engaged in Racketeering and theft against me.

2. Spoke to banks about selling properties that I was either 100% owner of or 75% owner of.

3. consulted with and sent emails out for the purpose of selling properties I was either 100% owner of or 75% owner of to Joseph Solans and his wife, as Rawson stole rents, uttered documents falsely, listed properties behind my back, and lied to tenants for furthering the racketeering conspiracy.

4. Work you did in legal consulting and emails for selling my properties as people pointed guns at me to sell my properties.

Attorney Scola you never said a word to me as you did this and no matter how you twist it, he committed 93A theft, fraud, and aided and abetted Racketeering and Domestic Terrorism against me from the money he stole from me. Kind of like having your cake and eating it too, and then hijacking the bakery and sugar plus dairy farms that supply the bakery for making the cakes and ice cream.

The above was to simply put the magnitude of the multi layered fraud, misconduct, and theft of Attorney Scola into perspective.

Further analysis of Attorney Scolas Actions and his aiding and abetting Racketeering and Domestic Terrorist Conspiracy.

I would like to start by stating that Attorney Scola requested that I give him a call in response to my 93A RICO suit that was filed in Worcester Superior Court in May 2011. Attorney Scola suggested that I speak to him by phone about "why it would be in my interest to drop him from the lawsuit." I called Attorney Scola on Wednesday July 20th, 2011. Attorney Scola claimed that the "attorney client privilege between him and me would be lost during my lawsuit against him." He said that "as a Real Estate Professional you could be charged for the ways in which properties were purchased through Michael Simmons your business partner." "You can be charged for any wrong doing because you and Michael should have known what was being done by real estate agents, brokers, and mortgage brokers." "The law says that even though you and Michael didn't know, you should have known."

It was Attorney Scolas attempt to use his position as an attorney and tactics against me (Kai Kunz) that he used against business partner Michael Simmons previously. Attorney Scola has used many tactics after being paid from money stolen from Kai Kunz. Stolen money was used paid to Scola for protecting Richard Rawson and others in Racketeering and Domestic Terrorist conspiracy.

Scola took stolen rent money from Kai Kunz's properties and was paid to give legal advice to individuals in Racketeering conspiracy. Attorney Scola never wanted Kai Kunz and Michael Simmons to communicate as Racketeering frenzy was going into full throttle during 2009, and Attorney Scola utilized his position as an attorney for giving advice solely based upon furthering the criminal conspiracies of Richard Rawson and others.

Attorney Scola never spoke to, never emailed, or communicated with Kai Kunz in any fashion as he worked transactions involving properties that Kai was either 75% owner of, or 100% owner of. Attorney Scola also did legal work without communicating with Kai Kunz (from stolen rent money stolen from him by Richard Rawson) while the following was going on from January 2009 until March 2010 and beyond

All were done as a pattern and multi layered conspiracy for furthering the Racketeering of others and himself.

# 1R: Jeffery Stephens of Fitchburg Board of Health

1- Sergeant Jackson is a well known go to man for drug dealers and criminals like Joseph Solans when they pay for protection.

2- Sergeant Jackson protected Joseph Solans drug dealing operations in Fitchburg, MA.

3- Sergeant Jackson went to paper for taking attention away from Joseph Solans and others (who pay him) drug dealing operations.

4- Sergeant Jackson went after owners and properties that Kai Kunz owned and Edward Ahern had utilities in his name on.

5- Sergeant Jackson did this to further the Racketeering and Domestic Terrorism of Joseph Solans, Lorie Spaulding, and others at the expense of Kai Kunz and Edward Ahern.

6- Jeffery Stephens protected properties, where drug dealing was going on from code violations in return for payoffs.

7- Jeffery Stephens ignored huge Health code problems at properties owned by Joseph Solans and individuals that worked with fake sheriff and extortionist Lorie Spaulding.

8- See enclosed chronology of actions committed by Jeffery Stephens and Sergeant Jackson.


1. Michael Simmons my business partner, bought properties in Fitchburg, MA as follows.
3-5 Johnson Street on 12-29-2006, 348 Elm St on 3-12-2007, 62-64 Prichard St and 50-60 Prichard St on 5-16-2007, 30 Crescent St in July 2007, 96 Daniels St, 153 Prichard St, and 158 Prichard St Fitchburg, MA in late July 2007.

2. Their were no significant code issues or problems with the Board of Health until late 2008. A considerable amount of improvements went into properties leading up into late 2008. Racketeering explosion occurred during this time wherein the Mcquinns and Bruce Boguslav met up with/teamed up with Joseph Solans, Kelle O'Keefe, Daniel Loring.

3. In late 2008, during time when a vicious Racketeering conspiracy was going into full throttle against Kai Kunz at his residence at 111 Church St. Unit 1. Northbridge, MA 01588, the town of Fitchburg, MA, made plans for a development that would involve the demolition and taking of Kai Kunz's properties at 3-5 Johnson St and 348 Elm St. Fitchburg, MA.

4. Jeffery Stephens is very active with town politics and has told Kai on phone with message that he speaks to the police regularly.

5. It was during this time that the town of Fitchburg wanted properties, that Jeffery Stephens went on a frenzy after Kai Kunz.

6. It was during this time that Jeffery Stephens started to tell Kai Kunz's tenants not to pay rent.

7. During a Housing court session in July 2008, Kai Kunz failed to get the Housing court to allow a subpoena of tenants that Jeffery Stephens was telling not to pay rent.

8. The Housing Court Judge, Diane Horan, refused to allow the Subpoena.

9. Michael Burns spoke at the Housing Court session in the place of Jeffery Stephens on this day, in case Kai Kunz asked Jeffery Stephens about his telling Kai Kunz's tenants not to pay rent.

10. During this hearing Michael Burns said that "we encourage tenants to pay rent, as it gives the owners the necessary funds for repairing the building that tenants inhabit."

11. Many people anonymously called the police and Board of Health during this time in late 2008 when the Town wanted Kai Kunz's properties and Jeffery Stephens was telling tenants not to pay rent and taking anonymous complaint from individuals involved with Racketeering conspiracy that were not tenants.

12. Kelle O'Keefe, Lorie Spaulding, Joseph Solans, Daniel Loring, their serial killer sidekick were the actual callers that did complaints against Kai Kunz's properties.

13. The twenty two times their were calls to police related to 348 Elm Street Fitchburg, MA 01420 quoted By Sergeant Jackson in the T and G (WHERE NOONE WAS EVER ARRESTED), were the result of Joseph Solans, Lorie Spaulding and others calling the police anonymously. Phone records will be audited.

14. . It was typical for their to be vandalism at Kai Kunz's properties by RICO conspirators, with a follow up call to the Board of Health.

15. Jeffery Stephens was aware of this and who was making calls as part of Racketeering conspiracy.

16. In spite of their being no drug arrests at Kai Kunz's property located at 348 Elm St, Kai Kunz was charged with having a noisy and disorderly house. The previous owner, Gino Mola put $300,000.00 into building. Kai Kunz was charged criminally for having a noisy and disorderly house, unlike several properties that had drug arrests.

17. Jeffery Stephens made the point of doing a story in the Telegram and Gazette with Sergeant Jackson. Story was done for diverting attention away from Joseph Solans drug dealing operations and to discredit the criminal informant work that Kai Kunz was and is involved with. Work that should earn him a purple heart for the backlash that has been committed against him in retaliation for his valiant efforts.

18. Sergeant Jackson made comments about calling Kai Kunz's insurance company and about tenants not paying rents in the Telegram and Gazette - See Exhibit on Telegram and Gazette article.

19. Article was done as premeditated way to defend Jeffery Stephens actions in telling tenants not to pay rent.

20. It was completely foolish for a law enforcement officer to reveal the intentions of law enforcement to the alleged criminals that they were targeting in an open forum in T and G. It shows how the complaints against Kai Kunz had nothing to do with the tenants and the building at all, as no competent and seasoned police officer would reveal their investigative pursuits to criminals in an open newspaper forum.

21. Kai Kunz turned Sergeant Mark Jackson into Captain Looney of Internal Affairs after he made the comments in the paper and pressed criminal charges on Kai for the actions of others.

22. Kai Kunz called Internal Affairs right after Telegram and Gazette incident, although Kai was given the run around about who handled Internal Affairs for several moths prior to his being able to make complaint.

23. Internal Affairs Complaint was taken. Mark Jackson illegally wanted to call Kai Kunz's insurance company and to get into the business of my tenants paying rent (as he said in paper), as a police officer.

24. Kai Kunz also made the point in the Internal Affairs complaint the Sergeant Jackson was violating

his constitutional rights by making him responsible for the actions of others.

25. It is all the more absurd when Kai Kunz is a top Whistle Blower...... who has never tolerated unruly behavior, and has maintained political positions that don't tolerate such behavior.

26. Jeffery Stephens, Michael Ciota, and Mark Jackson would regularly meet to work at maximizing their powers for inter agency collusion.

27. Captain Looney was subsequently relocated to Worcester, MA where he became a Police Detective after Kai Kunz's Internal Affairs Complaints.

28. After Captain Looney moved from the Fitchburg police department. Jeffery Stephens and Michael Ciota made the point of contacting DA Early and getting his support in the Telegram and Gazette about prosecuting absentee landlords. Kai Kunz actually visited properties multiple times each week for a long time. It was only in early 2010 when this became a lost cause, due to Jeffery Stephens telling tenants not to pay rent and constantly driving to everyone of Kai's tenants units without being called by the tenants and telling them not to pay rent.

29. Jeffery Stephens only went to Kai Kunz's properties without being called by tenants. Jeffery Stephens and never did the same actions with other owners.

30. Jeffery Stephens also never told any of other owners tenants not to pay rent, and some are at buildings that are much worse than any building that Kai Kunz ever owned in Fitchburg, MA.

31. Jeffery Stephens did a destructive combination of actions against Kai Kunz, that he didn't do against any other property owner.

32. Joe Early will be asked to testify about what was said to him about Kai Kunz's properties by Fitchburg City workers that wanted his support in a news article.

33. Jeffery Stephens did a destructive combination of telling my tenants not to pay rent and by doing what he did to no other owner. He went to every one of my tenants and knocked on doors without having been called.

34. Jeffery Stephens has admitted that every property in Fitchburg, MA and the State has more than one code issue during our 3-31-2010 hearing, but he would only go to my properties and go to every tenant without being invited. It was a Kai Kunz only policy.

35. Jeffery Stephens made the point of bringing the plumbing and electrical inspectors, plus the Building Inspector to Kai Kunz's properties. He did this to no other owners in the entire City of Fitchburg.

36. Jeffery Stephens and Michael Ciota speak at, and give legal advice to members of the Landlord association. Worcester Housing Court, police, and firefighters also speak at this private organization that Lorie Spaulding is a co owner of. See affidavit.

37. Jeffery Stephens used Anne Cramer of Leominster Board of Health's email address in March 2010, but stopped advertising this email address, as the Landlord Association made point of changing this email information in their online posting. See circled dates on EXHIBIT HEREIN. Emails and the recovery of them will be a part of the discovery and depositions.

38. Jeffery Stephens told Hosing Court officials to direct their focus on Kai Kunz, and not Michael Simmons when their were code matters.

39. When I brought this discrepancy in email and told Jeffery Stephens that I was going to the FEDs, I subsequently dropped off a lot of material at the Fitchburg MA police department, that went to the police detectives. The information dropped off contained information on Jeffery Stephens and Lorie Spaulding's involvement with RICO conspirators. See Exhibit.

40. Within two weeks of Kai Kunz's having told Jeffery Stephens about going to FEDs and going to the Fitchburg Police detectives, Michael Ciota was suddenly hired as the first ever full time City Solicitor.

41. Michael Ciota shares an office that is right next to the Mayors. You'll notice that in Exhibit, that Kai Kunz told Jeffery Stephens about corruption and the fact that the Mayor and the Police Chief walked into his building at 348 Elm St. Fitchburg, MA. Or they trespassed and took inordinate amounts of focus on Kai Kunz's properties.

42. When Kai Kunz was charged with having a noisy and disorderly house, the prosecutor told his Attorney Joseph Lussier the following in front of many people during court recess "I'd drop the charges, but I can't because the Mayor and the Police Chief insisted I didn't."

43. Lorie Spaulding manages over 300 units and never has problems with Board of Health issues, in spite of many buildings being total slums.

44. Using Lorie Spaulding for management makes owners Teflon to the Board of Health as records show. This corrupt/biased arrangement has allowed Lorie Spaulding to grow her business while giving kickbacks to Jeffery Stephens who lives way outside his means.

45. Lorie Spaulding used her pull in City and Police to deflect, as she was a manager for owners.

46. The absurd allegation of volunteered informant Kai Kunz tolerating drugs was made because it helped the focus to be on Kai Kunz (as Kai sent much information to DEA and FEDs???) while others who were friendly with Jeffery Stephens and Lorie Spaulding weren't looked at as they dealt drugs and committed Racketeering.

47. On 2-19-2010 Lorie Spaulding laughed that Kai Kunz's days were numbered and wrote the following on a Fitchburg District Court paper (in front of Fitchburg District Court workers), that she signed and dated "Joe Solans is on the hunt for you (Kai Kuhns) Lorie Spaulding 2-22-10" SEE EXHIBIT.

48. Kai Kunz subsequently mailed the original to the FBI and added noted to the copy the same day.

49. Lorie Spaulding said "Joe Solans had a friend of mine beat up, when he found out that he was an FBI informant and that he was looking to kill me." I know an informant who suffered brain damage from having his head smashed with a rock BTW...

50. Lorie Spaulding wrote above mentioned letter after August 4th, 2009 when two FBI agents went into Kai Kunz's residence and took samples from a poison attempt SEE EXHIBIT WHEREIN Kai Kunz MENTIONED SOLANS MONTHS EARLIER TO informant that had head smashed with rock.

51. After Lorie Spaulding signed the letter on 2-19-2010, Kai had another poison attempt against him.

52. Lorie Spaulding was involved with the murder attempts against Kai Kunz. Lorie Spaulding is so arrogant from the corruption benefits she received from Fitchburg City workers like Stephens and Ciota, and the courts, that she feels she can talk freely about her knowledge and involvement in murder conspiracies.

53. Joe Early and his having spoken up against Kai Kunz in the Telegram and Gazette, makes the decisions at the Worcester District court completely irrelevant.

54. Their was an Ayer Clerk that overheard the 3-31-2010 hearings, but insisted that Fitchburg was making the decision, while Fitchburg, MA said that it would be her that made the decision on whether or not to proceed on the 3-31-10 hearings.

55. It was only after 5-5-2-10 Fitchburg District Court hearings, that cases were transferred to Worcester, MA.

56. Kai Kunz filed follow up perjury charges due to the lies that Jeffery Stephens, Lorie Spaulding, and Michael Fronte said during 3-31-2010 hearings. Every charge of perjury can be proven solidly.

57. Thomas Noonan only heard the Fitchburg District Courts opinion on charges, and he never asked me about them. Attorney Scola and his murder investigation was transferred outside of Worcester, and all hearings should have been simply based upon the Telegram and Gazette story, which was an open forum.

58. Michael Ciota made the point of speaking to the Fitchburg District Court and having the 4-13-2010 Richard Rawson hearing at the Fitchburg Housing Court courtroom and also made the point of having the 5-5-2010 hearings at the same place.

59. Fitchburg District Court workers will be asked about Michael Ciota's actions and influences as a City Solicitor. Michael Ciota also knows Thomas Noonan personally, and Kai Kunz had asked that the hearing be held outside of Worcester County repeatedly.

60. Michael Ciota defended Jeffery Stephens with tax payers money for spending hundreds of thousands in extra money for Spaulding servings and his biases.

61. Corrupt city solicitor Michael Ciota subsequently went after a police officer named Tasca who he thought was taking too much overtime, which is a tiny expense compared to what Jeffery Stephens costs taxpayers. Michael Ciota also defends Mayor Quans corruption at tax payers expense.

62. Jeffery Stephens never gave Kai Kunz's properties any problems when Richard Rawson illegally listed them behind his back, uttered P and S agreements falsely, stole rents, and had Joseph Solans and wife as buyers.

63. Stephens spoke to them both and gave Kai no problems during criminal conspiracy wherein Richard Rawson lied to tenants (have affidavits from them) and committed a criminal conspiracy. You'll notice that Joseph Solans was mentioned as someone involved with conspiracy to commit murder by email, prior to Lorie Spaulding's writing. SEE EXHIBIT. Date of email was 12-25-2009 and letter from Lorie Spaulding was in late February 2010 by her own admission/signed signature to document.

64. Jeffery Stephens and Michael Ciota were both aware of the Racketeering being committed against Kai Kunz. Both manipulated courts, abused power, had biases, and more that caused significant harm to Kai Kunz.

65. The letter that Lorie Spaulding presented in court on 3-31-2010 from the Mayor of Fitchburg about having constable powers was outside normal procedure BY A MAYOR and likely a move that the Mayor did to cover Lorie Spaulding not being a constable previously, as mentioned in previous affidavit or email from Luke Gallant.

66. Lorie Spaulding being an illegal sheriff during her triple plus priced monopoly of Sheriff Servings is something that Michael Ciota was and is aware of.

67. In spite of this, Michael Ciota defended Lorie Spaulding during 4-14 Gardner District Court hearing. The letter by the Mayor will be analyzed and the mayor will be questioned.

68. During 4-14-2010 Gardner Court Hearing Kai Kunz had phone records to show that Jeffery Stephens was called earlier in the day on 1-13-2010 and Kai's manager Thomas Clark provided phone records to Judge Sullivan on that day.

69. Phone records showed that Jeffery Stephens perjured during that hearing and Kai had solid proof of his other acts of perjury.

70. Jeffery Stephens said that he never met Kai Kunz at a property in order to avoid my extortion charge. I could provide satellite information to show that I called Jeffery Stephens while both of us were at a property and had other such solid proofs of his perjuries.

71. Here are some additional Exhibits

Exhibit: A letter I sent to the States Ethics Committee in December 2009, or prior to the arrest by Lorie Spaulding.

Exhibit: Email correspondences with conclusions and information that was exchanged prior to and after Lorie Spaulding and Jeffery Stephens incidences.

Exhibit: Letter in late 2008 wherein Kai Kunz mentioned the relationship of Jeffery Stephens and the City of Fitchburg conspiracy with the Twin Cities Development company. Note that David Munoz spoke in T and G about Kai Kunz and used the corruption of Fitchburg for getting properties cheaper.
Exhibit: Lorie Spaulding getting a monopoly over management of Kai Kunz's former properties through the town of Fitchburg.

Lorie Spaulding took a picture of Kai Kunz's fathers plate on 1-13-10 at Gardner District Court and told Kai that she had an uncle in the FBI and that I shouldn't bother reporting conspiracies. Lorie Spaulding made the comment about her uncle in front of Jeffery Stephens, Walter Murray and others on January 8th, 2010, and Jeffery will be asked about it.

I can conclusively prove that Jeffery Stephens

1. Abused power and were biased against Kai Kunz.
2. Were malicious and targeted Kai for their career, political pressure, and self interests.
3. Jeffery Stephens at least indirectly aided and abetted Racketeering
4. Used his profession as a conduit for furthering a political crusade, and business plan for financial considerations with Lorie Spaulding and others.

## Outline of what will be revealed during deposition and discovery.

1. Emails from and to Jeffery Stephens at Anne Cramer, his personal, and his Board of Health email addresses.

2. Michael Ciotas emails

3. Phone records from anonymous callers that complained against 348 Elm Street Fitchburg, MA 01420 and the phone company

4. Information about Jeffery Stephens association with Joseph Solans, Kelle Okeefe, Lorie Spaulding, and others

5. Michael Ciota relationship with and communications with Fitchburg and Worcester District Courts.

6. Board of Health records and computer information.

7. Michael Ciotas communications as City Solicitor and elsewhere.

8. Information about Jeffery Stephens communications with tenants.

9. Information about Jeffery Stephens and Michael Ciotas discussions with Twin Cities Development.

10. Internal Affairs report

11. Telegram and Gazette information.

12. Affidavits from tenants.

13. Emails and dealings with Twin City Development members.

14. Mayor Quans emails.

15. Board of health reports on Properties managed by Lorie Spaulding

And more

## Specific witnesses and individuals to subpoena.

1. Detective Looney or former Fitchburg police Captain that did Internal Affairs.

2. Sergeant Fossa that handles present Internal Affairs for Fitchburg, MA.

3. Former and present tenants at my properties

4. Sergeant Mark Jackson

5. Members of Twin Cities Development

6. Mayor Quan.

7. Fitchburg Police Chief

8. Joe Early

9. Contractors for receivership

10. FBI Agent Steven Zeringue

11. IRS Agents

12. Paul Murray of the States Ethics Committee.

13. Confidential FBI informants.

14. Fitchburg District Court workers

15. Gardner District Court workers

16. Confidential DEA informants

And more.

# 1S: Jorge Torres of 54 Oread Street. Worcester, MA 01608

1- Enforcer and top drug dealer, extorter for Joseph Solans, who stole rents and intimidated tenants at Kai Kunz's properties wherein utilities were in the name of Edward Ahern due to extortion and kidnapping committed against him.

2- Stole rents and gave proceeds to himself and his aiding and abetting Racketeering and Domestic Terrorism.

3- Jorge Torres Pointed a gun at both Edward Ahern in March and August 2009 on Worcester on Park Ave and at Kai Kunz in both Fitchburg, MA on Prichard St and in Northbridge, MA at his residence in July 2009.

4- Was one of the individuals who fired a shot at Edward Ahern and tried to kill him in August 2009, while driving in a white pickup truck late at night on Park Ave in Worcester, MA. See also exhibits from tenants about Jorge Torres and Richard Rawson's criminal conspiracy.

5- Was directly involved with the Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

1. Stole Massive quantities of rental theft was being stolen from my Fitchburg (by Rawson, Jorge Torres and Solans serial killer sidekick) and Worcester properties by Richard Rawson.

2. Had guns pointed at Kai Kunz and Edward Ahern numerous times and told to do as Rawson and Solans says.

3. Aided at least one poison attempt against Kai Kunz and shooting against Edward Ahern.

4. Took papers taken from Kai Kunz's office/residence from sophisticated lock picks.

# 1T: Lorie Spaulding

Analysis of Lorie Spaulding's response to my Worcester Superior Court filing proves useful for adding clarity to complaint. The incredible effort to avoid saying anything in response to Kai Kunz's claims says a lot.

1. I want to start by responding to the five point affidavit that has been submitted by Lorie Spaulding. I will give her verbatim affidavit and then respond to her affidavit point by point.

2. I will address the other points raised in Motion to dismiss herein. I will address the motion to dismiss point by point.

RESPONSE TO FIVE POINT AFFIDAVIT:

" I Lorie Spaulding, being duly sworn, to hereby depose and state as follows:"

"1. I am the named Defendant in the above Captioned action."

ANSWER:   I do not disagree that Lorie Spaulding is the defendant in complaint. Her saying this is interesting, as the same Lorie Spaulding was served at the same address prior to a hearing on 3-31-2010.

'2. My only relationship with Plaintiff occurred in my then capacity as a duly appointed Constable when I Served process upon him."

ANSWER:   The use of the word "relationship" is a smart move do to because it is ambiguous with multiple applications as needed. You could for instance say that an arrest involved a past relationship with someone, whereas a threat or conspiracy committed against the same person, wasn't a relationship. That such instances are not physical, face to face in the case of a conspiracy and is hence not a relationship. Even smarter is Ms. Spaulding's saying that she only served process upon me, which is worded to avoid addressing the actions she did on 1-8-2010. This gives her wiggle room and allows her to conceivably avoid perjury in the future.

Her saying she had no other dealings with me other than the arrest would be an outright lie, so she used the word "relationship." The use of relationship allows her to make a general statement in her motion to dismiss herein, without outright committing perjury. Lorie Spaulding spoke to me on several occasions at the Fitchburg Court on Elm St, and spoke to me as well during the time when she wrote and signed the statement "Joe Solans is on the Hunt for you (Kai Kunz)." This paper is an exhibit and just one example of her dishonesty in statement two.

Lorie Spaulding's having said that she served process upon Kai is nothing short of an outright lie. During her 3-31-2010 hearing with me, she said "Kai was confused because he thought that my arresting him had to do with the Housing Court." She rightfully said this, and the Housing Court tape will verify my confusion. I was confused because Lorie Spaulding never served me and I subsequently didn't know what the arrest was about. She arrested me during a Housing Court session recess and prior to the completion of the Housing Court session wherein she had no authorization to do so. She admitted to not allowing for me to talk to my attorney, use the bathroom, and she also refused to tell my attorney about what the arrest was for on 1-8-2010. She admitted to these actions during the 3-31-2010 hearing.

Lorie Spaulding only gave Kai Kunz the civil capais during the 3-31-2010 hearing, and his Attorney Joseph Lussier was never given a copy of the civil Capais himself. Lorie Spaulding also likely used the word "relationship" to be able to be intellectually dishonest with the Court, without committing outright perjury. This is specifically the case because she will likely argue that when she wrote, signed and dated the paper that said "Joe Solans is out on the hunt for you (Kai Kuhns)", it was a random act and not a relationship like what occurs when someone arrests and detains someone else.

Lorie Spaulding here states that she was a Constable when she arrested me, but doesn't address the email correspondence from the Worcester Sheriffs Department in complaint. Email correspondence wherein Luke Gallant claims that Lorie Spaulding wasn't affiliated with the Sheriffs Department (Constables and Sheriffs both are.) She presented a letter from the Mayor, that stated that she was given the license.

I believe that Lorie Spaulding's saying that her relationship with Kai is limited to having served him as a Constable is an outright act of perjury. This is because this statement by implication says that she only served him a single time or only dealt with him during the 1-8-2010 incident that she admitted to under oath during 3-31-2010 hearing. Lorie Spaulding is a very talented writer and phrased her affidavit very carefully for the purpose of having wiggle room with her intellectually dishonest and statements that are outright acts of perjury in some cases. Her saying that she only had a relationship with me when she "served process upon him" could also be considered to be an outright lie, because it is phrased to mean a single occasion of service. This avoids the fact that Lorie Spaulding served me many times at my residence at 111 Church St. Northbridge, MA 01588. A place where she ran into my neighbors and spoke to them several times (my neighbors had some involvement in conspiracy to commit murder against me.) It also ignores that Kai made a complaint with the court about the triple the normal price of her servings which addressed her multiple servings. Kai reported the cost of her servings and monopoly of service through corrupt City worker Jeffery Stephens to the States Ethics Committee and other agencies. In fact Kai sent a letter to the States Ethics Committee about a conversation between Jeffery Stephens and Lorie Spaulding wherein they conspired to have me arrested at all costs. This letter was mailed about two weeks prior to the 1-8-2010 arrest. Lorie Spaulding is avoiding her many servings on me at my residence for Housing Court related matters by her deceitful statement, for many issues beyond the tort and the specific reasons for my claim herein. Kai also sent the civil capias letter to other agencies because he believe it was a forgery, that will be addressed in this trial. It stated that their was a warrant issued in January 2009 and that Lorie Spaulding basically waited a full year before doing the service for $200.00. Kai found that suspicious and that capias will be addressed in depositions and discovery.

Lorie Spaulding's statement about having no other dealings with Kai other than the "service" she did on him as a Constable, denies the paper hand written paper she wrote as well. The original of the paper she wrote (which was included in this complaint) to the FBI in Hudson, MASS. The original paper was on an approximately 4 by 5 inch paper that she wrote on. It was scrap paper at the Fitchburg District Court, as she

felt comfortable talking about her knowledge of another persons intent to kill me in front of Fitchburg District Court workers. Likely the reason why her arrest in 2007 for disorderly conduct and resisting arrest was held at Leominster, MA and not Fitchburg, MA in order to avoid a conflict as the article attests to. Something that Michael Ciota helped her to prevent during my hearings. This conflict will be addressed in depositions and discovery, as the arrest took place at the Fitchburg Court building. Prior to mailing her hand written letter to the FBI, I made a copy of it and added information on it from the conversation I had with Lorie Spaulding. I wrote notes on the copy during the day when she wrote the letter and I mailed the copy with the notes to the FBI on the same day that she wrote the letter. I wrote on a copy of letter, about my conversation with Lorie Spaulding less than 30 minutes after she wrote.

I would like to add that there are many situations wherein someone needs to have no direct face to face relationship with others, while they engage in organized crime and other criminal actions. Lorie Spaulding was and is aware of many criminal actions that were committed against Kai and she aided and abetted the criminal conspiracies. It was smart for her to have avoided the letter she wrote in motion to dismiss and only mention that I provided a "hand written letter." The verbal technicalities and other methods will not allow her to wiggle out of the damages she is directly and indirectly responsible for. Her taking picture of my fathers plate, who she sent plate information to will also be addressed during depositions and discovery. She will also be asked about her dealing with Joseph Solans and others, while addressing her phone records and email correspondences as well.

"3. While Plaintiff's complaint appears to allege I committed a tort, because of Plaintiffs use of double negatives and conclusions, as well as his incorporation of seemingly unrelated communications into his pleading, I am uncertain as to what action or inaction on my part serves as the basis for Plaintiff's complaint."

ANSWER: I allege that Lorie Spaulding committed tort because she committed tort. There are specific actions that Lorie Spaulding committed that were preplanned, deliberate, malicious, and part of Racketeering actions that she aided and abetted. Putting cuffs on Kai extra hard, not letting him talk to lawyer, telling him he can't use the restroom, not allowing me to get my coat in car in Fitchburg, making him ride with her to Gardner, MA and leaving him stranded in Gardner with no coat during winter weather. Her actions are a reality that she committed and they have nothing to do with whether or not Kai had spelling errors or if he mistakenly had double negatives in complaint. Lorie Spaulding admitted to virtually all of the above and that is a reality that will be addressed in court during depositions and discovery.

I am not an attorney, had zero Superior Court Experience, wrote complaint quickly, and was under a considerable amount of stress at time that I wrote complaint. The specifics in my complaint will be included once again in this letter against Attorney Van Burens motion to dismiss.

Lorie Spaulding claims that "I am uncertain as to what action or inaction on my part forms the basis for Plaintiff's complaint." This is intellectually dishonest and avoids the fact that Lorie Spaulding has an attorney. Does her attorney want to say he doesn't understand basis of complaint, or did he want her to write it up? It would be very convenient if a defendant could play ignorant to a complaint and get off, but Lorie Spaulding has a great deal of court experience and is just utilizing intellectual dishonesty for trying to avoid responsibility for her actions.

Lorie Spaulding claims that Kai incorporated seemingly unrelated communications into his pleading. The unrelated communications she must be referring to, has to do with the email correspondence that occurred in December 2009. The email I included in complaint, is relevant to my complaint for more than one reason.

1. Lorie Spaulding often laughed about my days being numbered as she maliciously wanted me to have an early demise or to be murdered. Her having known about Kai's life being in danger and admitting to that

knowledge in note, that she wrote and signed after a murder conspiracy in 2009, and before a subsequent attempt on his life in 2010. It says a great deal beyond her total arrogance and feelings of invincibility within the court systems. It shows that she at least has no respect for Kai's life, and it says even more about her character, and the type of person she is. It also shows that she has no regard for the law or the very basics of being a Constable or someone in law enforcement. If you are in law enforcement, or even a citizen, you are required to report murder conspiracies that you have knowledge of. You are committing a felony if you do not report a murder conspiracy to law enforcement. Character and having a total disregard for the Law as a law enforcement officer, are all relevant in a civil case. It is especially important if the same law enforcement officer (Lorie Spaulding) caused harm to an individual as a law enforcement officer and utilized her relationships with court workers for favors and more.

2. The email also shows, that Kai was onto the association Jeffery Stephens had with conspirators and that Lorie Spaulding is almost certainly more involved with. Anything that Jeffery Stephens is involved with IS SOMETHING THAT Lorie Spaulding is helping to orchestrate. Lorie Spaulding largely calls the shots and is the dominant personality in their arrangements and her relationship with Jeffery Stephens.

3. The email or exhibit in complaint herein also adds perspective to what Lorie Spaulding wrote. It shows that she was likely very aware of the conspiracy to commit murder that was done prior to and after the letter she wrote. I also believe that Lorie Spaulding is intimately aware of other criminal actions beyond the ones that she aided and abetted as they were being committed against me. She doesn't have to have any relationship with a crime victim, as that is what the RICO statute is about it seems.

"4. For all of the above reasons, I am unable to respond to Plaintiff's apparent allegation that my services of process upon him resulted in either damages noted in the Civil Action Cover sheet or the other violations Of law he appears to assert."

## ANSWER

Lorie Spaulding says that she is "unable to respond to Plaintiff's apparent allegation that my services of process upon him resulted in either damages noted in the Civil Action Cover Sheet or the other violations of law he appears to assert." Lorie Spaulding said that she only had a relationship with me during her capacity as a Constable when she served process upon me. If her only relationship with me involved service upon me on a single occasion then their would then be no reason for her to say that she "can't understand my claim in the Cover Sheet or the violations of law I appear to assert." The violations of the law that I spoke about in this complaint were outside of her service that she performed on 1-8-2010. Although that does not mean that she didn't potentially break the law during 1-8-2010 as well.

I will address the specifics of my claim later in this letter of opposition to motion to dismiss.

Lorie Spaulding did several actions that are a part of my claim. Her actions were beyond her actions during 1-8-2010 and extended into aiding and abetting Racketeering conspiracy that at least borders on domestic terrorism. The actions that she aided and abetted greatly effected (among other things) my Billion plus dollars worth of form 211 IRS Claims and my other Whistle Blower claims against companies and individuals on behalf of the Federal Government and the Tax Payers of America. If you engage in malicious behavior and Racketeering against someone who is working on large projects, then you are responsible for the damages caused by your having prevented individual to from full filling contract obligations and for them to work on projects effectively. Actions prevented much of the work to be compromised and the damages from this will be accurately considered. I am suing for punitive damages, pain and suffering, injury

as well. I believe that a Jury or Judge will find that my claim is substantial and might even exceed the demand of $4,003,000.00 that is in complaint.

"5. I therefore respectfully request the Court dismiss the Plaintiff's complaint, or, in the alternative, order Plaintiff to provide a more definite statement of his claim, including specificity as to any alleged tort and the relationship of any action or inaction on my part both to the extent of damages alleged and the, purported statutory claims noted in the Cover Sheet."

# ANSWER

I am working to better clarify my complaint and the specifics of claim. I believe that what has been provided is adequate, but will add clarity during this opposition to Attorney Van Burens Motion to Dismiss herein.

# Part 2

2. I will address the other points raised in Motion to dismiss herein. I will address the motion to dismiss point by point.

Attorney Van Buren list of alleged facts herein will be addressed point by point:

Attorney Van Buren correctly states that my complaint consisted of a two page complaint and an additional five pages of information in the form of email correspondence and a hand written note.

ANSWER: Attorney Van Buren makes the point of not addressing the content of the hand written note or the email correspondence. It seems that he wants to make issue with volume rather than content.

Attorney Van Buren uses the statement I made of "Lorie Spaulding didn't just serve me before making arrest.'

ANSWER: Attorney Van Buren avoids the fact that I claimed that Lorie Spaulding didn't serve me in complaint, which is clear. He utilizes a convenient part of sentence and avoids responding to not only the rest of the sentence, but the additional facts stated in complaint that clarify that potential writing error. The use of that is intellectually dishonest at best.

Attorney Van Buren states that the complaint continues with a disjointed narrative that includes allegations of conspiracy, informants, intimidation, as well as RICO and Domestic Terrorism.

ANSWER:

1. The conspiracy will be addressed during deposition and discovery as outlined earlier in this response. It

is certainly worth looking into when Lorie Spaulding wrote a letter about my life being in danger prior to and after murder attempts against me. It is further interesting that she mentioned Solans as being involved in a murder conspiracy as he evidently felt confidant that it was safe to tell Lorie Spaulding about the conspiracy without fear of her reporting it.

2. The disjointed comment about my mentioning informants was made pretty clear in complaint. Lorie Spaulding (in front of Fitchburg District Court workers) said that Joseph Solans had a friend beat up a friend of mine. He had the friend beat up because he found out that he was an FBI informant. I know someone who is an FBI informant. That individual had his head smashed with a rock and suffered brain damage. She will surely be asked about her knowledge of this during depositions and discovery.

3. I wasn't overly specific about intimidation. Although the issue of intimidation will be addressed thoroughly during discovery and depositions. Ms. Spaulding association with others will be looked into and the combination of her writing, statements, and the timing of her writing and actions make this a necessary part of claim.

4. My reference to RICO and Domestic Terrorism is quite clear. Lorie Spaulding at least knew about the Racketeering and Domestic Terrorist conspiracy I reported to the FEDs long ago. It involves the conspiracy to commit murder and other conspiracies outlined in email and a more serious part of which has been acknowledged by Lorie Spaulding. The extent of her involvement will determine if a jury or judge will award more than my $4,000,000.00 demand. I had $3,000.00 in doctor bills between Merrimack Valley Hospital and Doctor Milo of New England Neurological. I will be getting second opinion on nerve problems I continue to have in wrist. I was injured without question and had an x ray of bruise taken within 24 hours of injury initially.

5. Her actions and the impact of said actions on some of my work will be addressed during trial. I will obtain a Forensic Accountant during trial as I mentioned in cover sheet. This as with other many key points is ignored by attorney Van Buren. I will be happy to go over this response for Attorney Van Buren in person at court line by line to help clarify my objection to motion to dismiss to help him understand.

The present Lawsuit includes Lorie Spaulding as part of 93A RICO Lawsuit due to her integrated involvement in Racketeering/Domestic Terrorist Conspiracy. Here are the specifics

1. Her involvement in aiding and abetting Racketeering conspiracy.

2. Lorie Spaulding's attempts to undermine Law enforcement through her uncle in FBI which she brags of.

3. How Lorie Spaulding aided and abetted the infiltration of law enforcement through informants Kevin McCarthy and Joseph Young.

4. Lorie Spaulding's involvement with frame attempts against Kai Kunz for aiding and abetting Racketeering and trying to decrease credibility of Kai Kunz's testimony.

# 1U: Lydia Rawson of 33 Scenic Dr. Worcester, MA 01602

1. Was a conduit for the extortion, theft, Racketeering, and Domestic Terrorist frauds of husband Richard Rawson and others. She did this through having stolen monies in the form of checks to be signed over to her for deposit.

2. Helped fund Domestic Terrorist activities by having Richard Rawson launder money through her.

3. Helped undermine IRS collection efforts against Richard Rawson's tax evasion crimes.

4. Utilized her connections in Brazil for hiding assets from illegal gains her husband obtained.

5. Ignored but had knowledge of Utility Bill extortion that was committed against Edward Ahern for financial reasons and for aiding and abetting Racketeering and Domestic Terrorist Agendas of Organization.

When bank accounts, records from check cashing businesses, and other sources are audited. The extent to which Lydia Rawson aided and abetted Racketeering, rental theft, white collar frauds, extortion, Domestic Terrorism and more, will be more fully realized. Enclosed in this complaint is an exhibit of a check signed over into Lydia Rawson's name. See list of exhibits in other part of complaint.

# 1V: Attorney Michael Keller and 1W: Attorney Scott Burke

## See enclosed complaint to Board of Bar Overseers for details on complaint herein:

To Board Of Bar Overseers,

Enclosed is a complaint against attorneys' Michael Keller and Scott Burke of 250 Summer Street. Boston, MA. 02210.

Said attorneys acted fraudulently and unethically in the following ways:

RE: Edward Ahern versus Richard Rawson, Anthony Scola, and Keller Williams Greater Worcester.

Both attorneys represented Keller Williams Greater Worcester and Richard Rawson. They were properly served with papers. Both parties did not file an answer prior to the twenty (20) day time limit.

Both attorneys colluded with courts and got my default judgment overturned due to their court connections and sleaze tactics.

Both attorneys sent motions to dismiss to the incorrect address intentionally. My papers were clearly filed as

Edward Ahern

111 Church Street
Northbridge, MA 01588

And not

Edward Ahern
111 Church Avenue
Whitinsville, MA 01534


Both attorneys intentionally sent papers to the wrong address.

Both attorneys also called the court and paid workers to have my judgments against Keller
Williams Greater Worcester, MA dismissed. I had a judgment against Richard Rawson and Keller Williams
Greater Worcester, MA and the judgment was overturned due to payoffs that were given to court workers.
I have more than one witness to attest to this.

Attorney Burke and Attorney Keller acted dishonestly and violated my rights as a disabled American
citizen. Both attorneys have all the advantages in going up against me. I am a disabled PRO SEE plaintiff
That has been a victim of the fanatical Racketeering and Domestic Terrorist tactics of both attorneys clients.
Both attorneys dishonesty and breaking of ethics (at a minimum) is all the more extreme, as they have every
possible advantage and have to resort to tactics that they know how to do dishonestly, due to their Law
background and court connections. Advantages I do not have on any level.


Edward Ahern    1-508-244-1764


Part 2. Being efficient and saving court time by proactively addressing Motions to Dismiss that
are inevitably going to be filed by opposing counsel. This will tighten cases of Edward Ahern and Kai Kunz
and clarify complaint significantly.


Enclosed is my proactively addressing the motions to dismiss that are a foregone
conclusion:


Enclosed are oppositions to motions to dismiss from Lawsuit that I (Kai Kunz) filed against defendants
herein in Worcester Superior Court. I hope that the information herein will proactively address the

inevitable motions to dismiss that are going to be filed by opposing counsel.

1. Enclosed first is an opposition to a motion to dismiss that was filed by Attorney Gregory that represented Kelle O'Keefe, Mark Kavanach, Daniel Loring, Apple Country Realty, Keller Williams North Central, and Keller Williams Corporate: Since this lawsuit is against the same defendants for the same actions. It will be helpful to address the inevitable motions to dismiss, so that their will be added efficiency.

I want to be efficient and address the motions to dismiss prior to them being filed in the predictable fashion. My responses to previous motions to dismiss that were filed by defendants and or their attorneys will also be helpful in making Lawsuit more clear as well.

Enclosed is my oppositions to the motions to dismiss that will be filed very close to how the motions to dismiss were filed previously. It is therefore legally sound to address legal arguments now. Kelle O'Keefe, Daniel Loring, Mark Kavanach, Apple Country Realty, Keller Williams North Central, and Keller Williams Corporate. The motions to dismiss complaint will quote Mass Civil rules 12 (f), Mass civil rule P 8, and Mass Civil Rule 41 (b)(2).

Attorney Gregory's Motions to dismiss on behalf of Kelle O'Keefe, Daniel Loring, Mark Kavanach, Apple Country Realty, Keller Williams North Central, and Keller Williams Corporate

Attorney will ask that the court dismiss the complaint, and or "strike all redundant, immaterial, impertinent, or scandalous portions of the complaint."

ANSWER:

I stand by every claim in complaint I filed. I quote what others said and I have affidavits that came from individuals with first hand experience with the individuals in complaint. Attorney Gregory completely focuses on statements from others that I have quoted. He also goes on and on about my quoting what others have said and revealed to me (statements by defendants that has been said to more than one person who will be subpoena into court for depositions and discovery anyways). I will legally challenge every effort to strike any statements, that I made in complaint because every complaint about defendants is true and accurate.

Attorney Gregory cites rule Mass R. Civ. P 12(e)

He states that complaint lacks "a definite statement as to the specific claim(s) against defendants in complaint." Attorney Gregory asks that their be a more precise recitation of the facts --in numbered paragraphs relating to each of the Plaintiffs causes of action.

ANSWER: I will be adding clarity to my complaint in this letter with numbered paragraphs that will give a much more precise recitation of facts with specific causes of action. My letter to opposition to motions to dismiss herein will address the foundations of Attorney Gregory's motions to dismiss.

Attorney Gregory follows up with the following statement

"The complaint consists exclusively of redundant, immaterial, impertinent, and scandalous accusations that can only serve to harass, embarrass, and damage the professional reputations of the Movant Defendants, and which appear to have been filed only in a bad faith attempt to force the payment of money to the Plaintiff in settlement of his "claims";

ANSWER: I will need a number of averments to demonstrate the absurdity of this statement.

- Attorney Sinrich makes the following statement in his motions to dismiss on behalf of Ronald and Sheila McQuinn "While Plaintiff has recited various factual allegations against Defendants (and against numerous other individuals and entities, including attorneys, real estate brokers and other professionals)",.. Attorney Sinrich goes on to claim that I don't satisfy Superior Court Rules and Standards for Civil complaints. Attorney Gregory was either acting in bad faith by making the comment, or he was lied to by his clients.

- Attorney Gregory made very different statements to me when we spoke on the phone for about ten minutes in late June 2011. He thanked me for clarifying my complaint and said "I believe you are sincere about your allegations and the statements you made about defendants." I emphatically back up every claim I have made in complaint and will continue to sign every statement and correspondence freely under the pains and penalties of perjury (whether it is required by the court or not).

- Attorney Gregory goes on to say that the complaint appears to have been filed only in a bad faith attempt to force the payment of money to the Plaintiff in settlement of his 'claims';

What attorney Gregory has said in his statement is a double negative and shows bad faith. If Attorney Gregory truly believed that the complaint I made was a fabricated lie, then he would have no need to say that Complaint "appears to have been filed in a bad faith attempt to force the payment of money to the Plaintiff in settlement of his "claims"; It would be an outright criminal act of perjury and extortion.

Falsely accusing someone of criminal actions and acting in bad faith is reason for suit, and their have been attorneys who have been successfully sued for acting in bad faith during civil cases. I believe that attorney Gregory s clients lied to him. If Attorney Gregory falsely accuses me of committing a crime again or acts in bad faith further, I will be forced to file suit against him.

I have also reported the actions of individuals in complaint to the authorities. I would be quickly arrested and prosecuted if I lied about the incredibly serious matters in my complaint, to the worlds most preeminent investigative law enforcement agency (the FBI.)

Attorney Gregory goes on to say that the complaint "blatantly violates MASS. R. Civ. P. 8(a)(1) as he alleges that the complaint isn't "a short and plain statement of the claim showing that the pleader is entitled to relief."

Attorney Gregory says that the complaint violates MASS. R. Civ P  8(e)(1) which requires that "each averment of a pleading shall be simple, concise, and direct." Attorney Gregory goes on to say that "The Plaintiff accusations are so vague and incomprehensible that the Movant Defendants cannot reasonably frame an answer or determine what affirmative defenses may be available."

HERE IS MY ANSWER TO BOTH MOTIONS TO DISMISS:

MASS R. Civ. P 8(a)(1)  - I will give a simple and plain statement of claim, and further show that I am entitled to relief. I will also try and go up and beyond this Rule and Standard by adding further clarity to complaint in other sections of letter herein.

MASS. R. Civ P 8(e)(1) which requires that "each averment of a pleading shall be simple, concise, and direct." I will number specific averments and also give a chronology of events in part three of letter of opposition to motions to dismiss by Attorney Gregory herein. Other parts of letter for opposition to motions to dismiss herein will attempt to go up and beyond the standards and rules quoted by Attorney Gregory.

Attorney Gregory makes the comment that my accusations are "incomprehensible."

MY ANSWER

I would agree with attorney Gregory on this point and appreciate the accuracy of this observation. That is why, I rightfully say that their has never previously been more outrageous and psychopathic actions by Realtors, Brokers, Mortgage Brokers and other white collar professionals, against individuals and customers in the history of the Realtor and Broker businesses inception in America. It is all the more staggering that attempted murder, extortion, kidnapping, and more was committed against individuals that were victimized and who also made Realtors, Brokers, Mortgage Brokers ect.. Much money initially (more money than years of previously combined income in the case of Kelle Okeefe and Denise Peach). Since this occurred after white collar fraud and victimizing that was perpetuated against me and Michael Simmons, it should come as zero surprise that the following occurred since 11-1024B lawsuit was filed

- I had death threats against myself, family, and friends (gave tapes to FBI).
- Relatives received death threats on their answering machines (gave tapes to FBI).
- I have been stalked more intensely than usual (sent plates to FBI).
- Their have been multiple break in attempts at a relatives property where I store some papers.

Attorney Gregory now moves on to highlight sections of my complaint that have nothing to do with specific accusations. Instead the full focus is on quotes from others, and statements from others, that I thought were worth including in complaint. Note that I have only included a fraction of the comments and actions that were committed by individuals in complaint.

Attorney Gregory correctly says that my complaint is under RICO and he then moves to mention the number of defendants in complaint (as if Attorney Gregory has the all knowing answer to the number of defendants that should be in a complaint under all different circumstances). I would like to point out that I narrowed down the amount of defendants in complaint.

If attorney Gregory had read my opposition to motions to dismiss by other attorneys and wasn't given false information from defendants. I don't believe that he (a supposedly very ethical attorney) would resort to the words and bad faith tactics that he is using.

Attorney Gregory goes on in page three to say that my comments about the defendants is overly extreme and irresponsible. I would like to point out that, I will be very happy to prove that my statements are an accurate and on point description of the individuals in complaint. I Will back up my claims with numbers and facts as needed. I challenge attorney Gregory to prove any of my claims to be exaggerations.

- The actions committed by individuals in complaint is a first ever event by Realtors, Brokers, Mortgage Brokers and white collar professionals. I would like Attorney Gregory to quote a single time in the history of the United States or the world where the following occurred, under these specific circumstances.

1. Realtors, Brokers, and Mortgage Brokers made a very large sum of money and kickbacks by victimizing customers through white collar fraud.
2. The same White Collar professionals hacked into customers/victims emails, computers, cell phones, tried to kill victims after transactions, had a victim kidnapped, and even encouraged rental thefts, while trying to get the same properties. Or to work a conspiracy to take original properties sold by fraud to victims away from them for pennies on the dollar thereafter. Name a single time this magnitude of conspiracy and multi

layered conspiracy was ever previously committed by Brokers, real estate agents, mortgage brokers and white collar professionals against initial victims. Name a single similar incidence in the history of America or even the world attorney Gregory - I'd like to hear about a similar incident committed by Brokers, real estate agents, mortgage brokers and white collar professions that was even half as significant in the last seventy (70) years. I'm waiting.....

It is the most outrageous and psychopathic act of Racketeering by Realtors, Brokers, Mortgage Brokers, and Professionals in the history of the above professions existence (they existed for about three generations or during the inhabitance of seven Billion people on the face of the earth). I will be happy to back up my claims and obtain the FBIs crime statistics and scientific material to prove the validity of my statement. I would also like to point out that individuals who target innocent children are in protective custody in jail. Many of the individuals in my complaint threatened me with death and mutilation towards relatives that are innocent children. As I said "I will tenaciously back up everything statement and quotes that I have said about defendants in my complaint." Attorney Gregory resorts to baseless claims and scandalous accusations about my complaint. I challenge Attorney Gregory to prove that a single one of my statements are even exaggerations and for attorney Gregory to refrain, from hyperbole and scandalous statements about my complaint. I adamantly believe that I can prove that my statements are not only accurate, but responsible and conservative.

While Attorney Gregory is irresponsible, shows bad faith, and makes baseless claims about my statements and their validity. I will point out that he is acting in bad faith in the statements he makes thereafter. I will expose his statements below and reveal them for what they are.

Attorney Gregory outright lies and distorts the statements I quote in my complaint by the following statements. Attorney Gregory says that I "make countless wild and irrelevant accusations ranging from the alleged anti-American political and religious views and agendas of the various defendants (whom he claims are "domestic terrorists" with the "goal of empowering gang members" into a "quasi army" to "topple traditional mafias and intimidate law enforcement"), to purported mob connections, bank robberies, tax evasion, police corruption, money laundering, extramarital affairs, drug abuse, spreading of venereal disease, and a history of prostitution and other vulgarities.

Let me start by making every comment above clear. Attorney Gregory and his tirade above were so contrary to the context of the comments, that I will be forced to respond with the following

## Reality 101

## 1. The alleged anti American political and religious views of others.

I never once gave any opinion about any of the defendants political and religious views. I have no opinion on such matters and only quoted statements from others. I will however give credit to Attorney Gregory for the forethought he put into such a deceitful and unethical lie. His dishonesty reveals that his goals are based upon deceit and at least bad faith. His above lies were very well planned, and they reveal the level of BAD FAITH THAT ATTORNEY GREGORY HAS PLANNED FOR THIS CASE. Kelle O'Keefe has spoken to many people about her distain for me and Michael Simmons, and our alleged privilege. Kelle O'Keefe has spoken about a hatred of the system, and her disdain for people of alleged privilege like me and Michael Simmons. Kelle O'Keefe's comments as a Realtor who was supposed to represent clients is very relevant. It is all the more relevant when actions like attempted murder, and other atrocities were at least aided and abetted by Kelle O'Keefe. People in depositions and discovery will be asked about her comments about Michael Simmons and myself. People in depositions and discovery, will be asked about Kelle Okeefes potential motives. Motives come from many types of hatreds, anger, and prejudice. I make no comment about any ones political or religious views and never did, which is something that attorney Gregory knows. I quote statements that others have made and nothing more and this is something that someone with a law

degree couldn't have made a mistake about - which shows his bad faith. I find it interesting that Attorney Gregory misquotes me so much. It shows that he wants focus to be on everything but the facts, and he is acting in bad faith completely. I will sue Attorney Gregory and or his law firm personally if he continues to lie about my statements. I will do the same if Attorney Gregory further lies and makes false assumptions about what my thoughts were when I merely quoted what others said. I was quoting Kelle O'Keefe and what she continually had tirades about. Motives and statements are a part of deposition and discovery and Attorney Gregory will be sued personally if he continues to misquote me and take what I said out of context from bad faith.

## 2. The only part about religion in my complaint came from the mouths of Ronald and Sheila Mcquinn who are not clients of Attorney Gregory.

In the case of Ronald Mcquinn he said that "everything I say and do is an act."

Should I ask Attorney Gregory for his permission about what parts of peoples comments I should quote and which parts I should exclude??? Please advise.

In the case of Sheila Mcquinn she used any tactic necessary to intimidate others psychologically. I make the claim that they both utilize different tactics for furthering their criminal enterprise. I mention statements they have made that are relevant. During deposition and discovery others will be asked about comments and statements that the Mcquinns have made. Should the people ask Attorney Gregory about what quotes he thinks they should mention and which ones he doesn't like???? Attorney Gregory is being completely deceitful, is outright lying, and completely taking everything I say out of context. Many individuals who have worked for the Mcquinns came from the same Church the Mcquinns go to. Tactics used for getting others to be conduits for criminal activities is a very relevant issue (although I merely quote what others say and give zero opinions or insight into comments made by others). I believe that their level of deception towards others is relevant to my case. A Judge and not Attorney Gregory will decide on that matter. I do not make a single comment about any ones religious views or lack thereof. Name a single quote that says a word to the contrary Attorney Gregory....

## 3. I say that several (but not all) individuals in complaint are Domestic Terrorists.

Attorney Gregory, you are correct in this statement, as I absolutely do say that several individuals in complaint are Domestic Terrorists. Here is some information that you might find interesting if you read the Patriot Act and the definition of a Domestic Terrorist under it.

Domestic Terrorism has to do with actions that are done by an individual (s) to influence the laws, and intimidate society. Since Politicians make laws, Robert Meuller of the FBI correctly considered charging the shooter of Kathy Gifford's with Domestic Terrorism. Kidnapping, undermining the judicial system, and intimidating law enforcement, INTIMIDATING INFORMANTS all fall within the definition of Domestic Terrorism (as do other actions committed by several individuals in complaint.) During deposition and discovery it will likely be revealed that more than one informant and my civil rights were violated by attempts to deny me access to the Judicial System.

- My cell phone was tapped often during times when I spoke to law enforcement, and I have affidavits that mention some individuals in complaint using tactics to tap cell phones of people in law enforcement

and the hopes to intimidate them.

- I was kidnapped specifically to influence my willingness to use our system of justice.

- Death threats were placed on relatives answering machines after this complaint was filed. Threats against my relatives, myself, and friends was put on my cell phone after filing complaint. I got several death threats that if my case isn't dismissed I die with family. Wanting to place fear in others and deprive them of the American System of justice and its' laws is Domestic Terrorism.

- I have affidavits about individuals in complaint wanting to use tactics to get their way in the courts and with law enforcement through intimidation.

It is for these actions, and many others that I rightfully call many individuals in complaint Domestic Terrorists.

## 4. Plans are made to empower gang members and topple traditional mafia while intimidating law enforcement.

I have affidavits about several defendant in complaint planning to empower gang members they deal with. I also have information that I can't get into further detail about. I however (as with everything) stick to everything I say under the pains and penalties of perjury. I would like to see Attorney Gregory do the same thing (say everything under the pains and penalties of perjury). The above actions related to empowering large numbers of people happens to at least border on Domestic Terrorism.

## 5. Purported Mob Connections:

This one doesn't even deserve a sentence of explanation. We'll see what Federal Witnesses have to say. Attorney Gregory - did you ask Kelle about the emails she sent me about her being a part of her fathers former Mob connections and what she said to dozens of people about them?? You might want to ask her, or refrain from acting in bad faith.

## 6. Bank Robberies:

This one is really incredible. I quoted statements that were said to me, by others. Individuals like the serial killer sidekick of Kelle O'Keefe, Daniel Loring, Joseph Solans, the Mcquinns and others mentioned committing Bank Robberies. I have not said a single word about whether or not I believe them, because that is irrelevant. The quotes about Bank Robberies were just a part of larger quotes. Attorney Gregory however seems interested in the subject..

## 7. Tax Evasion:

Read the my opposition to attorney Sinrich and his motions to dismiss, which I emailed and mailed you (Attorney Gregory). You'll see that I was clear about why Tax Evasion was relevant to the claims I was

making. It is relevant because the same tactics used for tax evasion were used to hide kickbacks and give false expense and income information during white collar fraud committed against me and Michael Simmons by defendants being defended by Attorney Gregory and others. I will work very hard to make tax evasion a part of depositions and discovery because it is relevant to complaint and the tactics that were used by defendants.

## 8. Police Corruption:

This is an outright lie. I quoted what Michael Fronte and Richard Rawson have said. I made no reference to police corruption. It is just part of Attorney Gregory and his statements that range anywhere from acting in bad faith, to misquoting me completely, to intellectual dishonesty, to outright lies.

## 9.  Extramarital Affairs:

The only conceivable reference to extramarital affairs came from the following - When I quoted what Mark Kavanach said and when I mentioned a tactic that is used by the Mcquinns against customers.

I made no comments myself and have nothing more to say on the matter. Although Attorney Gregory likely wants to engage this topic and more topics that have nothing to do with the complaint. In the case of Mark Kavanach, he mentioned many things and he himself (who I quoted) said nothing specific about extramarital affairs. The real topic was what Mark Kavanagh said about why Daniel Loring chose to open a Keller Williams office. It had to do with his divorce, hiding assets, and Keller Williams Corporates willingness to turn a blind eye to actions that violate laws. This is relevant because the neglect and ignoring serious criminal transgressions exercised by Keller Williams Corporate and Keller Williams Greater Worcester is a part of 11-1024B Complaint. In the case of Keller Williams North Central their was knowledge of and participation in Racketeering and Domestic Terrorism.

## 10. Money Laundering:

I referenced money Laundering when quoting others and in describing the actions of Ronald and Sheila Mcquinn. Money Laundering is an issue that is relevant in the case with the Mcquinns and I made that clear to their attorney in my letter. In the case of Daniel Loring, Kelle O'Keefe, Joseph Solans, and others money laundering has to do with how they use the same money laundering techniques for doing the white collar fraud they perpetuated against myself, Michael Simmons, and other victims.

## 11. Drug Abuse

Their was one reference to this and it had to do with quoting Kelle O'Keefe. It has no place in complaint and I never made it part of complaint. Attorney Gregory is trying his best though.

## 12. Spreading of Venereal Disease:

Ask Mark about this one. I was just quoting what he said. I made zero comments about it myself and it has no place in complaint. Attorney Gregory is once against outright lying. I was clearly quoting what others said and making no comments about the subject myself. I am not going to limit quotes by others, because parts of the quotes have content that Attorney Gregory objects to.

## 13. A history of Prostitution:

I was quoting Kelle O'Keefe and Denise Peach. Am I supposed to quote others and ask Attorney Gregory for permission on what parts of quotes should be allowed ???

Attorney Gregory goes on to say that I informed the Police and FBI of many actions that were committed against me. He then takes what I said out of context and quoted me as saying unfortunately they "don't fully understand RICO." I said this only about the local police and it was related to only one specific incident. I made no such comment about the FBI. I believe that the local police themselves would admit that RICO is a matter that is best handled by the FBI. Attorney Gregory has once again outright lied about the context of my statement.

Attorney Gregory is correct about my willingness to sacrifice my life for reporting Domestic Terrorism and filing complaints that expose it. I got death threats on my cell phone against myself, family and friends after filing this complaint. Relatives of mine also had messages left on their phones. I was told to be careful and watch over my shoulder more than once by the FBI Agents. I tend to take what the FBI recommends seriously. I believe there is a strong possibility that I will be assassinated for filing this complaint and I refuse to go into witness protection.

Attorney Gregory goes on to say that "While the Plaintiff's claim(s) and particular factual allegations against the Movant Defendants are far from clear, the grossly improper nature of this pleading is not."

Attorney Gregory herein first starts to actually address the complaint. He does this by saying that my claims and particular factual allegations against Defendants are far from clear. Attorney Gregory, previously stated the following about my Complaint - "The complaint consists exclusively of redundant, immaterial, impertinent, and scandalous accusations that can only serve to harass, embarrass, and damage the professional reputations of the Movant Defendants, and which appear to have been filed only in a bad faith attempt to force the payment of money to the Plaintiff in settlement of his "claims";

Attorney Gregory lies and states that I repeatedly make reference to threats that as a Rat I would be "ground up into the cast of a dildo" and kept as a trophy by defendants. He even includes this false statement in the footnotes of page four. I would like to point out a few facts about the quote that I made.

1. I was quoting others and never made the dildo statement as it's phrased by attorney Gregory.
2. I quoted a statement by Kelle O'Keefe and made no reference to the other defendants. As such attorney Gregory is either being sloppy or acting in bad faith.
3. I have an affidavit from someone who said that Kelle O'Keefe made similar statements about mutilating the bodies of rate or informants.
4. I have reason to believe that that the Defendants would do such an action against me after a murder (which they almost succeeded with). Their were murder attempts against me after the Defendants profited from the victimizing they committed against me and Michael Simmons. Why would murder be enough under present circumstances wherein defendants spent money and had to pay a lawyer in the hopes that the attorney could bury me with motions and keep this PRO SE victim quiet.

Attorney Gregory says the following "The complaint should be stricken in its entirety as it consists only of redundant, immaterial, impertinent, and scandalous matters warranting dismissal."

The same Attorney Gregory spent considerable time doing nothing but lying and misquoting what I said in complaint. Attorney Gregory spent no time what so ever in discussing my complaint and its' specific

accusations against his clients. He only starts to address complaint when on page four he says

"While the Plaintiff's claim(s) and particular factual allegations against the Movant Defendants are far from clear, the grossly improper nature of this pleading is not." The above is a statement by Attorney Gregory that contradicts previous statements by Attorney Gregory about my entire complaint being an act of bad faith. Attorney Gregory shows not just bad faith, but he lies repeatedly, and only focuses on statements that he takes out of context. He focuses on nothing but quotes I mentioned. He tries to flip the matter and make the statements that were made by others, something that I am responsible for. He also puts thoughts into my head, as if he knew what I was thinking about others, and he outright lies repeatedly out of bad faith. I would like to point out that, I freely offer to

Defend every quote and statement that I have made in complaint. I will show that everything in complaint is appropriate and that Attorney Gregory is not only trying to silence a PRO SE Plaintiff. He takes it upon himself to lie, misquote and try every other act of bad faith necessary to deny this victim of Racketeering and Domestic Terrorism a voice in the courts. Attorney Gregory has all the advantages, but has to resort to acts of bad faith, misquoting, and outright lies for crushing a victim who is lucky to be alive. Attorney Gregory contradicts himself and then goes on to asking me to pay for defendants legal bills, after he admits that I have "particular factual allegations against defendants."

Attorney Gregory goes on to quote the case Morales V Digital Equipment Corp:

The case quoted by Attorney Gregory has zero relation to my complaint. Attorney Gregory compares a case that sounds at least semi frivolous were mine. A corporation phasing out jobs to remain competitive and being sued by workers that were no longer needed, has zero relation to my complaint. I would also like to point out that the words that were considered scandalous in the above case such as "concentration camp", "brain wash", and "torture", have no comparison to words in my complaint for the following reasons.

1. I quote what others say and don't make the comments to about individuals personally myself. I also don't use any of the words quoted by Attorney Gregory in the above case as a way to describe defendants. I do back up (and will continue to back up) my claim that the actions of many individuals in complaint are a new low that never previously happened within the realtor, broker, and mortgage broker profession in the United States. I will back up such claims with crime statistics and more if needed.

2. I can and will backup every word, quote, and statement what I have said in complaint. I would like to point out that I have offered to back up everything I have said, such as my demand figure. I for instance have defended my use of the word Domestic Terrorism in describing the actions of several defendants and I will quote the Patriot Act and not back down from my accurate and conservative accusations against defendants.

3. It is pretty offensive for Attorney Gregory uses the word concentration camp in describing words that were used out of context in another case and comparing it to my words (have distant relatives and others that died in such a place, along with millions of others.) He also uses the quote of brainwashing and torture and the fact that it was considered scandalous in the case he quotes. He seems to forget that the case he quoted didn't include (any) of the following actions against Plaintiff

- Extortion
- White collar fraud
- conspiracy to commit murder
- attempted murder
- home invasions
- voyeurism
- stalking
- threats
- Domestic Terrorism

- rental theft
- computer hacking
- email hacking
- phone cloning and violations of Federal wire tap laws.
- theft
- kidnapping
- holding as a hostage
- assault with a deadly weapon
- interference with contract relations
- corporate espionage
- obstruction of justice
- bribery
- kickbacks
- tax evasion
- lying to investigators
- perjury
- conspiracy against law enforcement
- civil rights violations
- wire fraud
- mortgage fraud
- bank fraud
- identity theft
- fraudulent credit pulls and monitoring

Attorney Gregory is showing bad faith for even comparing  Morales V Digital Equipment Corp:  to my complaint.

Attorney Gregory then goes to quote the next case of  Martin versus Hunt: In this case he only says that the case had portions stricken from the record wherein redundant and verbose, impertinent, and scandalous material was in case.  Interesting that no reference to case is made. I would also like to add that Attorney Gregory has done nothing but go about quotes I made about

1. what others said to me about others
2. what others said to me directly
3. information that I have in affidavits.

Not only are the cases quoted, not relevant to my case but the statements that were considered scandalous and impertinent were comments others made to describe others. That is a big difference from quoting others directly, quoting statements about what others have said about defendants and materials in affidavits I have. On no level (not even slightly) are any of the cases quoted by Attorney Gregory relevant to my complaint.

The same statement above  applies to the quoting of the case  Morse versus Weingarten wherein statements were stricken from the record. It has no bearing on my case but the case is only mentioned by Attorney Gregory by implication, for his attempt to make the following argument (that the feelings of his clients should form the basis of what facts and information from affidavits should be used in complaint). Well geez that would be a great defense if all defendants who could claim that the charge itself hurt their feelings and they felt it was scandalous (even though it is completely true.) I would like to point out that all the cases quoted by attorney Gregory, were for getting certain statements out of complaint and not for dismissing a case.

I commend attorney Gregory on now staring to quote cases that have some relevance.

In the case Bureerong versus Uvawas  Attorney Gregory claims that the function of rule 12 (f) is to avoid the expenditure of time and money that will arise from litigating spurious issues by dispensing of those prior to trial. He then says that the scandalous material could be prejudicial to defendants. I respect the honesty of this attempt. I will argue that Everything in my complaint that is argued to be scandalous and impertinent by Attorney Gregory in my complaint are statements defendants made and information from quotes that others put into affidavits. It should be noted that I stand by everything I have said and would also like to mention that the parts of quotes that are highlighted are from Attorney Gregory's defendants. The defendants seem to have told Attorney Gregory what statements they disliked the most, while completely avoiding the facts in complaint. Attorney Gregory fully avoids the complaint material as well.

Attorney Gregory then makes the point of quoting the same case again or Alvarado-Morales versus Digital Equipment Corp (geez he must have gotten only a few cases from his direct searches). He then attempts to put cases that are a five inch square peg and compare them to my complaint which is an unprecedented case.)

Attorney Gregory then makes the point of referencing the following cases as points of precedent for removing statements from my complaint that his defendants don't like.

Gilbert versus Eli Lilly and Company., INC  -  no relation to my case
David versus H.S. and M.W. Snyder  -  no relation to my case
Martin versus  Hunt  - no relation to my case.
Gleason versus Chain Service Restaurant -  no relation to my case

Not only do cases have no relation to my case. The cases cited above has (comments and opinions) stricken that had no relevance to the specific claims and damages that the Plaintiff was suing for. They were not

1. Statements that were just part of larger quotes that were made by others
2. Comments by others that were just part of larger quotes that were said to me directly.
3. The content of affidavits from others.

Attorney Gregory then goes on to reference a quote I made from a discussion with Mark Kavanach:

"Mark, you haven't followed the most basic codes of ethics, or even the law when you chose to ignore what you knew… when it lined your pockets. Mark, you should do what you know is right and speak up about everything you know and revealed to me."

Here is my simple answer Attorney Gregory. Mark Kavanach chose to ignore the murder, extortion, and other conspiracies that were plotted against me and others. Brokers and real estate agents have to disclose small property problems to clients and interested parties. Would not murder conspiracies and more be at least slightly more important to disclose to others than small property problems??? Mark knew about them, but chose to do nothing because he felt that reporting the Racketeering and Domestic Terrorism might reflect badly on Keller Williams North Central. Mark ignored matters that are far more serious than property issues for financial reasons. How much more important is it to disclose a murder conspiracy against someone than not tell a buyer about a small leak in the cellar of a house (something that has to be disclosed by law.) If Mark Kavanach testified against others and provided information, then I would probably drop him from the case. I believe Mark isn't a Domestic Terrorist or someone who would orchestrate a murder conspiracy, and other vicious tactics against others. Mark has a conflict of interest with other defendants, but he has chosen to defend other defendants ahead his country

and justice. That was my appeal, but it has been rejected and it will continue to be rejected. He is guilty of negligence and not reporting criminal activities that he knew were being committed by individuals such as Kelle O'Keefe and Joseph Solans who working for and dealing with workers of Keller Williams North Central, Apple Country Realty, and Daniel Loring. I have a right to offer this and to have this moral philosophy no matter what Attorney Gregory has to say about it.

Attorney Gregory lies in the next statement. He says that I invite any of the various defendants to contact me regarding my fair and generous offer.

1. I made no such appeals and only mentioned that in the case of David Hill and Mark, I would "be open" to Forgiving them and dropping them from the complaint if they spoke about the actions of others. I am being open and honest and should be commended for that. Attorney Gregory contradicts himself in his response as pointed out previously. He has distorted my statements, and hasn't acted in good faith.
2. I asked no specific defendants to call me and would only speak to their attorneys. It is wrong to speak to a defendant that is represented by counsel.
3. I was making the point that I have an open mind in some cases, but in other cases I will go to the end of the trial.

I gave no specifics and Attorney Gregory is putting words into my mouth and distorting what I said completely. Or in other words he is lying.

With the above facts clarified, I would like to get too the first half of page seven. Attorney Gregory goes on to talk about dismissing case because the complaint could bring forth actions by defendants that would potentially expose them to ridicule, embarrassment, harassment, and damage their professional reputations and business interests. What actions by the defendants would do this??? That is their action..

Here is my simple answer Attorney Gregory:

Individuals who want a good reputation shouldn't do financial fraud against customers and then do the following actions against the same victims after the initial victimization (conspire to kill customers, extort customers, do email and computer hacking against customers, have customers stalked, and more.) Oh BTW Attorney Gregory, you might also want to tell people who want to keep a reputation not to talk about actions that are repugnant to the over whelming majority of people. Actions such as threatening to grind up murder victims bodies to use as trophies, to target innocent family, to target informants, and to target people in law enforcement (I have affidavits). Of and should I exclude the threat against me, family, and friends that was left on my phone, and the phones of relatives after filing this suit if this action by defendants could damage their reputations???? Maybe the tapes of the threats that happened after filing this complaint, which were given to the FBI should be stricken from the complaint???? Is that what you are suggesting Attorney Gregory???? Terrorist threats against me and family for denying me the American Judicial system of justice, should be stricken…???

In the next part of page seven Attorney Gregory cites Mass R Civ. P..  41(b)(2)

He states that the complaint isn't a short and concise summary and is too confusing. He cites the case called Mnoe versus Com for precedent.

My answer to this is to add extra clarity to complaint in the next parts of this letter of opposition to Attorney Gregory's motions to dismiss. I will be adding clarity to complaint and bringing it up to the standards of the Rules used for dismissing complaint. This will be addressed in parts three, four, five, six of letter of opposition to Attorney Gregory's motions to dismiss herein. This letter will address the foundation of Attorney Gregory's motions for dismissing complaint. I do respect the suggestion to clarify my

complaint, and will be adding clarity to what was filed for better adhering to court rules and standards as outlined by Attorney Gregory.

Attorney Gregory goes on to make reference to rule 8(e)(1) in his motion to dismiss.

Attorney Gregory states that my complaint doesn't follow rule 8(e)(1) because my complaint isn't simple, concise, and direct. That I don't adequately give the Defendants notice of my claim, and upon which the grounds upon which my claim rests. He quotes the case Conley and Gibson for precedent. He then quotes the case of Lowden versus William M Mercer, and Gooley versus Mobil Oil Corporation for precedent.

He states that following the rule allows for defendants to respond and admit to certain allegations and to have others controverter. Interesting that this would be stated by Attorney Gregory, after having previously said that what "complaint was scandalous and done in bad faith." I would think that not contradicting ones self in legal proceedings and motions to dismiss would be a big part of good faith Attorney Gregory.

I would wager a guess that both cases have very little in common with my complaint. I would like to point out that I will be adding clarity and bringing my complaint up to the Courts standards and rules that are cited by Attorney Gregory in parts three, four, five, and six of my complaint.

Attorney Gregory brings a new level of honesty when he states the following in page nine of his letter for motions to dismiss. He states "although the complaint contains numerous arguments and conclusory statements and assertions of law, it fails to contain a short, plain statement"

Attorney Gregory goes on in the final part of page nine to state that Pro Se Litigants are bound by the same standards and rules as litigants that are represented by council. He quotes several cases for precedent such as

International Fidelity Insurance Co versus Wilson
Faretta versus California
Pandey versus Roulston
McCormick versus Labor Relations Comm'n
Jean versus Director of Div of Employment Sec

I would agree with these statements, but not completely. A Pro Se Litigant that doesn't have access to standard legal papers and cover sheets cannot make his case as official looking as their Lawyer competition can, and Pro Se Litigants don't have the references and peers to call upon, that their competitors do. In other words Pro Se litigants have every conceivable disadvantage, especially when Attorney Gregory can call upon dozens of attorneys at the large law firm he works at.

In spite of having every conceivable advantage at his disposal, attorney Gregory has acted in very bad faith with this response. He has misquoted me, put words into my mouth, made judgments that weren't true about why I call several defendants Domestic Terrorists and more. I believe in showing respect towards competitors and rivals in professional settings. I have answered every part of Attorney Gregory's letter and have not cherry picked anything. I have showed a much higher level of good faith and professional standards, in spite of having every possible disadvantage and being a total underdog.

I have made huge improvements to my complaint in parts 3,4,5,6 of letter herein and have added clarity to my complaint that makes it up to standards in rules cited for motions to dismiss by other attorneys and Attorney Gregory herein. I will continue to make such improvements throughout trial and put enormous heart into it.

What is really relevant when it comes to PRO SE litigants is when seasoned attorneys with all the advantages feel they need to act in bad faith towards PRO SE Plaintiffs. Equal Protection Under the Law

Pages eleven and twelve of complaint aren't statements to respond to and are rather a request to the court and the last page is an affidavit of mailing motions to dismiss by Attorney Gregory to others in complaint.

A statement and critical response to Attorney Gregory's eleven page letter for motions to dismiss.

Attorney Gregory spends the first seven and a half pages going on and on about parts of quotes from others and individuals who spoke to me directly. He goes anywhere from completely distorting what I quoted, putting words in my mouth, to talking about what he thinks my views and opinions are. He has pages numbered 1,2,,3,4,5,6,7,8,9, 11, 12. He is missing page ten, which is likely the most important page for me to respond to. I wonder why he is missing a page??

Attorney Gregory also shows bad faith by contradicting himself three times in complaint. His quoting of rules for motions to dismiss is pretty standard. However he goes from asking for dismissal to asking that certain contents of complaint be stricken from the record.

He goes anywhere from saying that my complaint is completely scandalous to saying that it contains numerous arguments, conclusory arguments, and assertions of law. The two can't be mutually reconciled. Attorney Gregory makes contradictions and distorts what I said and the context of statements I made in my complaint.

While Attorney Gregory can make the argument that my complaint wasn't clear and specific enough and he was confused about what I was arguing in complaint (this would merely be intellectually dishonest.) Attorney Gregory can't justify his changing positions on complaint and his putting words, and motives that aren't true into my mouth and head. If someone made false claims against me, I would work very hard to prove that the person filing complaint was a liar and that they committed fraud. If the Plaintiff was

1. Filing a complex RICO suit against several defendants
2. Was a PRO SE Plaintiff without court experience
3. Spoke to Law enforcement
4. Responded to numerous motions to dismiss by attorneys.
5. Responded to every argument made by opposition without cherry picking.

There is zero probability that I wouldn't be exposed as a liar committing a massive fraud and rightfully sent to jail. I have been totally honest and have been conservative, as I could have included more quotes, information about what defendants have said, and what others have said about defendants.

I would also like to point out that if I was looking for quick settlement, then I would have avoided a RICO suit. RICO suits are long and are rarely settled without a long drawn out legal battle. I expect the case to drag out for at least three years, as I will be constantly dealing with motions and legal tactics from start to finish.

Enclosed is an opposition to motions to dismiss that was previously filed in response to Attorney Anthony Scola's motions to dismiss. I have modified the opposition to motions to dismiss, to specifically reflect my Lawsuit. Attorney Scola is going to do the same or similar motions to dismiss. I have subsequently made the point of addressing most of the inevitable motions to dismiss now before they come. This will tighten up the Lawsuit and make court procedure more efficient.

Attorney Scola quotes the same cases for precedent as every other attorney writing motions to dismiss has used. Attorney Scola must use the same search methods that I don't have access to, and the repetition of the same cases suggests that their evidently aren't many cases to use for referencing my exceptionally unique complaint.

Attorney Scola claims that my complaint doesn't adhere to Civil Procedure Rule 12(b)(6) as the claim doesn't state a claim upon which relief could be granted. This would ignore the direct monetary and rental damages, property matters, specific damages, and further losses from Racketeering. Rule 12(b)(6) will be further addressed in parts three, four, five, and six of letter of opposition to motions to dismiss herein. I will add clarity to complaint in letter herein, with the goal of going up and beyond the standards of the Rules cited by Attorney Scola in his motions to dismiss.

I would like to point out that Attorney Scolas claim that my complaint fails to state a claim upon which relief could be granted. This statement assumes that the following actions committed against me aren't causes for a claim

- Extortion
- White collar fraud
- conspiracy to commit murder
- attempted murder
- home invasions
- voyeurism
- stalking
- threats
- Domestic Terrorism
- rental theft
- computer hacking
- email hacking
- phone cloning and violations of Federal wire tap laws.
- theft
- kidnapping
- holding as a hostage
- assault with a deadly weapon

- interference with contract relations
- corporate espionage
- obstruction of justice
- bribery
- kickbacks
- tax evasion
- lying to investigators
- perjury
- conspiracy against law enforcement
- civil rights violations
- wire fraud
- mortgage fraud
- bank fraud
- identity theft
- fraudulent credit pulls and monitoring

All of the above actions were committed directly and indirectly against me. They caused damages at varying levels, but to say that all these actions in their entirety don't constitute a cause of action is preposterous.

Attorney Scola then claims that my complaint fails to adhere to the standard of Civil Court Rule 8(a) and (b).

Attorney Scola claims that my complaint only makes conclusory allegations against the defendant. Parts two, three, and four of opposition to motions to dismiss herein will add clarity to complaint and adequately address any deficiencies cited by Attorney Scola. In fact the claims against attorney Scola are very straight forward and clear. The RICO complaint that I filed is particularly complex, vicious, and an extremely prescidant setting plus multi layered Racketeering conspiracy.

Attorney Scola uses the following quote of fact "The United States Supreme Court has ruled that its often-quoted language, i.e., that a complaint should not be dismissed for failure to state a claim unless claim appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

Attorney Scola then goes on to quote the same cases that every other attorney who filed motions to dismiss has quoted. These motions will be addressed from the further clarity added to complaint in the following sections of opposition to motions to dismiss herein.

His use of rule 9E for a motion to dismiss is interesting. It will be best addressed during other parts of letter of opposition to motions to dismiss herein. Attorney Scola took thousands of dollars worth of rent from the rental thefts of Richard Rawson at my Fitchburg and Worcester Properties, as Attorney Scola spoke to banks. Attorney Scola also communicated with Joseph Solans and Christina Solans to buy properties as they uttered false documents, did false listing agreements, had me intimidated with guns, and more. Attorney Scola did zero communicating during criminal conspiracies in Worcester, MA and Fitchburg, MA. He did legal work on properties (through emails, calls, and other mediums) but never communicated with me (the seventy five percent 75%) owner of Worcester properties and the one hundred percent owner of Fitchburg properties during the criminal conspiracies of Richard Rawson, Joseph Solans, Jorge Torres and Christina Solans.

Enclosed is an opposition to motions to dismiss that was previously filed in response to Attorney Gould's motions to dismiss on behalf of Bruce Boguslav and Michael. I have modified the opposition to motions to dismiss, to specifically reflect my Lawsuit. I have subsequently made the point of addressing most of the inevitable motions to dismiss now before they come. This will tighten up the Lawsuit and make court procedure more efficient.

Although Michael Fronte and Bruce Boguslav are not presently in 93A RICO suit herein. Case might be modified to include them in future and their actions were an extension of the Organization or Racketeering Conspiracy. Bruce Boguslav and Michael Fronte are in default and their will be motions accordingly.

Worcester Superior Court Complaint 11-1024B

Worcester Superior Court
Civil Clerk and Civil Judge
225 Main St.
Worcester, MA 01608

RE: Opposition to Attorney Goulds motions to oppose entry of default judgment on Bruce Boguslav and Michael Fronte. Opposition to Attorney Goulds motions to dismiss on behalf of Bruce Boguslav and Michael Fronte. The letter of opposition to motions to dismiss and against opposition to summary judgments herein will also had clarity to 11-1024B. Letter herein will address the foundation of attorney Gould's motions for dismissal.

In no way does my response to attorney Gould's letter imply that her clients shouldn't remain in default. Especially when she has had to primarily resort to lying, misquotes and childish name calling for making her claim that her clients should be granted additional time to respond.

I am a very fair, professional, and act from the highest levels of good faith. I want to end this opposition to motions to dismiss by attorney Gould by stating that, I believe her response wasn't just from a lack of some good faith. The contents of her response were likely influenced significantly by the defendants withholding many facts from Attorney Gould. Attorney Gould herself states that the Defendants had a hard time finding counsel and she probably would have refused taking them as clients if she knew all the details about their actions and Racketeering goals. I however can't compromise in response and not aggressively address the misquotes, false information, and lack of good faith that has been exercised by Attorney Gould. I freely sign everything I say under the pains and penalties of perjury, whether it's required by the court or not. Attorney Gould has all that advantages as a seasoned attorney but resorts to baseless name calling as she further cherry picks statements from my complaint. In one case she takes a single quote I made from Michael Fronte and used it over three times and outright lied in stating that it was my statement as she distorted my complaint. I address everything that she has to say in her motions to dismiss with no cherry picking.

Letter will be addressed as follows:

1. Response to specific statements, motions to dismiss, and motion to oppose entry of default judgment by Attorney Gould on behalf of Bruce Boguslav and Michael Fronte.

2. A short summary with specific numbered averments against Bruce Boguslav and Michael Fronte with a Chronology of events committed by Bruce Boguslav and Michael Fronte.

3. Further analysis of Bruce Boguslav and Michael Frontes Actions and their aiding and abetting Racketeering and Domestic Terrorist Conspiracy.

4. Some of what will be covered during depositions and discovery.

5. Individuals to subpoena and be witnesses.

6. Justification for demand.

1. Response to specific statements, motions to dismiss, and motion to oppose entry of default judgment by Attorney Gould on behalf of Bruce Boguslav and Michael Fronte.

Attorney Gould states that the complaint fails to comply with MASS Civil Rules 8, 10, and 11. Further stating that complaint is rambling, convoluted, and unsupported of probative facts. The above fails to consider the fact that their was zero reference to this being the first Superior Court filing I did and that I had zero reference to other cases that could give references for filing my precedent setting complaint. That someone without legal training could write a highly complex and precedent setting RICO complaint up to a seasoned attorneys standards on a first attempt. Attorney Gould has received my opposition to other attorneys motions to dismiss and will be able to see a dramatic improvement over the original complaint filed. The opposition to attorney Gould's motions to dismiss herein will also add clarity to complaint and address the Civil court rules cited by Attorney Gould. Affidavits from others, identifications, tapes, and more are hardly items that are not admissible as Attorney Gould continually states. She seems quite preoccupied with the word "inadmissible" for a claim that she says is out of a comic book.

Attorney Gould goes on to state by implication that she reads my mind when she says that my complaint is "fraught with imagination and speculation, by Plaintiffs own admission,".

This statement is intellectual dishonesty at best and likely an outright lie or misquote. I merely made the point of emphasizing the fact that the actions of individuals in complaint is a new level of Racketeering that actually overlaps into Domestic Terrorism. I said that there is no previous case involving the actions of Brokers, real estate agents, mortgage brokers, and mortgage experts that is as unique and extreme as what I outlined in the complaint I filed. The actions of others were unique and actually called bizarre by the FBI. The FBI deals with the more extreme and organized criminal actions and I have made the point to them, the CIA Agent I spoke to, and the Department of Homeland Security that many of the individuals in my complaint have organized a new form of Domestic Terrorism. I stand by that claim and will defend those statements and my positions in court. I would also like to add that attorney Sinrich who represents Ronald and Sheila Mcquinn himself said that many of my allegations against the defendants (the Mcquinn's), attorneys, real estate professionals and other professions were factual. Attorney Sinrich who represents Sheila Mcquinn who is a doctor of psychology made no such speculations about my state of mind, as Attorney Gould has taken it upon herself to do.

Attorney Gould goes on to say that the defendants took much time in determining what the complaints against them were about or if the complaint against them was about "dressing for Plaintiffs other grievances." What grievances would those be?

Attorney Gould went from being intellectually dishonest and misquoting me to outright lying and contradicting herself with the following.

Attorney Gould states that "in view of the apparently delusional state of the Plaintiff, it has taken even longer to find counsel willing to undertake this matter and to review the complaint on behalf of the Defendants."

First attorney Gould states that attorneys wouldn't ordinarily defend clients if a Plaintiff was delusional. This is hardly the case and attorney Gould seems to HAVE VERY LITTLE CONFIDANCE IN THE SYSTEM by extension. Does she believe that an attorney couldn't beat a delusional persons case in court? That someone with false claims based on delusion could take non sequitors and beat a seasoned attorney with grounded facts in court?? I will first make the point that I am much more grounded and in touch with reality than the average person, and I can easily prove this from any psychological testing or the opinion of a psychologist. If Attorney Gould persists with making false and unqualified psychological analysis about me, I will file suit against Attorney Gould. Her psychology analysis as an attorney who has no place in this complaint.

I would like to also point out that prior to the filing of complaint, the following happened. I spoke to a Federal Judge even though this case is being filed in Superior Court. The Federal Judge looked me in the eyes and asked me many questions. He asked me about specific individuals and entities in my complaint and I told the Judge about the poison attempts against me, the FBI Agents that entered my residence, the Informant that had his head smashed with a rock and more. After the long meeting with the Federal Judge under oath, I filed 11-1024B Complaint. The judge met me, asked me questions, and allowed for the court to pay for filing and service fees. The Judge has been through hundreds of cases, was about twenty years my senior, seen thousands of people in court, and has seen many different cases and circumstances. At no point did he question my sanity or make the claims that Attorney Gould has taken it upon herself to do.

Attorney Gould by implications claims that her clients should be given extra time to file a response and avoid the entry of a default judgment against them because of her analysis of my state of mind. I am someone that she has never met and refused to talk to at length when I called her on the 25th day of July 2011. I would also like for her to name the attorneys that wouldn't take the Defendants case due to their concern about Plaintiff being delusional. I believe that this is an outright lie, that should be addressed in depositions and discovery. I believe that this tactic is also in preparations for future defenses.

Attorney Gould goes on to state that the claim fails to comply with Civil Court rule 12 (b)(6) for failure to state a claim upon which relief could be granted. This would imply that the following actions committed against me in their entirety aren't a cause from which relief could be granted

- Extortion
- White collar fraud
- conspiracy to commit murder
- attempted murder
- home invasions
- voyeurism
- stalking
- threats
- Domestic Terrorism
- rental theft
- computer hacking
- email hacking
- phone cloning and violations of Federal wire tap laws.
- theft

- kidnapping
- holding as a hostage
- assault with a deadly weapon
- interference with contract relations
- corporate espionage
- obstruction of justice
- bribery
- kickbacks
- tax evasion
- lying to investigators
- perjury
- conspiracy against law enforcement
- civil rights violations
- wire fraud
- mortgage fraud
- bank fraud
- identity theft
- fraudulent credit pulls and monitoring

All of the above actions were committed directly and indirectly against me. They caused damages at varying levels, but to say that all these actions in their entirety don't constitute a cause of action just by themselves is preposterous. Although I will still further clarify causes of action in letter herein.

Attorney Gould then says that my complaint fails to conform with rules 8(a)(1), 8(e), 10(b), and 11(a) of Mass Civil Court procedures. She makes her argument into five parts, which she numbered.

1. Attorney Gould states that my complaint was lifted from a comic book.

ANSWER: Question to Attorney Gould:

Was it a comic book episode when I had myself, family and friends threatened on my answering machine and have subsequent threats left on relatives answering machines as well? Did the FBI classify the threats at the Worcester MA office under comic book file after they received the tapes? Did they do the same when they entered my residence and took poison samples? If my being kidnapped and held hostage is funny and comical, then at what age should kidnappings and murder attempts no longer be considered to be comical?? Maybe under the age of six years? You seem to be the all knowing expert and rule maker, so please let me know.

Attorney Gould then goes on to say that their is no "admissible" evidence. Where are those conclusions drawn from other than blind speculation?

Attorney Gould then goes on to say that I strung together the names of people and connected them through a legend.. It is quite the strategy for Attorney Gould to make such statements and not address the associations that Bruce Boguslav had with Kelle O'Keefe, Joseph Solans, and his serial killer sidekick among others. To not deny this fact and then say that I connect everyone by a legend is very contrary to the Affidavits I have. They will be included on August 2nd.

2. Attorney Gould now states in second averment that "it is not based upon any set of facts which is capable of proof or admissible evidentiary testimony."

ANSWER: It would be absurd for Attorney Gould to ignore the affidavits that Michael Fronte presented in District court from himself and also from Bruce Boguslav (See exhibit's). It seems that attorney Gould is

merely perseverating on the comments of Michael Fronte about Bruce Boguslavs alleged association with the head of Russian Organized Crime, as she continually tries to make Michael Frontes comments my own. I didn't make the quote from Michael Fronte about Bruce Boguslav a part of my claim. I merely mentioned WHAT Michael Fronte said because his comments (which he said to others) say a lot about Michael Fronte and the information he said might be information that will need to be a part of Discovery. That is why I said that "his comments and not mine" were speculative but could probably be proven through computer forensics. Attorney Gould jumps on this statement and aggressively milks it for all its' worth, while continually taking the quote out of context and putting it into my mouth.

3. In her third averment attorney Gould states that my claim isn't short and plain with a demand for judgment according to rule 8(a) (1) or (2). ANSWER: I was pretty clear about demand figure and will be taking time in this letter to add clarity and details to complaint. I will in turn address the rules in motions to dismiss THAT Attorney Gould claims aren't adequate in my complaint.

4. In part four Attorney Gould quotes rule 8 (e) (1) and states that "each averment of pleading shall be simple, concise, and direct." ANSWER: This will be addressed further in other section in opposition to motions to dismiss herein.

In part five Attorney Gould once again lies and says that I reference the state of mind of defendants. This is an outright lie that is actually quite tactical and not a mistake. Attorney Gould lies about me referencing the state of mind of defendants for justifying the scandalous hyperbole that she says about me. Only by stating that I reference other defendants states of mind can she remotely justify what her making false claims about me and my state of mind. I make no reference to the mindset of anyone and certainly not Boguslav or Fronte.

5. In part five Attorney Gould continually tries to milk the reference I made about quotes that Michael Fronte said about Bruce Boguslav to me and others. She is really trying hard to milk my reference to Michael Frontes comments for all their worth. Bruce Boguslav's associations will be part of testimony and he will be asked about any associations he had with the head of Russian Organized crime, just as others will be asked about Michael Frontes comments about Bruce and his past associations as a way to intimidate and extort individuals.

Attorney Gould once again lies about me making references to defendant states of mind. I only referenced actions of others as being Psychopathic and never referenced their state of mind in any way. Attorney Gould tries hard to imply that I referenced others states of mind which is a well thought out and planned fraud. Geez maybe she can claim a right to make baseless claims about my state of mind by claiming that I did the same to defendants. This is more clever because I didn't even indirectly make a single reference to her clients state of mind and merely called the "actions of others in complaint psychopathic." Making a statement that emphasizes the actions of others has nothing to do with their state of mind, and I would make no such claim about some ones state of mind. The effort on the part of Attorney Gould is pretty impressive though.

Attorney Gould then goes on to state that police records and board of health reports.

ANSWER: I didn't deal with the police but rather dealt with the FBI and a few police detectives. The local police aren't trained for handling RICO conspiracies as the FBI is and the local police will tell you the same thing. Wouldn't it be convenient if everyone could access classified information from investigations at anytime from detectives and the FBI.

As for the Board of Health I have a paper herein that you might find interesting. The Board of Health paid an unlicensed Constable triple the regular price to do sheriff servings on others. There is much more to say

that you can obtain from the complaint I filed, which is in Worcester Superior Court. I could write many pages about the Board of Health worker I dealt with and Bruce Boguslavs associations with the Board of Health Worker and his dealings with the City of Fitchburg will be dealt with in discovery and depositions.

Attorney Gould then goes on to say that I am on a fishing expedition and trying to catch some bits of evidence in the wide net I have cast. Why would attorney Gould reference a net during a civil case? She claims that I violate rule 11 because a complaint is not to be interposed for delay or harassment. Attorney Gould once again is putting motives into my mind (quite the trick.) I actually have filed this complaint because of the many criminal actions committed against me, damages, and more. The basis of her claim for me not adhering to rule 11 claims that Attorney Gould is correct in her hyperbole about my complaint, which are completely contrary to what attorney Sinrich has said. Attorney Sinrich who represents Sheila and Ronald Mcquinn said that my complaint contains many factual allegations against his clients (who Bruce worked for and was a business partner of) and lawyers, real estate agents, mortgage brokers, and other experts. So Attorney Gould seems to imply that she is a mind reader and total authority on evidence, affidavits, testimony, discovery, depositions, and more that she hasn't observed yet according to her own admissions.

Attorney Gould goes on to state the same cases for precedent that all the other attorneys have used. She cites Ianacchino versus Ford Motor Company and Chamberlain versus David. She doesn't include the other cases that other attorneys have used to reference my extreme RICO complaint.

Attorney Gould goes on to once again reference my claim to a comic book, as she seems quite familiar with comic books in using them as reference continually.

Attorney Gould then makes a fourth reference to the comments that Michael Fronte made to me about Bruce Boguslav and the leader of Russian Organized Crime. I made no such comments and merely brought the issue up because it was a tactic that Fronte used to intimidate others including myself. His association or lack of association with said individual doesn't have anything to do with my claim and demands. Attorney Gould doesn't just cherry pick from my complaint but she obsessively goes on and on about a my reference to a quote by Michael Fronte.

Attorney Gould goes on to state that the November 7th , 2008 trespass by Bruce Boguslav and Michael Fronte should be ignored for my lack of giving specifics as to any direct damages that the trespass caused. She then says by implication that the two FBI agents who went through my residence several times and took poison samples and more was a fantasy. I have affidavits that will be presented on August second about knowledge of the murder attempt. The FBI told me to watch over my should and be careful and they (not the local police) directly investigated the murder conspiracy against me and other matters. I have argued that the new form of Racketeering committed and planned by many defendants in my complaint is a new form of Domestic Terrorism. This is something that I said to a Federal Judge at Worcester Superior Court prior to filing my complaint and something that I have said to others under oath as well.

I will provide the Lease that was produced by Bruce Bouguslav, as I mailed it to several places that were quite interested in it.

Attorney Gould then speaks about Michael Fronte and rental theft. Attorney Gould will be happy to know that Bruce Boguslav wrote up an affidavit that Michael Fronte presented at his 3-31-2010 hearing. In the affidavit Bruce Boguslav claims many things

1. That Michael Fronte is a business associate that worked for him.

2. That Michael Fronte always kept meticulous records for customers.

3. That Michael Fronte was given permission to destroy and take materials from my property at 348 Elm St. Fitchburg, MA. 01420.

4. That Bruce worked for MPAT.

5. That Michael Fronte gave rents to me and Michael Simmons on at least four different occasions while

Bruce Boguslav was present.

- Michael Fronte kept no records and had his father call me and Michael Simmons and threaten us when he was questioned about whether or not he was stealing rents. I mailed the tape to the right place, and Michael Fronte stole massive amounts of rents from Fitchburg and Gardner properties when he had no authorization to do so. Michael Fronte gave none of the meticulous records that Bruce claims he gave to all customers but rather went on a stealing frenzy and had people point guns at me and stalk me (identifications and information being given to right place) if I ever made issue with what was going on. The information from Bruce Boguslav and Michael will be compared to much during depositions and discovery.

- Michael Fronte was given zero authorization to steal from and destroy my building at 348 Elm St. Fitchburg, MA. 01420. Michael Fronte adamantly denied having any involvement with the theft until I took pictures of some of the stolen materials that he took. Michael Fronte wrote up and signed an affidavit about the theft and forced me to sign a paper stating that he wouldn't be charged by me at gun point. Bruce Boguslav was doing a loan modification with the Mcquinns on 348 Elm St Fitchburg, MA during time of the theft that Bruce Boguslav admits to having knowledge of in his affidavit. Bruce Boguslav utilized the knowledge of Michael Frontes theft to customize the loan modification thru bank fraud and misrepresentation for furthering the theft that David Boudrea, Michael Fronte and Bruce Boguslav gained from handsomely. Michael Fronte brought the stolen material to my Gardner properties after the bank took over 207-213 Park St and 7-11 Glazier St. Gardner, MA. This was also during time wherein David Boudreau and partners were working with Bruce Boguslav and MPAT to take above properties and 74 Abbott St from me and Michael Simmons (as they were getting paid to do loan modifications.) I have more than one affidavit from others about this scheme. It was a multi layered fraud that will be further exposed during discovery and depositions. Bruce Boguslav and Michael Fronte admit to his taking rents and the affidavits from Boguslav, Fronte, other individuals is adequate in itself for moving case forward. This is not even accounting for further testimony, evidence, and more that will come from trial. The threatening paper originals were given to the right place and the threats on my phone after having filed this complaint and during many other times speaks for itself. It would have been smart if every defendants counsel used the same approach of hyperbole and scandalous accusations about my complaint and state of mind as Attorney Gould has used. Maybe you can all get together and make your plan on the same page..

2. A short summary with specific numbered averments against Bruce Boguslav and Michael Fronte with a Chronology of events committed by Bruce Boguslav, and Michael Fronte.

Ronald Mcquinn and Sheila Mcquinn are largely correct about one thing in their motion to dismiss. The Mcquinns didn't complete loan modifications as Bruce Boguslav helped orchestrate their frauds with his sidekick Michael Fronte.

The McQuinns and Bruce Boguslav however got tens of thousands of dollars to do loan modifications but had no intentions of doing what they promised they could get done, in a month or two with loan modifications. The Mcquinns were however honest when they promised that the banks were willing to give incredible interest rates, and lower principle balances to make mortgages work and thereby avoid short sales or a REO. The Mcquinns were correct about what they said about the banks and their willingness to make good deals. Their fraud cost me a $12,000.00+/month income, about a million in principle balances waved and more. This is part of damages, and the Mcquinns and Bruce Boguslavs role in aiding and abetting Racketeering/Domestic Terrorism also contributed to far larger damages.

The Mcquinns and Bruce Boguslav in particular teamed up with others such as Kelle O'Keefe, Daniel Loring, Joseph Solans, their serial killer sidekick and others. The above individuals that had originally committed fraud and Racketeering against me and Michael Simmons. The above Kelle O'Keefe, Daniel Loring, Joseph Solans, their serial killer sidekick and others committed a White Collar Racketeering fraud through themselves and MPAT from the beginning. The Mcquinns and Bruce Boguslavs forming of Home Savers shortly after the Attorney Generals Investigation against them, and just prior to the Kidnapping and murder attempt against me was no coincidence. They made Home Savers a non profit and made some of their MPAT workers such as Dave Garvey into owners of Home Savers. Home Savers was created to convolute matters legally and make it more difficult to prosecute the Mcquinns and Bruce Boguslav civilly. They could point fingers and talk endlessly about what business handled what in order to obstruct a civil suit. Geez.. I wonder if their not having signed for the services on MPAT and Home Savers might be a part of this ingenious plan??? Likely the same reason why they refused to sign for the certified servings I sent to 67 June St. Worcester, MA 01602 for MPAT and Home Savers servings. The letters went to the Post office and the Mcquinns refused to go to the post office and sign for packages. The servings were subsequently returned to me.

The Mcquinns and Bruce Boguslavs actions with Loan Modifications is a simple 93A for criminal fraud. What they did beyond this with Racketeering and Domestic Terrorism against the same customer brings the original white collar fraud to a whole new level of conspiracy, and makes the Mcquinns, Bruce Boguslav, and their entities for hiding their fraud (Home Savers, and MPAT) responsible for the damages that such actions caused me beyond properties.

I want to also thank the Mcquinns for actually admitting in Motion to Dismiss that many of the allegations that I make against both Mcquinns, and the others in the complaint is factual. It would be an oxymoron to admit to many of my claims as factual, and then say even part of the scandalous hyperbole that Attorney Gould has engaged in. This further demonstrates the lack of good faith and honesty in her motions to dismiss.

The specific lack of fiduciary responsibilities and 93A criminal fraud during business transactions with Michael Fronte and Bruce Boguslav is clear. Their role in Racketeering Conspiracy that at least borders on Domestic Terrorism will be part of, affidavits, testimony, and Depositions and Discovery.

Enclosed is an opposition to motions to dismiss that was previously filed in response to Attorney Sinrich's  motions to dismiss on behalf of Ronald

Mcquinn, Sheila Mcquinn, MPAT, and Home Savers Company. I have modified the opposition to motions to dismiss, to specifically reflect my Lawsuit. Counsel for Ronald Mcquinn, Sheila Mcquinn, MPAT, and Home Savers is going to do the same or similar motions to dismiss. I have subsequently made the point of addressing most of the inevitable motions to dismiss now before they come. This will tighten up the Lawsuit and make court procedure more efficient.

Attorney Sinrich claims that I fail to state a claim on which relief can be granted. That the following criminal actions that were perpetuated against me don't constitute a claim for relief

- Extortion
- White collar fraud
- conspiracy to commit murder
- attempted murder
- home invasions
- voyeurism
- stalking
- threats
- Domestic Terrorism
- rental theft
- computer hacking
- email hacking
- phone cloning and violations of Federal wire tap laws.
- theft
- kidnapping
- holding as a hostage
- assault with a deadly weapon
- interference with contract relations
- corporate espionage
- obstruction of justice
- bribery
- kickbacks
- tax evasion
- lying to investigators
- perjury
- conspiracy against law enforcement
- civil rights violations
- wire fraud
- mortgage fraud
- bank fraud
- identity theft

Every one of the above criminal actions as been successfully prosecuted and virtually all to possibly all of the above criminal actions have been a part of successful civil judgments. To have everyone of the above criminal actions committed against an individual or entity, and say that it doesn't constitute a claim or cause for relief, is a blatant lie. Every criminal action that was committed and mentioned above, for furthering the Racketeering conspiracy , was done in some capacity that caused financial harm and loss against me. Punitive damages and tort are another part of the damages that only add to the financial damage that was done directly and indirectly against me. Although I will agree that I have my work cut out for me to conclusively prove the $77,000,000.00 in damages trebled. I mentioned a forensic accountant from the start, as I stand by the generosity of my demand, and spoke about providing evidence that justifies my demand. I said the same thing to a Federal Judge that was very interested in knowing about the case I was filing, in spite of it being a filing in Superior Court. I answered all his questions under oath, and answered questions about the McQuinns/MPAT, and how I justified the damage claims. After my meeting with him, I filed the 11-1024B Claim herein. I told him about the poison attempt, the agents who entered my residence and took samples, an informant that had his head smashed with a rock, and why I think that the actions of individuals in complaint are beyond traditional organized crime and rise to Domestic Terrorism.

Attorney Sinrich cites rule 12(b) 6 and cites the following cases for reference. He quotes Citron versus Nader, Iannacchino versus Ford Motor Company, Bell Atlantic Company versus Trombly, Chamberlain versus Daved Inc.

It is interesting that these cases have been quoted in every motion to dismiss involving rule 12(b)6. These cases were cited by other attorneys. The entities in the cases wherein the above cases are quoted for applying rule 12(b) 6, and the different circumstances of those cases, shows that attorney Sinrich is just going through the motions and provides little that applies in anyway to my case. A case that is likely the most extreme example of vicious Racketeering in years. I believe that my filing was a valiant effort by a PRO SE Plaintiff, that is filing a much more complex RICO suit and having to relive the traumas as I write about them. Even still, I am going to add clarity and specifics to the complaint in parts two, three, four , and five of this letter of opposition to motions to dismiss by Attorney Sinrich. This will address the foundation of his reasons for dismissal under the rules he cites.

I concur in part with Attorney Sinrich when he says "Plaintiff has recited various factual allegations against Defendants (and against numerous other individuals and entities, including attorneys, real estate brokers, and other professionals)," Attorney Sinrich is only intellectually dishonest in the fact that, what I allege is merely a cursory description of the criminal actions of the individuals in my complaint. The specific actions committed by Defendants Ronald Mcquinn and Sheila Mcquinn and how they caused damages will be addressed in parts two, three, four, and five of my letter of opposition to motions to dismiss by attorney Sinrich.

Attorney Sinrich is not an accountant or a financial planner, but goes on to give his biased and baseless opinion about my claims for damages. I would be happy to show that I am able to prove the generosity of my $77,000,000.00 claim. He seems to forget that I mentioned a forensic accountant from the start and he ignores me mentioning a forensic accountant in the parts of my complaint that he quotes. He takes small parts of my complaint in quotes and interprets sections of the small quotes while ignoring the rest of the quote. Addressing his biased and deceitful statements about my demand doesn't require another second of my attention.

Attorney Sinrich by implication makes claims, about how cutting edge business models, whistle blower claims, and more turn massively profitable, and tries to apply it to me when he mentions my Real Estate Ventures. He would be surprised to know that most circumstances and rises, don't come from a linear step by step process. There are many ups and downs along the journey but even all the right tools for making a billion dollars. This doesn't matter if even a fraction of the actions committed against me occurred against someone else with the tolls and specific key to rise to such a level.. Forensic accountants are professionals that can prove a financial claim, and that is what will be done professionally. I want to also thank the

Mcquinns for actually admitting in Motion to Dismiss that many of the allegations that I make against both Mcquinns and the others in the complaint is factual. It would be an oxymoron to admit to many of my claims as factual, and then say that I am placing blame for losses in Real Estate. This further demonstrates the lack of good faith and honesty in motions to dismiss.

Ronald Mcquinn and Sheila Mcquinn take advantage of others financial problems when they go to them. Their senior age and grand parent like personalities are comforting and put other at ease. In my case, the problems cited were a result of the fraud, extortion, phone tapping, and more that were perpetuated prior to my meeting with the Mcquinns. The Mcquinns subsequently took advantage of the situation. I said it here, just as I have to the FEDs and the Federal Judge that I spoke to prior to filing this complaint.

Attorney Sinrich goes on to outright lie and say that I do not provide any dates, locations, circumstances, or any details supporting any of the following allegations against Ronald Mcquinn.

Enclosed is an opposition to motions to dismiss that was previously filed in response to Attorney Scott Burke and Attorney Kellers motions to dismiss on behalf of Keller Williams Greater Worcester and David Hill. I have modified the opposition to motions to dismiss, to specifically reflect my Lawsuit. The attorney (s) for Keller Williams Greater Worcester and David Hill are going to do the same or similar motions to dismiss. I have subsequently made the point of addressing most of the inevitable motions to dismiss now before they come. This will tighten up the Lawsuit and make court procedure more efficient.

. I will address points raised in motion to dismiss.

Motion 12 (b)(6) Complaint fails to make a claim upon which relief can be granted.

I will give a clear and concise summary of events that is numbered. I stand by everything in complaint and will say the following (as with everything else in this letter) under the pains and penalties of perjury. "The claims in this complaint are a cursory description of the defendants, and I believe that many of the defendants could be properly labeled as domestic terrorists."

I will number averments in claim and give a clear description of what actions were taken against me, and how they ended up causing in excess of $77,000,000.00 in damages. I intend to prove the number, and I mentioned a forensic accountant from the beginning. My complaint has been very conservative in its'

descriptions of actions committed against me by individuals in complaint. I will add detail to 11-1024B complaint in this opposition to motion to dismiss by Attorney Burke and Attorney Keller. While I can see some basis for the cause for rule 12 (b)(6), because I am not an attorney and I am filing a much more complex and serious RICO suit than normal. I can address any legitimate concerns, which will be done with respect to David Hill and Keller Williams Greater Worcester herein. I will add clarity and address the allegation that the complaint is overly broad, and without enough specifics in its' present form. I will give many specifics, and show that the need for the measures in discovery, and depositions is required under civil procedure, and even as a matter of National Security. I hope that I was clearly understood when I said that many of the individuals in this complaint are Domestic Terrorists according to the definition of the word.

Rule Mass R Civ Page 8 (a)(1).

While I can see some basis for the cause for rule 12 (b)(6) because I am not an attorney and I am filing a much more complex and serious RICO suit than normal. I will address any legitimate concerns about the clarity of complaint and the argument that 11-1024B IS overly broad and without enough specifics in its' present form. In regards to David Hill and Keller Williams Greater Worcester, I will give many specifics and show that the need for the measures in discovery and depositions is required under civil procedure. Rule 8 (a)(1) is interesting. I claim that the individuals in complaint or the Enterprise committed the following actions against me. Some individuals and entities committed more and some committed fewer of the following crimes, while contributing to the Racketeering conspiracy.

- Extortion
- White collar fraud
- conspiracy to commit murder
- attempted murder
- home invasions
- voyeurism
- stalking
- threats
- Domestic Terrorism
- rental theft
- computer hacking
- email hacking
- phone cloning and violations of Federal wire tap laws.
- theft
- kidnapping
- holding as a hostage
- assault with a deadly weapon
- interference with contract relations
- corporate espionage
- obstruction of justice
- bribery
- kickbacks
- tax evasion
- lying to investigators
- perjury
- conspiracy against law enforcement
- civil rights violations
- wire fraud
- mortgage fraud
- bank fraud
- identity theft

Everyone of the above criminal actions has been successfully prosecuted and their has been substantial civil court judgments from any of the specific criminal actions mentioned above. This is a rare and possibly a first time in history situation, wherein all of the above actions were committed in a Racketeering conspiracy. It never happened with Brokers and Realtors as conduits since the realtor and real estate broker profession existed. It is also the first time that realtors and brokers took it upon themselves to engage directly and indirectly in said actions, after having first committed financial fraud and other transgressions against Michael Simmons and me his business partner. It is a first time occurrence in the history of the real estate broker and sales person profession, which has existed for approximately three generations or during the inhabitance of seven billion individuals on the face of the earth. I limit the statements to actions of Realtor and Sales agents, when making the above statements of fact. It is a profession of trust, but the arrangement was utilized as a medium for all of the above mentioned violations of law. Due to the severity of the actions within a United State company, I do believe that the actions committed by the individuals in complaint undermine consumer confidence within the United States Economy. If a professional company in the United States had workers and owners that committed such atrocities, then how would it effect the American consumers confidence in commerce in America during a time when we have gotten lead paint toys from China and such. The same is true when it comes to the actions of MPAT and Home Savers that were lined up with David Bain, who was a Richard Rawson and Kelle O'Keefe plan from the beginning. Americans could never conceive that alleged financial professionals in America would do the crimes and psychopathic manipulating that the Mcquinns, MPAT, Home Savers, and Bruce Boguslav are engaged in. The United States lost its' Industrial Base largely, and now the individuals in this complaint have shown that this largely Service Sector economy has some individuals that commit crimes against customers with a psychopathic fanaticism that is exceptional. Racketeering has to do with an effect on Interstate Commerce and as such, the actions of individuals in Racketeering herein is not just Racketeering, but Domestic Terrorism, due to their targeting institutions that maintain public order, as I have affidavits that mention some individuals in Racketeering conspiracy herein bragging about ways to undermine law enforcement and even jurors when needed. I intend to make these points clear. To say that my complaint contains no allegations or facts that could plausibly suggest a cause of action against either defendant David Hill or Keller Williams Greater Worcester is intellectually dishonest, and it rises to being completely absurd if the statement referred to actions committed by others in this complaint in its' entirety.

Rule 10(a)(b). Part two and three of letter herein, will give further clarity to complaint with particular focus on David Hill and Keller Williams Greater Worcester. It will address the issues raised about complaint in motions to dismiss by Attorney Burke on behalf of David Hill and Keller Williams Greater Worcester. It was difficult to simplify the complaint to a single set of circumstances, due to the magnitude of the actions committed by individuals in complaint. I will have specific averments numbered and have paragraphs relate to a specific circumstance. Sentences will be specific to a single circumstance as well.

Enclosed is an opposition to motions to dismiss that was previously filed in response to Richard Rawson's motions to dismiss on behalf of himself. I have modified the opposition to motions to dismiss, to specifically reflect my Lawsuit. Richard Rawson is going to do the same or similar motions to dismiss. I have subsequently made the point of addressing most of the

inevitable motions to dismiss now before they come. This will tighten up the Lawsuit and make court procedure more efficient.

A response to all parts of Richard Rawson's letter with motions to dismiss.

Richard quotes the same cases for precedent and uses the same wording that was used by Attorney Scola. Part of depositions and discovery will have to do with showing that Richard Rawson was assisted by Attorney Scola and has tried to cover associations for purposes of defense in 11-1024B Complaint. Richard Rawsons writing is a copy of Attorney Scolas work and offers nothing that hasn't been included by every other attorney writing motions to dismiss against 11-1024B Complaint has used. Attorney Scola  must use the same search methods that I don't have access to, and the repetition of the same cases for precedant suggests that their evidently aren't many cases to use for referencing my exceptionally unique complaint.

Richard Rawson claims that my complaint doesn't adhere to Civil Procedure Rule 12(b)(6) as the claim doesn't state a claim upon which relief could be granted. This would ignore the direct monetary and rental damages, property matters, specific damages, and further losses from Racketeering. Rule 12(b)(6) will be further addressed in parts three, four, five, and six of letter of opposition to motions to dismiss herein. I will add clarity to complaint in letter herein, with the goal of going up and beyond the standards of the Rules cited by Richard Rawson or a copy of the work of Attorney Scola in Attorney Scolas motions to dismiss.

I would like to point out that Richard Rawson's claim that my complaint fails to state a claim upon which relief could be granted assumes that the following actions committed against me aren't causes for a claim

- Extortion
- White collar fraud
- conspiracy to commit murder
- attempted murder
- home invasions
- voyeurism
- stalking
- threats
- Domestic Terrorism
- rental theft
- computer hacking
- email hacking
- phone cloning and violations of Federal wire tap laws.
- theft
- kidnapping
- holding as a hostage
- assault with a deadly weapon
- interference with contract relations
- corporate espionage
- obstruction of justice
- bribery
- kickbacks
- tax evasion
- lying to investigators
- perjury
- conspiracy against law enforcement
- civil rights violations
- wire fraud
- mortgage fraud

- bank fraud
- identity theft
- fraudulent credit pulls and monitoring

All of the above actions were committed directly and indirectly against me. They caused damages at varying levels, but to say that all these actions in their entirety don't constitute a cause of action just by themselves is preposterous.

Richard Rawson then claims that my complaint fails to adhere to the standard of Civil Court Rule 8(a) and (b).

Richard Rawson claims that my complaint only makes conclusary allegations against the defendant. Parts two, three, and four of opposition to motions to dismiss herein will add clarity to complaint and adequately address any deficiencies cited by Richard Rawson. In fact the claims against both Richard Rawson and Attorney Scola are very straight forward and clear. The RICO complaint that I filed is about Racketeering that is particularly complex, vicious, an extremely precedent setting and multi layered conspiracy.

Richard Rawson uses the following quote of fact "The United States Supreme Court has ruled that its often-quoted language, i.e., that a complaint should not be dismissed for failure to state a claim unless claim appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

Richard Rawson then goes on to quote the same cases that every other attorney who filed motions to dismiss has quoted. The motions to dismiss cited by Rawson will be addressed when I add further clarity added to my 11-1024B complaint in sections 2,3,4,5,6 of my letter of opposition to motions to dismiss herein.

Richard Rawson's use of rule 9E for a motion to dismiss is interesting. It will be best addressed during other parts of letter of opposition to motions to dismiss herein. Richard Rawson stole well over $150,000.00 of rent from my Fitchburg and Worcester Properties, as Attorney Scola and Richard Rawson spoke to banks. Richard Rawson also communicated with Joseph Solans and Christina Solans to buy properties as Richard Rawson, Joseph and Christina Solans uttered false documents, did false listing agreements, had me intimidated with guns, and more. Richard Rawson and Attorney Scola did zero communicating with me during criminal conspiracies in Worcester, MA and Fitchburg, MA. Richard Rawson stole from properties and avoided me completely while he lied to tenants and worked hard to perpetuate his multi layered and organized Racketeering conspiracy. Although Richard Rawson communicated with RICO conspirators such as Joseph Solans, Christina Solans and their serial killer sidekick during Richard Rawson's criminal conspiracies with my properties and his extortion for trying to sell properties through intimidation and a murder conspiracy when that didn't work. Richard Rawson regularly communicated with Joseph Solans drug pusher Jorge Torres, Joseph Solans, Christina Solans, and their serial killer sidekick but avoided me completely (the seventy five percent 75%) owner of Worcester properties and the one hundred percent owner of Fitchburg properties.

Enclosed is an opposition to motions to dismiss that was previously filed in response to Attorney Adam Simm's motions to dismiss on behalf of Jeffery Stephens. I have modified the opposition to motions to dismiss, to

specifically reflect my Lawsuit. Attorney Simm's and or the attorney representing Jeffery Stephens and Sergeant Jackson is going to do the same or similar motions to dismiss. I have subsequently made the point of addressing most of the inevitable motions to dismiss now before they come. This will tighten up the Lawsuit and make court procedure more efficient.

I want to first start by saying that I gave the Sheriff the second page of complaint to serve. The court never would have payed for the filing fees and the service, if the second page - Exhibit A of my complaint, wasn't submitted during the filing. I also would have no advantage to not serving the second page of complaint. I believe that this situation comes from Michael Ciota and Jeffery Stephens utilizing their pull with the Sheriffs department. I have enclosed an email from Luke Gallant of the Worcester County Sheriffs Department - Exhibit B. He alleges that Lorie Spaulding isn't a licensed Sheriff. She is someone I have a complaint about, and someone that Jeffery Stephens paid over triple the normal amount for Sheriff servings, while giving her a monopoly of no bid servings. This is an important point in the case against Jeffery Stephens and Michael Ciota. The triple priced servings done by Lorie Spaulding, and her no bid monopoly of servings for the Fitchburg Board of Health and much more for the City of Fitchburg is something that City Solicitor Michael Ciota defended in court during a criminal hearing on 3-31-2010 and 4-14-2010. This should show that the information in exhibit A, that Attorney Simms submitted should be looked into by the Worcester Superior Court and the Board of Bar Overseers. Attorney Simms seemed to be very focused on not wanting me to clarify the fact that I have been a whistle blower for some time. It might have also had to do with the inside knowledge of the Fitchburg MA Internal Affairs complaint, which will be explained later on. The point raised in Exhibit A is hence something that Attorney Simms went out of his way to remove from the complaint.

## 1. Address every Attorney Simms Preliminary Statement and his reasons for motions to dismiss.

Rule 8(a)  Attorney Simms contends that my one page hand written complaint does not contain a "short and plain statement of the claim showing that the pleader is entitled to relief." That complaint uses words like "RICO conspiracy" and "Domestic Terrorism", and "includes no facts what so ever."

ANSWER: I will add clarity to complaint in this letter, which is an opposition to motion to dismiss. I will add facts and clarity to complaint.

Rule 12(b)(6) will be addressed in this opposition to motion to dismiss. I will put the complaint into a clear summary of events that is numbered.

Attorney Simms gives the following cases as precedent for his motion to dismiss

Bell Atlantic Corporation versus Trowbly,  Fabrizio versus City of Quincy, Nader versus Citron, and Iannacchino cases that have been cited as grounds for dismissing my complaint. Interesting that two cases have to do with Bell Atlantic and not other potential cases, that would be available if this was a typical grounds for dismissal. What are the stats behind the case precedent cited??... It is rarely used, as Plaintiff allegations are broadly interpreted, and my case will be made clear in this letter of opposition to motion to dismiss.

A clarification with a numbered and detailed summary of complaint will be addressed in the remaining parts of this letter of opposition to motions to dismiss.

Motions to dismiss on behalf of Jorge Torres, Attorney Michael Keller, Attorney Scott Burke, Joseph Solans, Christina Solans will be done in a very similar way to what has already been done by opposing counsel and defendants. By already doing opposition to the motions to dismiss that are coming. I will be able to tighten up response and save time, paperwork, and searching online by opposing counsel. This will be done by preemptively addressing what they are going to <u>try</u> and make issue of, in their motions to dismiss.

Enclosed is an opposition to motions to dismiss that was previously filed in response to Attorney Mizhir's to dismiss on behalf of David Boudreau. I have modified the opposition to motions to dismiss, to specifically reflect my Lawsuit. Attorney Mizhir and or the attorney representing David Boudreau is going to do the same or similar motions to dismiss. I have subsequently made the point of addressing <u>most</u> of the inevitable motions to dismiss now before they come. This will tighten up the Lawsuit and make court procedure more efficient.

Common Wealth of Massachusetts

Worcester Superior Court
Civil Action Number 11-10-24B

Kai Kunz versus Keller Williams Realty Company, ET AL, Defendants

Response to motions to dismiss dated June 8, 2011 by attorney Joseph Mizhir who practices at 144 Central St. Gardner, MA 01440, attorney for David Boudreau.

Before I address specific objections to motions. I want to address a few issues of concern.

1. Attorney Joseph Mizhir is a defendant in 93A RICO Suit 11-1024B herein. Aside from the definite conflict of interest with client David Boudreau, which I believe is allowed in civil matters. I want to bring up that in suit, I mentioned some specific criminal actions that were committed by Attorney Goldstein of 144 Central Street. Gardner, MA 01440 who is either the boss of, or business partner boss of Attorney MizHlr of 144 Central Street. Gardner, MA 01440. Long before filing suit, I previously reported the criminal mortgage fraud that Attorney Goldstein (the attorney for David Boudreau at the time) perpetuated with David Boudreau, Saverio Fulciniti, Kelle O'Keefe during the sales of 74 Abbott St. Gardner, MA 01440, 205-213 Park St. Gardner, MA 01440, and 7-11 Glazier St. Gardner, MA 01440. Since I had reported these crimes that were committed by both David Boudreau and Attorney Goldstein long before the filing of case 11-1024B. I believe that Attorney Mizhir representing David Boudreau violates the rules of conduct, or quite possibly, the rule of law it self directly. Although Case number 11-1024B will have clarity and specifics added to it, it still clearly mentioned the criminal actions committed by David Boudreau and Attorney Goldstein. Attorney Mizner read complaint prior to filing motions I am responding to herein.

2. In suit 11-1024B, I mentioned specific criminal actions that have been committed by both attorney Mizhir and David Boudreau. The criminal actions of both David Boudreau and Attorney Mizhir overlap and are part of the same acts of Racketeering. Attorney Mizhir likely has a great deal of concern about keeping his story consistent with David Boudreau. Decisions that are beneficial to David Boudreau concerning potential future indightments, will possibly be incompatible with the interests of his attorney, Joseph Mizner.

I ask the court to request that Attorney Mizhir recuse himself from representing David Boudreau.

3. I believe that much of the perjury, intellectual dishonesty, and obstructing justice that was committed by David Boudreau and Attorney Mizhir in this complaint, was done in order to mislead authorities for their own benefits. This was primarily due to the concerns of David Boudreau and Attorney Goldstein about potential criminal prosecution. In this, attorney Mizhir should recuse himself from defending David Boudreau further in this suit.

4. During my 6-6-2011 hearing with attorney Mizhir and David Boudreau, attorney Mizhir tried to make an argument about the validity of my criminal charges, by bringing up complaint 11-1024B and the number of individuals and entities in my complaints. He even made reference to the fact that he (attorney Mizhir) is someone in my lawsuit. He presented this civil case 11-1024B to Clerk Whitney Brown during the hearing at Gardner District Court. He was holding the complaint and was aware of my having got made a mistake on the employment and address information of Attorney Meisner of 11 Thornton St. Needham, MA and Attorney Mizner of 144 Central St. Gardner, MA. 01440 himself. This was a recorded session and Attorney Mizner acknowledged being in suit. I now ask Attorney Mizner if he accepts being served, or if a serving should be done again? He can reply to this request to the Superior Court and myself.

Response to strike Motion to Dismiss based upon Rule 12 (b) (6).

" 2. Even given every benefit of the doubt, the facts alleged cannot in anyway be scrambled to create a cause of action."

This is absurd and intellectually dishonest at best. The facts of the 93A RICO Suit herein contain actions that are not limited to the following - rental theft, perjury, stolen property, receiving stolen property,

extortion, fraud, false rental and expense information (white collar fraud during sales), conspiracy to commit murder, violations of civil rights, kidnapping, assault with deadly weapon, at least borderline Domestic Terrorism, stalking, hacking into personal and business computer (Racketeering), cloning cell phone and more. Most (if not all) of the above mentioned actions have been successfully used in cases wherein substantial amounts of damages were awarded in civil cases. All of the above actions have been criminally prosecuted. The actions mentioned above, which are a part of my 93A RICO Suit, have been used as a cause of action in tort cases and for addressing punitive damages as well. I even mentioned my desire to have a forensic accountant determine some damages that are directly and indirectly a result of the actions, lack of fiduciary responsibility (improper inactions) of individuals and entities in this case. The many criminal actions, and reasons for this civil complaint, were done as a pattern of behaviors and organized Racketeering. The criminal actions , malfeasance, misfeasance is very voluminous in scope and makes it more difficult for someone who isn't an attorney, or even an attorney who isn't familiar with RICO Law, to explain direct and specific causes of actions during their first ever RICO filing. RICO cases could be considered to be the most complex and difficult of cases. I had zero reference points when making this complaint, as I didn't even have access to other RICO suit filings for even a cursory overview of court cases that were filed, and how the allegations were properly written about and submitted. Under these circumstances it is nothing short of a personal attack that is highly unprofessional, to allege that what I filed was delusional. I think that the 6-6-2011 hearing (the tape of which will be requested for this case), will show that I handedly displayed a far superior grasp of facts, evidence, and the presentation of relevant information than seasoned attorney Joseph Mizhir. Oratory skills, and the articulation of facts, isn't even a contest. This 11-1024B case is substantial and could easily take the fulltime work of over three seasoned attorneys, and never mind one individual without a law degree or any experience in filing RICO suits. To say that the facts and actions of others outlined in complaint don't constitute a cause of action, is preposterous and nothing short of an outright lie. Punitive damages, tort, and damages that were caused by the Racketeering, Domestic Terrorism, and what it prevented me from pursuing will be validated. I believe either a Jury or Judge, and possibly a forensic accountant will find that my demand of $77,000,000.00 trebled to $231,000,000.00 is very fair and generous to defendants. The payment of damages will also hopefully demonstrate that the courts and America itself will not tolerate a new low in Racketeering, that is in fact outright Domestic Terrorism.

Attorney Mizhir says "the facts alleged cannot in anyway be scrambled to create a cause of action." Why would facts, that are trying to be understood, be "scrambled," as the act of scrambling is for confusion. If you are going to do a simple and very small response, then at least phrase it correctly. The facts  and actions committed by individuals and entities in suit, constitute cause of action and the pattern of Racketeering and conspiracy among individuals and entities in Racketeering enterprise (along with individuals and entities that aided and abetted enterprise). This makes the cumulative effect of the specific criminal actions and other actions of individuals in complaint more serious , as said actions were part of a pattern and conspiracy and are hence the  corollary for 93A RICO action herein.

 The specific actions of David Boudreau and attorney Mizhir will be included in this response to attorney Mizners motion to dismiss below. Since both individuals committed actions with their mutual assistance in many cases. I will give specifics on the actions and allegations against David Boudreau, while including and that of Attorney Mizhir to a smaller extent in this response.  This is necessary, because some of the actions of David Boudreau overlap with the actions of Attorney Mizhir. A pattern of Racketeering, organized conspiracy  were planned and implemented by David Boudreau and his association with others directly. The extent to which he knew about and was an accessory to attempted murder, extortion, blackmail, hacking and other crimes will come out in discovery, affidavits, testimony, and other evidence. To say that none of the actions in complaint are a cause of action is likely the most absurd  use of the 12 (b) (6) motion to dismiss ever attempted. It can be argued that the complaint that I wrote in a few days, with no reference for writing style in RICO suits, previous filings, could have been written more clearly, but that is what due process is about. Lawyers make mistakes in court and 93A RICO Complaints are probably the most complex and difficult of them all. The specifics of David Boudreau and attorney Mizners actions will be mentioned below my responses to his motions to dismiss herein. I will also include specific items, records, transactions, and actions related to David Boudreau and attorney Mizner that will be a part of this cases deposition and discovery process.

In the other part of Attorney Mizhirs motion to dismiss he said "1. The complaint filed by Plaintiff contains forty - two pages of rambling, delusional, and nonsensical allegations which the Plaintiff claims constitute a 93A RICO Complaint."

I want to first by saying that attorney Mizner shows at least intellectual dishonesty here. I will be requesting the tape from the 6-6-2011 hearing for the following reasons, related to this frivolous motion.

1. At 6-6-2011 hearing, attorney Mizner got very frustrated as we exchanged evidence and I continually showed that his points were irrelevant, as he tried to get focus off of my evidence with extraneous discussions. During the end of our hearing attorney Mizhir mentioned my 93A RICO complaint and showed it to the clerk, as if it had relevance in the criminal proceedings that were taking place. He said "Kai is delusional" and then later said "he is a serial liar." Or he made different accusations when it was legally expedient to him during the moment. Since attorney Mizhir took it upon himself to ascertain my mental state, then I have the following information to share, in order to show that he was once again being dishonest.

Being "delusional" and a "serial liar" at the same time are almost a total oxymoron. You are either one or the other with almost no exceptions. If I was the former, then attorney Mizhir would have wanted to exchange more at our hearing and he wouldn't have refused to answer my questions. If someone doesn't grasp reality, they break down and can be shown to be out of touch with continued questioning and challenges. I believe that my grasp of the facts in this case is exceptional, and believe that I have a much deeper, more mature, and a much more integrated understanding of both the world and how it works than attorney Mizhir. I would be willing to take a test with him to prove it, but request that discussions be professional and respectful hence forth. Attorney Mizhir didn't want to answer my questions, and one happened to be about whether or not he was familiar with RICO cases. If he handled RICO cases, such as the one he's handling here, wherein he thinks he should be granted motions. He would know the following. He would know the complexity of 93A RICO suits, and that no man on earth without any experience in them, with no legal training, no reference to proper filings, could write a more complex than usual RICO complaint (such as 11-1024B), that was to most attorneys standards on their first try. I still however was clear about specific events, actions, and a pattern of criminal conspiracy, that made the severity and implications of this case clear. Attorney Mizner makes allegations as it suits him and for the time being it seems that it is convenient and legally expedient to resort to baseless name calling. In fairness, I believe he is using a good strategy, because I believe he certainly doesn't want many of my allegations to be heard for his own financial and professional reputation. Attorney Mizhir knows that this case will expose his having criminally lied to Gardner Police and likely more. He knew that many facts in this case could cause Dave Boudreau, his boss or business partner Attorney Goldstein to get an indightment. Attorney Mizner subsequently encouraged Dave Boudreau to lie in depositions and he further advised him in ways to direct the focus of the authorities away from Racketeering and Domestic Terrorism, and direct them onto dead ends and lies. This will be looked into during deposition and discovery.

Here are the allegations and some of what will be pursued during depositions and discovery.

1. David Boudreau sold 74 Abbott St. Gardner, MA 01440, 205-213 Park St. Gardner, MA 01440, 7-11 Glazier St. Gardner, MA 01440, with false rental and expense information. Email correspondences, information at lending institution, tenant information, tax returns, bank accounts, and more will come out in deposition and discovery. Michael Simmons who is my business partner bought properties with this information. It was white collar fraud that inflated the values of the properties, due to the false information that was provided by David Boudreau. I also believe that their was camera photo shopping done with appraisals, and other white collar frauds that David Boudreau was directly involved with prior to purchases.

2. David Boudreau brought his false information that inflated values to another level of fraud and conspiracy when he did the following. Buyer Michael Simmons was told that down payment funds for the purchase of 205-213 Park St. Gardner, MA 01440 and 7-11 Glazier St. Gardner, MA 01440 were cross

collateralized from other properties owned by Michael Simmons, by the banks that were doing the first mortgage. He went to the closings and David Boudreau's attorney - Mark Goldstein emailed the third mortgages to Michael Simmons at                    just a day before the closings took place. This was a fraud that David Boudreau the seller knew about, his attorney Mark Goldstein facilitated his wishes, and utilized his knowledge as an attorney for perpetuating the fraud. HUDs, Bank information, Banking Commissioner information, and Attorney Information will reveal the fraud. David Boudreau also sold his 74 Abbott St. Gardner, MA 01440 property thru fraud. On 74 Abbott St closing, Boudreau ended up loaning over $3,000.00 towards closing expenses. The purchase was done with seventy percent bank financing and a thirty percent second mortgage. Their was a shortfall on closing costs, that was picked up by David Boudreau, with the help of Attorney Goldstein, who facilitated the closing in his office. David Boudreau sold properties from the start by providing false financials, fraud, misrepresentations and more. Tax returns, HUDs, checks, bank accounts, lending institutions information and more will be addressed in deposition and discovery.

3. David Boudreau stole a substantial amount of rents from properties he sold in late 2007 and early 2008, and did far more theft from November 2009 thru March 2010 as well. The thefts were in excess of $30,000.00 and don't even include items stolen from properties, and coins from washers and dryers at 205-213 Park St and 7-11 Glazier St. Bank accounts, tax returns, tenant information, and more will reveal the thefts he committed at properties. Thefts done at Gardner properties combined with false rental and expense information given on properties from start, lead to default. David Boudreau continually brought his fraud, theft, and racketeering conspiracy to a new level of execution.

4. In May 2008, David Boudreau threatened Michael Simmons and myself through email. He made it clear that he had the power and authority to do as he pleased to both me and Michael Simmons. I have affidavits from others who have spoken about Mr. Boudreau's arrogance in these matters. For every email he sent, he said many threats verbally. Michael Simmons was too intimidated to file charges against David Boudreau due to the threat Boudreau made against Michael Simmons mother. The emails sent to my email address were deleted prior to my digesting them by RICO conspirator that is also a hacker. Michael Simmons was lucky to be able to print the emails before someone in Racketeering enterprise hacked into his emails and deleted the email sent by David Boudreau.. David Boudreau's perjury during his transcripts with the Shrewsbury police were done largely due to David Boudreau's participation in Racketeering conspiracy that went into full throttle at the time of his emails. He wanted to separate himself from any acknowledgement of me (Kai Kunz) because the Racketeering was starting in full force during time of his emails, and I believe he was aware of the danger I was in , at the time that he met with the Shrewsbury Police about the emails he sent. In some emails, David Boudreau specifically mentioned that he had people watching me and Michael Simmons and Mr. Boudreau used less specific language that suggests that he was directly involved with Racketeering conspiracy that at least borders on Domestic Terrorism as early as the beginning of 2008. The transcripts of David Boudreau's discussions with the Shrewsbury Police will be reviewed to show more than one act of perjury, and Mr. Boudreau will be asked to comment on the content and purpose of the emails he sent during depositions and discovery. I believe he threatened and intimidated both me and Michael Simmons for immediate extortion. He also did the threats and extortion for the purpose of laying the groundwork for the future Racketeering actions that he had planned against me and Michael Simmons from the beginning.

5. Between the false rental and expense information, fraud closing and rental thefts thereafter, David Boudreau committed a pattern of criminal actions that furthered a Racketeering conspiracy. David Boudreau made an alliance with Russian Organized crime outfit named MPAT, for getting his properties back for thirty cents on the dollar. This was accomplished by having David Thibault who is a worker for MPAT, write up vastly inflated property related matters prior to foreclosures. David Boudreau's actions such as rental thefts, threats, participation in Racketeering/Domestic Terrorism, culminated in defaults. He then worked to profit further from his frauds by making an alliance with MPAT. MPAT was being paid to do loan modifications and from talking to David Boudreau who wanted to exploit the situation, found that they (MPAT and Bruce Boguslav) would make significantly more money by working inside purchase

arrangements with David Boudreau. This being similar to inside stock dealing, but is instead bank fraud on a more sophisticated level. David Boudreau now worked to further profit from the pattern of criminal activities, fraud, theft, and more that he already profited from. His emails, phone records, relationship with Scott Young, Glenn Klausner and other partner prior to the sales of his properties in January and April 2007, during sales in January 2007 and April 2007, and his arrangement with both partners for acquiring properties he obtained thereafter for thirty cents on the dollar in July 2009 and September 2010 will be looked into. Scott Young, Glenn Klausner, Attorney Mizhir (who is part of 11-1024B), Michael Fronte, Ronald Mcquinn, Bruce Boguslav, Sheila Mcquinn will be asked to provide documents and answer questions on properties during deposition and discovery. Bank records, email correspondence, calls, tax returns, bank accounts, and more will be fully looked into. I believe that Attorney Mizhir helped facilitate the inside dealing and bank fraud that David Boudreau handsomely profited from with the help of MPAT, Bruce Boguslav, Joseph Mizhir, Michael Fronte and partners. All with be part of deposition and discovery. He thereby was able to make his theft, extortion, threats, white collar fraud, receiving stolen goods into more and more profitable organized criminal conspiracies.

6. David Boudreau lied during his depositions with Michael Simmons, lied to Gardner police, and was assisted by Attorney Mizhir in perpetuating frauds. Both attorney Mizhir and David Boudreau lied to police, and in depositions in order to distract law enforcement from the Racketeering and Domestic Terrorism that Boudreau and Attorney Mizhir facilitated and were both fully involved with directly and indirectly. The Gardner Police will be asked about discussions with Attorney Mizhir and David Boudreau, and the depositions between David Boudreau and Michael Simmons will be analyzed. I believe that David Boudreau's perjury is relevant to this case, and believe that the reasons for his perjury and that of Attorney Mizhirs is even more important. David Boudreau committed perjury. All will be analyzed during depositions and discovery.

7. David Boudreau's new tenants and business partners will be asked to testify at depositions and discovery about their knowledge of new materials being installed in buildings. Michael Fronte admitted to having taken materials from my building at 348 Elm St. Fitchburg, MA in an affidavit that he further attested to on 3-31-2010 hearing. David Boudreau received tens of thousands worth of stolen materials from my property at 348 Elm St. Fitchburg, MA 01420. Michael Fronte, his helpers, the uhaul company that rented him the truck, Scott Young, Glen Klausner, partner with them, and more will be asked questions during deposition and discovery about theft of materials and many other matters as well. They will be required to provide financial, other information, and agreements related to the properties.

David Boudreau committed a pattern of Racketeering from the start. It was committed with a level of organization, planning, and multiple layered conspiracy that built upon itself. He is being sued specifically for the direct cost, future appreciation, and other financial damages. He is also being sued for punitive damages, tort, and other damages for his role in directly and indirectly participating in, and aiding and abetting RICO Conspiracy that at least borders on Domestic Terrorism. The specific actions he committed t constitute a civil cause of action to start. His actions were continuous, and built upon one theft and fraud after another. He participated in much more than the specific actions outlined in this response herein.

Attorney Mizhir has chosen not to recuse himself after having read my complaint. That is smart because it doesn't allow me to ask him questions about his role in this 93A RICO Complaint, due to the attorney client privelage. So by representing David Boudreau he becomes Teflon on causes of actions against him (Attorney Mizhir). This tactic is especially useful wherein the actions of attorney Miznir overlap and facilitate the actions of David Boudreau in this 93A Complaint.

The actions of David Boudreau and attorney Mizhir constitute a very clear cause of action. Their having aided and abetted Racketeering and Domestic Terrorism will be another level of cause of action that will come out during depositions and discovery. Attorney Mizhir has offered frivolous motions to dismiss and I will challenge them on solid grounds. In challenging his motions I will not have to be tangential, extraneous, intellectually dishonest, commit perjury, or resort to name calling as is the case of attorney Mizhir.

Attorney Mizhirs motion to dismiss on 9A of the rules of Superior Court is just standard , for not wanting to engage in a case. His having to resort to name calling, unspecific claims and reasons for dismissal speaks for itself. He mentions nothing specific in my claims, and that speaks for itself. Their isn't just specific causes of action, but there is a pattern of fraud, racketeering, and criminal actions which constitute a very clear and substantial cause for this 93A RICO claim. I will be happy to go over this response line by line, in order to help Attorney Mizhir understand it if necessary.

Enclosed is an opposition to motions to dismiss that was previously filed in response to Attorney Van Buren's motion to dismiss on behalf of Lorie Spaulding. I have modified the opposition to motions to dismiss, to specifically reflect my Lawsuit. Attorney Van Buren and or the attorney representing Lorie Spaulding is going to do the same or similar motions to dismiss. I have subsequently made the point of addressing most of the inevitable motions to dismiss now before they come. This will tighten up the Lawsuit and make court procedure more efficient.

June 25th 2011

CommonWealth of Massachusetts

Worcester Superior Court                                    Docket Number  WOCV  11-890B

Kai Kunz

vs.

Lorie Spaulding

Analysis of Lorie Spaulding's response to my Worcester Superior Court filing proves useful for adding clarity to complaint. The incredible effort to avoid saying anything in response to Kai Kunz's claims says a lot.

1. I want to start by responding to the five point affidavit that has been submitted by Lorie Spaulding. I will give her verbatim affidavit and then respond to her affidavit point by point.

2. I will address the other points raised in Motion to dismiss herein. I will address the motion to dismiss point by point.


RESPONSE TO FIVE POINT AFFIDAVIT:


" I Lorie Spaulding, being duly sworn, to hereby depose and state as follows:"

"1. I am the named Defendant in the above Captioned action."

ANSWER:   I do not disagree that Lorie Spaulding is the defendant in complaint. Her saying this is interesting, as the same Lorie Spaulding was served at the same address prior to a hearing on 3-31-2010.


'2. My only relationship with Plaintiff occurred in my then capacity as a duly appointed Constable when I Served process upon him."

ANSWER:   The use of the word "relationship" is a smart move do to because it is ambiguous with multiple applications as needed. You could for instance say that an arrest involved a past relationship with someone, whereas a threat or conspiracy committed against the same person, wasn't a relationship. That such instances are not physical, face to face in the case of a conspiracy and is hence not a relationship. Even smarter is Ms. Spaulding's saying that she only served process upon me, which is worded to avoid addressing the actions she did on 1-8-2010. This gives her wiggle room and allows her to conceivably avoid perjury in the future.

Her saying she had no other dealings with me other than the arrest would be an outright lie, so she used the word "relationship." The use of relationship allows her to make a general statement in her motion to dismiss herein, without outright committing perjury. Lorie Spaulding spoke to me on several occasions at the Fitchburg Court on Elm St, and spoke to me as well during the time when she wrote and signed the statement "Joe Solans is on the Hunt for you (Kai Kunz)." This paper is an exhibit and just one example of her dishonesty in statement two.

Lorie Spaulding's having said that she served process upon Kai is nothing short of an outright lie. During her 3-31-2010 hearing with me, she said "Kai was confused because he thought that my arresting him had to do with the Housing Court." She rightfully said this, and the Housing Court tape will verify my confusion. I was confused because Lorie Spaulding never served me and I subsequently didn't know what the arrest was about. She arrested me during a Housing Court session recess and prior to the completion of the Housing Court session wherein she had no authorization to do so. She admitted to not allowing for me to talk to my attorney, use the bathroom, and she also refused to tell my attorney about what the arrest was for on 1-8-2010. She admitted to these actions during the 3-31-2010 hearing.

Lorie Spaulding only gave Kai Kunz the civil capias during the 3-31-2010 hearing, and his Attorney Joseph Lussier was never given a copy of the civil Capias himself. Lorie Spaulding also likely used the word "relationship" to be able to be intellectually dishonest with the Court, without committing outright perjury. This is specifically the case because she will likely argue that when she wrote, signed and dated the paper that said "Joe Solans is out on the hunt for you (Kai Kuhns)", it was a random act and not a relationship like what occurs when someone arrests and detains someone else.

Lorie Spaulding here states that she was a Constable when she arrested me, but doesn't address the email correspondence from the Worcester Sheriffs Department in complaint. Email correspondence wherein Luke Gallant claims that Lorie Spaulding wasn't affiliated with the Sheriffs Department (Constables and Sheriffs both are.) She presented a letter from the Mayor, that stated that she was given the license.

I believe that Lorie Spaulding's saying that her relationship with Kai is limited to having served him as a Constable is an outright act of perjury. This is because this statement by implication says that she only served him a single time or only dealt with him during the 1-8-2010 incident that she admitted to under oath during 3-31-2010 hearing. Lorie Spaulding is a very talented writer and phrased her affidavit very carefully for the purpose of having wiggle room with her intellectually dishonest and statements that are outright acts of perjury in some cases. Her saying that she only had a relationship with me when she "served process upon him" could also be considered to be an outright lie, because it is phrased to mean a single occasion of service. This avoids the fact that Lorie Spaulding served me many times at my residence at 111 Church St. Northbridge, MA 01588. A place where she ran into my neighbors and spoke to them several times (my neighbors had some involvement in conspiracy to commit murder against me.) It also ignores that Kai made a complaint with the court about the triple the normal price of her servings which addressed her multiple servings. Kai reported the cost of her servings and monopoly of service through corrupt City worker Jeffery Stephens to the States Ethics Committee and other agencies. In fact Kai sent a letter to the States Ethics Committee about a conversation between Jeffery Stephens and Lorie Spaulding wherein they conspired to have me arrested at all costs. This letter was mailed about two weeks prior to the 1-8-2010 arrest. Lorie Spaulding is avoiding her many servings on me at my residence for Housing Court related matters by her deceitful statement, for many issues beyond the tort and the specific reasons for my claim herein. Kai also sent the civil capias letter to other agencies because he believe it was a forgery, that will be addressed in this trial. It stated that their was a warrant issued in January 2009 and that Lorie Spaulding basically waited a full year before doing the service for $200.00. Kai found that suspicious and that capias will be addressed in depositions and discovery.

Lorie Spaulding's statement about having no other dealings with Kai other than the "service" she did on him as a Constable, denies the paper hand written paper she wrote as well. The original of the paper she wrote (which was included in this complaint) to the FBI in Hudson, MASS. The original paper was on an approximately 4 by 5 inch paper that she wrote on. It was scrap paper at the Fitchburg District Court, as she felt comfortable talking about her knowledge of another persons intent to kill me in front of Fitchburg District Court workers. Likely the reason why her arrest in 2007 for disorderly conduct and resisting arrest was held at Leominster, MA and not Fitchburg, MA in order to avoid a conflict as the article attests to. Something that Michael Ciota helped her to prevent during my hearings. This conflict will be addressed in depositions and discovery, as the arrest took place at the Fitchburg Court building. Prior to mailing her hand written letter to the FBI, I made a copy of it and added information on it from the conversation I had with Lorie Spaulding. I wrote notes on the copy during the day when she wrote the letter and I mailed the copy with the notes to the FBI on the same day that she wrote the letter. I wrote on a copy of letter, about my conversation with Lorie Spaulding less than 30 minutes after she wrote.

I would like to add that there are many situations wherein someone needs to have no direct face to face relationship with others, while they engage in organized crime and other criminal actions. Lorie Spaulding was and is aware of many criminal actions that were committed against Kai and she aided and abetted the criminal conspiracies. It was smart for her to have avoided the letter she wrote in motion to dismiss and only mention that I provided a "hand written letter." The verbal technicalities and other methods will not allow her to wiggle out of the damages she is directly and indirectly responsible for. Her taking picture of my fathers plate, who she sent plate information to will also be addressed during depositions and discovery. She will also be asked about her dealing with Joseph Solans and others, while addressing her phone records and email correspondences as well.

"3. While Plaintiff's complaint appears to allege I committed a tort, because of Plaintiffs use of double negatives and conclusions, as well as his incorporation of seemingly unrelated communications into his

pleading, I am uncertain as to what action or inaction on my part serves as the basis for Plaintiff's complaint."

ANSWER: I allege that Lorie Spaulding committed tort because she committed tort. There are specific actions that Lorie Spaulding committed that were preplanned, deliberate, malicious, and part of Racketeering actions that she aided and abetted. Putting cuffs on Kai extra hard, not letting him talk to lawyer, telling him he can't use the restroom, not allowing me to get my coat in car in Fitchburg, making him ride with her to Gardner, MA and leaving him stranded in Gardner with no coat during winter weather. Her actions are a reality that she committed and they have nothing to do with whether or not Kai had spelling errors or if he mistakenly had double negatives in complaint. Lorie Spaulding admitted to virtually all of the above and that is a reality that will be addressed in court during depositions and discovery.

I am not an attorney, had zero Superior Court Experience, wrote complaint quickly, and was under a considerable amount of stress at time that I wrote complaint. The specifics in my complaint will be included once again in this letter against Attorney Van Burens motion to dismiss.

Lorie Spaulding claims that "I am uncertain as to what action or inaction on my part forms the basis for Plaintiff's complaint." This is intellectually dishonest and avoids the fact that Lorie Spaulding has an attorney. Does her attorney want to say he doesn't understand basis of complaint, or did he want her to write it up? It would be very convenient if a defendant could play ignorant to a complaint and get off, but Lorie Spaulding has a great deal of court experience and is just utilizing intellectual dishonesty for trying to avoid responsibility for her actions.

Lorie Spaulding claims that Kai incorporated seemingly unrelated communications into his pleading. The unrelated communications she must be referring to, has to do with the email correspondence that occurred in December 2009. The email I included in complaint, is relevant to my complaint for more than one reason.

1. Lorie Spaulding often laughed about my days being numbered as she maliciously wanted me to have an early demise or to be murdered. Her having known about Kai's life being in danger and admitting to that knowledge in note, that she wrote and signed after a murder conspiracy in 2009, and before a subsequent attempt on his life in 2010. It says a great deal beyond her total arrogance and feelings of invincibility within the court systems. It shows that she at least has no respect for Kai's life, and it says even more about her character, and the type of person she is. It also shows that she has no regard for the law or the very basics of being a Constable or someone in law enforcement. If you are in law enforcement, or even a citizen, you are required to report murder conspiracies that you have knowledge of. You are committing a felony if you do not report a murder conspiracy to law enforcement. Character and having a total disregard for the Law as a law enforcement officer, are all relevant in a civil case. It is especially important if the same law enforcement officer (Lorie Spaulding) caused harm to an individual as a law enforcement officer and utilized her relationships with court workers for favors and more.

2. The email also shows, that Kai was onto the association Jeffery Stephens had with conspirators and that Lorie Spaulding is almost certainly more involved with. Anything that Jeffery Stephens is involved with IS SOMETHING THAT Lorie Spaulding is helping to orchestrate. Lorie Spaulding largely calls the shots and is the dominant personality in their arrangements and her relationship with Jeffery Stephens.

3. The email or exhibit in complaint herein also adds perspective to what Lorie Spaulding wrote. It shows that she was likely very aware of the conspiracy to commit murder that was done prior to and after the letter she wrote. I also believe that Lorie Spaulding is intimately aware of other criminal actions beyond the ones that she aided and abetted as they were being committed against me. She doesn't have to have any relationship with a crime victim, as that is what the RICO statute is about it seems.

"4. For all of the above reasons, I am unable to respond to Plaintiff's apparent allegation that my services of process upon him resulted in either damages noted in the Civil Action Cover sheet or the other violations Of law he appears to assert."

## ANSWER

Lorie Spaulding says that she is "unable to respond to Plaintiff's apparent allegation that my services of process upon him resulted in either damages noted in the Civil Action Cover Sheet or the other violations of law he appears to assert." Lorie Spaulding said that she only had a relationship with me during her capacity as a Constable when she served process upon me. If her only relationship with me involved service upon me on a single occasion then their would then be no reason for her to say that she "can't understand my claim in the Cover Sheet or the violations of law I appear to assert." The violations of the law that I spoke about in this complaint were outside of her service that she performed on 1-8-2010. Although that does not mean that she didn't potentially break the law during 1-8-2010 as well.

I will address the specifics of my claim later in this letter of opposition to motion to dismiss.

Lorie Spaulding did several actions that are a part of my claim. Her actions were beyond her actions during 1-8-2010 and extended into aiding and abetting Racketeering conspiracy that at least borders on domestic terrorism. The actions that she aided and abetted greatly effected (among other things) my Billion plus dollars worth of form 211 IRS Claims and my other Whistle Blower claims against companies and individuals on behalf of the Federal Government and the Tax Payers of America. If you engage in malicious behavior and Racketeering against someone who is working on large projects, then you are responsible for the damages caused by your having prevented individual to from full filling contract obligations and for them to work on projects effectively. Actions prevented much of the work to be compromised and the damages from this will be accurately considered. I am suing for punitive damages, pain and suffering, injury as well. I believe that a Jury or Judge will find that my claim is substantial and might even exceed the demand of $4,003,000.00 that is in complaint.

"5. I therefore respectfully request the Court dismiss the Plaintiff's complaint, or, in the alternative, order Plaintiff to provide a more definite statement of his claim, including specificity as to any alleged tort and the relationship of any action or inaction on my part both to the extent of damages alleged and the, purported statutory claims noted in the Cover Sheet."

## ANSWER

I am working to better clarify my complaint and the specifics of claim. I believe that what has been provided is adequate, but will add clarity during this opposition to Attorney Van Burens Motion to Dismiss herein.

## Part 2

2. I will address the other points raised in Motion to dismiss herein. I will address the motion to dismiss point by point.

Attorney Van Buren list of alleged facts herein will be addressed point by point:

Attorney Van buren correctly states that my complaint consisted of a two page complaint and an additional five pages of information in the form of email correspondence and a hand written note.

ANSWER: Attorney Van Buren makes the point of not addressing the content of the hand written note or the email correspondence. It seems that he wants to make issue with volume rather than content.

Attorney Van Buren uses the statement I made of "Lorie Spaulding didn't just serve me before making arrest.'

ANSWER: Attorney Van Buren avoids the fact that I claimed that Lorie Spaulding didn't serve me in complaint, which is clear. He utilizes a convenient part of sentence and avoids responding to not only the rest of the sentence, but the additional facts stated in complaint that clarify that potential writing error. The use of that is intellectually dishonest at best.

Attorney Van Buren states that the complaint continues with a disjointed narrative that includes allegations of conspiracy, informants, intimidation, as well as RICO and Domestic Terrorism.

ANSWER:

1. The conspiracy will be addressed during deposition and discovery as outlined earlier in this response. It is certainly worth looking into when Lorie Spaulding wrote a letter about my life being in danger prior to and after murder attempts against me. It is further interesting that she mentioned Solans as being involved in a murder conspiracy as he evidently felt confidant that it was safe to tell Lorie Spaulding about the conspiracy without fear of her reporting it.

2. The disjointed comment about my mentioning informants was made pretty clear in complaint. Lorie Spaulding (in front of Fitchburg District Court workers) said that Joseph Solans had a friend beat up a friend of mine. He had the friend beat up because he found out that he was an FBI informant. I know someone who is an FBI informant. That individual had his head smashed with a rock and suffered brain damage. She will surely be asked about her knowledge of this during depositions and discovery.

3. I wasn't overly specific about intimidation. Although the issue of intimidation will be addressed thoroughly during discovery and depositions. Ms. Spaulding association with others will be looked into and the combination of her writing, statements, and the timing of her writing and actions make this a necessary part of claim.

4. My reference to RICO and Domestic Terrorism is quite clear. Lorie Spaulding at least knew about the Racketeering and Domestic Terrorist conspiracy I reported to the FEDs long ago. It involves the conspiracy to commit murder and other conspiracies outlined in email and a more serious part of which has been acknowledged by Lorie Spaulding. The extent of her involvement will determine if a jury or judge will award more than my $4,000,000.00 demand. I had $3,000.00 in doctor bills between Merrimack Valley Hospital and Doctor Milo of New England Neurological. I will be getting second opinion on nerve

problems I continue to have in wrist. I was injured without question and had an x ray of bruise taken within 24 hours of injury initially.

5. Her actions and the impact of said actions on some of my work will be addressed during trial. I will obtain a Forensic Accountant during trial as I mentioned in cover sheet. This as with other many key points is ignored by attorney Van Buren. I will be happy to go over this response for Attorney Van Buren in person at court line by line to help clarify my objection to motion to dismiss to help him understand.


The present Lawsuit includes Lorie Spaulding as part of 93A RICO Lawsuit due to her integrated involvement in Racketeering/Domestic Terrorist Conspiracy. Here are the specifics

1. Her involvement in aiding and abetting Racketeering conspiracy.

2. Lorie Spaulding's attempts to undermine Law enforcement through her uncle in FBI which she brags of.

3. How Lorie Spaulding aided and abetted the infiltration of law enforcement through informants Kevin McCarthy and Joseph Young.

4. Lorie Spaulding's involvement with frame attempts against Kai Kunz for aiding and abetting Racketeering and trying to decrease credibility of Kai Kunz's testimony.


Motions to dismiss on behalf of Jorge Torres, Attorney Michael Keller, Attorney Scott Burke, Joseph Solans, Christina Solans will be done in a very similar way to what has already been done by opposing counsel and defendants. By already doing opposition to the motions to dismiss that are coming. I will be able to tighten up response and save time, paperwork, and searching online by opposing counsel. This will be done by preemptively addressing what they are going to try and make issue of, in their motions to dismiss.


Statement by Edward Ahern about inevitable Motion's to Dismiss that are coming:

Proactively addressing the inevitable Motions to Dismiss based upon rule 12, rule 8, rule 41, rule 9. It would be very convenient if Racketeering/Domestic Terrorist fanatics could bankrupt individuals who expose and speak up about their fanatical agendas. Such predatory actions can utilize gains from their Racketeering/Domestic Terrorist to pay an attorney from money they extorted from victims. Unlike the bankrupted victims that have their patriotic lawsuits dismissed due to an inability to afford counsel during tough economic times. The RICO/Domestic Terrorist fanatics thereby have a way in which the financial problems America faces can be utilized for furthering their fanatical Racketeering/Domestic Terrorist agendas on more future victims. To allow their actions to go the extra mile by making Citizens/victims unable to properly expose such actions in court due to their inability to pay counsel. It also helps the Racketeering/Domestic Terrorist fanatics when victims (such as myself) are disabled and unable to fully respond to the motions to dismiss to come. Dismissing the PRO SE complaints of disabled victims like me (there are many others that fear for their lives and are unwilling to file suit and or go to authorities) on legal technicalities is a green light to encourage enemies of America to bankrupt disabled and outspoken patriots that expose Racketeering and Domestic Terrorism. Since the Nations security is far more important than technicalities that have as many interpretations as there are judges. I ask that their be consideration for the damage done to me psychologically. It effects my ability to focus on this filing lawsuit this PRO SE (it is being filed PRO SE due to RICO fanatics bankrupting me and my ability to overcome my limitations.) I ask that court consider that counsel ask for clarification on any parts of my complaint and help clarify their positions.

In the motions to dismiss their will inevitably be a recitation of a decision involving a Fidelity case wherein a PRO SE litigant was asked to maintain the same legal standards of opposing counsel. This is not the typical rule and their should be considerable understanding when the nations security is effected from cases that expose out of control Racketeering agendas that harm Americas financial institutions and public confidence. It is all the more fair to ask for consideration, due to the fact that the calculated agendas of others to terrorize me and harass me constantly with threats and intimidation effects my ability to file my case as a PRO SE litigant to the best of my abilities as a disabled American, who is supposed to have the same rights as others. The case quotes to come in opposing counsels motions to dismiss will also have no real relation to my precedent setting case. Luckily for said defendants, I have my work cut out for me. I can't afford an attorney, a Psychologist to back up the psychological damage done to me, a forensic accountant and a few other necessary experts for justifying every penny of my $5,100,000.00 demand. Said defendants were very clever in picking me as a victim as they know that they can have my complaints likely squashed by attorneys they can afford due to money they earned by victimizing disabled Americans like

Myself.

Part 3. Ways in which individuals act in coordinated Racketeering/Domestic Terrorist conspiracy. How their actions caused financial and individual damage to Edward Ahern and Kai Kunz.

## By Kai Kunz and Edward Ahern

Kelle O'Keefe, Daniel Loring, Mark Kavanach, Joseph Solans, Christina Solans, Richard Rawson, Keller Williams North Central Leominster, MA, Apple Country Realty of 65 Park Street. Ayer, MA, Joseph Solans of 170 W Main Street. Groton, MA, Christina Solans of 170 W Main Street Groton, MA Fiefdom Holdings Syndicate of 170 W Main Street. Groton, MA, Polonia Realty Holdings LLC, Keller Williams Corporate 1221 South Mopac Expressway., Suite 400. Austin, TX. 78746, and David Boudreau of 253 Fernwood Drive. Gardner, MA 01440

Kelle O'Keefe, Daniel Loring, and Mark Kavanach orchestrated the Racketeering frenzy that caused Kai Kunz and Edward Ahern a huge amount of losses. Daniel Loring and Kelle O'Keefe in particular put together the individuals who worked towards the Organizations goals. Kelle O'Keefe, Mark Kavanach, and Daniel Loring ran and run a mortgage fraud, appraisal inflation scam, bank fraud, identity theft, extortion, drug dealing, murder, Racketeering, Domestic Terrorist, money laundering, home invasion, financial fraud, tax evasion, Rental theft, and civil rights violating operation.

Daniel Loring did a considerable amount of appraisal fraud, mortgage fraud, bank fraud, IRS fraud, and more during his career with Apple Country Realty. Daniel Loring established Keller Williams North Central and subsidiaries in the middle of 2007. Daniel Loring utilized Keller Williams North Central for evading monies due his wife Pamela with Apple Country Realty and white collar ventures he profited from during divorce. Daniel Loring is said by several sources to have picked Keller Williams due to their known corruption and tax evasion tactics. Daniel Loring needed a company to work with wherein it would be a helpful conduit for laundering his illegally obtained money.

Daniel Loring brought his white collar fraud enterprise into new levels of depravity when he teamed up with corrupt tax evading Realtor, failed business woman, and former prostitute named Kelle O'Keefe. Ms Collette, Ms. Collette's sons, White collar fraudster Mark Kavanach, Drug dealer/extortionist/killer/ arsonist/bank robber, and career criminal Joseph Solans, and other associates thereafter such as the Mcquinns, Boguslav formed the backbone of Daniel Loring and Kelle O'Keefe's operations.

The Racketeering, white collar fraud, tax evasion business, and operations of Daniel Loring went to a whole new level when he created a more sophisticated and far reaching criminal organization in late 2007. During the middle of 2007 Daniel Loring teamed up with Joseph Solans, Kelle O'Keefe, Mark Kavanach and associates. Daniel Loring set up Joseph Solans drug dealing operations at the building he rented at 63-65 Park Street. Ayer, MA where he subleased the property to Joseph Solans. Daniel Loring, Kelle O'Keefe, Mark Kavanach, and associates helped Joseph Solans expand his drug dealing operations through real estate work in Fitchburg, MASS. Joseph Solans was thereby able to expand his drug dealing operations into Fitchburg MA, Gardner, MA, and other areas. Now with plans to expand into Florida and the Southern states.

Daniel Loring, Kelle O'Keefe, Mark Kavanach and associates presently assist Joseph Solans and his drug dealing operations. Said operations were and are greatly assisted from the real estate dealings wherein Daniel Loring, Mark Kavanach, Kelle O'Keefe, and associates assisted Joseph Solans grow his operations. Operations wherein gang member tenants deal drugs on behalf of Joseph Solans and even Kelle O'Keefe, Daniel Loring, and Mark Kavanach.

Kelle O'Keefe, Daniel Loring, Mark Kavanach, Joseph Solans and others in enterprise have also worked to empower gang members with sophisticated methods for gaining power over traditional mafias (due to numbers in gangs), intimidating jurors, intimidating law enforcement, undermining technology, and communications of law enforcement, and other tactics that undermine the public order. See enclosed affidavits. Note that I will be including more affidavits as trial progresses. Some individuals writing affidavits have to go into witness protection before doing affidavits. Daniel Loring, Kelle O'Keefe, Mark Kavanch, and others bring racketeering to a whole new level of depravity and danger to public order and even the financial health of America.

Daniel Loring, Kelle O'Keefe, Mark Kavanach, and associates also were instrumental in helping Joseph Solans and his serial killer sidekick extort New Hampshire Land Owners out of second mortgages, and land itself. All associates worked together in furthering this extortion against individuals who were veterans and the elderly in a few cases. This fanatical Racketeering agenda got to me (Kai Kunz) and Edward Ahern as well.

Identity theft, forgery, stalking, harassment, wire tapping, computer hacking, home invasions, theft, and more is the norm and not the exception.

Myself and Edward Ahern were kidnapped, harassed, terrorized, had my cell phone tapped, emails hacked, family and myself stalked and more. Edward Ahern had utilities put into his name by conspirators so that they could make more money for the fanatical Racketeering/Domestic Terrorist conspiracies of the individuals in this 93A RICO Law Suit. Joseph Solans and his/Kelle O'Keefe's, Daniel Lorings, Mark Kavanaches' serial killer sidekick extorted Edward Ahern into furthering their Racketeering, theft, and other conspiracies against Kai Kunz and Michael Simmons.

Edward Ahern was kidnapped, stalked, harassed, tortured and forced to put his name into the utilities at 50-60 Prichard Street, 62-64 Prichard Street, 153 and 158 Prichard Street, 3-5 Johnson Street, Fitchburg, MA, 74 Abbott Street Gardner, MA, 5-7 Lowell Street, 69 and 71 Maywood Street, 32 Birch Street 32-32 ½ Ellsworth Street Worcester, MA. I was kidnapped by Joseph Solans, Kelle O'Keefe's, Daniel Lorings and associates serial killer sidekick and brought under gun point to Richard Rawson's residence at 33 Scenic Drive Worcester, MA 01602. This happened in March 2009 when Edward Ahern was kidnapped at gunpoint on Park Ave in Worcester MA by Solans serial killer sidekick in a red truck. The truck had another passenger that was approximately 50 years old with gray hair, a medium to stocky build. Solans serial killer sidekick (who often drove a motorcycle when he pointed a gun at me and threatened/stalked me prior to and after kidnapping) got a call on his cell phone during kidnapping. He was addressed as "Mr. Landry" from the caller.

When I (Edward Ahern) was brought into Richard Rawson's house I was showed pictures of my family at Richard Rawson's residence and told by Solans serial killer sidekick and Richard Rawson that "your family and you will be savagely tortured and murdered if you don't comply with Richard Rawson, Solans and associates." Solans/Kelle O'Keefe's, Daniel Lorings, and Mark Kavanaches serial killer sidekick was likely in early forties, bald, approximately 6' tall, and very likely a heavy drug user. I was told that Richard Rawson, Michael Fronte, Jorge Torres, and David Boudreau would be limited in how much they could steal on behalf of the revolution, if utilities had to be payed. I asked Rawson and Solans serial killer sidekick why I would be helping them. They said that it wasn't my concern, and that I would get credit for furthering the revolution once it gained power. I was lectured about Kai and Michaels privilege and why the American system is an evil system that needs to be overthrown.

Richard Rawson said he was Teflon and "I will fucking steal another $150,000.00 from properties owned by Kai and Michael." "I will have Kai successfully killed next time he rats and the same goes for you, Simmons, and family as well." Putting the utilities into my name cost me over $100,000.00 in utility bills, ruined my credit, and caused many other problems. I was stalked and harassed and I had my cell phone conversations played back to me and those of my family members as well.

Richard Rawson did identity theft against me and had the utility bills mailed to his residence. Richard Rawson, Joseph Solans, Jorge Torres called Unitil for furthering the Racketeering conspiracy. My putting utilities into my name allowed Rawson, Solans, Boudreau, Fronte, Solans serial killer sidekick, and others to steal far more in rent. This is because putting utilities into my name would allow for less payments from rental thefts to go to utility expenses. This allowed rent stealers to steal hundreds of thousands extra in rents.

At meetings I was at. Individuals in Racketeering conspiracy spoke about empowering gang members in massive numbers and teaching them philosophies that would make them fanatical adherents to their racketeering and revolutionary causes. Talk about making associates and members more fanatical than the defenders of IWO Jima during WW2 and other disturbing discussions were present during meetings I had the unfortunate experience of being at with several Racketeering conspirators in late 2008, 2009. See affidavits.

Richard Rawson said he wished Kai was successfully poisoned and died a painful death for hurting the revolution. Rawson said "we will all team up and make sure that we discredit Kai by any means possible." "If I fail the revolution I will commit suicide and the same goes for others as well."

Polonia Realty Holdings LLC is merely a medium for asset protection on behalf of Joseph Solans. Ownership between Christina Solans and Joseph Solans is routinely changed as needed. When covering up the land thefts, drug dealing, extortion, domestic terrorism is convenient. Ownership is changed accordingly In corporations between Christine and Joseph Solans. It is simply a conduit

Fiefdom Holdings Syndicate LLC is a medium for asset protection and the Racketeering/Domestic Terrorist goals of Joseph Solans.

Apple Country Realty is the Corporation established by Daniel Loring for furthering his white collar frauds, drug dealing, racketeering, and Domestic Terrorist goals/agendas.

Keller Williams North Central was established by Daniel Loring and his straws (the Colletes, Mark Kavanach) for furthering the white collar fraud and tax evasion of Daniel Loring. The second benefit and goals from Apple Country North Central is that it separates income Daniel earns from Apple Country for avoiding money due from divorce, and it allows Daniel to separate himself from potentially being caught and losing assets from his involvement with Joseph Solans, Keller O'Keefe, their serial killer sidekick, and others.

Keller Williams Corporate has become a conduit for protecting the Racketeering and Domestic Terrorist activities of Keller Williams North Central and Keller Williams Greater Worcester, MA. Keller Williams Corporate can't deny the statistical impossibility that they are not responsible for not properly overseeing the Racketeering and Domestic Terrorist activities of a full two offices that have created a whole new level of Racketeering and psychopathic depravity that no other Real Estate Brokering entity in the history of the United States ever came close to duplicating. Having Guinness Book of World records level Racketeering at one office might be an anomaly and something that was an unfortunate. However having two Real Estate Offices that have committed and plan the inconceivable is beyond random chance. The unheard of happened because Keller Williams Corporate attracts the lowest levels of depravity to its' Franchises. Keller Williams Corporate exists and makes money because of what they allow Franchise owners to avoid the minimal standards of audit and oversight that is required of any legitimate Franchiser.

Christina Solans was involved with the stalking, murder plots, extortion, theft, drug dealing operations, land thefts, murder plots, and Racketeering committed by Joseph Solans, Kelle O'Keefe and associates. Christina Solans often showed up at social clubs and bars I frequented when I picked up woman and did social networking. I was often asked many questions by Christina Solans. Questions were about Kai Kunz's sleeping patterns, whether or not the FBI believed what he said, whether or not Kais' father had Military intelligence information and if he could be potentially kidnapped, and other vile conspiracies. Christina told me that Kai would be poisoned and that her husband Joseph Solans has had dozens of people killed

through tainted drugs. That he gets big money for assassinating people through this method. She said that gang members that dealt drugs for her husband would be encouraged to join the military for access to high end weaponry, cutting edge fighting methods, and connections into the military for overthrowing traditional mafias and giving extreme power towards the revolution... as she called it.

When Joseph Solans pointed a gun at me and had me a few days before having me kidnapped, he said that my family, young relatives, friends, and everything I hold dear, would be annihilated if I didn't put utilities into my name or if anyone reported him or his friends. He said that "the Italians kill you, the Russians kill you and your family, but we will kill you, family, friends, pets and more even if you had nothing to do with ratting on us." "We will not be stopped and we are the future!!!"

Ronald Mcquinn, Sheila Mcquinn, Bruce Boguslav, Michael Fronte and others, were new members and entities of the organization. Paths were crossed when computer hackers from the Daniel Loring, Kelle O'Keefe, Joseph Solans, Mark Kavanach, serial killer sidekick and others Racketeering/Domestic Terrorist organization crossed paths with the Racketeering organization of Ronald Mcquinn, Sheila Mcquinn, Bruce Boguslav, Randal Devries and others. It created a Racketeering explosion that culminated into a Racketeering frenzy against Michael Simmons, Edward Ahern, and Kai Kunz that was so fanatical it made the defenders of IWO Jima in WW2 look like laid back cowards (as has been bragged about by defendants such as Richard Rawson) and it was so devious it would make John Gotti flinch.

Jeffery Stephens and Sergeant Jackson protected the drug dealing, racketeering, and Domestic Terrorist operations of Joseph Solans, Kelle O'Keefe, Daneil Loring, Lorie Spaulding, and others. They did specific actions to get attention, and create contempt for the ultimate informant (Kai Kunz) and make him look like he was responsible for Fitchburgs drug problems (which have existed before he ever even knew about the existence of the city). All the while protecting Joseph Solans drug dealing operations and doing everything possible to make murderers, drug dealers, and extortionists that pay money look good. They likewise demonize informants that do more than anyone else to curb real crime. Note that it is rare when someone volunteers to be an informant without being asked, as a good gesture to their country's health.

David Hill and Keller Williams Greater Worcester protect any amount of Racketeering and Domestic Terrorism for money. They knew about and ignored/protected the actions of Richard Rawson, and others. Richard Rawson did several fraud escrow statement in committing bank fraud. He was able to commit these frauds due to a lack of oversight on behalf of Keller Williams Greater Worcester, MA.

Attorney Burke and Attorney Keller acted corruptly with Superior Court and went out of their way by implication to aid and abet Racketeering and Domestic Terrorism.

Their were many threats, extortion plots, phone tapping, email and computer hacking and more that didn't stop. It would take me six hundred pages to list all the specific incidences involving the gun threats, extortion plots, thefts, frauds and more from Joseph Solans, Kelle O'Keefe, Daniel Loring, Denise Peach, the Mcquinns, Bruce Boguslav, their serial killer sidekick, the Mcquinns and associates.

By Kai Kunz below

Kelle O'Keefe constantly tried to get others involved in her extorting and Racketeering schemes with others by talking endlessly about me (Kai Kunz) and Michael Simmons alleged privilege, and how she had it tough growing up, and her background. She asked for extra commissions in order to facilitate deals and

asked for kickbacks in many forums from sellers. She tried to justify actions against me and Michael Simmons due to our alleged privileges compared to her background and that of others. She got kickbacks and constantly worked against me and Michael Simmons interests. She did the above while orchestrating Racketeering, and future conspiracies with Daniel Loring, Joseph Solans, their serial killer sidekick, Denise Peach, and associates against us. Kelle O'Keefe and Denise Peach pulled Michaels credit, and even mine while also having a system wherein they knew if our credit was pulled. I gave well over two thousand pages worth of pictures, information, plates, information on individuals, tapes, audio, and more to the right authorities. That certainly shows that I back up everything I claim. I say the above and everything else in this lawsuit under the pains and penalties of perjury.

In 2005 I got a call from James Crossin who now was self employed and had a business named North American Financial at 384 Main St. Worcester, MA 01608. He said that he had 100% CLTV financing for commercial properties and lenders that would do 100% land or property rehab acquisitions with 100% construction loans. He had previously floated the name and recommended Saverio Fulciniti of Atlantic Mortgage previously. He had said that the previous issues he had were due to the company he worked for in Reliant mortgage and that, he would no longer be handicapped by their incompetence. That he was now working for himself with commercial and (Quote me Rate) for residential deals. I believe that Quote Me Rate has been out of business for some time. I wanted to have a strong cash flow source so that I could focus on new pursuits with large business models and applications. I had a real estate license at the time but wasn't familiar with the profession and didn't think that I would have time.

I was sent cash flow information or listings from Kelle O'Keefe of Apple Country Realty in Ayer, MA. James Crossin suggested that she was incredibly qualified as an agent and that she was the person that he insisted was used as a buyers agent for property acquisitions. I really thought that the incredible financing institutions he raved about having, and the potential cash flow from financing sources was worth sucking it up, and using an agent that I didn't think was the most qualified by any means. James Crossin and Kelle were finalizing a deal wherein buyers of Kelles from New York were buying a laundry business, and close to closing. With hindsight I found out that James Crossin utilized Inter bay and worked well with Kelle. They didn't have to disclose the companies tax returns to the bank and instead gave the bank, a financial statement written out on the business, which James Crossin brags he did for the bank. They also did not show the tax returns to the buyers and at best showed them part of the returns. This didn't show that the business would be making a loss based upon the mortgage and other expenses. James Crossin used Inter bay in this case because of the huge leverage they do on limited cash flow, and the fact that they don't require tax returns from businesses. Interbay often overlooks this information in favor of questionable financial statements (such as many manufactured by Saverio Fulciniti, James Crossin, Denise Peach) when they do. In fact the buyers were confused and didn't like the loan terms at the closing. Though they ended up buying because the attorney for Inter bay told the buyers that they would loose a $28,000.00 deposit if they backed out of the deal. The same attorney for Interbay also did at least 1 closing with Michael Simmons as well - 348 Elm Street Fitchburg, MA to start. This giving of partial information and utilizing banks for getting around negative cash flow/the need for disclosing tax returns as proof of income, is the typical modus operandi that O'Keefe and associates would do. Often Kelle would cut and paste buyers previous signatures to signature area of papers for extensions, or rate disclosures that she didn't want the buyers to read. She did this with me and Michaels deals as well. The deal above was something that was a typical action done by Kelle O'Keefe, Denise Peach, Saverio, or James Crossin. It seems that the Crossin and O'Keefe duo were focused on not only getting deals done, but also in lining us up for future extortion, going after relatives and friends for money and blackmail, rent thefts and the taking of properties as icing on the cake.

Letter by Kai and Edward Ahern that was already sent to right department. Letter explains Racketeering frenzy and modus operandi of organization quite well.. Letter also

has important information about actions committed against Kai Kunz and Edward Ahern that caused huge financial and individual damage.

In September 2006 until Jan 2007, several properties were looked at with 100% CLTV offers put on them. James Crossin was the person who was attempting to finance the properties. We had offers placed on several deals with 100% CLTV or 70% bank financing and a 30% seller seconds. It ended up in mid December 2006 that James Crossin finally found out that Inter bay no longer did 100% CLTV loans. He was working with his friend at Inter bay in Mansfield, MASS named Paul Keane. After finding this out (assuming it was an accident) he said that he would submit the loans to another bank and needed new disclosures signed. This had to do with his prearranged lawsuit that he and Kelle O'Keefe were going to split. Michael was told to sign disclosures related to a great bank that did 100% CLTV loans as well. The disclosures were in fact vague agreements wherein James Crossin was to receive 1 point on every property that a P and S was done on in addition to $1,750.00 for each property as well. This was for whether or not the property was financed or wasn't, so that James Crossin was getting tens of thousands of dollars as a mortgage Broker no matter what happened. James Crossin also asked Michael if he could get him any assets he had himself or that his parents had which named him as a beneficiary on them. He explained and Kelle concurred that these assets could be used as assets that could be used for assets that down payment funds could be seasoned from. That from this he could get many deals done and for the others he could cross collateralize with existing equity in Church St units. Michael dropped financial off at Kelle O'Keefe's office at Apple Country Realty and James Crossins office as well. Kelle ended up faxing these financials to dozens of realtors and more. Some of the papers she faxed, which were altered, were also used for closings with her fax number on them from Apple Country Realty. By this time in January 2007 74 Abbott St Gardner, MA, 3-5 Johnson St. Fitchburg, MA, and 6-8 Mariom St. Haverhill, MA had already been closed with 100% clean CLTV loans. James Crossin said that based upon appraisals the purchased properties and existing Church St units had equity in them, which could subsequently be used for cross collateralizing and getting down payment funds for property acquisitions as well. The intentions in doing deals from the start were the same as with every previous deal that was done with me and partners prior (100% by the book).

James Crossin said he could cross collateralize from other properties for down payments as well. From here Michael Simmons dropped off assets with Kelle O'Keefe who said that "I have investors who will finance you for acquisitions." That if sellers didn't have the money, she would have one of her associates lend money from the equity in properties. 348 Elm St was bought in March 2007 with the seller Gino Mola providing the down payment funds. Attorney Bowin who had an office on Prichard St in Fitchburg, MA. did a mortgage that was placed on 3-5 Johnson St. Fitchburg, MA. Or in effect Michael was pulling money out of 3-5 Johnson St. Fitchburg, MA for obtaining down payment for 348 Elm St. Fitchburg, MA. The same thing was done for the purchases of 62-64 Prichard St. Fitchburg, MA, 50-60 Prichard St Fitchburg, MA as well. The same seller Gino Mola gave the buyer Michael Simmons the down payment funds and Attorney Bowen did mortgages for properties that were utilized for loans that produced down payment funds for properties. Kelle O'Keefe, Saverio and Peach said that these deals were done barely legally, but legally nonetheless. Information escaped little by little as deals proceeded.

Here are some points before I get into all aspects of the transactions that were done. This came out in bits and pieces from other people such as Saverio and Denise Peach when they complained about one another when they got heated.

1. On many deals and during all stages, Kelle O'Keefe cut and pasted Michaels signature onto papers such as extensions, P and S agreements, loan papers, and such. She faxed this information from her office and home to mortgage brokers when needed for transactions to proceed. She even presented different pages or new P and S pages when needed for making deals work.

If you can think of something shady that a realtor could do. Kelle O'Keefe has done it and likely more. She faxed Michaels fathers Fidelities to many people and her fax number was on at least few of the altered financials used for closing. This was particularly the case with the first few deals done with James Crossin. She also likely spoke about this at length through email with Denise Peach in particular and even Saverio

Fulciniti. I heard from Lorie Spaulding that Joseph Solans broke ties with Kelle O'Keefe because she spoke to many people about much of the details of activities she did with him in the extortion and classic fraud way as well.

2. Saverio Fulciniti was a referral of James Crossin, while Denise Peach was from Kelle O'Keefe. Both Saverio and Denise Peach were said to be individuals who co brokered with James Crossin and would give him points for deals that they closed. James Crossin, Saverio, Kelle O'Keefe, and Denise Peach said that James Crossin was going to file a lawsuit if Denise Peach, and Saverio were not used as mortgage brokers. Joseph Solans was from Denise Peach who knew him for a long period of time.

Joseph Solans told me after I stopped dealing with Kelle O'Keefe that he would get me, and that I would have to deal with him, Kelle O'keefe and associates for the rest of my life. . Kelle used to say that she could cry and convince anyone of anything and mentioned in late 2007 that she "cried her way out of an IRS issue in 2007."

Kelle O'Keefe assured me near the end of association that dealings with her, Peach, Solans, and associates will never end, and that the real estate transactions were just the beginning. After association ended with Kelle O'Keefe. Joseph Solans followed up by calling me on 1-508-266-0164 office phone and saying "I know who your family and friends are, and I can make it go away with $720,000.00." He said that "me and Kelle O'Keefe will quickly make you wish you got it ($720,000.00) by any means possible, when you and those close to you experience things that you can never comprehend or even imagine!!" He said this before in a round about way, when we met at Keller Williams in Leominster, MA as well. This was also said to me by the secretary at Keller Williams in Leominster, MA who was close with Kelle O'Keefe. I believe her name was Donna and she had long blond hair and was in mid to late forties. This was in August before the Worcester, MA deals closed.

I was angry about the false financial and income/expenses that were done by Kelle, Denise and Saverio (this will be addressed in a property by property deal description.) I wasn't fully aware of who committed the fraud and the extent of the fraud until a lot later. This was due to the paper thefts and financial emails being deleted during Racketeering/Domestic Terrorist frenzy. Rents were lied about, made up, and expenses were intentionally deflated. Kelle O'Keefe and Denise Peach told me that if me and Michael Simmons backed out of the Worcester deals they would make our lives a living hell. At this point Kelle O'Keefe, Daniel Loring, Joseph Solans, and the organization mentioned lots of information about my associates, family, and day to day routines. This is information they primarily got from tapping my cell phone, hacking into my emails, and starting to have me scoped fairly regularly through Solans and his extortion, poison, and RICO king associates. The Racketeering/extortion frenzy made me extremely uneasy but with hindsight I should have gone to authorities sooner.

I thought something was up but I didn't take the threats/extortion as seriously as I should have. The email wherein Kelle O'Keefe mentions Mafia contacts (that I sent to you) was far less than 1% of the threats and extortion that was done. Though in fairness to them, they also gave positive and uplifting reasons why the Worcester properties should be bought as well. Positive (but false) incentives such as equity lines and help with management, which never happened of course.

3. Kelle O'Keefe even tried to shake down Diagle who was an appraiser for Key Stone appraisal services. She was completely out of control when she met up with Solans. Although even before meeting Solans, and in the very beginning, she was trying to get money through fraud. The first fraud and extortion scheme was with James Crossins fraud/joke law suit and kickbacks. Kelle O'Keefe routinely asked for extras from selling realtors such as Tony Champa, Arthur Vekos, and more.. and I believe that their were price puffs through false financials with money going to her and Peach plus Saverio. Certainly in the case of the McCarthys and Alan Kupelnick their was endless finagling and games she played in the hopes of getting extras. She was and is out of control as are Peach, Solans, and to some extent Saverio. In this their was endless finagling and games that even made their way to my condo and into my refrigerator, sink, and vitamins in the form of poison against me and bullets directed at Edward Ahern. Below is a cursory description of the modus operandi of Kelle O'Keefe, Daniel Loring, Joseph Solans, the Mcquinns, David

Boudreau, Bruce Boguslav, Michael Fronte, their serial killer sidekick and associates.

### 1. 3-5 Johnson St. Fitchburg, MA 01420.

Property closed on 12-29-06 for $250,000.00 with a 70% Bank Loan, and a 30% Seller Second. This was all done by the book. Crossin used Argent Mortgage through Citizens Financial. The rents given in the listings were $800.00+/month. O'Keefe altered Michaels parents financials in this deal and the cover sheet and fax number were from her. The deal itself was very doable and was done by the book from what I know. Although every time I turn around I find out that Kelle O'Keefe, Daniel Loring and Racketeering/Domestic Terrorist associates have done more and more actions that were off the wall and often frightening.

### 2. 74 Abbott St. Gardner, MA 01440.

This property was bought in the same exact manner and $250,000.00 price as was 3-5 Johnson St. Fitchburg, MA. In this deal as with 3-5 Johnson St. Though there is the possibility that O'Keefe and Crossin did anything under the sun. It was a straight 70/30 deal that was 100% CLTV and thoroughly kosher. Save for any altered financials that Kelle O'Keefe or James Crossin submitted.

### 3. 6-8 Mariom St. Haverhill, MA. 01830.

This property was purchased for $220,000.00 as an owner occupied deal. It had 85% bank financing and a 15% seller second. It had nothing funky and was done by the book.

### 4. 348 Elm St. Fitchburg, MA 01420

Bought for $150,000.00 with a $30,000.00 seller second, a $105,000.00 Inter Bay first, and 10% down deal. It closed in early March 2007.

This property was done with Inter bay as an owner occupied business. Many details were found out after purchase and during the loan modification attempts in 2008 until early 2009. This deal was done by James Crossin as mortgage broker, Tony Champa as sales agent, John Bowen the Sellers attorney (Bowen is also long time friend and business associate of Tony Champa), and Kelle O'Keefe.. Kelle O'Keefe and Daniel Loring faxed Michaels parents financials to dozens of realtors after altering them and utilized them for assets needed for deals. James Crossin, Kelle O'Keefe, Gino Mola, and Tony Champa were at the closing with the same Inter Bay attorney that did the dry cleaning business purchase mentioned previously. This (348 Elm Street Fitchburg, MA 01420) was property that town wanted badly.

Lorie Spaulding and Jeffery Stephens used their contacts and influence to try and help Joseph Solans, Kelle O'Keefe, and Racketeering conspirators by any means possible. Joseph Solans knew this and didn't want to step on their toes by going after 348 Elm Street initially. He let Lorie Spaulding/Jeffery Stephens and their corruption within Fitchburg run the show with 348 Elm Street and 3-5 Johnson Street in Fitchburg, MA. Michael Fronte ripped the building apart in late April 2009 and May 2009, as the Mcquinns and Bruce Boguslav negotiated with banks to cover up situation with the theft from 348 Elm Street by a worker of MPAT (Michael Fronte). The Mcquinns aided and abetted the murder, extortion, Racketeering/Domestic Terrorism plots for the benefits of David Boudreau. David Boudreau had materials from 348 Elm Street. Fitchburg, MA 01420 installed into his Gardner Buildings during inside bank fraud take backs of 30 cents on the dollar.

Joseph Solans, Kelle O'Keefe, Denise Peach, Lorie Spaulding were the ones who called the town and police to complain about issues at this property at 348 Elm Street Fitchburg, MA. 01420 for many reasons.

Before any properties sold their were prearranged RICO extortion stunts with outright thefts planned. Likely more that I am not even aware of.

## 5. 205-213 Park St and 7-11 Glazier St. Gardner, MA 01440.

Both properties were bought for $330,000.00 with 75% bank financing with Green Point Mortgage, a 15% seller second and 10% down payment. The properties closed on 4-12-07. Attorney Richard Gilmore was the closing attorney during these transactions. Kelle O'Keefe, Dave Boudreau, Michael Simmons, Attorney Goldstein, and Scott Young were at the closings. Scott Young is a former NHL Star, that Dave Boudreau was indebted to. In this transaction Saverio Fulciniti was the mortgage broker. These properties worked well cash flow wise because people in Gardner payed. The rental figures were inflated as can be shown by email correspondence wherein Saverio told Dave Boudreau what he needed to show for bank financing. Dave Boudreaus numbers were very contrary to what was the reality, as was found out after purchase. Between the 2 properties David Boudreau fudged the rent numbers by close to a grand with the help of Kelle and Saverio. Kelle O'Keefe also managed to deflate expense figures by over $300.00/month on the Glazier St oil bills (alone), and never mind the $300.00/month plus deflate in water/sewer expenses he presented. This is while David Boudreau also simultaneously bloated the washer and dryer income figures by over $300.00/month. $2,000.00/month discrepancy in income and expenses without batting an eye lash.

The expenses were also much higher than the reality. This is the case wherein the oil expenses were given on 7-11 Glazier St. The actual bills that came from Dave Boudreau's oil purchases on Glazier St from Chair City oil will be substantially different. Kelle O'Keefe also had rental information from Boston sent to the appraiser with HUD information on it. I got a hold of what was faxed and given by Kelle to the appraiser and believe I sent it to you. She presented it as market rent for Gardner and presented other rental information to the appraiser.

For his part, Dave Boudreau made sure the appraiser didn't get into the units that were in the worst condition. As a result these units had to have huge amounts of work put into them. David Boudreau and Kelle O'Keefe also did photo shopping with the properties units. The vacant units also had rental information given that was 100% false as well. In this deal Dave Boudreau's attorney Mark Goldstein did the third mortgages for the down payments that Dave Bodreau lent from what I believe was the refinance of a property that David Boudreau had. Attorney Goldstein emailed the third mortgages to Kelle O'Keefe, Dave Boudreau, Michael Simmons                , and Saverio Fulciniti prior to the April 12, 2007 closings. In this transaction as with others, Kelle O'Keefe faxed altered financials of Michaels parents to Dave Boudreau as did James Crossin. They also gave the same financials to many other people for property acquisitions. This information was found out after closings, and from speaking to sellers holding mortgages. These properties (205-213 Park St and 7-11 Glazier St Gardner, MA) worked better than most with only a small negative cash flow, because the tenants paid and the interest rate were good.

Tid Bits on deals

Former NHL player Scott Young lent Dave Boudreau money to make transaction a reality and Dave assigned much of his second mortgages to him. This same Scott Young lent, and bought these same properties after a prearranged MPAT auction wherein they were paid (as records show) for a loan modification, while getting prices as low as possible on these properties for a maximum kickback from Scott Young and David Boudreau. Scott Young also did a P and S with Michael Simmons for purchasing 74 Abbott St. Gardner for $65,000.00. This and more was done with MPAT at the barrel of a gun literally. Dave Boudreau who stole considerable rents in late 2007 and early 2008, and again from November 2008 through March 2009, wanted to get properties back after selling initially through financial fraud. He used his property as an ATM to the detrimant of his then business partner James Boone.

The rental thefts, property thefts, extortion, and more was planned by David Boudreau from the start. Both properties were bought back for about 30 cents on the dollar from Lehman Brothers that bought the

mortgages from Green Point prior. Lehman Brothers had a big issue with Green Point and wanted them to take back these mortgages that were sold to them, because they were false. Sheila Mcquinn said that Lehman got a hold of Richard Gilmore ESQ and Saverio Fulciniti and asked for the HUD documents. They both said that they did not have them. They lucked out as this was right before Lehman went bankrupt. As, I mentioned before "Michael made emails for every single property and scanned income, rental, expense and HUD information into them. I also believe that I have the same information inside my computer as it first has to be scanned into a computer, before going into the emails. My computer was given to State Police crime lab. During RICO explosion many papers were taken and such, but I luckily focused on doing things via permanent emails that are in Michaels name through hotmail. If ever they are deleted , they can be retrieved by a data recovery, whereas a lost paper is gone.

Lehman Brothers was offering great terms and conditions that MPAT for loan modifications. MPAT of course never shared this information. They always had their own motives and always alluded to me and Michael Simmons that we would loose everything if they (MPAT/Mcquinns/Boguslav/Home Savers) at least didn't get half of what they would get ($1,000,000.00 according to them) if they were authorized to do short sales through their inside short sale buyers. The buyers happened to be O'Keefe, Joseph Solans, Denise Peach, and associates. Though Rawson felt it should be Kupelnick in Worcester, MA property transaction/property thefts so he could get a double commission and kickback with the help of Anthony Scola. Anthony Scola and Richard Rawson spoke to banks with mortgages on the Worcester, MA properties and the Fitchburg MA properties. This was in anticipation of the extortion and murder conspiracies that would make the sales of the properties by force a foregone conclusion.

## 6. 50-60 Prichard St and 62-64 Prichard St. Fitchburg, MA 01420.

50-60 Prichard St and 62-64 Prichard St. Fitchburg, MA were purchased together and closed on the same day in the middle of May 2007. In this transaction good ol O'Keefe did the following with Tony Champa. Their were about 5 vacancies in the buildings together. 50-60 Prichard St Fitchburg, MA is a 7 family that had 4 vacancies, while 62-64 Prichard St which was a 3 family with 1 vacancy. Tony Champa filled vacant units with furniture while Kelle O'Keefe listed units for rentals on MLS. Before the appraiser arrived she made the MLS say that the units had been rented for an amount that was needed for bank financing purposes. This was done either with Apple Country or Keller Williams North Central which she worked for thereafter with criminal extortionist owner Daniel Loring. This was mentioned by Paul Sclottier who (with his son) owns Josephs fresh produce. Paul also sold a bar in Keane NH to Gino Mola, that is now Ginos Bar and Grille. The appraiser for Green Point was also given false rental information as well. In this Saverio Fulciniti, Kelle O'Keefe, and Tony Champa actively worked to bamboozle Michael Simmons, me, the appraiser, and the bank by extension. This bloated the income figures by well over $2,500.00/month and they managed also to cover property defects with shades and other means. This was done while also intentionally keeping the appraiser, me, and Michael Simmons out of the worst units.

Appraisers will usually be satisfied if they get into 80% of the units. Although in the case of Inter Bay they will accept nothing less than 100% of the units, and the cellar. In this case with Green Point, the mortgage Broker can pick the appraiser. The same appraiser that did all of Saverio's transactions, was also the one that does most of Saverio's deals (if not all) with companies such as Green Point wherein Saverio can pick the appraisers.

Water/Sewer and other expenses were also overlooked and deflated. The income issue with the 2 properties was many times more significant. In these transactions Saverio always tried to use a lender that didn't require the tax returns on the properties being financed. In this deal and others, the P and S agreements were changed wherein addendums having to do with fixing the properties taken out by Kelle O'Keefe and Daniel Loring. This was done when the P and S agreements were submitted to the banks. The sellers denied

any knowledge of having addendums in the P and S agreements. If there is anything shady that a realtor has ever done, be assured that Kelle O'Keefe has done it. She will have also come up with new things that are one of a kind in fraud/extortion.

While Kelle did the above with P and S agreements, and playing with Michaels parents financials to Mortgage Brokers and dozens of realtors. Denise Peach was simultaneously being a master of giving partial papers on mortgage disclosures. She thereby only submitting copies of Mortgage Disclosures to banks by fax. The original mortgage disclosures were quite a different story. Denise Peach would then have disclosures that were signed by Michael at closings and not given to him. Saverio was straight forward and did things on one level, while Denise Peach was many levels deeper into fraud. Denise Peach and Kelle O'Keefe also had much more grand plans involving Joseph Solans, their serial killer sidekick, and future extortion. If their was no money or if property thefts failed then their would be death for the victim (s) of myself and Michael Simmons.

50-60 Prichard St was sold for $320,000.00. It was financed 75% through Green Point mortgage with a seller second of 15%, and a 10% down payment. 62-64 Prichard St was sold for $220,000.00 with a first mortgage of 75% with Home EQ, and a 25% down payment. The 10% or $32,000.00 on 50-60 Prichard St and the 25% or $55,000.00 on 62-64 Prichard St were made into 1 mortgage by Attorney Bowen for $87,000.00. The $87,000.00 mortgage was subsequently placed on both of the above properties. Gino Mola gave the down payment funds in the form of a 32,000.00 cashiers check and a $55,000.00 cashiers check to Michael before the closings. Joseph Solans had his eyes on these properties before they were even bought. Joseph Solans and Daniel Loring saw the potential in these properties for running drugs out of them through tenants. Tenants would be screened for those purposes. Kelle O'Keefe was in on prearranged racketeering and wanting properties for future drug dealing operations as well. I wouldn't want to be rude and leave her out/ignore.

7. 23-25 Crescent St. Fitchburg, MA. 01420. This property closed in the middle of July 2007.

Property was sold for $325,000.00 with a 75% first mortgage with Green Point, a 15% seller second and 10% down. The down payment was put into HUD as was 205-213 Park St and 7-11 Glazier St. Gardner, MA. 01440 closings. In these cases their wasn't even the situation wherein the funds were borrowed from another property in the form of a cashiers check. These were closings done by Richard Gilmore of Danvers, MA whom Saverio picked as the closing attorney. With this property their was little to no lying about income. It was off by about $250.00/month which was small.. The big issue was the expense of the oil consumed by this very large building and the impending lead paint issues. Tony Champa and Kelle O'Keefe said that this property was de leaded , and provided papers that said that the units were deleaded. These papers, as with many others were taken from residence/office during RICO explosion. The same deleaded papers were given for every property, and thereafter taken during RICO explosions. The oil expenses of $3,000.00/year were way off from the actual $8,000.00+/year. The fact that their was more than one tenant with a lead paint complaint to be in the works, made this property a failure from the start. Attorney Bowen did the usual mortgage and Kelle O'Keefe and Tony Champa were at closing with Attorney Gilmore at Attorney Bowens office on Prichard St. Fitchburg, MA. The $32,500.00 down payment was put into the HUD, even though their was never money lent to Michael Simmons from the other properties that the $32,500.00 mortgage was placed on. In this attorney Bowen and attorney Gilmore didn't find it necessary to have a cashiers check exchanged it seems.

8. 153 Prichard St. Fitchburg, MA, 158 Prichard St. Fitchburg, MA, 94-96 Daniels St. Fitchburg, MA. And 64-66 Mechanic St. Leominster, MA. Properties closed in late July 2007. All had 75% LTV bank financing with 25% down payments.

These 4 Properties were sold only 1 day apart with the 2 Prichard St properties closing first with Inter Bay and the other 2 properties closing with Velocity Funding.

These properties in particular had incorrect information. Since 2 of the properties used a different bank than the other 2 properties, the following happened.

Renters from one property were renters at another property. As an example, if Joe Smith was a renter at 158 Prichard St, he might be listed as a tenant at 94-96 Daniels St. Fitchburg, MA 01420. Beyond these tactics for getting around vacancies the following was done. Rental information was bloated significantly. As one example, the commercial tenant at 94-96 Daniels St. Fitchburg was paying $650.00/month but the TAW was changed to $850.00/month. Did I mention that the unit was in fact vacant for this commercial unit!!

Much of the rental information that was presented to banks was also given to me and Michael Simmons after the closings. He luckily scanned papers into property emails as I had told him to do with all property information. The emails had HUD, TAW, income, and expense information in them. In total the rents were bloated between all 4 properties by about $2,900.00/month and the expenses were $3,000.00/month lower than the reality. Kelle O'Keefe played with the TAWs for this purpose, and the appraisals were absurd pufferies. I mentioned details about this in papers sent previously.

Through Anne Bellamy and Lorie Spaulding Daniel Botwinik set his eyes on these properties when they got into trouble. This wasn't just caused by the appraisal puffing and false rental/expense information given during property acquisitions. The effects financially caused by Solans and associates going to properties and telling tenants not to pay rent reared its' ugly head. Daniel Botwinik mentioned his associations with Solans and Spaulding in June 2008 when I met him, and showed properties to him. Daniel Botwinik subsequently spoke to me about specific things Solans did in late November 2008. This was just after Solans got the cameras and most extortion tools out of my condo. Dianna Peppar 1-413-221-0299 called me as well, and let me know how well good ol Kelle and Solans got me, with a laugh.

In this case Attorney John Rogaris did closings at the Fitchburg Registry of Deeds for the 2 Prichard Street closings. He used his attorney Matt Arakalian in that closing.

The same attorney for John Rogaris, named Matt Arakalian did the closings for 94-96 Daniels St. Fitchburg, MA and 64-66 Mechanic St Leominster, MA the next day at Keller William North Central in Leominster, MA. During this closing the secretary mentioned Solans and that I (Kai Kunz) better stay in line. She also mentioned that "me and Kelle are professional criers who would be believed long before they even considered 1 word of truth you had to say, you fucking autistic subhuman." "We'll get you in ways you could never possibly imagine if you don't play ball." Kelle often bragged and laughed about having cried her way out of an IRS audit in 2007. The secretary mentioned above that threatened on behalf of Joseph Solans and Kelle O'Keefe is the secretary with long blond hair, about 5 9" and 145 lbs. I believe her name is Donna. They started bugging my place sooner, as Kelle mentioned details about things she couldn't have known unless things had already been done in late July 2007 and early August 2007. Although she had my phone tapped at this time. She also had some level of bugging in my car that was already done. It also came from the email and computer hacking that she had done to me and others.

It was a closing wherein Kelle O'Keefe was their and it was from the accumulation of her actions which were not limited to making the double leases. Double leases wherein, tenants with the same name would have a TAW at 2 different residences. Two different residences or one at a Prichard Street Fitchburg, MA 01420 property and other lease for the same tenant at either Daniels St Fitchburg, MA 01420 or Mechanic Street Leominster, MA at the same time. This being done due to their being 2 different banks between the 4 property purchases. Or one bank financed 153 and 158 Prichard Street Fitchburg, MA 01420 and the other

bank financed 94-96 Daniels Street Fitchburg, MA 01420 and 64-66 Mechanic Street. Leominster, MA.

## 9. 99-105 Church St Northbridge, MA 01588

This property was done 100% by the book, although their was likely false information given to the appraiser as far as vacancies go by Kelle O'Keefe. Money in account was used for down payment, and it was done all by the book. Kelle O'Keefe asked the realtor Martin Greene if he could re list the property for a higher price before the appraiser came, and he adamantly said NO! I would like to mention that this is something that Kelle O'Keefe did regularly. She had properties re listed for higher amounts with selling agents. If there is a scheme you know, then it is guaranteed that Kelle O'Keefe did every scheme to the detriment of buyers and the banks financing the deals as well. Success was the goal in everything done and this was never to be compromised. In the case of Kelle O'Keefe she put this aside and even prearranged to have properties fail and gain them thereafter, through Solans and by any means possible. This approach of utilizing puffed listings, known appraisers, the changing P and S agreements, and mortgage applications for enticing me and Michael was the norm. Their was absolutely nothing that she didn't do. I would even suspect that she had my mangers cell phones, and the phone of agents who listed Church St, and other properties for rent tapped. Kelle O'Keefe and Solans would go to such lengths to make a point, extort, and gain leverage over me and Michael Simmons is something they did with outright fanaticism. If there is something corrupt that (is possible) it is almost certain that it was done by Kelle O'Keefe, Joseph Solans, Denise Peach, Daniel Loring, and the Racketeering/Domestic Terrorist Cabal..

## 10. 129 S Elm St. Bradford, MA. 01830

This property was a five family that had false rental information. The addendum to P and S addressing the roof, and other property matters was removed at closing. Rental information and expense information was way off as well. On the next day the following happened which created an issue, that will give you very solid leads…..

The bank was not satisfied with the escrow statement from attorney John Rogaris and the bank was about to pull the funding unless certified funds were acquired equaling the amount that was due by the buyer on the HUD statement. Attorney Rogaris had Michael Simmons and seller Carlos Delgado go to his office. The 2 and John Rogaris secretary (forget her name but she was around 28 or so.) They went to Citizens Bank. It was the branch that Attorney John Rogaris frequents the most. Denise Peach had emailed Michael several times and said that attorney John Rogaris wanted Michael to open a Citizens Bank Checking account (sent you emails from her) and I now see why he did. At the bank Michael, Carlos, and John Rogaris' secretary went to a specific bank teller. His secretary told Michael who it was to be out of necessity. The bank teller opened a temporary account with Michael Simmons and deposited $130,000.00+- from Attorney John Rogaris escrow funds (or whatever account it was) and into Michael Simmons account. This made a cashiers check that was used for the closing. It was one that could be traced to Michaels account it would seem. In this Michael had an account opened for him at this Citizens branch for a full 10 minutes or so. This purchase was for $530,000.00 and it closed in July 2007. I was told (as was Michael) that the down payment was coming from cross collateralizing equities in existing properties and that all of this was kosher.

One more piece of information.

The appraiser who did the appraisal on the property at 129 S Elm Street Haverhill, MA was asked to have the appraisal put into the name of another bank. I have heard this isn't allowed particularly with commercial

properties. An extra $1,250.00 was paid for this appraisal maneuver. This seems similar to the situation wherein Michael Simmons paid more than once for the appraisal on 2 Gage St. Worcester, MA. Michael paid more than once, and he made a check out to the appraiser named Diagle of Key Stone Appraisals. They did several appraisals and when Denise Peach sent the appraisals after closings by email. The emailed appraisals were copies (not originals) and the cost for them was crossed off. This was all manipulated into kickbacks for Kelle O'Keefe as Interbay paying for the appraisal expenses at closings. This all was another method that was utilized by Kelle O'Keefe, Daniel Loring, Denise Peach for maximizing the fraud kickbacks, and thefts that Kelle O'Keefe received with the help of Daniel Loring/Keller Williams North Central. The comparables and other information was a cut and paste job. I can get the appraisals she sent if needed, as they were sent by email. Unless they were deleted during RICO explosion. I would guess that there is much to say here about what Daniel Loring, Kelle O'Keefe, Denise Peach, Joseph Solans do with appraisals and stunts regarding them.

Note on Worcester transactions

Then their was the altering of Fidelities which were done by Kelle O'Keefe and Daniel Loring. Both Daniel Loring and Kelle O'Keefe faxed the altered Fidelities to many realtors in Massachusetts, and to the mortgage brokers for the loans. Worcester was an attempt to make things work as that would get loans from Kupelnick as a lender, I was told. Kelle O'Keefe promised to help with a management company for savings on existing properties, and income from managing other properties. That is what the incorporation of Caleb Management was about. This all would be very useful due to the mega hours that me and Michael were working on properties.

I always wanted success and to use real estate success from property acquisitions as a stepping stone into high technology ideas, cutting edge technologies, and more. I never wanted real estate transactions to be anything but a step in the right direction.

Amazing how the Racketeering conspiracy started right away and was so multi layered and organized.

Kelle O'Keefe also told many realtors that me and Michael had millions as trust fund children and did many things that are likely beyond what is presented herein. She has mentioned that she has a background that would make anyone think twice about ratting on her. This all goes far beyond deals and closings.

These give 2 more solid leads in John Rogaris and tax attorney John Foletti. How both attorneys did schemes on behalf of O'Keefe, Peach, and Rawson. Their was IRS and kickback schemes on a whole new level with Kelle O'Keefe and Denise Peach trying to extort attorney Rogaris. The duo are completely out of control and they found a very good fit with Joseph Solans. Joseph Solans is a frothing fanatic that bring Racketeering/Domestic Terrorism to a level that Kelle O'Keefe, Daniel Loring, Denise Peach, and associates never previously imagined.

Before these closings tKelle O'Keefe and Richard Rawson promised capital from Kupelnick for adding parking at 99-105 Church St. Northbridge, MA for thousands in extra rents and other extremely cost effective means, that capital could be used for. Capital could repair the damage caused by the misinformation and other actions that were done by Peach, O'Keefe, Loring, and Saverio during property purchases.

They insisted (I sent email) that David Bain was used for management in Worcester, MA as a requirement for Alan Kupelnick to lend and sell properties. The lending that was promised made me and Michael Simmons naively hope that we could turn things around. Capital could also possibly be used for a high technology cash flow sources as well.

At this time (can send emails of promises) Kelle promised to help me start a property management business. Something I wanted to do, and incorporated in the form of Caleb Management for those purposes. Kelle said that she would help me and Michael Simmons get cash flow moving after Worcester property purchase deals. Aside from threats, money that seller (Alan Kupelnick was going to lend after sales), she enticed us with promises to help with management due to the huge undertaking the Worcester properties would entail. She also promised to help me and Michael Simmons do commercial mortgages for extra cash flow. I wanted to make everything successful and was devoting mega time towards that.

In addition to the positive things Kelle said, she also threatened me and Michael Simmons with her Mafia connections through father and Joseph Solans "and his killer side kick" if me and Michael didn't close on Worcester properties. She also made the point of telling me and Michael Simmons things, in an intimidating way to show that she knew who our relatives and friends were and where they lived. This unnerved me and she got the information about my families/friends from having tapped my phone among many other methods she used such as email and computer hacking as well.

## 11. 32-32 ½ Ellsworth St and 5-7 Lowell St. Worcester, MA

32-32 ½ Ellsworth St was a 5 family with 4 2 bedroom units, a spacious 3 bedroom unit on 3rd floor, and a 2 bedroom single family house. It appraised for $259,900.00, and 5-7 Lowell St was an 8 family with 3 very large 3 bedroom units, 3 very large 4 bedroom units, and 2 studio apartments. The total rental income between the 2 buildings was just over $10,000.00/month or $10,400.00/month when fully occupied.

In the 2 above mentioned Worcester properties, the tenants pay for their own utilities. 5-7 Lowell Street appraised for $375,000.00 and the 2 together appraised for $634,900.00. Or about $100.00 under 153 and 158 Prichard St. Fitchburg, MA 01420. The above 2 Fitchburg, MA buildings had 11 units and the landlord paid gas on every single unit, and the electric on most of the units. Did I mention that the 2 Fitchburg properties listed above had a total rental income of $6,600.00 in appraisal report, but the true reality of their rental income was even lower.

The same appraiser appraised 32-32 ½ Ellsworth St, 5-7 Lowell St. Worcester, MA and 153 and 158 Prichard St. Fitchburg, MA 01420. The appraisers name was Swift and I believe he is friends with Richard Rawson as is Daigle. I sent email correspondence on the appraisal issue that Kelle and Denise sent to Michael Correia who then forwarded it to me. This email exchange is enclosed as an exhibit. The email was deleted, by RICO plotters, but I luckily retrieved it unlike many others. The Fitchburg and Worcester properties appraised for the same amount. The Worcester properties were worth double what the Fitchburg properties were worth based upon the income approach. The Worcester properties were also almost double the Fitchburg properties based upon a sales comparison approach.

These 2 properties closed simultaneously in September, 2007. Alan Kupelnick (as always) was not at the closings. Realtor Richard Rawson did the closings for Alan Kupelnick. Alan Kupelnick had a tax attorney named John Foletti do his closings and escrow money purchases after closings. Since their were no mortgages on the properties and the down payment was being borrowed from the seller. The seller wasn't getting it - so the following happened in order to make these 1031 Tax exchange sales happen correctly.

Attorney John Rogaris did fraud title for the banks. Attorney Rogaris showed mortgages or liens on Alan Kupelnicks properties that didn't exist for

1. The same amount as what the down payments were to be and

2. Another mortgage or lien on properties for the specific amount of money that was going in the form of kickbacks to Kelle O'Keefe, Denise Peach, and Richard Rawson.

In this case wherein IRS fraud was done to get deals done. Kelle O'Keefe and Denise Peach tried to get money allocated to them under the radar screen of John Foletti. Their was an out of control frenzy on the part of Peach and O'Keefe that showed no control or limits. Denise Peach had at some points threatened and extorted attorney John Rogaris as had Kelle O'Keefe. Joseph Solans extorted Attorney Rogaris as well. John Rogaris was and is a dirty attorney. He is not however a vicious frothing psychopaths like O'Keefe, Peach, and Solans are.

### Another Tid Bit

In this closing or the closing of 476 Park Ave and 19 Ward St. Worcester, MA their was $132,000.00 left on the closing table. It was money that Denise Peach tried to grab under the radar screen of John Foletti. Michael mentioned this happening. It was money that ended up being split up between Rawson, O'Keefe, and Peach.

### Another Tidbit

In these closings Attorney John Rogaris put money that was taken out of Alan Kupelnicks account and used it to white wash the non existent mortgages on properties so everything added up for the 1031 exchange that Alan Kupelnick was doing through his Tax Attorney John Foletti. Denise Peach wanted, and requested that Michael open a Citizens checking account for these purposes as she emailed several times. Attorney Rogaris took it out of his account and circulated it through Kupelnicks and back to himself or if it went from Kupelnicks account or that of his tax attorney's into John Rogaris'?? Either way it was done.

## 12. 476 Park Ave and 19 Ward St. Worcester, MA

19 Ward St appraised via Diagle for $360,000.00. It was a 6 family with 6 2 bedroom units. Though he put 3 bedroom units in his appraisal report. Just as was done with 476 Park Ave Worcester, MA wherein he put 7 3 bedroom units while they were really 7 2 bedroom units. He appraised Ward St for $360,000.00 and Park Ave for $440,000.00

These properties closed in the same way as the above properties sold in 32-32 ½ Ellsworth St and 5-7 Lowell St. Worcester, MA. With Kelle O'Keefe, Richard Rawson, Attorney John Rogaris, and John Foletti the Tax attorney for Alan Kupelnick at the closings. Would like to also mention that the originals for these closings were taken from office during RICO explosion. These HUD originals were however put into emails assigned to specific properties as well. This was done in case any games were played. The emails were ones that Michael Simmons and myself put into his name for specific properties and income/expense, HUD, and other important information. Although the emails were deleted during Racketeering frenzy, they can be retrieved through a data recovery.

## 13. 32 Birch St, 71 Maywood St, 69 Maywood St Worcester, MA

These 3 3 families were purchased with 72% financing from the bank Equity One which was subsequently purchased by Popular Mortgage thereafter. The properties were purchased for $765,000.00 or $255,000.00 for each of the properties. The remaining 28% was given in the form of a cashiers check that was fake and

made by Richard Rawson. Richard Rawson used the same fake cashiers check for an escrow statement for closing the loan.

215 and 217 Beacon St. Worcester, MA were purchased with 80% Bank financing with Equity One. 20% was put down by the same above mentioned method. Richard Rawson produced a fake cashiers check that was large enough for the down payments of all 5 of the 3 family properties together. The five 3 family properties closed on the same day, and at the same closing. The 2 Beacon St properties were bought for $510,000.00 or $255,000.00 each. In this closing their was zero room for anything resembling legitimacy. The same fraud cashiers check was used for closing 2 Gage Street with another fraud escrow statement from Richard Rawson. Actions that Keller Williams Greater Worcester intentionally ignored.

## Michael Comeau, Richard Rawson, and Saverio Fulciniti.

Michael Comeau is the cousin of Dave Boudreau and he lives at 40 Coburn Ave. Gardner, MA 01440. He is a sheriff, and close friend/cousin of Dave Boudreau. Michael Comeau was victimized by Richard Rawson and Scola but he knew exactly what he was doing in fraud transactions. Though, Michael Comeau was promised cash out deals. The capital was for property fix up, and promises that owner Alan Kupelnick would be fair and help with some fix ups after purchase. Same sort of lies and false promises that me and Michael Simmons were promised. However the lies and flase promises towards Michael Comeau was on a lower scale. Michael Comeau assisted Lorie Spaulding with her fraud sheriff games, and her triple priced serving monopoly through the city of Fitchburg, MA.

He bought several properties from Alan Kupelnick.

1.  2 Gage St and 5-7 Eastern Ave. Worcester, MA.

This property was purchased for $705,000.00. It was bought from Alan Kupelnick of Samark Realty Trust. This same property had serious issues with appraisals and financing. It was the one wherein Kelle O'Keefe, Denise Peach, John Rogaris had Michael bring payment for the appraisal to John Rogaris' office twice. The appraisal was an expense they refused to put into the HUD (even though Interbay paid $1,500.00 towards appraisal fees during closing transactions. I believe that this had to do with the corrupt appraiser named Daigle and kickbacks that were given to Kelle O'Keefe instead of Michael Simmons. In this their were things done that were likely off the wall. Denise Peach did many white out moves with financials. Denise also cut and pasted appraisal values given to banks, and did other outrageous things. Just as Kelle hid and did things such as cut and pasting signatures of Michael Simmons and others.

In the above mentioned deal

1. The same fake cashiers check used for purchasing the 5 above mentioned 3 families was used for purchasing 2 Gage St and 5-7 Eastern Ave.

2. The fake cashiers check was emailed from Saverios email address and sent to Richard Rawson. Richard Rawson then did an escrow statement for the purchase with the fake cashiers check. This fraud cashiers check was produced by Richard Rawson and Kelle O'Keefe prior.
It was also sent to Michael Comeau in the same email.

3. Richard Rawson promised to have Alan Kupelnick give Michael Comeau $25,000.00 after the closing. He gave it to Michael Comeau about 2 weeks after the closing because Alan Kupelnicks Tax attorney John Foletti had to get it out of the funds used for the 1031 exchange. A move that isn't that simple as you got to do it under the radar screen.

The closing was done with Richard Gilmore. Prior to closing Richard Rawson gave the escrow statement and copy of the fake cashiers check that he and Kelle O'Keefe produced prior to the closing. Their was an issue after the closing of Gage Street and the bank wasn't funding the loan. The bank was concerned over the escrow statement and down payment.

The above was solved when Matt Arakalian of John Rogaris' office volunteered as the buyers attorney. Attorney Arakalian sent an email to the banks attorney. The banks attorney accepted Attorney Arakalians statement, and the deal was closed/documents were recorded a few days after the actual closing date. Matt Arakalian is the attorney who closed the following for John Rogaris,

1. 153 and 158 Prichard St. Fitchburg, MA 01420. 64-66 Mechanic St Leominster, MA and 94-96 Daniels St. Fitchburg, MA.

while John Rogaris did

476 Park Ave, 19 Ward St, 32-32 ½ Ellsworth St, and 5-7 Lowell St. Worcester, MA

129 S Elm St. Haverhill, MA.

I would like to mention prior that attorney John Rogaris didn't close the loan for Michael Comeau because Denise Peach and Kelle O'Keefe threatened him incessantly that they would turn him into the banking commissioner if he closed Gage St without Kelle O'Keefe and Denise Peach receiving $100,000.00 plus in kickbacks. In this they sent many emails and called attorney Rogaris' office incessantly. It was during this time that I got incessant threats from Kelle O'Keefe and Denise Peach as well. Kelle and Denises threats were directed at me and family. After stopping association with Kelle O'Keefe and Denise Peach when the reality of everything reared its' ugly head. Joseph Solans called and told me that he knew who my family was, where they are and that he would get me and them if I ever turned anyone in or even spoke ill of anyone.

3. Michael Comeau was approved to close on 3 other properties with Allan Kupelnick but Rogaris decided not to close the loan A FEW days before their scheduled closings. This was in either LATE April or May 2008. Comeau was approved and ready to close with a bank. Rogaris chose not to, because Kelle O'Keefe and Denise Peach told him that if he did close the deal with Comeau, they would turn him in to FEDs. The alternative would be that Kelle O'Keefe and Denise Peach got substantial kickbacks from the deal. This was about the time wherein Solans was having me followed and such by his sidekick that kidnapped me (I can identify and a few others). This was right before their anticipated closings, and as a result Michael Comeau had to use another bank because Saverio didn't have another attorney to do what Saverio wanted to do with fraud deal. As such the deal was brought to Attorney Richard Gilmore. Saverio changed to Interbay and Michael Comeau borrowed $100,000.00 from a friend of Richard Rawson's who is an attorney and accountant in one. This is the same accountant/attorney that was going to help do fraud bankruptcies and such. This was mentioned prior but the dots were not connected. This individual owns several properties in Worcester, MA and lives in Shrewsbury, MA I believe.

Comeau borrowed the money and a mortgage was placed on 46 Coburn Ave and 2 Gage St for collateral.

Of course he never mentioned in the loan applications, that he (Michael Comeau) was borrowing the down payment funds. The down payment money was recycled with the usual approach done ie. fake non existent mortgages done in fraud titles so that things added up for Alan Kupelnicks 1031 Tax exchanges. In this Alan Kupelnick gave the down payment back to Michael Comeau so that it could be recycled between purchases.

Tid Bit

Richard Rawson promised to give Michael Comeau cash out after his purchases. The amount that was to go to Michael Comeau was listed in the HUDs under something else. The money that Michael Comeau was illegally promised, ended up going to Richard Rawson. A similar thing happened wherein the money that was supposed to be lent to Michael Simmons got into the hands of Kelle O'Keefe and Denise Peach. It was quite the incentive especially when you feel under the gun and have maintenance plus cash flow issues that only cash can fix. The loan or cash out that Michael Simmons was supposed to get from closings was supposed to have been a construction loan.

The money on the last 3 purchases was recycled and I believe that attorney Anthony Scola did the last 2 closings that Comeau did as purchaser. Richard Rawson took funds that were supposed to go to Comeau. Attorney Scola helped facilitate the recycling, and give back of down payment funds to Comeau for future deals. While Attorney Scola also did fraud title in the manner Rogaris did for 1031 Tax exchange reasons with Kupelnick. Just as Scola did fraud title with Fitchburg, MA properties which he submitted to banks for the purpose of selling properties when I was only owner. Then the hope was to get me (as exhibit/email said) to sign deeds. Plan was for me to have an early demise if I didn't sign the deeds.

Also of note is that Scola often uses Sheriff Trepasso next door to him and in the same building for notarizing his fraud closings. I believe that he is related to the Trepasso that was convicted of accepting bribes for fixing traffic tickets and other favors.

In all this

Saverio, Kelle O'Keefe, Attorney John Rogaris, Secretary of John Rogaris, Attorney Matt Arakalian, Alan Kupelnick, Tony Champa, Dave Boudreau, Daniel Loring, Attorney John Foletti, Anthony Scola, Richard Rawson, Denise Peach, Michael Comeau, Citizens Bank contact of Attorney Rogaris, and Richard Gilmore to some extent. You have every detail I can remember and trace. For missing originals and any deleted financial emails with loan documents in them that were deleted during RICO explosion. You can access these deleted emails through a data recovery. In emails are HUDS, and financials showing a big discrepancy from figures given by most sellers.

Secondarily you have Dwayne King, Gino Mola, Michael Correia, Carlos Delgado, Attorney John Bowen, Attorney Mark Goldstein.

Michael Comeau was also given many false rental and expense figures by Richard Rawson and Saverio Fulciniti. I also believe that Comeau pays Rawson Kupelnicks second mortgages which weren't recorded.

Every detail herein is 100% solid and can be verified as is, through paper trail with IRS, in emails, and with the registry of deeds online.

# Part 4. Preliminary and Partial list of 78 Exhibits and their relation to Racketeering/Domestic

Terrorist conspiracy that caused Kai Kunz and Edward Ahern huge amounts of harm and torture. Note that these exhibits are merely a fraction of what is available at this time. The vast majority of papers, financials, and more were taken from office, deleted from computer, and deleted from online email sources during Racketeering/Domestic Terrorist explosion.

## 1. Vanessa Torrez exhibit:

A small example/description of the Racketeering conspiracy of Richard Rawson. As Richard Rawson was stealing rents, lying to tenants, and Uttering many documents falsely. He was having Joseph Solans and his Racketeering/Domestic Terrorist associates threaten me, hack my cell phone, hack my computer/emails, and try to kill me when knowledge that I couldn't be extorted into signing over deeds became clear.

## 2. Rawson doing identity theft, fraud, and theft against William XI:

Enclosed is online printout of Richard Rawson's identity theft, fraud, and total arrogance. He outright does fraud in online format and demonstrates that he truly believes his own ravings about being invincible legally (see affidavits.) Note that the vast majority of individuals were too scared for their lives and that of their families to do affidavits about Richard Rawson, Jorge Torres, Kelle O'Keefe, Daniel Loring, the Mcquinns, Boguslav, Joseph Solans, and others.

## 3. Affidavit from Fronte on 348 Elm Street Fitchburg, MA 01420 and David Boudreau's thefts of material and multi layered criminal fraud. Richard Rawson's criminal conspiracy in Fitchburg, MA is mentioned in affidavit as well.

Michael Fronte acknowledged the enclosed document as his own during 3-31-2010 Fitchburg District Court Hearing. Affidavit shows that materials that were stolen from 348 Elm Street Fitchburg, MA 01420 (Kai Kunz's building) were taken to properties (and kept plus sold) for installing into properties that were taken over by David Boudreau after his multi layered financial fraud/Racketeering conspiracies with MPAT/Mcquinns/Boguslav, and others.

Michael Fronte's affidavit also shows how Richard Rawson stole from Kai Kunz's properties and avoided him completely. The same was done by Jeffery Stephens who helped criminal conspiracy (see exhibit 63). Exhibit 63 also sheds light on Anthony Scola and his direct involvement in assisting Joseph Solans and Richard Rawson's Racketeering/Domestic Terrorism.

Also Michael Simmons affidavits show. He was extorted into doing many things and professionals/legal

professionals in particular know he didn't have majority interest.

4. Affidavit from Fronte. Richard Rawson's uttering false documents as needed for furthering his financial frauds, and Rawson being a conduit for property theft, Racketeering,

Extortion, and rental theft RICO.

Exhibit about Richard Rawson's criminal fraud and uttering of false documents. He wanted to sell and get commissions as he engaged in Racketeering, rental theft, fraud, extortion, and aiding and abetting murder plots to finalize his goals. Affidavit also speaks about stolen material that was brought to properties being acquired by David Boudreau through inside dealings and fraud that he engaged in with the Mcquinn's and Boguslav. See Exhibit 35 from Glenn Brosseau for more.

5. Yaneidi email about Rawson and Torres:

A small example/description of the Racketeering conspiracy of Richard Rawson. As Richard Rawson was stealing rents, lying to tenants, and Uttering many documents falsely. He was having Joseph Solans and his Racketeering/Domestic Terrorist associates threaten me (Kai Kunz), hack my cell phone, hack my computer/emails, and try to kill me when knowledge that I couldn't be extorted into signing over deeds became clear.

6. Note left by Joseph Solans after Richard Rawsons fraud listing expired:

Joseph Solans left the note on my door at residence at 111 Church Street. Northbridge, MA 01588. He left it merely for me to hopefully call him and have him lie about any conversation we had. Solans serial killer sidekick that kidnapped me on 11-17-2008 pointed a gun at me that night and two of his enforcers Joseph Alverez and Joshua Christiansen did as well.

7. Newspaper drop off on November 13th 2009 by Solans and 62AC82 gun threat:

On November 13th or the day before the note dropped off by Joseph Solans with his serial killer sidekick. I received a newspaper from Solans through 62AC82 MA and the same individual pointed gun at me and threatened to have me and family killed if I ratted on "Solans the head King!!". This happened on same day after drop off.

8. Fraud listing agreements:

Richard Rawson Uttering documents falsely as Keller Williams Greater Worcester was completely negligent to fact that only Kai Kunz is owner of properties being listed on MLS, and not individual in listing agreement. Listing agreements were for covering up and making inside Solans property theft, rental theft, extortion, murder conspiracy property transaction/sale look like their was a legitimate buyer. Phone records and emails will show that this uttering of false document and the ignoring of it by Keller Williams Greater Worcester was just part of fraud, and criminal actions that were done in furthering fraud, theft, and Racketeering/Domestic Terrorist goals of Rawson, Solans, Kelle O'Keefe, Daniel Loring, and others in organization.

9. Breaking an Entering by 62AC82 MA who planted poison on behalf of Solans, Mcquinn's, O'Keefe, Daniel Loring, and other defendants such as David Boudreau as well:

Seen here with scrubbie and gloves on for covering up potential prints from previous Home Invasions, murder plots, and thefts/Corporate espionage. Same individual was scolded by Christina Solans in front of Richard Rawson in July 2009 at 111 Church St. Northbridge, MA 01588 for failing to succeed at the planting of pellets and powder in Kai's residence.

10. Lydia Rawson and Tenant David Deangelo sign over Affidavit and check.

Affidavit from Fitchburg tenant about the racketeering fraud that Richard Rawson, Jorge Torres, and others committed on behalf of Joseph Solans, Kelle O'Keefe, Mark Kavanach, Daniel Loring, and others. Check clearly shows Richard Rawson signing the check over to his wife for furthering Racketeering conspiracy, and getting around his IRS audit and tax fraud. Used wife for money laundering.

11. Thefts by Richard Rawson in receipts:

Richard Rawson ignored me (Kai Kunz) - as did Jorge Torres as they stole from my properties and worked property extortion and theft conspiracies by lying to tenants.

Affidavit from Fitchburg tenant about the racketeering fraud that Richard Rawson, Jorge Torres and others committed on behalf of Joseph Solans, Kelle O'Keefe, Mark Kavanach, Daniel Loring, and others.

12. Torres rental thefts:

See tenant affidavits and receipts

### 13. P and S uttered falsely by Christina Solans:

Read Simmons affidavits about being forced. P and S Agreement (one of many) that was uttered falsely by Christina Solans, on behalf of the murder and extortion conspiracies of Joseph Solans, Kelle O'Keefe, Daniel Loring, and associates.

### 14. Rawson receipts from taking money from the handicapped

Receipt from the Hollister's who are mentally retarded/handicapped individuals that Richard Rawson took money from. Jorge Torres often drove the tenants to check cashing places for his theft. The lies that Richard Rawson and Jorge Torres told to the Hollister's for getting money will be part of depositions and discovery.

### 15. Email to Agent Zeringue, and Joseph Lussier and the subsequent actions by Spaulding:

Email shows that information was factual by her subsequent actions. I mentioned fake sheriffs, and false information being served to tenants as part of Aiding and Abetting criminal extortion, Rental theft, property theft, and murder conspiracies of Joseph Solans, Richard Rawson, Kelle O'Keefe, Daniel Loring, and the Mcquinns.

### 16. Page sent to states ethics committee prior to Spaulding's actions.

Note that this is a small part of the integrated and very organized Racketeering. This letter was sent on December 22, 2009 and the event happened on January 8th, 2010.

### 17. More rental theft by Richard Rawson and no communications- see Fronte Exhibits 3 and 4. See also Exhibits 5, 13, 18, and 19. He advised tenants not to communicate with me (Kai Kunz) and advised others not to as well, during his multi layered conspiracy.

### 18. Rawson fraud landlord verification form:

Richard Rawson signed many landlord verification forms, welfare forms, and Social Security papers. He thereby committed State and Federal fraud, in furtherance of Extortion, Racketeering, rental theft, property theft, and murder conspiracies. State and Federal agencies, workers affidavits, and papers will be part of depositions and discovery

19. Jessica Ortez affidavit against Richard Rawson:

Affidavit from Fitchburg tenant about the lies and fraud that Richard Rawson, Joseph Solans, Jorge Torres, and others perpetuated. Fraud that Richard Rawson, Jorge Torres, and others committed on behalf of Joseph Solans, Kelle O'Keefe, Mark Kavanach, Daniel Loring, and others. The fraud outlined in Affidavit by implication doesn't begin to cover the uttering false documents, extortion, utility fraud, fraud against state, fraud against government, and conspiracy to commit murder. Quite the frenzy!

20. Rawson management contract Uttered Falsely:

Simmons was extorted (as Affidavits attest to) but Simmons refused to sign many other papers for covering Rawson, Scola, and Solans civally.

21. Ahern and Kunz BBO complaint on Scola:

A very conservative and responsible account of Attorney Scolas actions. Board told Ahern that complaint was too large and outside their capabilities.

22. Pictures of wire:

Pictures show a very small part of the fanatical and very sophisticated Racketeering conspiracy that is gradually undermining country's stability.

23. Boguslav and Landry:

Russian organized crime member Bruce Boguslav and his Russian Organized crime associate Mr. Landry. Admitting that he is dangerous with technology. Bruce is a member of MPAT and Home Savers or the Mcquinns outfit.

24. Email from Kelle O'Keefe about fathers connections and threatening if loyalty isn't abided by and Worcester properties aren't closed on:

This email was a tiny part of the extortion, threats, and more that was directly committed by and aided and abetted by Kelle O'Keefe. For every threat that she put in writing, she said countless threats verbally and through her Racketeering conspirators through gunpoint (such as her serial killer sidekick that kidnapped me.) Kelle outright extorted me and Michael Simmons with Worcester properties.

25. More emails from Kelle O'Keefe with threats.

She threatened me (Kai Kunz) and Michael Simmons numerous times with death towards family and friends, if we didn't do as she wanted. See a small part of the threatening emails that were sent by Kelle O'Keefe in furthering the extortion and Domestic Terrorism conspiracy she was and is directly involved

with. Most of the emails were deleted, just as Kai Kunz and Michael Simmons financial emails were
continually deleted during Racketeering frenzy.

26. Internal affairs letter:

Letter gives a very small description of Fitchburg fraud's and conspiracies.

27. Letter about Spaulding prior to her actions:

This letter speaks much about the premeditated conspiracies of Lorie Spaulding. The follow up actions of
Lorie Spaulding speak even louder.

28. Letter of bruise from Spaulding and leaving me stranded, intimidating my father and
on:

Lorie Spaulding refused to let me talk to father, refused to let me use bathroom, refused to let me get coat,
and left me stranded in Gardner, Massachusetts.

29. Transcripts about appraisal push and emails. This email was deleted by RICO
plotters as was a huge amount of other emails.

Email is a very small part about the fraud that was utilized during transactions. Here are transcripts
between Kelle O'Keefe, Denise Peach, and seller Michael Correia.

30. Previous emails with financials in them that were deleted by RICO plotters:

Emails that contained financial information in them. They were deleted during Racketeering frenzy. Emails
with financial information and papers from office/residence were continually taken. It was all part of
covering out of control white collar fraud during real estate transactions and Racketeering that followed.

31. David Boudreau email about shooting and jail connections:

Arrogant email is only eclipsed by David Boudreau's email wherein he stated that he is friends with Judge
Fox and that he will be protected in court. Sent to Michael Simmons and myself. Email about Judge Fox
(like many emails) was subsequently deleted during Racketeering frenzy. Here David Boudreau threatens to
have Michael Simmons raped/sodomized, thrown in jail for no reason, and shot if necessary. Interesting too,
in that David Boudreau also sent emails wherein he mentioned "people are watching." This was done in

March 2008, or during time when Racketeering, voyeurism/photo shop, extortion started to go into full throttle.

### 32. David Boudreau document uttered falsely for perpetuating theft further:

David Boudreau instructed tenants to pay rent, just as he continually told tenants in writing to pay him (David Boudreau.) Here David Boudreau puts his rental theft conspiracy in writing.

### 33. Fronte forgery:

Forged a towing request and submitted it to the Fitchburg police. Michael Fronte also fraudulently signed several of my Corporate checks. This was done by David Bain as well.

### 34. Lease wherein Michael Simmons was forced to sign a lease prepared by Ronald Mcquinn, Bruce Boguslav, and Joseph Solans in November 2008.

Lease had very unusual language in it. Lease was used for covering the Racketeering, extortion, and murder conspiracies of Joseph Solans, Kelle O'Keefe, Daniel Loring, and others. It was particularly used for covering for the Corporate espionage, Racketeering, Kidnapping, voyeurism/photo shopping, murder conspiracies that had, and was often taking place.

### 35. Affidavit from Gardner tenant Glenn Brosseau:

Email sheds light about the racketeering fraud that Richard Rawson, Jorge Torres and others committed on behalf of Joseph Solans, Kelle O'Keefe, Mark Kavanach, Daniel Loring and David Boudreau. Email shows multi layered conspiracy to some extent.

### 36. Deeds from Gardner transactions:

Gives a small overview of David Boudreau's inside multi layered theft, inside dealings, and fraud with the Mcquinn's and Boguslav..

### 37. Invoice from Mcquinns:

A very small part of monies payed to the Mcquinns, as they worked against interests of customers (Michael Simmons and Kai Kunz). The Mcquinns instead worked rental theft, extortion, property theft, and other Racketeering actions on behalf of Joseph Solans, Kelle O'Keefe, Daniel Loring, Mark Kavanach and others.

38. Fax from Lussier to the Mcquinns in late 2008:

The fax was ignored as the Mcquinn's were ignoring primary owner (Kai Kunz), extorting Michael Simmons, and directly assisting rental theft, extortion, property theft, and murder conspiracies of other defendants and their associates.

39. Affidavit from Boguslav:

Affidavit has many holes in it, which was and is explained in my opposition to Attorney Gould's Motions to Dismiss in part two of complaint herein.

40. Information on David Boudreau's partners

41. Some financial information and financial email addresses.

Emails (among many others) that were deleted during RICO Explosion. Such tactics considerably delayed the time wherein Michael Simmons, and Kai Kunz in particular determined the extent of the Racketeering frenzy.

42. Banking commissioner on Joseph Solans

Very conservative and on point description of Joseph Solans and his involvement with Racketeering/Domestic Terrorist Conspiracy.

43. Real Estate Board on Richard Rawson:

Very accurate, on point, and conservative description of Richard Rawson, and his participation in Racketeering/Domestic Terrorist conspiracy.

## 44. Real Estate Board on Kelle O'Keefe

Very accurate, on point, and conservative description of Kelle O'Keefe and her participation in Racketeering/Domestic Terrorist conspiracy.

## 45. Real estate board on Loring:

Very accurate, on point, and conservative description of Daniel Loring and his participation in Racketeering/Domestic Terrorist conspiracy.

## 46. Exhibit I: See 24 page indisputable proof of fraud Racketeering conspiracy against Kai Kunz.

Kai proves fraud and racketeering in letter to FBI and other agencies. It is an example of how the fanatical and sophisticated racketeering/Domestic Terrorist conspiracy that Mr. Kunz has been exposing has infiltrated the FBI through informants and the money that informants were paid. It also shows how...

46A. Kai Kunz was right on target when he said that the Racketeering and Domestic Terrorism he was reporting has goals of infiltrating and intimidating law enforcement.

46B. Demonstrates the on target validity of the affidavits Edward Ahern singed and notarized under penalties of perjury, and mailed to FBI, local police, Department of Homeland Security, and elsewhere.

46C. Kai was targeted due to his having spoken up about, and exposing Racketeering and Domestic Terrorist conspiracy.

46D. Shows that informants will be bought and that the fanatical racketeering/Domestic Terrorist conspiracy that Kai Kunz and Edward Ahern reported is very real and to be taken very seriously.

## 47. See enclosed 8 page affidavit by Edward Ahern

Affidavit was notarized, signed under the pains and penalties of perjury, and mailed to (among other places) the FBI, local police, Department of Home land Security. Consisting of 8 pages about experiences and meetings. The exhibit serves as a cursory description/recitation of statements, and actions that were committed/planned by individuals/defendants in Racketeering/Domestic Terrorist conspiracy.

48. See enclosed 12 page affidavit by Edward Ahern

Affidavit was notarized, signed under the pains and penalties of perjury, and mailed to (among other places) the FBI, local police, Department of Home land Security. Consisting of 12 pages about experiences and meetings. The exhibit serves as a cursory description/recitation of statements, and actions that were committed/planned by individuals/defendants in Racketeering/Domestic Terrorist conspiracy.

49. Unitil, Nstar, National Grid Bills that Edward Ahern was extorted into accumulating

This disabled man was extorted for extra money that could be stolen as a result of utilities being put into the name of Edward Ahern. Racketeering/Domestic Terrorist frenzy that was stealing rents on massive scale, ripped buildings apart as well, such as 348 Elm Street Fitchburg, MA 01420 - See Exhibit 3. Materials from such actions were subsequently stolen, sold, and or utilized.

50. Newspaper article on Richard Rawson

Properties at 69 Maywood Street, 71 Maywood Street, and 32 Birch Street that were taken over for thirty cents on the dollar due to Richard Rawson's Extortion and Racketeering (see affidavits from Michael Simmons.) Note that very little to none of the massive amounts of theft prior to inside fraud sales with inside buyer went towards repairs. Rather rental theft income went into the pockets of Richard Rawson.

51. Newspaper Article on David Boudreau, which is a small part of the white collar criminal he is:

David Boudreau likewise forged documents and signatures during Gardner, MA transactions and elsewhere.

52. Letter from Luke Gallant about Spaulding's fraud

This letter from Luke Gallant and Richard Rawson's identity theft against Kai Kunz's corporation online speaks volumes about the arrogance and brazenness of Racketeering conspiracy.

53. Letter about me (Kai Kunz) in paper and Stephens

This article was specifically done for protecting Joseph Solans drug dealing operations and tarnishing an informant who met with police and reported anything and everything to authorities (thousands of pages.) Others who had actual drug arrests at buildings were ignored, while I was pursued when their were no drug arrests at 348 Elm Street.

54. Landlord Association and town collusion

Lorie Spaulding's Land Lord Association and how City officials attend meetings in pure conflict of interest. Note that this creates a huge conflict for members of association versus non members. This is fully realized with Jeffery Stephens and City officials ignoring all properties that are managed by Lorie Spaulding, or who are members of her organization.

## 55. Email to Stephens prior to

Email to Stephens prior to his going on a frenzy after me. He had previously ignored properties when Richard Rawson was committing his criminal conspiracy and milking properties.

## 56. Hand written letter of Spaulding:

Letter from fraud sheriff Lorie Spaulding who acted as a sheriff and got a monopoly of servings on behalf of corrupt city worker Jeffery Stephens, and others at triple plus the going rate. She signed and dated a paper in February 2010 at the counter of the Fitchburg District Court. In paper she wrote and signed She states "Joe Solans is on the hunt for you Kai Kunz". She said this many times and laughed about my days being numbered. She signed this letter after unsuccessful murder attempts against me, and prior to future murder attempts against me. She felt comfortable enough to sign paper, and reveal much in front of Fitchburg District Court workers.

## 57. Email to McCarthy's prior to Spaulding's writing:

Email to informants prior to letter from Lorie Spaulding about Joseph Solans being on the hunt for me (Kai Kunz). The letter shows once again, that everything I have said and reported is accurate, on point, and known by others in organization. Note that informants in exhibit herein have been paid off, and used for infiltrating FBI through Racketeering/Domestic Terrorist fanatics. It says a lot when friends and associates are paid big money to go against Government and get at primary nemesis/reporter - Kai Kunz. See exhibit 46.

## 58. Email to Zeringue prior to Spaulding's actions on January 8[th, 2010].

Email to Zeringue about events that took place prior to the events that unfolded with Lorie Spaulding.

59. Paul Murray emails

Emails to Paul Murray. The information that I (Kai Kunz) sent to Paul Murray came full circle with the developments in Fitchburg MA with Twin Cities Development taking over properties. Everything I reported to many agencies has come full circle beyond my descriptions already.

60. Papers showing inside collusion:

61. $17,000.00 electric bill for 1 month of use. This clearly shows the level of sophistication that the fanatical Racketeering Enterprise is engaged in.

It says a lot when Racketeering conspirators are playing with Americas Utilities/infrastructure and financial blood flow. Jeffery Stephens (will get) has paperwork about utility fraud being perpetuated in Fitchburg, MA as well. Defendants spoke about gaining power by intimidating law enforcement, and there is no doubt that screwing with Americas infrastructure is a true plan as affidavits will show.

62. Court decision on 108 versus 180:

Lorie Spaulding's resisting arrest and disorderly conduct charge was held in Leominster, MA  See Exhibit 76. Tapes show that the actual charge for the Sheriff serving was $180.00 and not $108.00. The writing was done intentionally to be able to qualify as mistake.

63. Email about Fitchburg wanting properties and extortion:

Notice the reference made about the City of Fitchburg wanting my (Kai Kunz's) properties. Jeffery Stephens, Lorie Spaulding, and the city of Fitchburg approached  RICO plotters about their interest in buying my properties but they never spoke to me (the owner of properties.) This email is quite telling. Attorney Scola and Richard Rawson are preparing closing papers for properties that were only in the name of Kai Kunz in October 2009. Extortion and threats were thereafter done after this email with guns by Joseph Solans, serial killer sidekick , 62AC82 MA, 1268GY MA in November 2009 and thereafter. Edward Ahern had utilities in his name on properties, which was done due to the his having been extorted by Richard Rawson. Utilities were forcibly put into Edward Ahern's name because Rawson and Jorge Torres wanting to steal as much money as possible as they pushed murder, theft, extortion property theft conspiracy. If utilities were not put into the name of Edward Ahern, then Richard Rawson and Jorge Torres

would have to give more of their rental thefts towards the utility bills. Tenants certainly would not pay rent if their utilities were turned off.

## 64. Hole in common area:

Used for corporate espionage and extortion tactics by camera placed in it by Joseph Solans, Daniel Loring, Kelle O'Keefe, and associates.

## 65. Letter or complaint to SEC about Stephens exploiting the retarded

Letter about how Jeffery Stephens victimized retarded/disabled people for doing his dirty work about telling tenants not to pay rent. He exploited the disabled for aiding the Racketeering of Joseph Solans, Daniel Loring, the Mcquinns, Kelle O'Keefe, Lorie Spaulding while real slum lords who paid $$ were ignored. Joseph Solans drug dealing, Racketeering/Domestic Terrorist actions were ignored because he paid corrupt City workers like Jeffery Stephens and Sergeant Mark Jackson $$$$.

## 66. Mayor Wang gives deputy powers, which is almost unheard of for a Mayor.

Letter that Lorie Spaulding presented during 3-31-2010 Fitchburg District Court Hearings. She was given letter from Mayor who signed paper retroactively to cover for Lorie Spaulding. Covering for MS. Spaulding's having fraudulently acted as a Sheriff for a monopoly of quadruple priced Sheriff Servings for Fitchburg City. She gave Lorie Spaulding deputy or Constable powers for a period of 1 year.

## 67. 3 page affidavit from Simmons:

This cursory description of events and modus operandi of defendants is telling. Affidavits from others that have the courage to risk their lives on behalf of their Country by doing affidavits about defendants in this complaint herein is on the horizons'

## 68. 9 page affidavit from Simmons:

This cursory description of events and modus operandi of defendants is telling. Affidavits from others that have the courage to risk their lives on behalf of their Country by doing affidavits about defendants in complaint herein is on the horizons'

## 69. Affidavit Stephen Kemperle:

This affidavit will be solidified by a Forensic Accountant. The letter speaks volumes about financial damages and also about Racketeering frenzy.

70. Email to Agent Zeringue as Solans Serial Killer Sidekick had just called and threatened me. He showed up at place I was at shortly thereafter and pointed gun at me. I was stalked, threatened, and harassed with more intensity after filing 1024B Lawsuit in Worcester Superior Court. No doubt that such expenditure with hired thugs could be used elsewhere by RICO fanatics/defendants.

71. Call from serial killer sidekick that kidnapped Kai on November 17th, 2008 and Edward in early June 2011

How he called Kai in early June 2011 a few days after individuals in RICO suit were served. See email to FBI Agent Stephen Zeringue a few minutes after call from the serial killer sidekick of Kelle O'Keefe, Daniel Loring, Joseph Solans, the Mcquinns, and more.

72. Phone Message left on Kai Kunz's phone and parents phone about everyone single person will die:

These messages were recorded to tapes. Their were also countless machine gun messages, gun blasts, and other threats. Messages were mailed to FBI and Department of Homeland Security.

73. Calls to Kai Kunz and Edward Ahern with threats of death against us and family/friends.

This was done constantly. It was usually followed up with someone driving by and pointing guns at us, being threatened with a gun in person, and having pictures of relatives shown to us by Racketeering/Domestic Terrorist fanatics. For every call that was recorded, their were hundreds of calls that were not.

74. Email of Kelle to Richard about lining up David Bain for future extortion, theft, and kickbacks:

This is a good example of how the Racketeering/Domestic Terrorism, with extortion, theft, and more was planned from the beginning on a very large scale. Bringing forth an original and very danger form of Racketeering.

75. IRS letter that was signed by Kai Kunz and Michael Simmons under the pains and penalties of perjury in front of a witness.

This letter is a very conservative and cursory description of the out of control Racketeering/Domestic Terrorist conspiracy that Daniel Loring, Joseph Solans, Kelle O'Keefe, the Mcquinn's, and other defendants are pushing. They are pushing this Racketeering with a fanaticism that would put the defenders at Iwo Jima to shame.

76. Lorie Spaulding's avoiding a conflict of interest in Fitchburg District Court, by having her criminal hearing elsewhere.

Demonstrates that her inside pull was known about years before I (Kai Kunz) made complaints against her at Fitchburg District Court wherein hearings were held at Fitchburg District Court on 3-31-2010 and 5-5-2010. She has gained more pull since her 2007 hearing for sure.

77.   Affidavit/letter from Dennis Meager:

Letter from Dennis Explains payoff and protectionism. Letter was on Detective Ouillette and when millions are at stake, much money can and will be paid out. Corrupt police officer/detective protecting Racketeering.

78.   Picture of Screws in doors:

Done during night of November 9[th, 2008] attempted criminal forced throwing out of my (Kai Kunz's) residence by force. Goal of criminal act was for covering up and removing (before it was caught) Joseph Solans, Daniel Loring's, Kelle O'Keefe's voyeurism/photo shop fraud, and bugging equipment at Kai Kunz's residence/office.

# Part 5. Justification for Edward Ahern's demand of $1,700,000.00 trebled to $5,100,000.00 and Kai Kunz's demand of $19,000,000.00 trebled to $57,000,000.00

## Justification for Edward Ahern's demand of $1,700,000.00 trebled to $5,100,000.00

What is permanent psychological scarring worth? I was subjected to incredible amounts of fear, torture, was kidnapped, almost killed, harassed, threatened, and more.

The utility bill extortion caused me to have north of $100,000.00 in utility bills. I was kidnapped and told that me and my family/friends would be killed if I didn't put utilities into my name.

What is the value of applications and working with a new technology for alleviating the fresh water shortage that is becoming an issue in America and the world? What would being 5% of that development be worth? The present demand only calculates the following…

1. Future earnings that have been ruined due to my inability to pursue schooling because of Racketeering and Domestic Terrorist frenzy.
2. The life time effects of being scarred from the traumatic experiences I suffered from.
3. The effects that the Racketeering and Domestic Terrorism will have on my already disabled condition. A condition I have worked extremely hard towards overcoming.

Present demand doesn't even calculate for my inability to make good on my pursuits with others.

Business ventures, new applications, insights, and more, are very difficult propositions to execute and capitalize on. This is the case even when everything is organized and there are basic capital requirements for printing papers and other bare essentials. It takes discipline, effort, focus, and a semi problem free environment for success. To take a disabled person like myself with my limited income and subject the person to murder plots, harassment, torture, inconceivable amounts of fear and more. The damage caused by fanatical harassment, extortion, murder attempts, threats against myself, family, loved ones, and friends is beyond too much. It is more than enough to ruin any pursuit and make me scarred for life in mind and emotions.

$1,700,000.00 trebled to $5,100,000.00 seems very fair and generous. I would much prefer to have my mind and emotions in tact and work hard towards my goals without Racketeering and Domestic Terrorist agendas torturing me. What good is a modest income for life worth, compared to being stripped of my means to enjoy a settlement and pursue the ventures and educational pursuits that are and always have been a passion of mine. I can't read or focus on anything like I could when my full 145+ IQ faculties and incredible levels of happiness were flowing freely.

## Justification for Kai Kunz's demand of $19,000,000.00 Trebled to $57,000,000.00

Demand is very generous and fair for the following reasons

1. Real Investments value comes from long term appreciation, cash flow and value. What were properties inflated by, based upon false rental, expense, and appraisal information?

Answer: No less than $3,800,000.00 on face value at acquisition and $9,000,000.00 over just 12 years based upon the 200 plus year average of real estate going up 2% above inflation with ups and downs, but a consistent average during cycles. A Forensic Accountant will work wonders here. I could justify the numbers myself, but I don't have the degree or certification to be considered expert court testimony.

2. Being harassed, having emails deleted, being psychologically tortured through death threats and murder conspiracies, and massive thefts and extortion. How would these events effect $1,000,000,000.00 of Tau Quan and other Government claims.

A Forensic Accountant and Psychologist will do wonders here. A Psychologist will give expert testimony about how these actions would effect someone's ability to finish and mint out such huge claims wherein the Whistle Blower gets 15-30% of collections. A Forensic Accountant will be invaluable in providing expert testimony about how taking my papers, deleting emails, hacking into my computer, and how such RICO plots would effect my claims. Do the simple math here to see how this alone could easily quadruple the Demand figure in my law suit.

3. Affidavit from a Nobel Prize Candidate. He acknowledges that I am as skilled in his top profession as he himself is (in creativity and insights.) His affidavit speaks for itself. He has definite opinions about how the Racketeering/Domestic Terrorist conspiracy effected my ability to finalize work and projects.

4. What is psychological stress and a traumatic experience. How a near endless worth of such experiences would cause damages. This by itself could come close to equaling the demand figure herein.

Anything else would make the combined losses larger than the very fair and generous demand figure herein by at least an order of magnitude.

# Part 6. Some of what will be addressed at depositions and discovery.

What will be covered during discovery and depositions is by no means limited to the following Three Hundred and Eighteen (318) items. Every one of the issues mentioned below are very relevant to complaint. I will prove that every item issue below is relevant to complaint and or case after the inevitable motions to suppress are filed.

1. Email addresses of Kelle O'Keefe, Mark Kavanagh, Daniel Loring, Joseph Solans, serial killer sidekick that kidnapped me, and others at Keller Williams North Central.

2. Drug Overdoses in Fitchburg, MA and their relation to the drug dealing operations of Joseph Solans and Kelle O'Keefe. How this psychopathic behavior was utilized for victimizing many customers and why most were too afraid to speak up.

3. Phone records and a list of different Cell phones that have been used by Kelle O'Keefe, Mark Kavanagh, Daniel Loring, Joseph Solans, serial killer sidekick that kidnapped me, and others that worked Racketeering/Domestic Terrorist conspiracy.

4. Business transactions involving Kelle O'Keefe and Daniel Lorings transition from Apple Country Realty and Keller Williams North Central.

5. Business arrangements between different owners at Keller Williams North Central.

6. Business arrangements between Keller Williams North Central and Keller Williams Corporate.

7. Business arrangements between Keller Williams North Central and Apple Country Realty.

8. How Sheila Mcquinn said that Loan Modifications could be accomplished in a month or two for most properties.

9. Transactions involving Apple Country Realty and Keller Williams North Centrals buyers, and the mortgages that said buyers got done through Joseph Solans, Metro Mortgage, and SF Financial.

10. HUD's , bank information, and escrow statements involving buyers and sellers of Kelle O'Keefe, Daniel Loring, Mark Kavanach, and others at Apple Country Realty and Keller Williams North Central.

11. Testimony and emails from workers and associates of Keller Williams North Central and Apple Country Realty. Testimony and emails will not be limited to their knowledge of Kelle O'Keefe, Daniel Loring, Mark Kavanach and the relationship that the above three had with Joseph Solans, and serial killer sidekick that kidnapped me (Kai Kunz).

12. Kelle O'Keefe, Daniel Loring, Mark Kavanagh, Joseph Solans, Denise Peach, serial killer sidekick, and their communications with Brokers and Sales Agents involved with offers, property viewings, and communications involving transactions with Michael Simmons and myself (Kai Kunz).

13. Testimony from Brokers and Real Estate agents that communicated with Kelle O'Keefe, Daniel Loring, and Mark Kavanagh about offers, transactions, sales, and letters of interest involving Michael Simmons as buyer and his financials.

14. Testimony from workers at Keller Williams North Central and Apple Country Realty and the relationship between the testimony and tapes.

15. Escrow Accounts and the Personal Bank Statements of Daniel Loring, Kelle O'Keefe, Mark Kavanagh.

16. Tax returns of Kelle O'Keefe, Daniel Loing, and Mark Kavanagh.

17. Kelle O'Keefe, Daniel Loring, Mark Kavanagh, and their relationship to Joseph Solans and serial killer sidekick in several New Hampshire land and property acquisitions.

18. Kelle O'Keefe, Daniel Loring, Denise Peach, others, and their business relationship with Joseph

Solans, and serial killer sidekick.

19. Kelle O'Keefe, Mark Kavanagh, Daniel Loring, Denise Peach, and their aiding and abetting Joseph Solans and his serial killer sidekick in murder conspiracies against me (Kai Kunz) and others. Particular focus will be on the deaths of Joseph Solans tenants, his tenants friends/associates, and their death through overdose/tainted drugs, and how this mirrors the poison attempts against myself (Kai Kunz).

20. Extortion, phone tapping, extortion through others pointing guns, stalking, cell phone tapping, email/computer hacking, and other criminal actions that Kelle O'Keefe, Daniel Loring, Mark Kavanagh, Joseph Solans, Denise Peach, and their serial killer sidekick committed against me (Kai Kunz), customers of Keller Williams North Central, Customers of Apple Country Realty, Customers of Joseph Solans, Customers of Denise Peach. Customer lists at Keller Williams North Central, Keller Williams Greater Worcester, Apple Country Realty, Joseph Solans as mortgage Broker will be part of deposition and discovery.

21. Testimony from individuals who dealt with Kelle O'Keefe such as Arthur Vekos, Christina and Kevin McCarthy, Dianna Burns, Tony Champa, and Dianna Peppar.

22. Information and testimony from closing attorneys such as Richard Gilmore and John Rogaris.

23. HUD information and analysis of kickback trail that Kelle O'Keefe , Denise Peach, Daniel Loring, Joseph Solans, and others received from closings.

24. Financials of Michael Simmons parents that were altered by Kelle O'Keefe and Daniel Loring for facilitating transactions. Faxing and emailing of altered financial will be analyzed.

25. Escrow Statements during transactions with Kelle O'Keefe, Daniel Loring, and Mark Kavanagh.

26. Testimony from Realtors, Mortgage Brokers, and co workers of Daniel Loring, Kelle O'Keefe, and Mark Kavanagh. They will be asked about statements the above have made about Michael Simmons and myself (Kai Kunz) and our alleged financial privilege. How fanatical philosophical views lead others to extreme actions frequently.

27. Comments/statements that Kelle O'Keefe has made about her fathers Gambino crime family (LA Costa Nostra) connections and her speaking about obtaining his connections (she bragged about it in email threats to Kai Kunz.)

28. Kelle O'Keefe's statements to co workers, mortgage brokers, brokers, and real estate agents about being a former prostitute and her belief that me (Kai Kunz) and Michael Simmons deserved to be treated terribly due to our families privilege. This information is relevant due to motives for actions.

29. Review of affidavits from others about associations of Kelle O'Keefe, Denise Peach, Daniel Loring, the Mccquinns, Boguslav, Joseph Solans, had with their serial killer sidekick, and others.

30. Review of testimony about Kelle O'Keefe, Joseph Solans, Serial killer sidekick, and their associations with gangs and their attempts to empower Gang members in massive numbers (in affidavits).

31. A review of Appraisals submitted by Denise Peach to Bay View Loan Servicing.

32. Review of P and S Agreements and other records with Daniel Loring, Denise Peach, and Kelle O'Keefe have/should have, on business Partner Michael Simmons purchases.

33. The illegal credit pulls done against me and Michael Simmons and the illegal equipment that Kelle O'Keefe, Denise Peach, and Joseph Solans had for monitoring Michael Simmons credit pulls.

34. Expert testimony from Accounting professionals.

35. Expert testimony from CBA professionals.

36. Expert testimony from Military experts on what constitutes Domestic Terrorism and a threat to the National and financial security of America.

37. A $17,000.00 electric bill for 1 month service and the utility bill fraud committed by Racketeering/Domestic Terrorist fanatics.

38. Utility bill fraud and water/sewer bill fraud and plans Racketeering/Domestic Terrorist fanatics or most defendants have with empowering gangs to undermine utility and water supplies and thereby extort the state and government. Much like how traditional terrorist and war enemies target utility infrastructure and water supplies.

39. Suspicious and untimely deaths and their relation to racketeering/domestic terrorist fanatics in this complaint.

40. Poison/other murder conspiracies and larger plans of racketeering enterprise. See affidavits.

41. Emails from and to Jeffery Stephens from Anne Cramer's email address, his personal email address, and his Board of Health email addresses.

42. Michael Ciotas emails

43. Phone records from anonymous callers complaining about 348 Elm Street Fitchburg, MA and other properties owned by Michael Simmons/Kai Kunz in Fitchburg MA, Worcester, MA, and the phone company records. Will show that complaints against Kai Kunz's properties were done by defendants and their associates as part of organized Racketeering conspiracy/protection Racket.

44. Information about Jeffery Stephens association with Joseph Solans, Kelle O'Keefe, Lorie Spaulding, and others.

45. Michael Ciota's relationship with and his communications with Fitchburg and Worcester District Courts.

46. Board of Health records and computer information.

47. Michael Ciotas communications as City Solicitor and elsewhere.

48. Information about Jeffery Stephens communications with tenants.

49. Information about Jeffery Stephens and Michael Ciotas discussions with Twin Cities Development.

50. Internal Affairs report

51. Telegram and Gazette information.

52. Affidavits from tenants.

53. Emails and dealings that Jeffery Stephens and Michael Ciota had with Twin City Development members.

54. Mayor Quans emails.

55. Board of health reports on Properties managed by Lorie Spaulding and a review of the properties conditions.

56. Email addresses of Kelle O'Keefe, Mark Kavanagh, Daniel Loring, Joseph Solans, serial killer sidekick that kidnapped me, and others at Keller Williams North Central.

57. Email Correspondence from Kelle O'Keefe, Mark Kavanagh, Daniel Loring, Joseph Solans, serial killer sidekick that kidnapped me, and workers at Keller Williams North Central, with particular focus on emails that have been deleted.

58. Phone records and a list of different Cell phones that have been used by Kelle O'Keefe, Mark Kavanagh, Daniel Loring, Joseph Solans, serial killer sidekick that kidnapped me, and others that worked Racketeering/Domestic Terrorist conspiracy.

59. Business transactions involving the transition of Kelle O'Keefe and Daniel Lorings from Apple Country Realty to Keller Williams North Central.

60. Kelle O'Keefe and Joseph Solans associations and communications with Shawn Taylor and Randal Devries of R and R Property Management.

61. Joseph Solans, Kelle O'Keefe, Daniel Loring, the Mcquinns, Boguslav, and their having Kai Kunz and Michael Simmons stalked.

62. Former revolutions/attempts to overthrow Governments and their relationship to the fanatical Racketeering/Domestic Terrorist actions of most defendants in complaint.

63. Look into business arrangements between Kelle O'Keefe, Daniel Loring, Mark Kavanagh, Joseph Solans, and their serial killer sidekick. Business arrangements will not be limited to rental agreements at the Apple Country Realty office

64. Transactions involving Apple Country Realty and Keller Williams North Centrals buyers and the mortgages that said buyers got done through Joseph Solans and SF Financial.

65. HUDs , bank information, and escrow statements involving buyers and sellers of Apple Country Realty and Keller Williams North Central wherein they were buyers or sellers of Kelle O'Keefe, Daniel Loring, and Mark Kavanagh.

66. Testimony and emails from workers and associates of Keller Williams North Central and Apple Country Realty. Testimony and emails will not be limited to the associations that Kelle O'Keefe, Daniel Loring, Mark Kavanach had with Joseph Solans, and their serial killer sidekick that kidnapped me.

67. Present modus operandi of Terrorists and the relationship towards their actions and the tactics employed by Racketeering/Domestic Terrorist fanatics in complaint.

68. Statistics on overdoses in Fitchburg MA and Gardner, MA prior to and during time wherein Joseph Solans, Kelle O'Keefe, Daniel Loring and associates dealt drugs out of areas (or more specifically from 2006 onwards).

69. Psychologist expert testimony on the dangers of fanaticism and the similarities between the fanaticism of individuals in complaint and the defenders of Iwo Jima. Expert testimony will establish behavior patters among defendants and its' relation to actions committed against Kai Kunz and Michael Simmons.

70. Civil Rights Laws and what constitutes a violation of civil rights.

71. Laws concerning the disabled and the hate crimes committed against Kai Kunz and Edward Ahern.

72. Expert testimony from Forensic Psychologists on what brings about trauma that creates life time consequences for victims. Particular focus will be on the actions committed against disabled Edward Ahern and the life time damages that the defendants actions caused him and Kai Kunz.

73. Laws concerning the targeting of individuals with disabilities. How the fraud, extortion, kidnapping, stalking, and more committed against Edward Ahern is the premiere example of targeting the disabled.

74. Kelle O'Keefe, Mark Kavanagh, Daniel Loring, Denise Peach and their aiding and abetting Joseph Solans and his serial killer sidekick in murder conspiracies against drug runners, and addicts in Fitchburg, MA, Gardner, MA and elsewhere.

75. Testimony about Kelle O'Keefe claiming that she could dispose of her own relatives with impunity and that she will do the same to anyone who rats on her, Daniel Loring, Mark Kavanach, Denise Peach, Joseph Solans, and others. How this testimony relates to claims by Kelle O'Keefe of having a young child of hers die very young.

76. Testimony from individuals who did mortgages with Kelle O'Keefe, Daniel Loring, Mark Kavanach, the Mcquinns such as Saverio Fulciniti, Albert Matz, Adam Husband, Andrew Sears, and others.

77. Information and testimony from closing attorney John Bowen.

78. Poison Conspiracies and their relation to mass murders on large scale.

79. The Theories of Karl Marx and their similarities to defendants empowering gang members on large scale and their indoctrination tactics.

80. Superior Court Lawsuit filings by Kai Kunz and their relationship to calls made by defendants to Kevin McCarthy and Joseph Young..How Government was infiltrated by defendants by paying informants.

81. Communications of defendants with Kevin McCarthy and Joseph Young and the subsequent failed frame attempts against Kai Kunz.

82. Communications that defendants have had with Northbridge Police and their working to cover up Racketeering Conspiracy through a unified conspiracy.

83. Statements made by defendants to law enforcement and the contradictions between these statements and the facts.

84. Statements by defendants and their working to fraudulently frame Kai Kunz in order to discredit his claims and silence him due to murder attempts having failed.

85. The untimely death of Gail Simmons and the timing of death compared to threats left on Kai Kunz's parents answering machine after Kai filed 1024B RICO suit in Worcester Superior Court. Tape mailed to FBI will be utilized.

86. The communications that defendants had with Northbridge Police for covering up many criminal acts, which are not limited to the extortion and murder attempts committed against Kai Kunz.

87. Contradictions in statements made by David Boudreau at depositions and statements to Gardner Police.

88. Statements made by David Boudreau to Gardner Police for covering up and aiding and abetting Racketeering/Domestic Terrorism of defendants.

89. Richard Rawson and Attorney Anthony Scolas communications with banks when both worked to sell my (Kai Kunz's) Worcester and Northbridge, MA properties to Joseph Solans and Christina Solans, when I was seventy five percent (75%) owner of properties.

90. Richard Rawson and Attorney Anthony Scolas communications with banks for sales when I was one hundred percent (100%) owner of Fitchburg MA Properties.

91. A list of (all) email addresses used by Attorney Scola, Richard Rawson, and all defendants.

92. A list of (all) cell phones and phone numbers utilized by Attorney Scola, Richard Rawson, and all defendants.

93. Email correspondences from all of Richard Rawson, Attorney Scolas, and all defendants email addresses. Their will be particular focus on emails that have been deleted.

94. Phone records and analysis of why some phones were used by defendants to only call certain people.

95. Title company workers from O'Conell Title Services (handled sale of Kai Kunz and Michael Simmons Worcester, MA properties).

96. Bank workers from Banks that were with properties I (Kai Kunz) owned. Communications that they had with Richard Rawson and Attorney Scola.

97. Legal Documents that Attorney Scola sent to Michael Simmons and Richard Rawson.

98. Pay Pal transactions and all financial records of Attorney Scola, Richard Rawson, and all defendants.

99. Tax returns of Attorney Scola, Richard Rawson, and all defendants.

100. Phone records from all phones and communications between Joseph Solans, Christina Solans, Attorney Scola, Jorge Torrez, their serial killer sidekick, and other defendants.

101. Phone records from all phones and communications between defendants and the relationship between the calls and events such as the kidnappings of Kai Kunz and Edward Ahern.

102. Communications between defendants and the relationship of this with the lawsuit filed by Edward Ahern in 2012 and the hit and run committed against Edward Ahern's nephew in March 2012.

103. Anthony Scola and Richard Rawson's knowledge of Racketeering/Domestic Terrorism and his aiding and abetting murder conspiracies and extortion committed against me (Kai Kunz). How this was all done during time when Richard Rawson stole from my properties and tried to sell properties wherein I was either 75% to 100% owner of properties.

104. MLS Transactions that Richard Rawson put online.

105. Escrow statements done by Richard Rawson and Anthony Scola.

106. Phone and email records of Richard Rawson, the Mcquinns, Bruce Boguslav, Kelle O'Keefe, Daniel Loring, and who they associated/dealt with during Racketeering and Domestic Terrorist Conspiracy committed against Kai Kunz, Edward Ahern, and others.

107. Title company workers and bank workers involved with transactions wherein Richard Rawson was a real estate agent involved in the transactions and Anthony Scola was an attorney.

108. Workers at Keller Williams Greater Worcester and Keller Williams North Central. How they knew about Racketeering/Domestic Terrorist conspiracies of Rawson, O'Keefe, Loring, Kavanach, and did nothing. Demonstrating the level of negligence committed by both of the above offices and Keller Williams Corporate.

109. Records at Keller Williams Greater Worcester and what Richard Rawson submitted to banks.

110. Particular focus on Richard Rawson's emails and transactions with Saverio Fulciniti, Attorney John

Rogaris, Michael Comeau, Michael Simmons, and others.

111. Richard Rawson's associations with Attorney Scola prior to his dealings with Kai Kunz and Michael Simmons. Richard Rawson's dealings with attorney Scola from December 2007 until present.

112. Listing of all cell phones and regular phones that Sheila and Ronald Mcquinn used and when/why they changed phones.

113. Listing of email addresses used by Ronald and Sheila McQuinn, and all defendants.

114. Bank Accounts in the United States, Virgin Islands, and elsewhere that are used by the Mcquinns, and all defendants

115. Records and HUDs from former attorneys that were used by Ronald and Sheila Mcquinn for short sales.

116. Records of the Mcquinns and Bruce Boguslavs short sale buyers.

117. Records of the Mcquinns, their workers, their partners, and Bruce Boguslavs Loan Modification Customers

118. Records of the Mcquinns having owners deed properties into their names (the Mcquinns and or their trusts) for the alleged purpose of talking to banks on behalf of customers. Reality being the fraud insider negotiations for getting properties from banks for minimal amounts and to the benefits of the Mcquinns.

119. Deferred maintenance records that the Mcquinns had submitted to banks on behalf of customers.

120. Full review of what the Mcquinns submitted to banks for loan modifications while they were being paid $750.00/month per mortgage by Kai Kunz and Michael Simmons.

121. Review of transcripts and emails between the Mcquinns, Bruce Boguslav, and the banks where they had mortgages that were being worked on for Kai Kunz and Michael Simmons.

122. Skeleton or fraud Bankruptcies the Mcquinns had Michael Simmons and other customers engage in for getting the banks to go down lower in price and make the Mcquinns more money. Very contrary to the loan modification goals that the Mcquinns were engaged for.

123. Testimony and affidavits about the Mcquinns and Bruce Boguslavs relationship with and dealings with Joseph Solans, Kelle O'Keefe, Shawn Taylor, Daniel Loring, and others.

124. Bank representatives that will discuss typical loan modifications that professionals complete, and how much they charge (illegal to charge until a loan modification is completed in many states.) The Banks that the Mcquinns worked with will be analyzed about their willingness and ability to do loan modifications.

125. How David Boudreau sold 74 Abbott St. Gardner, MA 01440, 205-213 Park St. Gardner, MA 01440, 7-11 Glazier St. Gardner, MA 01440, with false rental and expense information. Email

correspondences, information at lending institution, tenant information, tax returns, bank accounts, and more will come out in deposition and discovery. Michael Simmons who is my (Kai Kunz's) business partner bought properties with this information. It was white collar fraud that inflated the values of the properties, due to the false information that was provided by David Boudreau. Their was camera photo shopping done with appraisals, and other white collar frauds that David Boudreau was directly involved with prior to purchases by Michael Simmons.

126. How David Boudreau brought his false information that inflated values to another level of fraud and conspiracy when he did the following…..

126A   Buyer Michael Simmons was told that down payment funds for the purchase of 205-213 Park St. Gardner, MA 01440 and 7-11 Glazier St. Gardner, MA 01440 were cross collateralized from other properties owned by Michael Simmons, by the banks that were doing the first mortgage.

126B   Michael Simmons went to the closings and David Boudreau's attorney - Mark Goldstein emailed the third mortgages to Michael Simmons at             just a day before the closings took place. This was a fraud that David Boudreau the seller knew about, his attorney Mark Goldstein facilitated his wishes, and utilized his knowledge as an attorney for perpetuating the fraud. HUDs, Bank information, Banking Commissioner information, and Attorney Information will reveal the fraud.

126C   David Boudreau also sold his 74 Abbott St. Gardner, MA 01440 property thru fraud. On 74 Abbott St closing, Boudreau ended up loaning over $3,000.00 towards closing expenses. The purchase was done with seventy percent bank financing and a thirty percent second mortgage. Their was a shortfall on closing costs, that was picked up by David Boudreau, with the help of Attorney Goldstein, who facilitated the closing in his office.

126D   David Boudreau sold properties from the start by providing false financials, fraud, misrepresentations and more. Tax returns, HUDs, checks, bank accounts, lending institutions information and more will be addressed in depositions and discovery.

127. How David Boudreau stole a substantial amount of rents from properties he sold in late 2007 and early 2008, and did far more theft from November 2009 into March 2010 as well.

127A   The thefts were in excess of $48,000.00 and don't even include items stolen from properties, and coins from washers and dryers at 205-213 Park St and 7-11 Glazier St.

127B   Bank accounts, tax returns, tenant information, and more will reveal the thefts he committed at properties. Thefts done at Gardner properties combined with false rental and expense information given on properties from start, lead to default. David Boudreau continually brought his fraud, theft, and racketeering conspiracy to a new level of execution. In such an impressive way that ROC Racket outfit MPAT/Home Savers/Mcquinns took much notive and respect towards Mr. Boudreau.

128. Analysis of emails from David Boudreau In May 2008, wherein he threatened Michael Simmons and myself (Kai Kunz).

128A   David Boudreau made it clear that he had the power and authority to do as he pleased to both me and Michael Simmons.

128B   I have affidavits from others who have spoken about Mr. Boudreau's arrogance in these matters (see both exhibits).

128C   Since emails occurred during time when Racketeering was going into full throttle. David Boudreau and his emails/associations with others involved with extortion, murder attempts, email hacking and more will be analyzed.

129. David Boudreau's making of an alliance with Russian Organized crime outfit named MPAT, for getting his properties back for thirty cents on the dollar. The inside short sale dealings and fraud that MPAT/Mcquinns and Bruce Boguslav did with banks as they were being paid to do loan modifications.

130. David Boudreau lied during his depositions with Michael Simmons, lied to Gardner police, and was assisted by Attorney Mizhir in perpetuating frauds. The Gardner Police will be asked about discussions with Attorney Mizhir and David Boudreau, and the depositions between David Boudreau and Michael Simmons will be analyzed.

131. David Boudreau's new tenants and business partners will be asked to testify at depositions and discovery about their knowledge of new materials being installed in buildings.

131A   Michael Fronte admitted to having taken materials from my building at 348 Elm St. Fitchburg, MA in an affidavit that he further attested to on 3-31-2010 hearing.

131B   David Boudreau received tens of thousands worth of stolen materials from my property at 348 Elm St. Fitchburg, MA 01420.

131C   Michael Fronte, his helpers, the Uhaul company that rented him the truck, Scott Young, Glen Klausner, partner with them, and more will be asked questions during deposition and discovery about theft of materials and many other matters as well. They will be required to provide financial, other information, and agreements related to the properties.

132. How David Boudreau committed a pattern of Racketeering from the start.

132A   It was committed with a level of organization, planning, and multiple layered conspiracy that built upon itself.

132B   How He is being sued specifically for the direct cost, future appreciation, and other financial damages. He is also being sued for punitive damages, tort, and other damages for his role in directly and indirectly participating in, and aiding and abetting RICO Conspiracy that at least borders on Domestic Terrorism.

132C   How The specific actions he committed constitute a civil cause of action to start. His actions were continuous, and built upon one theft and fraud after another. He participated in much more than the specific actions outlined in this response herein. This will be part of depositions and discovery

133. How and why The Mcquinns were introduced to me (Kai Kunz) by David Bain, for fixing the mortgage problems that were occurring. Rental theft, extortion, phone tapping, stalking, and more doesn't usually help a business (emphasis added).

134. Why David Bain met with Kelle O'Keefe several times prior to property acquisitions in Worcester, MA.

135. Why Richard Rawson wanted David Bain to be the manager.

136. How David Bain was a conduit for Kelle O'Keefe and Joseph Solans premeditated Racketeering and Domestic Terrorist agendas.

136A  How David Bain offered to be a conduit for furthering their Racketeering, fraud and extortion that went from selling properties plus extortion and moved all the way into my sink, supplements and beyond.

136B  How the same is true when Kelle O'Keefe spoke to David Boudreau and Richard Rawson at Keller Williams North Central more than once and lined up the Gardner and Worcester, MA property take backs/property thefts, rental thefts, extortion through email, extortion through other means, and more.

137.  How Kelle O'Keefe spoke to dozens of realtors and sent them Michael Simmons parents financials, which she and Daniel Loring altered.

138.  Why David Bain and David Boudreau met at Apple Country Realty and Keller Williams at both Keller Williams North Central and Greater Worcester several times without me (Kai Kunz) and Michael Simmons. They met with Kelle O'Keefe, Joseph Solans, and Daniel Loring prior to the purchases of the Gardner Properties (Dave Boudreau sales) and Worcester properties (David Bain was the manager of for the seller of properties).

139.  How Racketeering was a plan from start as Joseph Solans worked at Daniel Lorings Apple Country office at 63 Park St. Ayer, MA.

139A  After Daniel Loring opened the Keller Williams North Central office in Leominster, MA.  Kelle and Loring moved to Keller Williams North Central while continuing business with Joseph Solans and Apple Country at the old address at 63 Park St. in Ayer, MA.

139B  It was white collar fraud that was planned from the start, with additional plans that were executed long after initial purchases.

140.  How Daniel Loring and Kelle O'Keefe helped Joseph Solans and his serial killer sidekick extort land owners (more than one was elderly and a war veteran) out of land and second mortgages that were to be executed as part of sales.

141.  Why Kelle O'Keefe met with my secretary named Holly Hanson in November 2007 in order to scope out the property for Joseph Solans and his serial killer sidekick that kidnapped me and was involved with the murder conspiracies against me. I caught Joseph Solans serial killer sidekick that later kidnapped me at my property on the day of meeting with Kelle looking at my property. He drove off on his motorcycle when I spotted him.

142.  How the Camera, bugging, and other conspiracies inside my residence and office went into full throttle in April 2008 but the phone tapping, email/computer hacking and more went into effect with Kelle O'Keefe, Joseph Solans, their serial killer sidekick, and Daniel Loring in June 2007.

143.  How The fraudulent rental/expense information, the fraud rental agreements, and rental scams, altered Appraisals, altered HUDs, and more, added massively to the weight of the massive thefts that were being committed by David Boudreau and David Bain.

144.  Why The Mcquinns were enthusiastically recommended by David Bain for loan modifications. Just as Kelle O'Keefe and Richard Rawson insisted that David Bain be used as management.

145.  Why Upon meeting the Mcquinns at 10 Mariom St. Worcester, MA or David Bain's residence in

June 2008, Kai Kunz and Michael Simmons only discussed their doing loan modifications on properties. Neither me (Kai Kunz) or Michael Simmons ever discussed short sales.

146. Why loan modifications could be done in a month or two at the latest with a good professional. Discovery will prove this and be used for making just part of case against Mcquinns and Boguslav's multi layered and premeditated fraud.

147. How The Mcquinn's were told that Kai was 75% owner of properties through Company William XI Properties Series LLC at first meeting in June, by email several times thereafter, by phone and fax by my attorney Joseph Lussier, and how the corporate papers were emailed to both Mcquinn's in September 2008. Why Mcquinn's ignored this fact and worked against company owner (due to Kai being unable to bend to extortion).

148. Why and how The Mcquinns brought Bruce Boguslav into the picture in August 2008, as he was a worker on behalf of the Mcquinns as they worked to have the vast majority of properties go to short sale with potential inside buyers (Joseph Solans, Kelle O;Keefe, Daniel Loring and Racketeering/Domestic Terrorist associates). Bruce Boguslav was and is their sidekick in Russian Organized Crime for shaking down customers with perceived deep pockets.

149. How Bruce Boguslav and the Mcquinns started to hack into Kai Kunz's computer/email, tap his phone, and had him scoped by their associates in Russian Organized Crime (ROC).

150. Why Bruce Boguslav routinely called Michael Fronte that occasionally did repairs and minor maintenance on my Fitchburg and Gardner Properties. The discussions started in September 2008.

151. How Bruce Boguslav and the Mcquinns started to encourage Michael Fronte to steal rents aggressively in late September 2008 and told Fronte that he and MPAT were working to get rid of properties (that me and Michael Simmons payed over $75,000.00 to have loan modifications done on) and that Bruce would have the new owner utilize Michael Fronte as a property manager.

152. How Bruce Boguslav called many of the banks that had mortgages on properties owned by Kai and Michael Simmons and worked the same fraud scam that the Mcquinns work, wherein they work to sell properties with prearranged prices with banks, to inside buyers that they get huge kickbacks from on the side of the HUDs. Bruce Boguslavs, Anthony Scolas, Richard Rawson's, the Mcquinns, Joseph Solans discussions with the banks will be part of depositions and discovery.

153. Events surrounding October 2008 wherein Bruce Boguslav and the Mcquinns started to communicate with and met up with Joseph Solans, Kelle O'Keefe, and their serial Killer Sidekick that kidnapped Kai, held him hostage. How their serial killer sidekick was and is a ground person for their corporate espionage, voyeurism, extortion and more.

154. How Michael Fronte was given $17,000.00 from Michael Simmons to complete work, as Bruce Boguslav and the Mcquinns said that he was approved to do work with the banks and had to be used with David Bain as well in order to get loan modifications completed. This was one of many lies that was said to Kai and Michael Simmons. All to be evaluated to show organized strategy of multi layered Racketeering conspiracy and similarities to how it was used against other customers of the Mcquinns and Boguslav.

155. Event wherein Bruce Boguslav and Michael Fronte entered Kai Kunz's residence on November 7th

2008 and Kai was confronted at gun point by 166LXO RI and Solans serial killer sidekick that held him hostage. They told Kai to leave or get mowed down by firearms.

156. Affidavits about a meeting that was held with Bruce, the Mcquinns, Solans, and others wherein they co-oberated about covering the tracks of Joseph Solans and associates in return for kickbacks from the Fitchburg, MA drug dealing operations that were being committed by Joseph Solans and Kelle O'Keefe.

157. Why In October 2008 Bruce Boguslav spoke to the Board of Health Worker Jeffery Stephens and constable Lorie Spaulding about running a story on Kai (a volunteered DEA informant) about his toleration of drugs at properties in order to get attention away from the person who paid them for protection (Joseph Solans and Jorge Torres.)

158. Why David Bain and Richard Rawson entered Kai Kunz's residence and tried to throw him out by force on November 9th 2008. Why They took many papers, and scoped residence in order to help Solans get camera and bugging equipment for his corporate espionage and extortion schemes out of residence for covering himself and his many other similar operations as part of Racketeering/Domestic Terrorist large scale agendas. How two of Joseph Solans and the Mcquinns grunts pointed guns at Kai Kunz to support them and their activities. It was during this day that first signs of poison were noticed.

159. Several machine gun messages were left on Kai Kunz's answering machine on November 11th and later - mailed tapes and many others to FBI as Kai had informed them about camera setup in residence and office that they addressed.

160. Why after Michael Fronte was asked about his rental theft by me (Kai Kunz) and Michael Simmons and asked to meet with our attorneys in late November 2008. Michael Frontes father thereafter left threatening messages on the answering machines of Kai Kunz and Michael Simmons (tapes were mailed to the FBI as were many previous tapes.)

161. Why after meeting with Solans, O'Keefe, Loring, and others several times (have affidavits from a few meetings) the Mcquinns started Home Savers for the purpose of trying to separate themselves from the attempted murder, shakedowns, kidnapping, and more that was about to go into full throttle, and with a fanaticism that can only be rivaled but not surpassed.

162. How The Mcquinns and Bruce Boguslav communicated with Kelle, Solans and their serial killer sidekick with new cell phones in December 2008.

163. How The Mcquinns and Bruce Boguslav were payed tens of thousands of dollars for loan modifications as they aided and abetted, plus assisted in the following actions against Kai Kunz and Edward Ahern-

- Conspired to have us killed
- Conspired to have Kai agree to short sales from kidnapping.
- Conspired to have Kai agree to short sales by having people point guns at him
- Encouraged David Bain and Michael Fronte, to give them (Mcquinns and Boguslav) a cut from their rental thefts.
- Had Kai and Edward Ahern stalked by 166LXO RI, AZ769 MA, 2716XO MA and others.
- Violated Federal Wire Tap Laws against Kai by having his cell phone, email, and computers hacked/tapped.
- Like Joseph Solans, Kelle O'Keefe, and Daniel Loring, the Mcquinns and Bruce Boguslav had Kai called

and had his previous conversations and those of his friends/relatives played back to him, in order to show that they were effectively stalking his relatives and friends.

- Were given money by Joesph Solans in return for being offered lower prices on my properties, that they expected me to sell by force or after I was dead through Michael Simmons or the banks.

- The Mcquinns and Bruce Boguslav helped Joseph Solans and Kelle O'Keefe in trying to hopefully cover their tracks with the corporate espionage, voyeurism/extortion camera and bug setup at my residence and office. Too late....

164. How Kai Kunz's cell phones were tapped, computer and email hacked, in order to undermine and find out about what he might have revealed to the FEDs.

165. How Daniel Loring, Joseph Solans, Daniel Loring, the Mcquinns, Bruce Boguslav and associates Orchestrated and planned Racketeering/Domestic Terrorist plots in trying to and planning to tap the cell phones and hack into the computers and emails of individuals in law enforcement.

165A    I have affidavits of their plans from others.

165B    Don't know if they succeeded but do know that they did the same in hacking into emails of mine and calls I made that were to the authorities.

166.    Why Joseph Solans, Kelle O'Keefe's, Daniel Loring's use of espionage against Law Enforcement and Informants combined with kidnappings to undermine someone's rights to the American legal system is Domestic Terrorism.

167. Why the Mcquinns stopped dealing with Kai Kunz while receiving money for loan modifications in November 2008. Why the Mcquinns were however meeting continually without Kai or even Michael Simmons. How they met regularly with David Bain, Michael Fronte, David Boudreau, Joseph Solans, and others in Racketeering/Domestic Terrorist conspiracy.

168. Why the Mcquinns contract that Kai Kunz refused to sign was taken from his residence on November 7th, 2008 thru Bruce Boguslav and Michael Fronte.

169.    Why contract taken on November 7th 2008 was modified and emailed from Bruce Boguslav to Kai Kunz in January 2009 with language to cover for Joseph Solans, Kelle O'Keefe, Daniel Loring and others a few months later.

170.    Why Mcquinns insisted that contract include information about needing to have David Bain and Michael Fronte collect rents.

171.    Why contract also asked for blanket permission for the Mcquinns and Boguslav to talk to any and all interested parties about my (Kai Kunz's) properties without first asking Kai Kunz. Boguslav and the Mcquinns sent a similar contract in January 2009 which I have.

172.    Analysis as to why the Mcquinns would need a blanket authorization in a contract for doing loan modifications as they were hired to do and were being paid tens of thousands to do from the start!

173.    Why Poison attempt (s) against Mr. Kunz started right at that time when Bruce Boguslav and Michael Fronte entered Kai's residence in early November 2008.

174. Expert testimony on likelihood that no modification would be completed during time when Banks were extremely reasonable (as they are today.)

175. Analysis of the $100,000.00+ in payments that the Mcquinn's and Bruce Boguslav received and what was done.

176. What the banks were typically giving customers that applied for loan modifications, during time when Mcquinns and Bruce Boguslav spoke to Solans and received tens or thousands of dollars to do Loan Modifications. Or from September 2008 onwards.

177. The future income and cash flow from properties wherein the minimal standards for collections was received and loan modifications were completed. Minimal collections and audit standards will be utilized.

178. How the Mcquinns were aiding and abetting Racketeering/Domestic Terrorism against Michael Simmons and Kai Kunz when they were paid tens of thousands of dollars from them.

179. Emails to the Mcquinns and Bruce Boguslav wherein they were made known about financial fraud that was committed by Kelle O'Keefe, Daniel Loring and others during transactions in July, August, September, October 2008.

179A    Emails that were sent to them by Kai Kunz and how the Mcquinns/Boguslav changed positions in what they told banks during RICO explosion wherein they met up with Joseph Solans, Kelle O'Keefe, Daniel Loring and associates in October 2008.

180. What was presented to banks by the Mcquinn's prior to, during, and after RICO/Domestic Terrorism explosion wherein they crossed paths with Joseph Solans, Kelle O'Keefe, Daniel Loring and associates.

181. The role that the Mcquinns and Bruce Boguslav played in murder attempts against Kai Kunz.

182. Why Bruce Boguslav and Michael Fronte entered Kai Kunz's office/residence on November 7th, 2008 and why first poison attempt was discovered on November 9th, 2008 when their was an attempted forced extortion eviction against him to cover for Joseph Solans, Kelle O'Keefe, Daniel Loring, and Racketeering/Domestic Terrorist fanatics..

183. The role that the Mcquinns and Bruce Boguslav played in trying to cover and aid and abett the murder, voyeurism, extortion, theft, and other conspiracies of Joseph Solans, Kelle O'Keefe, Daniel Loring, Mark Kavanach and associates.

184. How Massive quantities of rental theft was being stolen from my (Kai Kunz's) Fitchburg properties (by Rawson, Jorge Torres, and Solans serial killer sidekick) and my Worcester properties by Richard Rawson and David Bain.

185. Review of gun threats and extortion that was committed against Kai Kunz and Edward Ahern numerous times as both Kai and Edward were told to do as Rawson, Solans, Mcquinns, and O'Keefe says.

186. More than one poison attempt against Kai Kunz and assassination attempts against Edward Ahern.

187. Papers taken from Kai Kunz's office and residence from sophisticated lock picks.

188. Worcester and Fitchburg MA properties that Kai Kunz was owner of and that were listed on MLS without his knowledge or permission.

189. P and S agreements that were uttered falsely by Christina Solans through the help of Richard. How documents uttered falsely were done in furtherance of murder, theft, and extortion conspiracy.

190. How Richard Rawson sent a text to Kai and told him "don't give me any orders" when I told him not to manage or do anything at my properties without my permission. Text, phone call from Attorney Joseph Lussier, and subsequent actions by Richard Rawson will be reviewed.

191. How Edward Ahern and Kai Kunz received numerous death threats and directives informing them to do as Richard Rawson, Joseph Solans, and Kelle O'Keefe wanted.

192. How Kai Kunz and Edward Ahern were stalked constantly.

193. How Richard Rawson and Attorney Scola were illegally talking to the banks involved with Kai Kunz's Worcester and Fitchburg properties. How all of this was done while ignoring owner (Kai Kunz) and in furtherance of the theft, extortion, and murder conspiracies against Kai Kunz and Edward Ahern.

194. How Attorney Scola legally advised Michael Simmons to acquiesce to extortion and Domestic Terrorist tactics and not report anything.

195. Attorney Scola communications to Joseph Solans and associates through phone and email.

196. How Attorney Scola, Richard Rawson, Daniel Loring, and other defendants aided and abetted Racketeering and Domestic Terrorist conspiracies.

197. How Attorney Scola had numerous conflicts of interests.

198. How Attorney Scola stole money, misappropriated funds, and lied to the Board of Bar Overseers. How he utilized the same tactics against Kai Kunz.

199. How Attorney Scola outright committed fraud on behalf of Rawson's, Solans, O'Keefe's, Lorings, Kavanach's actions and planning. How Scolas actions were done as a pattern and multi layered conspiracy for furthering the Racketeering of others.

200. Attorney Anthony Scolas communications with banks when he worked to sell Worcester and Northbridge, MA properties that were owned by Kai Kunz to Joseph Solans and Christina Solans when he (Kai Kunz) was seventy five percent (75%) owner of properties.

201. Attorney Anthony Scolas communications with banks when Kai was one hundred percent owner of Fitchburg MA Properties.

202. A list of (all) email addresses used by Attorney Scola and Richard Rawson.

203.  A list of all cell phones and phone numbers utilized by Attorney Scola and Richard Rawson.

204.  Email correspondences from all of Richard Rawson and Attorney Scolas email addresses with particular focus on emails that have been deleted.

205.  Phone records and analysis of why some phones were used only to call certain people by Attorney Scola, Richard Rawson, and defendants.

206.  Title company workers from Oconell Title Services (handled sale of my Worcester, MA properties).

207.  Bank workers from Banks that were with properties owned by Kai Kunz, that communicated with Richard Rawson and Attorney Scola.

208.  Legal Documents that Attorney Scola sent to others, such as Michael Simmons and Richard Rawson.

209.  Pay Pal transactions and all financial records of Attorney Scola and defendants.

210.  Tax returns of Attorney Scola, Richard Rawson, and all defendants.

211.  Phone consulting records and ledgers for what Attorney Scola submitted to the Board of Bar Overseers.

212.  Attorney Scolas representation of Richard Rawson and any conversations he (Anthony Scola) had with Fitchburg District Court workers.

213.  Affidavits that refers to Richard Rawson and Attorney Scola stating they have court connections, particularly through attorney Scolas relative that is a Judge.

214.  Testimony will be reviewed about Richard Rawson stating that Attorney Scola has proven to be able to get away with murder and how like such a bold claim, Attorney Scola acts recklessly and arrogantly with his brazen acts (outlined in Complaint filed and in this letter that better clarifies complaint) of theft, fraud, and misconduct.

215.  Attorney Scolas and Richard Rawson's continuous changing of emails and cell phone numbers and the reason for it.

216.  What attorney Scola said to the Board of Bar Overseers that he represented from December 2008 until present.

217.  David Hills, Richard Rawson's, Keller Williams Greater Worcester Corporations emails will be reviewed.

218.  Affidavits and testimony about meetings wherein the Mcquinns, Bruce Boguslav, and Michael Fronte discussed ways to undermine law enforcement and tap the personal cell phones of police detectives, FBI informants, and eventually the cell phones and computers of FBI Agents that they hoped to intimidate.

219.   Lorie Spaulding's uncle and her claims that his position within the FBI would be enough to effect proper investigation of Racketeering and Domestic Terrorism. She said this in front of Walter Murray, Jeffery Stephens and others on 1-8-2010 at Fitchburg Housing Court.

220.   Letter Lorie Spaulding signed about Joseph Solans being on hunt for Kai Kunz. How she said this in light of previous and future murder attempts against Kai Kunz and said the following in front of Fitchburg District Court workers "Joe Solans found out you have a friend that is an FBI informant." "His friend beat up your friend when he found out." She nodded her head and laughed when I asked her if he was looking to kill me. She also laughed routinely about my days being numbered.

221.   Quadruple priced Sheriff servings and a monopoly of them through Lorie Spaulding's inside City connections.

222.   Mayor Quan deputizing Lorie Spaulding (see exhibit) and how/why she deputized her to cover her quadruple priced sheriff servings when she wasn't a licensed Sheriff.

223.   Forensic Technician to recover deleted emails from parties.

224.   Phone records from David Hill, corporate at Keller Williams Greater Worcester , and Richard Rawson

225.   Records for transactions done by Richard Rawson and Keller Williams Greater Worcester will be reviewed.

226.   Keller Williams Greater Worcester and Richard Rawson's escrow statements will be reviewed.

227.   David Hill and Keller Williams Greater Worcester will make an accounting of their transactions, listings, and offers, related to Richard Rawson

228.   Individuals in Keller Williams Greater Worcester will be asked about their knowledge of Racketeering and Domestic Terrorism that occurred and what the corporate owners and David Hill knew about it.

229.   Testimony from workers at Keller Williams will be compared to potential FED tapes.

230.   Escrow statements, disbursements, and accounts of attorneys in transactions involving Kelle O'Keefe as realtor, with Daniel Loring, and Mark Kavanach as realtor in transactions.

231.   Mayor Quan and her telling Fitchburg Prosecutor that he couldn't drop charges against me (Kai Kunz). Prosecutor knew charges were a total fraud and extortion for Fitchburg wanting my properties for pennies on the dollar.

232.   Phone records of individuals who complained about  property of Kai Kunz at 348 Elm Street Fitchburg, MA 01420, when their were no arrests and drug dealers buildings with arrests were ignored. All part of organized Racketeering conspiracy.

233.   Housing Court tapes wherein Jeffery Stephens committed perjury multiple times.

234. Lorie Spaulding's statements in front of Fitchburg District Court workers wherein she stated "Joe Solans is on the hunt for you." "His friend beat up your friend when he found out that he was an FBI informant." She subsequently said "yes", nodded her head and laughed when I asked if he was looking to kill me.

235. Tapes from 4-14-2010 Fitchburg District Court hearing and Jorge Torres involvement with theft and Racketeering for property theft extortion scams in Fitchburg, MA.

236. Attorney Adam Simms statements about my having only served clients with a 1 page unsigned lawsuit. Clearly shows inside dealings with Sheriff on part of Jeffery Stephens and Michael Ciota.

237. State papers that Richard Rawson signed and submitted in furthering rental theft, extortion, property theft, murder conspiracies of Joseph Solans, the Mcquinns, Daniel Loring, Kelle O'Keefe, Mark Kavanach, and others.

238. Federal papers that Richard Rawson signed and submitted in furthering rental theft, extortion, property theft, murder conspiracies of Joseph Solans, the Mcquinns, Daniel Loring, Kelle O'Keefe, Mark Kavanach, and others.

239. Emails sent out from Kai Kunz's email address by Racketeering conspirators/defendants and their muscle.

240. How the actions and perjury of attorney Mizhir overlap and facilitate the actions of David Boudreau in this 93A Complaint.

241. Information and statements made by David Boudreau to Gardner Police

242. Information and statements David Boudreau's counsel made to Gardner Police

243. Attorney Keller and Attorney Burke's lawsuit papers from Edward Ahern's filing at Worcester Superior Court.

244. Analysis of Worcester Superior Court lawsuit by Edward Ahern and what Attorney Keller and Attorney Burke presented to court/clerks

245. Mailing addresses utilized by Attorney Burke and Attorney Keller and what was on Filing papers during Edward Ahern's RICO suit filing in Worcester Superior Court..

246. How Daniel Loring, Kelle O'Keefe, and Mark Kavanach found willing Racketeering participants in David Boudreau, Richard Rawson, and David Bain from the start.

247. Computer hacking done by defendants for committing Racketeering, extortion, and Domestic Terrorist acts against victims and for undermining stability of American economy.

248. Bank accounts and tax returns of Richard Rawson and all defendants.

249. Bank accounts and tax returns of David Boudreau and all defendants.

250. David Boudreau past and present financial relationships with Glenn Klausner and Scott Young who bought Gardner properties through inside dealings. How this was committed after massive thefts, fraud, stolen property and more was done during original sale, after sale, and prior to take over by David Boudreau's inside buyers.

251. Bruce Bouguslav and the Mcquinn's dealings with banks, defendants, and others.

252. Bank accounts and tax returns of Lydia Rawson

253. Accounting of check cashing businesses and banks that were used by David Boudreau, Richard Rawson, Michael Fronte, David Bain.

254. Tax returns and bank accounts of David Bain during employment with MPAT and Home Savers.

255. Richard Rawson and Attorney Anthony Scolas communications with banks when both worked to sell my (Kai Kunz) Worcester and Northbridge, MA properties to Joseph Solans and Christina Solans, when I was seventy five percent (75%) owner of properties.

256. Richard Rawson and Attorney Anthony Scolas communications with banks when I (Kai Kunz) was one hundred percent (100%) owner of Fitchburg MA Properties.

257. A list of (all) email addresses used by Attorney Scola and Richard Rawson and all defendants.

258. A list of (all) cell phones and phone numbers utilized by Attorney Scola and Richard Rawson and all defendants.

259. Straw purchase deals done with Joseph Solans seven straw buyers and James McCall in particular.

260. Extortion committed against seller prior to straw purchases by Joseph Solans.

261. Listing of all cell phones that Bruce Boguslav and Michael Fronte used and when they changed phones.

262. The tapes that Kai Kunz mailed to the FBI

263. The $17,000.00 receipt from money Michael Fronte received. He used the money to buy Cadillac service.

264. Information about the triple priced sheriffs servings and protectionism that Lorie Spaulding gave towards drug dealers. Her associations with Bruce Boguslav in aiding and abetting Racketeering.

265. Why drug dealing tenants operations were ignored and false information was continually said about informant Kai Kunz.

266. Phone records from all phones and communications between Joseph Solans, Christina Solans, Attorney Scola, Jorge Torrez, their serial killer sidekick, defendants, and business partners/associates of defendants.

267. Corruption involving Fitchburg Board of Health and payoffs from drug dealers like Joseph Solans.

268. How the premeditated Racketeering, extortion, thefts, stalking, email/computer hacking, voyeurism, murder conspiracies of Kelle O'Keefe, Daniel Loring, Mark Kavanach, Joseph Solans, Richard Rawson, David Boudreau and others grew and then exploded into a fanatical Racketeering frenzy that overlapped into Domestic Terrorism when the Mcquinns, Shawn Taylor, Randal Devries, Bruce Boguslav, and others crossed paths.

269. The business arrangements between Bruce Boguslav and the Mcquinns of MPAT.

270. The incorporation of Home Savers and Bruce Boguslavs part in company.

271. The changes in the ownership of Home Savers and the changes in the businesses structure of both Home Savers and MPAT.

272. The business workings of MPAT and Home Savers and their similarities to the workings of Russian Organized Crime.

273. Listing of email addresses used by Michael Fronte and Bruce Boguslav.

274. Testimony from customers of Keller Williams North Central, Apple Country Realty, MPAT, Home Savers and the incidences of the following

274 A. Phone calls wherein a female (husband never knew) called late at night and asked for a husband (divide and conquer tactic of Mcquinns). Will be addressed when customers are questioned.

274 B. Emails that were sent from customers email addresses and had content that was favorable to Mcquinns, Kelle O'Keefe, Daniel Loring, Joseph Solans, Bruce Boguslav and others in Racketeering conspiracy.

274C. Email and computer hacking that was committed against customers.

274D. Identity theft that customers suffered.

275. Records and HUDs from former attorneys that were used by Ronald/Sheila Mcquinn, Bruce Boguslav and Michael Fronte for short sales.

276. Records of the Mcquinns and Bruce Boguslavs short sale buyers.

277. Records of the Mcquinns and Bruce Boguslavs Loan Modification Customers

278. Attorney Anthony Scolas communications with banks when he worked to sell Worcester and Northbridge, MA properties to Joseph Solans and Christina Solans when Kai Kunz was seventy five percent (75%) owner of properties.

279. Phone records and emails of Kevin McCarthy to show Joseph Solans, Kelle O'Keefe's, Daniel Loring and others in Racketeering and Domestic Terrorist agendas infiltrated government through paying off informants.

280. Analysis of how Edward Ahern's and Kai Kunz's warnings to FBI, local police, Department of Homeland Security, and others about Joseph Solans, Kelle O'Keefe, Daniel Loring, the Mcquinn's and others trying to undermine and infiltrate law enforcement were dead on accurate. This being long before indisputable events took place recently against Kai Kunz, which proves Edward Ahern and Kai Kunz were correct over a year ago.

281. Deferred maintenance records that the Mcquinns and Bruce Boguslav submitted to banks on behalf of customers.

282. Full review of what the Mcquinns and Bruce Boguslav submitted to banks for loan modifications while they were being paid $750.00/month on per property.

283. Review of transcripts and emails between the Mcquinns, Bruce Boguslav, and the banks where loan modifications were supposed to be worked on.

284. How Bruce Boguslav and Michael Fronte knew about the attempted murder against me (Kai Kunz), and how they helped facilitate it prior to their entering my residence on November 7th, 2008.

285. Testimony and affidavits about the Mcquinns and Bruce Boguslavs relationship and dealings with Joseph Solans, Kelle O'Keefe, and others.

286. How the Mcquinns worked on negotiating the lowest possible prices with the banks on behalf of Joseph Solans, Kelle O'Keefe, Denise Peach, and their serial killer sidekick from October 2008 onwards.

287. Contractors that Michael Fronte dealt with such as Green Monsters owner.

288. Record keeping and reports from Michael Fronte.

289. Record keeping and reports from MPAT and Bruce Boguslav.

290. List of all individuals that Bruce Boguslav called and had dealings with during October 2008 until present.

291. Affidavits that reference Richard Rawson and Attorney Scola stating they have court connections, particularly through attorney Scolas relative that is a Judge.

292. Testimony from others will be reviewed about Richard Rawson stating that Attorney Scola has proven to be able to get away with murder and how like such a bold claim, Attorney Scola acts recklessly and arrogantly with his brazen acts (outlined in Complaint filed and in this letter that better clarifies complaint) of theft, fraud, and misconduct.

293. Attorney Scola, Richard Rawson's and most defendants continuous changing of emails and cell phone numbers and the reason for it.

294. How the inside bank fraud with David Boudreau was accomplished through multi layered insider bank dealings with MPAT/Mcqquinns and Bruce Boguslav.

295. Bank Accounts of Jorge Torres and all defendants

296. Tax returns of Jorge Torres and all defendants

297. Cell phone numbers and records of Jorge Torres

298. Check Cashing businesses frequented by Jorge Torres and all defendants

299. Cell phone numbers and records of Mariom Alverez and all defendants

300. Cell phone numbers and records of Joseph Alverez.

301. Cell phone numbers and records of Shawn Taylor of R and R.

302. Bank accounts of Marion Alverez and Joseph Alverez.

303. Internal Affairs reports.

304. Multiple death threats after I (Kai Kunz) filed 1024B RICO suit in Worcester Superior Court

305. Death threats on my (Kai Kunz's) cell phone after filing 1024B RICO suit in Worcester Superior Court.

306. Death threats on Kai's parents answering machine after filing 1024B case at Worcester Superior Court.

307. License plate numbers of individuals who pointed guns and threatened on behalf of Enterprise.

308. Testimony from former CIA operatives who are now detectives, about parallels between actions of individuals in Organization utilizing high technology and Cold War/warfare tactics that are beyond Racketeering.

309. All phone numbers and records of defendants

310. Emails that were deleted from Michael Simmons email address that were sent from David Boudreau and others. Deleted Emails such as David Boudreau bragging about his connections and friendship with Judge Fox who influenced District Court decisions.

311. Email and cell phone forensic experts testimony.

312. Check Cashing businesses utilized by all defendants

313.   Financial emails of Kai Kunz and Michael Simmons that were deleted and how this caused delays in determining the extent of Racketeering/Domestic Terrorism that was committed by defendants.

314.   Affidavits and testimony about meetings wherein Joseph Solans, the Mcquinns, Bruce Boguslav, Michael Fronte, and others discussed ways to undermine law enforcement and tap the personal cell phones of police detectives, FBI informants, and eventually the cell phones and computers of FBI Agents that they hoped to intimidate.

315.   Phone records and emails of Joseph Solans.

316.   Bank Accounts in the United States and elsewhere that are used  Michael Fronte and Bruce Boguslav and defendants.

317.   Why Threats on behalf of Solans, the Mcquinns, Boguslav and associates made to Edward Ahern and Kai Kunz to have family, and friends killed was left on our answering machines and even our parents answering machine shortly after filing 11-1024B complaint.

318.   Analysis and Testimony about how Racketeering/Domestic Terrorists (many of defendants are) worked fanatically but unsuccessfully to frame Kai Kunz by paying others money.

Part 7.   Some of the individuals who will be witnesses or subject to subpoena.

Potential individuals to subpoena and call as witnesses are by no means limited to the following One Hundred Thirty Four (134) plus individuals.

1. Workers at Keller Williams North Central.
2. Workers at offices of Apple Country Realty
3. Pamela Loring.
4. Principals at Keller Williams North Central such as the Collette's.

5. Realtors and Brokers that have dealt with Kelle O'Keefe, Daniel Loring, and Mark Kavanagh.

6. Mortgage Brokers and Metro Mortgage workers that have dealt with Daniel Loring, Apple Country Realty, Kelle O'Keefe, and others.

7. Andrew Sears of SF Financial.

8. IRS Agents

9. Bank Representatives from closings done with Kelle O'Keefe on behalf of business partner Michael Simmons.

10. Title Company representatives

11. Attorney Richard Gilmore

12. Attorney Matt Arakalian.

13. Dianna Burns

14. Appraiser Diagle of Key Stone Appraisal Services.

15. Appraiser Michael O'Hare of O'Hare Appraisal Services in Worcester, MA

16. FBI Agents

17. Banking Commissioner Agents

18. FBI informants

19. Business and Racketeering witnesses.

20. ICE Agents

21. Relatives, friends and others that have witnessed the extortion, racketeering, and Domestic Terrorist tactics used against Edward Ahern and Kai Kunz.

22. Russell Croteau

23. Broker Ronald Weinstein

24. Real Estate Agent Todd Matthews

25. Seller Mr. Jalbert

26. Realtor Martin Greene

27. Sellers involved with Joseph Solans financing transactions.

28. Mortgage Broker Saverio Fulciniti.

29. Insurance Agent Nancy Mahoney.

30. Albert Matz mortgage broker

31. Saverio Fulciniti

32. Appraisers involved with Denise Peach and Saverio Fulciniti financed deals.

33. Workers from Department of Homeland Security

34. Mariom Alverez

35. Joseph Alverez

36. Shawn Taylor of R and R Property Management

37. Manager and workers at Bank of America Mortgage on West Boylston St. Worcester, MA.

38. Former and present customers of Ronald and Sheila Mcquinn

39. Bank representatives that Ronald Mcquinn, Sheila Mcquinn, and Bruce Boguslav dealt with for properties owned by Michael Simmons and myself.

40. Contractor David Thibault.

41. Fitchburg City officials that spoke to the Mcquinns and Bruce Boguslav.

42. Closing attorneys involved with Ronald and Sheila Mcquinns transactions

43. Banking Commissioner Agents

44. Attorney General Staff.

45. Marcello Mallegni of LBM Financial

46. Attorney Joseph Lussier

47. Informants

48. Tracy Wheeler

49. Douglas Valk

50. Present and former Workers of MPAT.

51. Psychologists if needed for documenting effect actions committed against me (Kai Kunz) would have on my ability to work on business pursuits, existing properties, and whistle blower claims work.

52. Bank workers that dealt with the Mcquinns, Boguslav, MPAT, and or Home Saver Workers during modification pursuit.

53. Paul Keane former worker of Interbay Funding

54. Keith Brown

55. Contractors that Bruce Boguslav and Michael Fronte dealt with.

56. Detective Looney or former Fitchburg police Captain that did Internal Affairs.

57. Sergeant Fossa that handles present Internal Affairs for Fitchburg, MA.

58. Former and present tenants at properties that Edward Ahern had utilities in his name on.

59. Sergeant Mark Jackson

60. Members of Twin Cities Development

61. Mayor Quan.

62. Fitchburg Police Chief

63. Joe Early

64. Contractors for receivership

65. FBI Agent Steven Zeringue

66. Paul Murray of the States Ethics Committee.

67. Confidential FBI informants.

68. Confidential DEA informants

69. Former and present customers of Ronald/Sheila Mcquinn, former and present customers of Bruce Boguslav.

70. Bank representatives that Ronald Mcquinn, Sheila Mcquinn, and Bruce Boguslav dealt with for properties owned by Michael Simmons and myself (Kai Kunz).

71. Alan Kupelnick

72. Fitchburg City officials that spoke to the Mcquinns and Bruce Boguslav.

73. David Bain

74. Closing attorneys involved with Ronald and Sheila Mcquinns transactions

75. Banking Commissioner Agents

76. Informants

77. Dave Garvey

78. Mr. Shea

79. Present and former Owners/workers of Home Savers

80. Michael Burns of Board of Health.

81. Bank workers that dealt with the Mcquinns, Boguslav, MPAT, and or Home Saver Workers during modification pursuit by Michael Simmons, Kai Kunz, and former customers of MPAT/Home Savers..

82. Diane Larson a former worker and realtor of MPAT.

83. David Boudreau's business partners in Gardner transactions.

84. Contractors that Ronald Mcquinn, Sheila Mcquinn, Richard Rawson, Bruce Boguslav and Michael Fronte dealt with.

85. Workers from Keller Williams North Central

86. Workers from Keller Williams Greater Worcester (both branches).

87. MLS workers

88. Title Insurance company workers for closings involving transactions with Michael Simmons, Joseph Solans, John Rogaris and associates.

89. Attorney John Rogaris

90. Tony Champa

91. Robert Wunschel owner of Valley Plumbing and Heating

92. Citizens Bank workers that handle IOLTA accounts for John Rogaris

93. Dianna Peppar's emails

94. Confidential FBI informants

95. State Police Officers

96. Attorney John Bowen

97. Patricia Baker

98. Customers and business partners/business associates who have had dealings with David Hill and Principals of Keller Williams Greater Worcester

99. Workers at Keller Williams Greater Worcester.

100. Bank representatives that spoke to Attorney Scola and Richard Rawson.

101. Title Departments at banks that spoke to Richard Rawson and Attorney Scola.

102. Title Company representatives from sales of properties that utilities were in the name of Edward Ahern on.

103. Sheriff and Notary in same building as Attorney Scola at 47 Harvard St. Worcester, MA

104. Notaries that have notarized closing papers and legal documents on behalf of Attorney Scola.

105. Attorney Scolas client list for determining notaries used by Attorney Scola for covering his representations of others in conflict of interest.

106. Ledger and book keeping provided by Attorney Scola

107. Bank accounts and IOLTA accounts of attorney Scola

108. Financial papers and pay pal account information that Attorney Scola provided to the Board of Bar Overseers.

109. O'cconell Title Service representatives that handled the sales Worcester Properties.

110. Banking Commissioner Agents

111.   Business and Racketeering witnesses.

112.   CIA Testimony

113.   Department of Home Land Security Testimony

114.   Tenants from Kai Kunz's Worcester, MA and Fitchburg, MA properties.

115.   Principals and workers at Keller Williams Greater Worcester

116.   Principals and workers at Keller Williams Corporate

117.   Extortion victims in land transactions involving Joseph Solans, Kelle O'Keefe, Daniel Loring, and associates.

118.   Michael Comeau of 46 Coburn Ave. Gardner, MA. 01440

119.   Adam Husband

120.   Seller John Romano of Maple Street Springfield, MASS

121.   Real Estate Agent Dianna Peppar.

122.   David Boudreau business partner Scott Young

123.   David Boudreau business associate Glenn Klausner.

124.   Tenants at Worcester properties that were owned by Michael Simmons and Kai Kunz

125.   Tenants at Gardner properties that were owned by Michael Simmons and Kai Kunz

126.   Tenants at Fitchburg properties that were owned by Michael Simmons and Kai Kunz

127.   Lorie Spaulding's uncle who is an FBI Agent.

128.   Walter Murray of Murray Property Management

129.   Thomas Clarke

130.   Fitchburg, MA developer Daniel Botwinik

131.   Luke Gallant of the Sheriffs department.

132.   Fitchburg District Court workers that overheard Lorie Spaulding's comments about Joe Solans being on hunt and wanting to kill Kai Kunz.

133.   Workers at Unitil, National Grid, Nstar that spoke to Richard Rawson, Joseph Solans and others about utilities that were in the name of Edward Ahern.

134.   Joseph Solans Straw buyer James McCall

Signed under the pains and penalties of perjury,

_____
Kai W Kunz

Edward G. AHERN